IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

RECEIVED

DOUGLAS CHERRY, DR. LANCE DYESS, 2007 OCT 12  P 3: 32
IRA EDMONDSON, JIMMY JONES,
RACHEL MCKINNEY, LINDA               DEBRA P. HACKETT, CLK
MIDDLETON and VICTOR STAFFORD,       U.S. DISTRICT COURT
                                     MIDDLE DISTRICT ALA

    Plaintiffs,

v.

AIG SUNAMERICA LIFE ASSURANCE
COMPANY, f/k/a ANCHOR NATIONAL
LIFE INSURANCE COMPANY, AXA
EQUITABLE LIFE INSURANCE
COMPANY, f/k/a THE EQUITABLE LIFE
ASSURANCE SOCIETY OF THE UNITED
STATES, AXA DISTRIBUTORS, LLC, f/k/a
EQUITABLE DISTRIBUTORS, LLC,
KEMPER INVESTORS LIFE INSURANCE
COMPANY, HARTFORD LIFE
INSURANCE COMPANY and MAXINE
CHAPPELL,

    Defendants.

CIVIL ACTION NO. 1:07CV923-F

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

---

## JOINT NOTICE OF REMOVAL

Defendants AIG SunAmerica Life Assurance Company ("AIG SunAmerica"), AXA

Equitable Life Insurance Company ("AXA Equitable"), AXA Distributors, LLC ("AXA

Distributors"), Kemper Investors Life Insurance Company ("Kemper") and Hartford Life

Insurance Company ("Hartford") (collectively referred to as "Defendants") make this special

and limited appearance and give notice that this matter is hereby removed pursuant to  28 U.S.C.

§§ 1441(b) and 1446, *et seq.* from the Circuit Court Houston County, Alabama, to the United

States District Court for the Middle District of Alabama.[1]  This action could have been filed in

---

[1] This Notice is filed without waiving, and specifically reserving, the right to compel arbitration of any and all of
Plaintiffs' claims.  Furthermore, the Defendants do not waive and specifically reserve the right to assert any and all

this Court pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between Plaintiffs and the properly joined defendants and the amount in controversy as to each individual Plaintiff exceeds the sum of $75,000, exclusive of interest and costs. In support of this Notice of Removal, Defendants show unto the Court as follows:

## PROCEDURAL BACKGROUND AND NATURE OF THE SUIT

1.      On or about June 13, 2005, Plaintiffs filed a Statement of Claim in arbitration against Raymond James & Associates, Inc. ("Raymond James"), styled *Douglas M. Cherry, Lance K. Dyess, Ira J. Edmondson, Jimmy E. Jones, Rachel McKinney, Linda J. Middleton and Victor Stafford v. Raymond James and Associates, Inc.*, NASD Arbitration No. 05-03030. *See* Statement of Claim in NASD Arbitration No. 05-03030, attached hereto as Exhibit A. The Statement of Claim charged Raymond James with the same wrongdoing that Plaintiffs allege against the Defendants in the present action, namely, fraud in connection with the sale of 10 variable annuity contracts. More specifically, Plaintiffs alleged that Chappell, the Raymond James financial advisor who serviced Plaintiffs' accounts, misrepresented that the annuities they purchased would guarantee their principal, plus a 5% or 6% rate of return. In that proceeding, Plaintiffs asserted the following causes of action: breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control, violation of federal and state securities laws and violation of NASD Rules of Fair Practice. Plaintiffs claimed in the first action that they were entitled to compensatory damages of "not less than $2,000,000." *Id*. at ¶ 90.

---

affirmative defenses, including, but not limited to, those set forth in Rule 12 of the applicable Rules of Civil Procedure.

2.     On October 2-6 and 9-12, 2006, Plaintiffs' case was tried before a three-person NASD arbitration panel.

3.     On October 26, 2006, the arbitration panel issued an award in favor of the Plaintiffs. *See* NASD Award, attached as Exhibit B.  The panel awarded the Plaintiffs compensatory damages totaling $577,000, plus attorney's fees of $124,334, costs of $26,946.05 and post-judgment interest.  The panel found Raymond James liable for breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control and violation of federal and state securities laws and NASD Rules of Fair Practice.

4.     Raymond James paid the award in full on October 31, 2006, rendering the award satisfied. *See* Exhibit C.

5.     On September 5, 2007, Plaintiffs filed an Original Complaint, styled *Douglas Cherry, Dr. Lance Dyess, Ira Edmondson, Jimmy Jones, Rachel McKinney, Linda Middleton and Victor Stafford v. AIG SunAmerica Life Assurance Company, f/k/a Anchor National Life Insurance Company, AXA Equitable Life Insurance Company, f/k/a The Equitable Life Assurance Society of the United States, AXA Distributors, LLC, f/k/a Equitable Distributors, LLC, Kemper Investors Life Insurance Company, Hartford Life Insurance Company and Maxine Chappell*, Case No. CV-2007-000508, in the Circuit Court of Houston County, Alabama.  A true and correct copy of all process and pleadings as served upon Defendants is attached hereto as Exhibit D and is incorporated herein by reference in accordance with 28 U.S.C. § 1446(a).

6.     Just like Plaintiffs' arbitration proceeding against Raymond James, this lawsuit involves a dispute over alleged representations made to the Plaintiffs by Chappell in connection with the sale of variable annuities issued by Defendants AIG SunAmerica, AXA Equitable,

Kemper and Hartford. Plaintiffs' core allegation is that the Defendants misrepresented that the Plaintiffs could purchase a "seven year investment from Defendants which had a guaranteed rate of interest of either 5% or 6%, if held to maturity," and that their principal would also be guaranteed. Complaint at ¶16. Plaintiffs claim that the Defendants failed to disclose "that there was no guaranteed interest rate associated with the variable annuity products," that their principal was not guaranteed, and they "could not have complete access to their investment" after the seven year period.    Complaint at ¶17. Plaintiffs assert claims for fraud, suppression, negligent/wanton training and supervision, breach of contract, conversion, civil liability for illegal sale of securities, violation of Alabama securities law, breach of fiduciary duty and negligence and wantonness. All of the claims against Chappell, the non-diverse defendant, are barred as a matter of law by the doctrines of res judicata (claim preclusion) and satisfaction of judgments.

## BASIS FOR REMOVAL

7.    Removal is proper under 28 U.S.C. § 1332, because there is complete diversity of citizenship between the Plaintiffs and the properly named Defendants. As discussed more fully below, Chappell is an Alabama resident, but her citizenship should not be considered for purposes of diversity jurisdiction because she is fraudulently joined. The amount in controversy exceeds $75,000.00 with respect to each individual Plaintiff, exclusive of interest and costs.

8.    Plaintiffs are citizens of the State of Alabama. *See* Complaint at ¶¶ 1-7.

9.    AIG SunAmerica is an Arizona corporation with its principal place of business in California. As a result, AIG SunAmerica is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of causes.

4

10.    AXA Equitable is a New York corporation with its principal place of business in New York. Pursuant to 28 U.S.C. §1332(c)(1), AXA Equitable is a citizen of the State of New York. As a result, AXA Equitable is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of causes.

11.    AXA Distributors is a New York corporation with its principal place of business in New York. Pursuant to 28 U.S.C. §1332(c)(1), AXA Distributors is a citizen of the State of New York. As a result, AXA Distributors is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of causes.

12.    Kemper is an Illinois corporation with its principal place of business in Bellevue, Washington. Pursuant to 28 U.S.C. §1332(c)(1), Kemper is a citizen of the State of Washington. As a result, Kemper is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of causes.

13.    Hartford is a Connecticut corporation with its principal place of business in Simsbury, Connecticut. Pursuant to 28 U.S.C. §1332(c)(1), Hartford is a citizen of the State of Connecticut. As a result, Hartford is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of causes.

14.    Chappell is a citizen of the State of Alabama. Chappell's joinder in this action, however, does not preclude diversity jurisdiction because she has been fraudulently joined. The

citizenship of fictitious or fraudulently joined defendants such as Chappell is not considered for purposes of removal on the basis of diversity. 28 U.S.C. § 1441(a).

**I.    There Is Complete Diversity of Citizenship Because Chappell Has Been Fraudulently Joined.**

15.    Pursuant to 28 U.S.C. § 1441(b), an action shall be "removable ... if none of the parties in interest properly joined and served as defendants is a citizen of the state in which such action is brought." A non-diverse defendant named in a state court action may be disregarded, and the action may be removed to federal court, when the joinder of the non-diverse defendant is fraudulent. *See Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998). A determination of fraudulent joinder is based on an analysis of the causes of action alleged in the complaint at the time of removal. *See Coker v. Amoco*, 709 F.2d 1433, 1440 (11th Cir. 1983). If there is no reasonable possibility that Plaintiffs can establish a cause of action against the non-diverse defendant, then the non-diverse defendant has been fraudulently joined and her presence must be disregarded for jurisdictional purposes. *See Legg v. Wyeth*, 428 F.3d 1317, 1324-25 (11th Cir. 2005) (explaining that "the potential for legal liability must be reasonable, not merely theoretical. In considering *possible* state law claims, possible must mean more than such a possibility that designated resident can be hit by a meteor tonight. That is possible. Surely, as in other instances, reason and common sense have some role.") (emphasis in original) (internal quotations and citations omitted); *Owens v. Life Ins. Co. of Georgia*, 289 F. Supp. 2d 1319, 1323-24 (M.D. Ala. 2003) (citing *Triggs*, 154 F.3d at 1287). "[T]he proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment." *Fowler v. Provident Life and Acc. Ins. Co.*, 256 F. Supp. 2d 1243, 1247 (N.D. Ala. 2003). When the non-diverse Defendant is disregarded, complete diversity of citizenship exists and, thus, this Court has jurisdiction under 28 U.S.C. § 1332(a)(1).

6

16.    Chappell must be disregarded as a party because there is no possibility -- much less a "reasonable possibility" -- that Plaintiffs can establish any claims against her. *See Adams v. Smith*, No. 3:06-cv-000743, 2006 WL 3802371 at *3 (M.D. Ala. 2006) (fraudulent joinder exists when "the plaintiff has no possibility of proving a cause of action against the defendant"); *Teddar v. F.M.C. Corp.*, 590 F.2d 115, 117 (5th Cir. 1979) (holding that courts shall disregard the citizenship of fraudulently joined defendants when determining if complete diversity exists). Chappell has been fraudulently joined on the grounds that each of the Plaintiffs' claims against her are completely barred by the doctrine of res judicata. *See Fortier v. State Farm Mut. Auto Ins. Co.*, No. Civ.A. 99-2136, 1999 WL 717638 at *4 (E.D. La. Sept. 13, 1999) (finding fraudulent joinder on the basis that claims against non-diverse defendants were barred by res judicata); *see also Bullock v. United Benefit Ins. Co.*, 165 F. Supp. 2d 1255, 1257 (M.D. Ala. 2001) (finding that the plaintiff had no possibility of establishing a cause of action against the resident defendant on the basis that the claims against the defendant were barred by the statute of limitations). As explained in more detail below, Plaintiffs are thus unable to state a valid cause of action against Chappell.  Chappell's fraudulent joinder does not, therefore, preclude the removal of this case.

A.    **All of Plaintiffs' Claims Against Chappell Are Barred by Res Judicata.**

17.    There is no reasonable possibility that the Plaintiffs can recover against Chappell because each of their claims against her are completely barred by the doctrine of res judicata.  Res judicata prevents Plaintiffs from abusing the litigation process by "foreclosing relitigation of matters that were litigated or could have been litigated in an earlier suit." *Mangrum v. Alabama Medicaid Agency*, No. 3:06-cv-952-MEF, 2007 WL 779732 slip op. at *1 (M.D. Ala. March 13, 2007).  Because Plaintiffs have already filed an arbitration proceeding

against Raymond James in which they prevailed on the same claims asserted in the present action, Plaintiffs' current claims against Chappell are barred from relitigation and are due to be dismissed in their entirety.

18.     Res judicata requires a finding of the following elements in order to bar a subsequent suit:

> (1) there must be a final judgment on the merits; (2) the decision must be rendered by a court of competent jurisdiction; (3) the parties, or those in privity with them, must be identical in both suits; and (4) the same cause of action must be involved in both cases.

*Mangrum*, 2007 WL 779732 at *1 (citing *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986)).  Because each of these elements is satisfied here, Plaintiffs' claims against Chappell are completely barred.

### 1.     Plaintiffs' First Action Was Concluded With a Final Judgment on the Merits.

19.     The panel's award in Plaintiffs' first action constitutes a final judgment on the merits and satisfies the first element of res judicata.  "An arbitration proceeding can have res judicata or collateral estoppel effect."  *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir. 1985).  "When an arbitration proceeding affords basic elements of adjudicatory procedure, such as an opportunity for presentation of evidence, the determination of issues in an arbitration proceeding should generally be treated as conclusive in subsequent proceedings, just as determinations of a court would be treated."  *Greenblatt*, 763 F.2d at 1360. In the present case, Plaintiffs had a full nine days to present their case to the arbitration panel in the prior action, and the arbitration panel entered an award in favor of the Plaintiffs after considering all of the evidence presented during the hearing.  *See* Exhibit B at p. 2-5.  Moreover,

the arbitration was held pursuant to the rules of the NASD, which provide for discovery and other procedural safeguards akin to those in a judicial proceeding. The arbitration panel's award itself notes that the panel entered its decision "in full and final resolution of the issues submitted for determination," "[a]fter considering the pleadings, the testimony and evidence presented at the hearing." *See* Exhibit B at p. 2. The pleadings, testimony and evidence necessarily included the allegations contained in Claimants' original Statement of Claim, which are the same factual allegations set forth in the instant Complaint. *See generally* Exhibit A at ¶¶ 3-6, 15-52; Complaint at ¶¶ 16-49. The panel's award therefore operates as a "final judgment on the merits" for res judicata purposes.

> **2.    The Judgment in Plaintiffs' First Action Was Rendered By a Court of Competent Jurisdiction.**

20.    The second requirement for res judicata is also met in this case. The arbitration panel had jurisdiction over the previous action by virtue of Plaintiffs' account agreements with Raymond James, each of which included binding arbitration clauses. Moreover, each of the Plaintiffs voluntarily submitted their claims to the NASD and signed Uniform Submission Agreements explicitly accepting the NASD as the forum authorized to decide the dispute. *See* Exhibit B at p. 1. The award in the previous action was therefore rendered by a court of competent jurisdiction. *See Greenblatt*, 763 F.2d at 1360.

> **3.    Chappell Shares Privity With Raymond James and Satisfies Res Judicata's Identity of Parties Requirement.**

21.    "Alabama law defines 'identity of the parties' broadly-as broadly as due process allows." *Thompson v. Smith*, 52 F. Supp. 2d 1364, 1369 (M.D. Ala. 1999). For res judicata purposes, identity between parties is found "when they are the same or in privity with one

another." *Mangrum v. Alabama Medicaid Agency*, No. 3:06-cv-952-MEF, 2007 WL 779732 slip

op. at *2 (M.D. Ala. March 13, 2007). The Eleventh Circuit has defined privity as:

> "'a relationship between one who is a party of record and a
> nonparty that is sufficiently close so a judgment for or against the
> party should bind or protect the nonparty.' Privity exists where the
> nonparty's interests were represented adequately by the party in
> the original suit. Privity also exists where a party to the original
> suit is 'so closely aligned to a nonparty's interest as to be his
> virtual representative.'"

*N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1560-61 (11th Cir. 1990). Although not exclusive, courts

may examine the following factors in considering whether virtual representation exists between

parties: "(1) participation in the first litigation, (2) apparent consent to be bound, (3) apparent

tactical maneuvering, and (4) close relationships between the parties and non-parties."

*Gustafson v. Johns*, No. 06-13508, 2007 WL 63999 at *3 (11th Cir. Jan. 9, 2007).

      22.      It is clear that Raymond James was in effect representing Chappell as well as

itself in the prior action. During the time period at issue in that action (the same time period at

issue in this action) Chappell was a registered representative of Raymond James. <u>Chappell was

the selling and servicing agent for each of the Plaintiffs' annuity investments purchased through

Raymond James</u>. During the prior arbitration proceeding, Raymond James called Chappell as its

primary fact witness. Chappell's extensive testimony played a key role in Raymond James'

defense, as it was offered to refute each of the Plaintiffs' claims. Thus, not only did Chappell

have a close relationship with Raymond James, but she also participated substantially in the prior

case by playing a key tactical role in Raymond James' defense. As such, Raymond James acted

as Chappell's virtual representative in the prior case, creating privity between itself and

Chappell. *See Gustafson*, 2007 WL 63999 at *3; *N.A.A.C.P.*, 891 F.2d at 1560-61.

23.     Moreover, a number of courts have found that for purposes of res judicata, privity exists between principals and agents. *See, e.g. New York Life Ins. Co. v. Deshotel*, 946 F. Supp. 454, 460 (E. D. La. 1996) ("The Fifth Circuit has explicitly recognized that privity exists between principals and their agents for purposes of res judicata.") (citing *Russell v. SunAmerica Securities, Inc.*, 962 F.2d 1169, 1172 (5th Cir. 1992) ("finding privity for res judicata purposes even where relations between two parties were merely analogous to principal and agent") and *Pelletier v. Zweifel*, 921 F.2d 1465, 1502 (11th Cir. 1991) ("finding privity for purposes of res judicata between principal and agent")); *Spector v. El Ranco, Inc.*, 263 F.2d 143 (9th Cir. 1959) (holding that suit against employee was barred by judgment in favor of his employer, and cited with approval in *Russell*, 962 F.2d at 1174, for the proposition that where "the relations between two parties are analogous to that of principal and agent, the rule is that a judgment in favor of either, in an action brought by a third party, rendered upon a ground equally applicable to both, is to be accepted as conclusive against the plaintiff's right of action against the other."); *Fiumara v. Fireman's Fund Ins. Co.*, 746 F.2d 87 (1st Cir. 1984) (cited with approval in *Russell*, 962 F.2d at 1174, for the proposition that where defendants in second action were acting as agents of defendants in original action, "they clearly qualify as persons in privity with [the original defendants]" and "the res judicata defense is unmistakably available to them.").

24.     As Plaintiffs do not dispute, at all times relevant to this action (and the prior action), Chappell was an agent of Raymond James. *See* Exhibit A at ¶ 2. Because Chappell was an agent of Raymond James, she stands in privity with Raymond James for res judicata purposes. Thus, although Chappell was not a named respondent in the prior arbitration, her interests were adequately represented by Raymond James, and as its agent, she satisfies the identity element of res judicata.

11

**4.    Plaintiffs' claims in both cases consist of the same cause of action.**

25.    Finally, the same cause of action is involved in both of Plaintiffs' cases.

> [T]he principal test for comparing causes of action is whether the primary right and duty or wrong are the same in each action. Res judicata applies not only to the precise legal theory presented in the prior case, but to all legal theories and claims arising out of the same nucleus of operative fact. The whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time. Under both Alabama law and federal law, the doctrine of res judicata prohibits the relitigation of all matter which was or could have been litigated in the prior action.

*Families Concerned About Nerve Gas Incineration v. U.S. Dep't. of the Army*, 380 F. Supp. 2d

1233, 1261 (N.D. Ala. 2005); *see also Gustafson v. Johns*, No. 06-13508, 2007 WL 63999 at *4

(11th Cir. Jan. 9, 2007); *Mangrum v. Alabama Medicaid Agency*, No. 3:06-cv-952-MEF, 2007

WL 779732 slip op. at *2 (M.D. Ala. March 13, 2007). There are two principal inquiries in

determining whether identity of causes of action exist: "(1) whether the claims arise out of the

same evidence, wrongful acts or disputes, or present the same issues (in particular, factual ones),

and (2) whether the claims would be subject to proof by the same evidence." *Thompson v.*

*Smith*, 52 F. Supp. 2d 1364, 1370 (M.D. Ala. 1999).

26.    As a comparison of Plaintiffs' Statement of Claim in arbitration to their current

Complaint makes clear, the primary wrong alleged in this case was also alleged in the earlier

action. At the core of the present complaint is the allegation that Chappell misrepresented that

the annuities Plaintiffs purchased provided them with a guarantee of principal plus a 5% or 6%

rate of return. As exemplified below, the same exact claim was alleged in the earlier arbitration:

> ▪ "Chappell also promised that she could provide Cherry with an investment that would guarantee his principal investment and that would pay him a five-percent rate of return for seven years." Exhibit A at ¶ 19; Complaint at ¶ 26.

- Chappell informed Dyess that she could invest his funds in a product that would provide him a guaranteed six-percent return, compounded annually. . . Chappell informed Dyess that at the end of a seven-year period, he would get his entire principal back." Exhibit A at ¶ 25; Complaint at ¶ 29.

- "Chappell specifically told Edmondson that she could invest his life savings in a product that would provide him with a guaranteed five-percent return without exposing his principal to any risk." Exhibit A at ¶ 30; Complaint at ¶ 34.

- "Chappell told Jones and his wife that she could provide him with and [sic] investment that would guarantee his principal and provide him with a guaranteed six-percent return." Exhibit A at ¶ 35; Complaint at ¶ 37.

- "Chappell promised McKinney that the investment principal would be guaranteed and that the annuity would provide a guaranteed six-percent rate of return." Exhibit A at ¶ 42; *see* Complaint at ¶ 42.

- "Chappell promised Middleton that she could place her savings in a product that would produce a guaranteed 5% rate of return and that would also guarantee the return of Middleton's principal at the end of seven years." Exhibit A at ¶ 46; *see* Complaint at ¶ 45.

- "Chappell specifically told Stafford that she could invest his life savings in a product that would provide him with a guaranteed five-percent return without exposing his principal to any risk." Exhibit A at ¶ 50; *see* Complaint at ¶ 48.

27.     It cannot be questioned that these allegations arise out of "the same nucleus of operative fact." The complaints make clear that the facts offered in support of Plaintiffs' allegations are identical in both cases, and revolve around the same meetings between Plaintiffs and Chappell, and the same alleged representations made by Chappell during those meetings. Moreover, the fact that both complaints involve the same primary causes of action, which arise out of the same transactions between Chappell and the Plaintiffs, is also telling. The complaints allege the following common causes of action: breach of fiduciary duty, breach of contract, fraud, negligence and violation of Alabama Code § 8-6-19. In addition, both complaints allege

13

omission or suppression, and supervisory failures. There can be no dispute that the claims in both actions "would be subject to proof by the same evidence," as the substantive factual allegations of both complaints are identical. As such, Plaintiffs' attempt to re-litigate the same claims against Chappell in the current action is clearly barred by res judicata.

**B.    The Claims Against Maxine Chappell are Barred by a Satisfaction of Judgment.**

The same undisputed facts that support preclusion of further claims against Maxine Chappell based upon res judicata also support such preclusion based upon satisfaction of the prior award or judgment. Under long-established Alabama law, "where there has been a judgment against one of two joint tort-feasors, followed by an acceptance of satisfaction of such judgment by the plaintiff," a further action against one of the joint tort-feasors is barred. *See Shepherd v. Maritime Overseas Corp.*, 614 So.2d 1048, 1050 (Ala. 1993)(quoting *Jones v. Russell*, 206 Ala. 215, 218, 89 So. 660, 662-63 (1921). The plaintiffs herein received an award against Raymond James based upon the alleged conduct of Maxine Chappell or its supervision of Maxine Chappell. Raymond James has satisfied that judgment, as evidenced by the correspondence to the NASD Dispute Resolution dated October 31, 2006, attached as Exhibit C. Based upon that satisfaction, no further action based upon Maxine Chappell's conduct will lie. As a matter of law, the claims against Maxine Chappell are not viable, and therefore she has been fraudulently joined herein.

## II.    The Amount in Controversy Requirement is Satisfied.

28.    Plaintiffs' Complaint asserts various contract and tort claims and seeks unspecified compensatory damages and punitive damages in an amount to be determined by jury. *See* "Wherefore" clause following ¶ 99 of Plaintiffs' Complaint.

29.    In order to meet the $75,000 jurisdictional threshold in a case with an unspecified claim for damages, Defendants need show only that "the amount in controversy more likely than not exceeds the [now $75,000] jurisdictional requirement." *Tapscott v. MS Dealer Service*, 77 F.3d 1353, 1357 (11th Cir. 1996), overruled on other grounds by *Office Depot v. Cohen*, 204 F.3d 1069 (11th Cir. 2000); *Kilpatrick v. Martin K. Eby Construction Co., Inc.*, 708 F. Supp. 1241, 1242-43 (N.D. Ala. 1989) (holding that the "amount in controversy requirement has been met" even though "the State Court complaint does not demand judgment of a specified dollar amount").    In this case, Defendants can remove to federal court if they can show, by a preponderance of the evidence, facts supporting jurisdiction. *Tapscott*, 77 F.3d at 1357.    A lower burden of proof is warranted where damages are unspecified, such as in the instant case, because there is simply no estimate of damages to which a court may defer. *Id.*

30.    Prospective punitive damages must also be considered in any calculation of the amount in controversy. *See Holley Equipment Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1535 (11th Cir. 1987) ("When determining the jurisdictional amount in diversity cases, punitive damages must be considered, unless it is apparent to a legal certainty that such cannot be recovered.") (citations omitted); *Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240 (1943) (claims for compensatory and punitive damages should be aggregated to determine jurisdictional amount in controversy).    Further, in Alabama, when a plaintiff seeks recovery against an insurance company and asks for punitive damages, the recovery, if the plaintiff

prevails, may very well exceed the jurisdictional amount. *See, e.g. Bolling v. Union Nat'l Life Ins. Co.*, 900 F. Supp. 400, 405 (M.D. Ala. 1995); *Wakeland v. Brown & Williamson Tobacco Corp.*, 996 F. Supp. 1213, 1222 (S.D. Ala. 1998) (applying "preponderance of the evidence standard" and finding that amount in controversy requirement was satisfied even though complaint did not specify amount of damages).

31.    Defendants deny the allegations of Plaintiffs' Complaint and deny that their conduct in connection with Plaintiffs' investments is actionable.    Nonetheless, in evaluating whether diversity jurisdiction exists for the purposes of removal, the Court need only look to what amount is "in controversy."    *See* 28 U.S.C. § 1332.    According to the Complaint, Defendants allegedly misrepresented that the Plaintiffs were guaranteed to receive a return of their principal, plus a guaranteed investment return of 5% or 6% (compounded annually) after seven years. *See* Complaint at ¶ 51.  Plaintiffs claim damages based on the argument that they "cannot obtain a return of their principal," and "did not earn either the applicable 5% or 6% interest on their investments."    Complaint at ¶ 56.    These allegations alone conclusively demonstrate that each of the Plaintiffs' claims individually satisfies the amount in controversy requirement, as each Plaintiffs' principal investment plus the applicable 5% or 6% rate of return, compounded annually over seven years, easily exceeds the $75,000 jurisdictional minimum as to each Plaintiff.  In fact, Plaintiffs' allegation that they did not earn a 5% or 6% rate of return on their principal investment, compounded annually over seven years, is alone sufficient to satisfy the amount in controversy.  The following chart identifies the principal investment made by each Plaintiff as alleged in the Complaint.  The chart further illustrates the investment return that

Plaintiffs' principal would have earned over a seven year period, compounded annually at the applicable rate.[2]

| Plaintiff | Principal Investment[3] | Rate of Return[4] | Investment Return[5] | Total[6] |
|---|---|---|---|---|
| Cherry | $518,972 | 5% | $211,273.72 | $730,245.72 |
| Dyess | $435,419 | 6% | $219,290.18 | $654,709.18 |
| Edmondson | $416,505 | 5% | $169,559.36 | $586,064.36 |
| Jones | $207,495 | 6% | $104,500.76 | $311,995.76 |
| McKinney | $424,000 | 6% | $213,539.23 | $637,539.23 |
| Middleton | $190,605 | 5% | $77,595.38 | $268,200.38 |
| Stafford | $296,131[7] | 5% | $120,555.06 | $416,686.06 |

32.    As the above chart illustrates, if each Plaintiff were to receive an award of damages consistent with the return of their principal investment alone, each Plaintiff would receive over $75,000. Moreover, if each Plaintiff were to receive damages solely consistent with the return that their principal would have earned over a seven year period, compounded annually at the applicable rate, each Plaintiff would receive over $75,000. Of course, if each Plaintiff were to receive a combination of their principal investment plus an investment return

[2] This chart demonstrates what Plaintiffs allege. Defendants dispute Plaintiffs' claims, they dispute that any money is owed in this case, and they dispute Plaintiffs' method of determining damages.

[3] As alleged in Plaintiffs' Complaint, with the exception of Stafford (See footnote 6, supra).

[4] As alleged in Plaintiffs' Complaint. Defendants deny Plaintiffs' allegation that they were guaranteed a certain rate of return on investments.

[5] Represents amount of interest earned on the principal investment shown, compounded annually at the rate of return alleged by the Complaint, after seven years.

[6] Represents principal investment plus investment return.

[7] Plaintiffs' Complaint does not specify the amount of Stafford's principal investment in the annuities at issue. Attached as Exhibit E are Stafford's June 30, 2000 annuity quarterly account statements, which show Stafford's initial contributions to the annuities that he purchased through Chappell. These statements show that Stafford's principal investment in the annuities at issue totals $296,131.

compounded over seven years at the applicable rate, each Plaintiff would receive an award of no less than $268,200. Thus, Plaintiffs' individual claims for compensatory relief alone will far exceed the $75,000 amount in controversy. In addition, when combined with Plaintiffs' related claims for damages for mental anguish and emotional distress, the amount is unquestionably met.

33.    In addition to (and independently of) their claims for compensatory damages, Plaintiffs' claims for "benefit of the bargain" damages also satisfies the jurisdictional amount in controversy requirement. Complaint at ¶ 56 ("As a proximate consequence of Defendants' fraud and misrepresentations, Plaintiffs were injured and damaged as follows: (a) Plaintiffs have paid monies for an investment which was not what they bargained for"). For example, during the arbitration proceeding, Plaintiffs voluntarily offered exhibits which outlined the legal basis for each of their claims, and illustrated Plaintiffs' market adjusted losses pursuant to a well-managed account theory. Pursuant to the well-managed account theory, Plaintiffs claimed "benefit of the bargain" damages as follows: $302,341 (Cherry), $257,573 (Dyess), $283,076 (Edmondson), $115,713 (Jones), $187,979 (McKinney) $139,743 (Middleton) and $204,602 (Stafford). *See* Hearing Exhibits at p. 35, attached as Exhibit F. Thus, by Plaintiffs' own admission, their "benefit of the bargain" damages in this case (based on the same claims asserted in the previous case) easily exceed the $75,000 amount in controversy as to each Plaintiff.

34.    Since the compensatory benefits and "benefit of the bargain" damages alone could independently exceed the amount in controversy, not counting the claimed punitive damages which can only serve to increase the amount at issue, the amount in controversy is readily satisfied beyond any doubt.

35.    For the foregoing reasons, the jurisdictional amount for diversity jurisdiction is satisfied in this case.

36.     If any question arises as to the existence of the requisite amount in controversy, then Defendants request the opportunity to submit post-removal evidence in accordance with the procedure recently adopted by the Eleventh Circuit. *Sierminski v. Transouth Financial Corp.*, 216 F.3d 945, 949 (11th Cir. 2000). In affirming the denial of plaintiff's motion to remand, the Eleventh Circuit held that the district court properly considered defendant's post-removal evidence including defendant's requests for admission directed to the amount in controversy. The Eleventh Circuit explained that, "[w]e align ourselves with our sister circuits in adopting a more flexible approach, allowing the district court when necessary to consider post-removal evidence in assessing removal jurisdiction." *Id.*

**III.    The Removal is Procedurally Correct.**

37.     This Notice of Removal is timely because it is being filed within thirty days of service upon the first-served Defendant. Chappell, the first served Defendant, was served with Plaintiff's Complaint on September 14, 2007. Therefore, Defendants have filed this Notice of Removal within the 30-day time period required by 28 U.S.C. §1446(b).

38.     All properly served and joined defendants have consented to the removal of this case to federal court. Chappell, through counsel, has joined in and consented to this removal. *See,* Exhibit G attached hereto.

39.     Venue is proper in this district under 28 U.S.C. §1446(a), because this district and division embrace the place in which the removed action has been pending and because a substantial part of the events giving rise to Plaintiff's claims allegedly occurred in this district.

40.     Pursuant to 28 U.S.C. §1446(a), all pleadings, process, orders, and all other filings in the state court action are attached to this Notice as Exhibit D.

41.     Pursuant to 28 U.S.C. §1446(d), promptly after Defendants file this Notice, written notice of the filing will be given to Plaintiffs.

42.     Pursuant to 28 U.S.C. §1446(d), a true and correct copy of this Notice of Removal will be filed with the Clerk of the Circuit Court of Houston County, Alabama, promptly after Defendants file this Notice.

WHEREFORE, DEFENDANTS AIG SunAmerica Life Assurance Company, AXA Equitable Life Insurance Company, AXA Distributors, LLC, Kemper Investors Life Insurance Company and Hartford Life Insurance Company hereby remove this action from the Circuit Court of Houston County, Alabama, to the United States District Court for Middle District of Alabama, Southern Division, and request that this Court enter such further orders as may be necessary and appropriate.

Respectfully submitted,

_____
A. Inge Selden III (SEL003)
John N. Bolus (BOL022)
Andrea Morgan Greene (GRE102)
Attorneys for Defendants AIG SunAmerica Life
Assurance Company, AXA Equitable Life
Insurance Company, AXA Distributors, LLC,
Kemper Investors Life Insurance Company,
Hartford Life Insurance Company

OF COUNSEL:
MAYNARD, COOPER & GALE, P.C.
Attorneys at Law
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, Alabama 35203-2602
(205) 254-1000
Fax: (205) 254-1999

20

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Joint Notice of Removal has been served upon the following listed persons by placing a copy of the same in the United States mail, first-class postage prepaid and properly addressed as follows:

Richard S. Frankowski
BURKE, HARVEY and FRANKOWSKI, LLC
One Highland Place
2151 Highland Avenue
Suite 120
Birmingham, Alabama 35205

Thomas E. Baddley, Jr.
Baddley & Mauro, LLC
2545 Highland Avenue, Suite 201
Birmingham, AL  35205

on this the 12th day of October, 2007.


---

OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DOUGLAS CHERRY, DR. LANCE DYESS,      )
IRA EDMONDSON, JIMMY JONES,           )
RACHEL MCKINNEY, LINDA                )
MIDDLETON and VICTOR STAFFORD,        )
                                      )
        Plaintiffs,                   )
                                      )
v.                                    )
                                      )
AIG SUNAMERICA LIFE ASSURANCE         )
COMPANY, f/k/a ANCHOR NATIONAL        )
LIFE INSURANCE COMPANY, AXA           )
EQUITABLE LIFE INSURANCE              )
COMPANY, f/k/a THE EQUITABLE LIFE     )
ASSURANCE SOCIETY OF THE UNITED       )
STATES, AXA DISTRIBUTORS, LLC, f/k/a  )
EQUITABLE DISTRIBUTORS, LLC,          )
KEMPER INVESTORS LIFE INSURANCE       )
COMPANY, HARTFORD LIFE                )
INSURANCE COMPANY and MAXINE          )
CHAPPELL,                             )
                                      )
        Defendants.                   )

RECEIVED

2007 OCT 12 P 3: 32

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
CIVIL ACTION NO. _____

---

**EXHIBIT A TO
JOINT NOTICE OF REMOVAL**

Richard S. Frankowski, Esq.
(Ala. Bar #ASB-1734H70F)
**WHATLEY DRAKE LLC**
2323 2nd Avenue North
Birmingham, Alabama 35203
Tel:  (205) 328-9576
Fax:  (205) 328-9669

Attorney for Claimants

## IN ARBITRATION BEFORE

## NASD DISPUTE RESOLUTION

DOUGLAS M. CHERRY, LANCE K. DYESS,       )
IRA J. EDMONDSON, JIMMY E. JONES,        )
RACHEL MCKINNEY, LINDA J. MIDDLETON,     )
and VICTOR E. STAFFORD,                  )
                                         )
              Claimants,                 )
                                         )
v.                                       )     CASE NO.: _____
                                         )
RAYMOND JAMES AND ASSOCIATES, INC.,      )
                                         )
              Respondent.                )

## STATEMENT OF CLAIM

## STATEMENT OF CLAIM

### I.    PARTIES

1.    Claimants Douglas Cherry, Dr. Lance Dyess, Ira Edmonson, Jimmy Jones, Rachel McKinney, Linda Middleton, and Victor Stafford (hereinafter "Claimants") are residents of Alabama.

2.    Raymond James and Associates, Inc. (hereinafter "Raymond James" or "Respondent") is a Florida corporation doing business in the state of Alabama through its representative, Maxine Chappell (hereinafter "Chappell"). The Claimants paid for, and used the services of Chappell and Raymond James.

### II.    NATURE OF THE CASE

3.    This is a claim seeking redress for the wrongful conduct of Chappell and Raymond James, relating to the sale of variable annuities to Claimants. The variable annuities were unsuitable for each of the Claimants. Not only did each of the Claimants already have a tax-deferred plan in their IRAs, but they all had expressed a need for conservative investments that would provide interest income and not diminish their invested principal. At the time of the variable annuity sales, four of the Claimants had retired. Chappell advised each of the Claimants to purchase the annuity despite their retirement status and age.

4.    Plaintiffs seek compensatory and punitive damages, attorney's fees and expenses, and other remedies for unlawful and unconscionable conduct of Raymond James and Chappell in connection with the sale of the unsuitable variable annuity vehicles, as well as for the poor training and supervision of the Raymond James representative.

5.      Raymond James and Chappell have behaved in an unlawful and unconscionable manner in order to increase their own revenues to the detriment of the Claimants. By selling variable annuity products to the Claimants, who had already invested in qualified plans, Respondents pushed unsuitable products upon the Claimants that provided little or no benefit to the investors, but very large benefits to Raymond James and Chappell.

6.      Because all of the Claimants are either elderly or ill, and because of the particularly egregious nature of Raymond James' behavior, Claimants request an expedited arbitration schedule in a location convenient for the Claimants.

## A.    VARIABLE ANNUITY CONTRACTS

7.      Variable annuities are investment vehicles designed for retirement savings. They are essentially contracts between the contract owner ("owner") and a life insurance company. In return for the owner's payment(s), the insurance company agrees to provide either a regular stream of income or a lump sum distribution at some future time. The owner's premiums generally are invested in one or more securities portfolios, where they may earn interest and/or capital appreciation. No taxes are due on any earnings until the earnings are actually paid out.

8.      Variable annuity contracts have two stages, the accumulation stage and the distribution stage. The accumulation period begins as soon as the owner invests. The investment may be in the form of a single premium, or it may be in the form of multiple premium payments. In either case, once payment is made, the funds begin to accumulate tax-deferred earnings. The principal and interest can later be distributed to the owner in the form of a regular income or as a lump sum. The invested funds usually purchase

2

"accumulation units" in the insurance company's separate account, which is separate from the company's regular portfolio of investments. This separate account is used to purchase shares of professionally managed securities portfolios.

9.     The underlying securities in which the funds are invested have the potential to earn interest and/or dividends. However, the securities also have the potential to decline in value. The downside risk of variable annuity products is often brushed over while the benefit of the product, its ability to compound funds in a tax-deferred environment, is often promoted. While the tax-deferred character of these products can allow the value of the annuity to grow faster than a comparable taxable investment, this benefit is useless when the investor already has invested via a tax-deferred account/plan such as an IRA or 401(k).

## B.    ALLEGED BENEFITS OF VARIABLE ANNUITIES

10.     One of the most commonly touted advantages of the variable annuity is its tax-deferred benefit. This tax-deferred benefit, however, cannot provide any advantages to an investor who has already invested in a tax-deferred account/plan such as an IRA or a 401(k). In fact, the only situation in which a variable annuity would provide any benefit whatsoever to an investor whose money is growing tax-deferred in an IRA or 401(k) occurs when the investor has already invested the maximum amount allowable for the IRA or 401(k). Even in this situation, however, a variable annuity may not be the most beneficial product because they require the investor to maintain them for a number of years or else surrender a substantial percentage of the value of any withdrawal. The Claimants had not invested the maximum amount allowable into their IRA account, and had no need for a variable annuity product.

3

11.    A second frequently cited benefit of the variable annuity is its death benefit. Variable annuity products typically provide a so-called guaranteed death benefit. The insurance company typically guarantees that in the event of death before the annuity begins to pay money back to the owner, the beneficiary will receive the greater of either: a) entire amount of the premiums paid, less withdrawals, charges and fees, or b) the current contract value. While investment representatives may claim that this is a "benefit", it is actually just a return of a portion of the fees invested plus or minus any market growth or decline. The guaranteed death benefit certainly does not provide a set policy value payable upon death to a beneficiary. Rather, it only pays if the investment declines in value and the investor dies before annuitization (when the owner chooses to take the guaranteed income for life). As such, a simple term life insurance policy would be a much wiser and cheaper investment for someone wanting this type of benefit.

## C.    DETRIMENTS OF VARIABLE ANNUITIES

12.    The detriments associated with variable annuity vehicles far outweigh any alleged benefits conferred upon the investor.

a.    Income deferral is utterly irrelevant when the annuity is held in an IRA or 401(k).

b.    The growth of an annuity is fully taxable as income. When the owner decides to begin taking money, either as a stream of income or as a lump sum payment, the income will be taxed at ordinary income rates. This is the case for the owner or his or her heirs. When compared to the growth of index funds, which are taxable as capital gains to the investor and subject to zero income tax to heirs, the detriment of the variable annuity becomes obvious.

c.    Variable annuities are very expensive investment vehicles, and have fees, as well as charges for mortality insurance associated with them. Typically, variable annuities have an investment management charge of .25 to 1 percent (or higher) per year. They also have a Mortality and Expense (M&E) fee of 1 to 1.5 percent.

4

Furthermore, the mortality insurance only pays if the investment diminishes in value AND the investor dies before he or she annuitizes. The annuities that defendants recommended for the Claimants included contingent deferred sales charges, administrative charges, mortality and expense risk fees, service charges, and other portfolio expenses.

d.    Annuities promise a guaranteed income for life, however, if the investor chooses to annuitize the contract, two things happen. First, the investor sacrifices the principal, and when he or she dies, zero will be left to his or her heirs unless special coverage is purchased at additional costs. Also, if the investor wants to take cash out for any reason, he or she can't because the money belongs to the insurance company, and is no longer the investor's. Second, in exchange for giving the insurance company all of the investor's money, the insurance company promises to pay the investor a certain amount for a long as he or she lives. However, the amount the insurance company pays is typically extremely small.

e.    Beneficiary designations are irrelevant when the variable annuity is inside an IRA or 401(k) plans because these plans already provide for beneficiary designations outside of probate.

f.    The fees, charges, and expenses associated with variable annuities typically are not detailed on monthly, quarterly, or annual statements. In fact, many firms include a line item for "fees" and fail to include the fees that are associated with the variable annuity. The reason these fees are not included is due to the fact that firms take the fees and charges out of the vehicle's growth prior to distribution. In other words, the charges are netted out of the gross amount of growth, whatever is left is then detailed on performance statements. Because of this procedure, the fees associated with variable annuities are hidden, and investors are unable to see the actual costs associated with the variable annuities.

g.    The sub-accounts that make up the investments in a variable annuity have their own fee/expense structures that further increase the costs associated with variable annuities.

13.    The financial press has also highlighted the detriments of variable annuities:

5

a.    "Although variable annuities can pay off in very limited circumstances..., most investors will do better buying and holding mutual funds outside rather than inside this tax shelter."

    - *Don't Let the Bells and Whistles Distract You*, Kiplinger.com, December 3, 2001 (Ex. 1A)

b.    "Do you want proof positive that investors are irrational? Here it is: Sales of variable annuities went up 16% last year, to $85 billion. A variable annuity is a mutual fund-type account wrapped in a thin veneer of insurance that renders the investment earnings tax-deferred. The tax deferral is just about the only good thing you can say about these investment products. Almost everything else about them is bad: the high – sometimes outlandishly high – costs, the lack of liquidity, the fact that the annuity converts low-taxed capital gains into high-taxed ordinary income. That tax deferral comes at a very high price."

    - *The Great Annuity Rip-Off*, Forbes Magazine, December 6, 2001 (Ex. 1B)

c.    "...[A]nnuities are actually a lot more complex and have downsides that salesmen may not mention. The higher fees of most annuities can often cancel out their tax advantages; most annuities lock in investors for years; and annuities saddle heirs with higher taxes, unlike mutual funds or most other investments. For these reasons, many investment experts say annuities are usually unsuitable for most older investors."

    - *At Annuity University, Agents Learn How to Pitch to Seniors*, Wall Street Journal, July 2, 2002 (Ex. 1C)

d.    "The death benefit, which usually costs more than $1000 for a $100,000 account, isn't going to help you if the market tumbles while you're still alive. Companies that guarantee your principal while you are alive often charge another $1000 a year on a $100,000 account. Yet the chances of your benefiting are almost nil."

    - *Why Variable Annuities Are Just For a Few*, Kiplinger.com, March 30, 2003 (Ex. 1D)

e.    "Many experts view variable annuities, a tax-deferred investment vehicle with an insurance contract, as inappropriate for elderly clients because of high fees and because the products' tax benefits

6

generally are realized only over decades. Customers also pay steep 'surrender' fees for taking money out early."

- *State's Annuity Investigation Widens*, The Wall Street Journal, February 18, 2005 (Ex. 1E)

f.    "Of course, I can't blame my grandmother for not understanding what she bought. These are complex insurance contracts larded with bells and whistles that make them enticing and expensive, and often misunderstood by the very people selling them."

- *An Annuity For Grandma? Say It Isn't So,* The Wall Street Journal, March 6, 2005. (Ex. 1F)

g.    As annuity sales practices come under greater scrutiny, the National Association of Securities Dealers is taking a closer look at its policy on sales contests, a common promotional tactic for the insurance product. To encourage the sale of annuities, financial-services companies and insurers often offer salespeople financial rewards and other prized through contests. As long as the contests are conducted within NASD guidelines, broker-dealers don't have to disclose to their clients that they're participating in a contest based on generating the most annuity sales."

- *NASD Rethinks Its Policy On Annuity Sales Practices*, The Wall Street Journal, March 22, 2005. (Ex. 1G)

h.    "The    World's    Lousiest    Estate    Planning    Vehicle    - There's no getting around the income tax due on annuities. In fact, if you die with money remaining in your annuity, your beneficiary will inherit all the taxes that you have deferred. Compare this to a mutual fund, whose basis is stepped-up at death. In that case, your beneficiary would owe no taxes on the gains."

- *What's Wrong With Variable Annuities*, SmartMoney.com, 2005 (Ex. 1H)

i.    "Anytime anyone criticizes such shenanigans, annuity sellers rush to counter with claims that variable and fixed deferred annuities help retirees defer taxes and their heirs avoid probate. Both claims are true. But does that mean retirees should put their nest eggs in an annuity? In general, no, say financial planners and independent insurance consultants. And annuity experts at TIAA-CREF, the New York retirement-services company that created the variable annuity in 1952, agree. In short, the tax consequences and long holding periods necessary to make a variable annuity attractive

7

don't make sense for retirees. (Also, many annuities often pay big commissions to brokers, who often aren't forthcoming about their financial interests.)"

- *When Putting Your Nest Egg Into an Annuity Makes Sense*, The Wall Street Journal, March 30, 2005 (Ex. 1I )

j.    "Annuity sales can be highly lucrative.  Commissions can reach 12 percent of the money invested, far greater than fees typically generated on stocks and other investments.  Mr. Ragazzo, the deputy attorney general of California, said his office had found that some companies selling annuities sponsored trips to Hawaii and Europe for top agents.  'Some of these guys are former used-car salesmen bringing in $600,00 a year,' he said."

- *Who's Preying on Your Grandparents?* The New York Times, May 15, 2005  (Ex. 1J)

## D.    COMMISSION STRUCTURES

14.    The primary factor that drives investment representatives to push expensive and useless products on their unsuspecting clients is an extremely profitable commission structure for the broker/dealer, as well as the investment representative. Commissions are paid directly to broker/dealers, who then transfer a percentage of the commission to the selling investment representative.  The commissions are usually based upon a percentage of the contract sold.    Beyond the up-front commission, the representative may also receive "trails", or a percentage of the premiums paid by the owner throughout the duration of the annuity contract.    In order to recoup the commissions and trails paid to the investment representative, insurance companies force the investor to maintain the contract for a number of years.  If the investor chooses to withdraw from the variable annuity he or she will often be required to pay a substantial surrender fee or contingent deferred sales charge.  This charge is frequently as high as 7% of the value of the withdrawal.  As such, variable annuities are not prudent, short-term

8

investments nor are they appropriate for elderly investors and for those who require liquidity.

## III.     FACTUAL BACKGROUND

### A.     DOUGLASS CHERRY

#### Background

15.     Mr. Douglas Cherry was born in 1942, and was raised on a farm in Martin, Tennessee.  Cherry never finished high school.  At the age of sixteen, he left home and began working in a factory.  After working in a number of factories, Cherry ultimately came to Alabama and began working at Pea River Electric in 1969. Cherry worked as a lineman and a foreman at Pea River for over thirty years.

16.     In 1999, Cherry retired from Pea River at the age of fifty-seven.  During Cherry's employment at Pea River, he accumulated approximately $143,972 in his 401(k) account and approximately $375,000 in his retirement account.  Throughout his career at Pea River, Cherry only invested in his retirement plan and IRA.  After retiring from Pea River Electric, Cherry rolled over both of these accounts to Maxine Chappell and Raymond James.  These funds accounted for Cherry's entire life savings.

#### Chappell's Investment Advice To Cherry

17.     Douglass Cherry first heard of Maxine through a presentation she made at "Wellness Day" at Pea River Electric.  After hearing her presentation, Cherry set up a meeting to discuss his finances.

18.     The first meeting occurred in Chappell's office in Dothan, Alabama. Cherry and his friend, Ira Edmonson attended the meeting together.  During this meeting,

Chappell gained the trust of Cherry by telling him that she grew up on a farm, that she was a Christian, and that she knew how hard money was to earn.

19.    Chappell also promised that she could provide Cherry with an investment that would guarantee his principal investment and that would pay him a five-percent rate of return for seven years. Chappell specifically told Cherry that he could take out his entire principal after seven years. This appealed to Cherry. Cherry had a very conservative investment history, and had specifically told Chappell that he wanted conservative investments that would provide some income and not put his life savings at risk. Based on Chappell's promises, Cherry rolled over his entire life savings to Raymond James and Chappell. Chappell placed Cherry's funds into Raymond James account # 88171358, funded with two variable annuities:    (1) AXA Equitable Accumulator, contract 99 631 766, and (2) Putnum Allstate Advisor, contract number PA00051159. (Ex. 2) Unfortunately, Chappell's promises to Cherry, and to each of the other Claimants, were totally false.

20.    During this initial meeting and in subsequent meetings, Chappell failed to ask questions about Cherry's background and needs in order to determine whether a variable annuity was suitable for him. Chappell also failed to inform Cherry that the variable annuities were insurance products that only guaranteed part of his funds through a death benefit. Had Cherry known this, he would not have purchased the annuities. Indeed, Cherry already owned a life insurance policy at the time of the annuity sales and had no need for additional life insurance.

10

### Cherry's Portfolio and Losses

21.    Approximately one year after Cherry purchased the variable annuities, he noticed that the investments were not performing as Chappell had promised. Cherry contacted Chappell and asked about the investments. Chappell told Cherry that his principal was guaranteed and that the market fluctuations did not affect his investments because of the guarantee. Chappell also told Cherry not to worry about his investments.

22.    Chappell and Raymond James' supervisors knew or should have known that variable annuity products were not appropriate for Cherry, or for any other individual that had already invested in an IRA or 401(k), who wanted conservative investments, who was elderly, who needed income, and who wanted to protect their life savings. Furthermore, Chappell funded both of these annuities with 100% equities, an asset allocation that was wholly unsuitable for Cherry.

23.    Since the time that Chappell placed Cherry in the unsuitable variable annuity products, Cherry has lost approximately $134,980 and has paid thousands in fees and expenses. This figure does not include Cherry's lost opportunity costs.

### B.    DR. LANCE DYESS

### Background

24.    Dr. Dyess was born in 1956. Dyess ultimately attended UAB, where he received his M.D. Dr. Dyess currently practices medicine in Elba, Alabama.

### Chappell's Investment Advice to Dyess

25.    Around 1998, Dyess contacted Chappell to assist him with his investments. At the time, Dyess was concerned about market volatility and wanted more stability in his portfolio. Dyess told Chappell that he wanted low risk because he thought

the market was unstable. Chappell told Dyess that she could provide him "with the best of both worlds." In Dyess's initial meeting with Chappell, Chappell informed Dyess that she could invest his funds in a product that would provide him a guaranteed six-percent return, compounded annually. Chappell also promised Dyess that if the market outperformed the guaranteed six-percent rate, Dyess would get the benefit of the greater rate of return. Finally, Chappell informed Dyess that at the end of a seven-year period, he would get his entire principal back. Dyess specifically asked about these guarantees and Chappell told him that the SEC would not let her sell a product that didn't have such financial stability.

26. During Dyess's meetings with Chappell, Chappell never discussed Dyess's insurance needs. Chappell also failed to inform Dyess that the variable annuity was an insurance product that only guaranteed part of his funds through a death benefit. Had Dyess known this, he would not have purchased the annuity. In fact, at the time Chappell convinced Dyess to invest in the variable annuity, Dyess already had life insurance and had no need for additional coverage.

**Dyess's Portfolio and Losses**

27. Dr. Dyess invested approximately $435,419.00 with Chappell and Raymond James in November of 1998. The funds were placed in an Equitable Accumulator Rollover IRA, contract number 98 684 790. (Ex. 3) Contrary to Chappell's promises, Dyess received neither a six-percent rate of return, nor the return of his guaranteed principal. Dyess's concerns were memorialized in letters he wrote to Raymond James and to The Equitable. (Ex. 4). Ultimately, neither The Equitable nor Chappell provided Dyess or his accountant, Ernest Clark, with an explanation of the false

12

promises Chappell had made. As a result of Chappell's negligence and/or fraud, Dyess

sustained net out of pocket losses of approximately $75,000.    This figure does not

include Dyess's lost opportunity costs.

## C.    IRA EDMONSON

### Background

28.    Ira Edmonson was born in 1938. He, like Mr. Cherry, did not graduate

from high school, but did receive a GED. Edmonson worked at Pea River Electric for

over thirty years. During this time, Edmonson was very conservative, and placed his

money in the Pea River Electric retirement plan and in his 401(k). At the time of his

retirement in 2000, Edmonson had accumulated over $400,000 in retirement savings.

### Chappell's Investment Advice to Edmonson

29.    Edmonson first heard of Maxine through a presentation she made at

"Wellness Day" at Pea River Electric. After hearing her presentation, Edmonson set up a

meeting to discuss his finances.   Edmonson attended the first meeting with his friend

Douglas Cherry. In the meeting, Chappell gained the trust of Edmonson by telling him

that she was a Christian and that she would watch out for his life savings.

30.    During the meeting, Chappell specifically told Edmonson that she could

invest his life savings in a product that would provide him with a guaranteed five-percent

return without exposing his principal to any risk. This is the exact same statement

Chappell made to Cherry. Edmonson was very clear with Chappell that he needed some

income, that he could not afford to lose his life savings and that he did not want any risky

investments.   Despite Edmonson's desire for safe investments, Chappell funded

13

Edmonson's portfolio with two annuities that held 100% equities. This asset allocation was wholly unsuitable for Edmonson.

31.    During this initial meeting and in subsequent meetings, Chappell failed to ask questions about Edmonson's background and needs in order to determine whether variable annuities were suitable for him. Chappell also failed to inform Edmonson that the variable annuities were insurance products that only guaranteed part of his funds through a death benefit. Had Edmonson known this, he would not have purchased the annuities.

32.    After investing with Chappell, Edmonson went to her for advice about building a new log cabin. Edmonson wanted to make sure that he could afford the new home. Chappell advised him to build it. She also told him that he had enough money to last twenty years. This advice was incorrect and exposed Edmonson's life savings to additional risks.

**Edmonson's Portfolio and Losses**

33.    Chappell sold Edmonson two variable annuities. The first was an Equitable Accumulator annuity, number 300 611 540, in which Edmonson placed approximately $206,217. (Exhibit 5). The second was a Scudder Destinations annuity, contract number KI11015009, in which Edmonson placed approximately $210,288. (Exhibit 6). Chappell funded both of these annuities with 100%, an asset allocation that was wholly unsuitable for Edmonson. As a result of Chappell and Raymond James's negligence, fraud, and state and federal securities law violations, Edmonson has sustained net out of pocket losses of approximately $193,000. This figure does not include Edmonson's lost opportunity costs.

14

**D.    JIMMY JONES**

**Background**

34.    Jimmy Jones was born in April of 1950 in Enterprise, Alabama. Jones graduated from high school and attended three years of college. In 1971, prior to finishing college, Jones went to work for GTE. After working for GTE for almost thirty years, Jones retired November of 1999. During this time, Jones accumulated approximately $207,495 in retirement savings.

**Chappell's Investment Advice to Jones**

35.    Prior to retiring in 1999, Jones received a call from Chappell. Chappell told Jones that she heard he was retiring and that she wanted to meet with him about his retirement planning. Jones had heard about Chappell and also knew that Chappell's brother worked at GTE, so he made an appointment. Jones and his wife met with Chappell. In the meeting, Jones emphasized that he wanted an investment that would protect his retirement savings and provide him with some income. Chappell told Jones and his wife that she could provide him with and investment that would guarantee his principal and provide him with a guaranteed six-percent return. Based on Chappell's promises, Jones rolled over his retirement savings of approximately $207,495 to Raymond James in November of 1999.

36.    During this initial meeting, Chappell failed to ask Jones questions about his background and needs in order to determine whether a variable annuity was suitable for him. Chappell also failed to inform Jones that the variable annuity was an insurance product that only guaranteed part of his funds through a death benefit. Had Jones known this, he would not have purchased the annuity. Like the other claimants, Jones already

15

owned a life insurance policy at the time of the annuity sale and had no need for additional life insurance.

### Jones' Portfolio and Losses

37.    Chappell placed Jones' funds in Raymond James account # 80962527 and funding the account with a Putnam Hartford Capital Manager annuity, contract # 710702480 (Ex. 7)  However, after Jones invested with Chappell and Raymond James, he began to see a decline in his investments.  Jones called Chappell on multiple occasions to question her about the losses.  Chappell consistently said that everything was fine and that no changes needed to be made.  After hearing this same response on numerous occasions, Jones realized that Chappell had misrepresented the product, so he moved his investments to another broker in 2003.

38.    As of March, 2005, Jones had lost approximately $50,709 in his Raymond James account.  (Ex. 8)  This figure does not include Jones' lost opportunity costs.

### E.    RACHEL MCKINNEY

### Background

39.    Rachel McKinney was born in Dale County, Alabama in 1948.  McKinney graduated high school, but did not go to college.  In 1967, McKinney began work with GTE and worked as an operator, wirer, and electronic technician for approximately thirty years.  In 1999, McKinney retired from GTE at age 50.  At the time of her retirement, McKinney had retirement savings of around $424,000.

**Chappell's Investment Advice to McKinney**

40.    McKinney learned of Chappell through other GTE employees.  McKinney also knew that Chappell's brother worked at GTE.  McKinney ultimately heard Chappell speak at a presentation at Wallace College.  After the presentation, McKinney made an appointment with Chappell.

41.    In McKinney's meeting with Chappell, McKinney told Chappell that she was conservative, needed some income, and that she could not afford to lose her life savings.  McKinney also informed Chappel that McKinney's husband had retired in 1993 and that the McKinney's had no other income.

42.    Despite McKinney's needs for a conservative investment, Chappell sold McKinney a variable annuity.  Just as she had promised the other claimants, Chappell promised McKinney that the investment principal would be guaranteed and that the annuity would provide a guaranteed six-percent rate of return.

43.    Chappell, once again, failed to ask questions about McKinney's background and needs in order to determine whether a variable annuity was suitable for her.  Chappell also failed to inform McKinney that the variable annuity was an insurance product that only guaranteed part of her funds through a death benefit.  Had McKinney known this, she would not have purchased the annuity.  Indeed, McKinney already owned a life insurance policy at the time of the annuity sale and had no need for additional life insurance.

**McKinney's Portfolio and Losses**

44.    On or around March of 1999, Chappell placed McKinney in Raymond James account # 80550852 and funded it with an AIG Sun America Polaris II variable

17

annuity, contract # P3799510481. (Ex. 9)  Despite McKinney's need for conservative investments, Chappell funded the annuity with 100% equities.  As of December of 2004, McKinney had sustained net out of pocket losses of approximately $54,379.  (Ex. 9)  This figure does not include McKinney's lost opportunity costs.

## F.  LINDA MIDDLETON

### Background

45.    Linda Middleton was born in Houston County, Alabama in 1947. Middleton did complete high school and began to work at GTE.  Middleton worked at GTE for 30 years.    While employed at GTE, Middleton worked as a long-distance operator, dispatcher, and supply operator driving trucks and forklifts.  Throughout her career, Middleton only invested in the GTE retirement plan.

### Chappell's Investment Advice to Middleton

46.    Middleton learned of Chappell from Chappell's brother, Ronald Hughes, who also worked at GTE.  Middleton called Chappell and set up a meeting.  During the meeting with Chappell, Middleton stated that she needed income and wanted very conservative investments that would not place her life savings at any risk.  Chappell promised Middleton that she could place her savings in a product that would produce a guaranteed 5% rate of return and that would also guarantee the return of Middleton's principal at the end of seven years.

47.    Chappell failed to ask Middleton questions about her background and needs in order to determine whether a variable annuity was suitable for her.  Chappell also failed to inform Middleton that the variable annuity was an insurance product that only guaranteed part of her funds through a death benefit.  Had Middleton known this,

18

she would not have purchased the annuity. Like the other claimants, Middleton already owned a life insurance policy at the time of the annuity sale and had no need for additional life insurance.

### Middleton's Portfolio and Losses

48.    Middleton invested approximately $190,605 with Chappell and Raymond James in Raymond James account # 80916088. Chappell placed Middleton's life savings in an Equitable Accumulator Rollover IRA, contract number 99 629 647 (Ex. 10) Contrary to Chappell's promises, Middleton received neither a five-percent rate of return, nor the return of her guaranteed principal. As a result of Chappell's negligence and/or fraud, Middleton sustained net out of pocket losses of approximately $75,000. This figure does not include Middleton's lost opportunity costs.

### G.    VICTOR STAFFORD

#### Background

49.    Mr. Victor Stafford was born in 1943, in Clio, Alabama. Stafford attended school until eighth grade, at which point he had to quit to work on his family farm. In 1970, Stafford began working with Pea River Electric. For most of his time there, he performed service work. Stafford retired in March of 2005.

#### Chappell's Investment Advice to Stafford

50.    Stafford first met Chappell at "Wellness Day" held at Pea River. After Chappell's presentation, Stafford contacted her to set up a meeting. Stafford and his wife met with Chappell around the end of 2000 prior to Stafford's retirement. During the meeting, Chappell specifically told Stafford that she could invest his life savings in a product that would provide him with a guaranteed five-percent return without exposing

19

his principal to any risk. This is the exact same statement Chappell made to Cherry and to Edmonson. Stafford specifically said to Chappell that he needed some income, that he could not afford to lose his life savings and that he wanted conservative investments. Despite Stafford's desire for safe investments, Chappell funded Stafford's portfolio with annuity that held 100% equities.

51.     During this initial meeting and in subsequent meetings, Chappell failed to ask questions about Stafford's background and needs in order to determine whether a variable annuity was suitable for him. Chappell also failed to inform Stafford that the variable annuity was an insurance product that only guaranteed part of his funds through a death benefit. Had Stafford known this, he would not have purchased the annuity. Indeed, Stafford already owned a life insurance policy at the time of the annuity sale and had no need for additional life insurance.

**Stafford's Portfolio and Losses**

52.     Chappell placed Stafford's retirement savings in Raymond James account and funded the account with two variable annuities: (1) AXA Equitable Accumulator variable annuity, contract number 300 610 913, and (2) Putnam Hartford Capital Manger, contract # 710804263 (Exhibit 11). Contrary to Chappell's promises, Stafford received neither a five-percent rate of return, nor the return of her guaranteed principal. As a result of Chappell's negligence and/or fraud, Stafford sustained net out of pocket losses of approximately $100,000. This figure does not include Stafford's lost opportunity costs.

20

## IV.     NASD REGULATIONS

53.     The National Association of Securities Dealers has attempted to regulate the improper sale of variable annuities by developing rules and by providing notices to its members.  Since Raymond James is required by law to register as a broker/dealer and to become a member of the NASD, its representatives knew or should have known of the numerous rules and notices the NASD sent to its members.

## A.     NASD RULES AND NOTICES TO MEMBERS

54.     Variable annuities are securities and their distribution is subject to NASD rules.

55.     The National Association of Securities Dealers, Inc. (NASD) Rule 3010 (Exhibit 12) requires each member to establish and maintain a system to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules.

56.     NASD Rule 2310 (Suitability Rule) (Exhibit 13) prescribes the basic requirements of performing suitability reviews.  The rule provides that a member shall have reasonable grounds for believing that [a] recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.  The Suitability Rule also provides that a member shall make reasonable efforts to obtain information concerning: (a) the customer's financial status; (b) the customer's tax status; (c) the customer's investment objectives; and (d) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

21

57.    NASD Conduct Rule IM-2310.2 (Exhibit 14) provides that members and registered representatives have a fundamental responsibility for dealing fairly with their customers.

58.    In Notice to Members 96-86 (Exhibit 15), the NASD stated that when recommending variable annuities or variable life insurance, the member and its registered representative are required to make reasonable efforts to obtain information concerning the customer's financial and tax status, investment objectives, and such information used or considered reasonable in making recommendations to the customer. This same Notice also listed specific factors that could be considered when recommending variable annuities and variable life insurance contracts.  These factors include:

   a.  a representation by a customer that his or her life insurance needs were already met;

   b.  the customer's express preference for an investment other than an insurance product, the customer's inability to appreciate fully how much of the purchase payment or premium is allocated to cover insurance or their costs, and a customer's ability to understand the complexity of variable products generally;

   c.  the customer's willingness to invest a set amount on a yearly basis;

   d.  the customer's need for liquidity and short-term investment;

   e.  the customer's immediate need for retirement income; and

   f.  the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

59.    In Notice to Members 99-35 (Exhibit 16), the NASD further reminded members of their responsibilities regarding the sales of variable annuities.  Specifically, NTM 99-35 provided the following instructions for registered representatives:

   a.  Customer Information

22

1)  Members should make reasonable efforts to obtain comprehensive customer information, including the customer's occupation, marital status, age, number of dependents, investment objective, risk tolerance, tax status, previous investment experience, liquid net worth, other investment savings, and annual income.

2)  Registered representatives should discuss all relevant facts with the customer, including liquidity issues such as potential surrender charges, tax penalties, fees associated with the product, including mortality and expense risk charges, administrative charges, investment advisory fees, applicable premium taxes and market risk.

3)  Registered representatives should make certain that the application and any other information provided by the customer to the member is complete and accurate, and that the material is promptly forwarded to a registered principal for review.

4)  The registered representative and a registered principal should review the customer's investment objectives, risk tolerance and other information to determine that the variable annuity contract and the underlying subaccounts recommended to the customer are suitable. The registered principal should compare the information in the account application with other relevant information sources to check for apparent accuracy and consistency prior to approving the transaction.

b.  Product Information

1)  The registered representative should have a thorough knowledge of the specifications of each variable annuity that is recommended, including the death benefit, fees and expenses, subaccount choices, special features, withdrawal privileges, and tax treatment.

2)  A current prospectus should be given to the customer when a variable annuity is recommended. Prospectus information about important factors, such as fees and expenses and the illiquidity of the product, should be discussed with the customer.

c.  Liquidity and Earnings Accrual

23

1) Lack of liquidity, which may be caused by surrender charges or penalties for early withdrawal under the Internal Revenue Code, may make a variable annuity an unsuitable investment for customers who have short-term investment objectives. Moreover, although a benefit of a variable annuity investment is that earnings accrue on a tax-deferred basis, a minimum holding period is often necessary before the tax benefits are likely to outweigh the often higher fees imposed on variable annuities relative to alternative investments, such as mutual funds.

2) The registered representative should inquire about whether the customer has a long-term investment objective and typically should recommend a variable annuity only if the answer to that question, with consideration of other product attributes, is affirmative. In general, the registered representative should make sure that the customer understands the effect of surrender charges on redemptions and that a withdrawal prior to the age 59 ½ could result in a withdrawal tax penalty. In addition, the registered representative should make sure that customers who are 59 ½ or older are informed when surrender charges apply to withdrawals.

3) The member should develop special procedures to screen for any customer whose age may make a long-term investment inappropriate, such as any customer over a specific age. Based on certain contract features, some customers of advanced age may be unsuitable for a variable annuity investment.

d. Income, Net Worth, and Contract Size Thresholds

1) Members should establish procedures to require a principal's careful review of variable annuity investments that exceed a stated percentage of the customer's net worth, and any contract in which a customer is investing more than a stated dollar amount.

e. Investment in Tax-Qualified Accounts

1) Some tax-qualified retirement plans (e.g., 401(k) plans) provide customers with an option to make investment choices only among several variable annuities. While these variable annuities provide most of the same benefits to investors as variable annuities offered outside of a tax-

24

qualified retirement plan, they do not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax-qualified retirement plan itself.

2) When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (e.g., 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary. The registered representative should recommend a variable annuity only when its other benefits such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation.

3) A member should conduct an especially comprehensive suitability analysis prior to approving the sale of a variable annuity with surrender charges to a customer in a tax-qualified account subject to plan minimum distribution requirements.

60. In Notice to Members 00-44 (Exhibit 17), the NASD continued its efforts to prevent broker/dealers and their representatives from pushing variable annuity products onto unwary and unsuspecting individuals. In NTM 00-44, the NASD provided in part the following:

a. Guidelines For Supervision of Variable Life Insurance Sales

1) Variable life insurance products may be appropriate for a customer with a need for life insurance and an ability to pay for permanent life insurance protection. Nevertheless, since the cash value and death benefit may fluctuate due to the performance of the investments in the separate account, a variable life insurance customer should also be able to assume investment risk and understand the implications of adverse investment performance.

b. Customer Information

1) When recommending a variable life insurance policy, members and their registered representatives should make

25

reasonable efforts to obtain comprehensive customer information, such as the customer's age, annual income, net worth, liquid net worth, number of dependents, investment objective, sources of funds for investment, investment experience, existing investments and life insurance, time horizon, and risk tolerance.

2) The registered representative should document this type of information in a customer account information form and should submit it with every variable life insurance application. A registered principal should review the account information form and verify that the recommendation of both the policy and the subaccount allocation is consistent with the customer's investment objectives and risk tolerance.

c. Review of Customer Information

1) The member should consider whether the customer desires and needs life insurance and whether the customer can afford the premiums likely needed to keep the policy in force.

2) A member may wish to establish internal percentage ratio guidelines, such as the ratio of scheduled or target premium to income or household income, or percentage scheduled or target premium to liquid net worth. While these ratio guidelines are no substitute for proper supervision, they may assist in the review for variable life insurance affordability and excessive amounts of coverage. If the ratio exceeds the member's parameters, an extra level of supervision and review may be warranted. If parameters are exceeded, the registered representative should submit additional supporting documentation or a written explanation. To assist principals in their review of variable life insurance applications, members may wish to provide a checklist of items for the principal to review.

3) Members may wish to establish special supervision requirements for sales to older customers. Life insurance is often appropriately purchased by older investors. However, variable life insurance may not be suitable for an older investor who is primarily seeking an investment rather than an insurance product. Additionally, members should carefully consider whether and older investor has

26

the financial means to sustain the likely amount of policy premium payments.

d. Product Information

1)  Registered representatives should be thoroughly familiar with the features and costs associated with each recommended variable life insurance policy, including surrender charges, premium and cash value charges, separate account charges, underlying fund fees, subaccount investment options, loan provisions, fee-look periods, and policy premium lapse periods. The registered representative also should be able to clearly convey such information to the customer so that the customer can make an informed decision regarding the recommendation.

2)  Variable life insurance policies have features of both traditional insurance products and securities. Accordingly, members may provide their registered representatives with examples, such as lifestyle case studies, to illustrate what the member considers to be potentially unsuitable recommendations and what type of activity would warrant an extra level of supervisory review.

3)  Members may also wish to provide customers with member-approved product information brochures, in addition to any required disclosure documents, that explain the features and principal risks associated with variable life insurance.

4)  Registered representatives should provide customers with a current prospectus when recommending a variable life insurance policy. Registered representatives should be available to discuss with customers the information that is contained in the prospectus.

61.   Given the rules and Notices to Members, Chappell and Raymond James knew or should have known that variable annuity products were not appropriate for the Claimants or any other individuals who already benefited from a tax-deferred investment, who were elderly and/or sick, who needed income, and who wanted to maintain conservative positions without exposure to their principal.

27

## V.    CLAIMS

### A.    BREACH OF FIDUCIARY DUTY

62.    Claimants reallege and incorporate paragraphs 1 through 61, above.

63.    By reason of the fact that Chappell and Raymond James acted as Claimants' broker, Respondents owed a fiduciary duty to Claimants to act in the utmost good faith and in dealing with Claimants, including, but not limited to, the following:

      a.    The duty to recommend an investment only after studying it sufficiently to become informed as to its nature, price and financial volatility;

      b.    The duty to inform the customer of the risks involved in purchasing or selling a particular security or insurance product;

      c.    The duty to refrain from self dealing;

      d.    The duty not to misrepresent or omit any fact material to a transaction; and

      e.    The duty to act in the best interests of Claimants.

64.    Respondent breached each of the above duties.

65.    As a result of Respondent's breaches, Claimants have been damaged in an amount according to proof.

66.    The aforementioned acts of Respondent were willful, wanton, malicious and oppressive and justify the awarding of exemplary and punitive damages against Respondent in an amount according to proof.

67.    In addition, Claimants seek all consequential damages proximately caused by Respondent's wrongful conduct, including, but not limited to lost opportunity costs, interest, adverse tax consequences, professional and attorneys fees.

28

## B.    BREACH OF CONTRACT

68.    Claimants reallege and incorporate paragraphs 1 through 67, above.

69.    Respondent is obligated to provide Claimants with competent and professional services in accordance with applicable industry rules, regulations, customs and practices. Such obligations were mandated by the very nature of Respondent's business, business affiliations and undertakings for Claimants. By the conduct outlined above, Respondent breached its contract with Claimants.

## C.    COMMON LAW FRAUD

70.    Claimants reallege and incorporate by reference paragraphs 1 through 69, above.

71.    By reason of the fact that Respondent acted as Claimants' broker and agent, Respondent owed a duty of good faith and fair dealing to Claimants.

72.    Respondent breached its duty to Claimants by misleading Claimants to their prejudice and to Respondent's advantage. Specifically, Respondent's advantage consisted of compensation in the form of commissions, profits or other remuneration it received by misleading Claimants into believing that the variable annuities at issue guaranteed Claimants' principal, provided a guaranteed rate of return, and were suitable for the Claimants. Claimants reasonably relied upon Respondent's misrepresentations and material omissions, and as a result, Claimants were damaged. Furthermore, had Claimants known the true facts, they would never have purchased the variable annuities.

73.    Claimants have been damaged in an amount according to proof.

29

74.    The aforementioned acts of Respondent were willful, wanton, malicious and oppressive and justify the awarding of exemplary and punitive damages against Respondent in an amount according to proof.

**D.    NEGLIGENCE**

75.    Claimants reallege and incorporate by reference paragraphs 1 through 74, above.

76.    Respondent owed a duty to the Claimants to manage their investments with their best interests in mind, including a duty to provide them with accurate advice. Further, Respondent owed the Claimants a duty to accurately and adequately explain the risks inherent in the particular investments strategies that they recommended.

77.    Additionally, Respondent violated its duties under NASD and NYSE rules, such as the "know your customer rule" by recommending unsuitable securities for the Claimants in disregard of the Claimants' risk tolerances, needs, and financial situations.    To the extent that Respondent violated and/or disregarded its own internal compliance guidelines, they are liable to the Claimants for their losses resulting from such negligence.

**E.    NEGLIGENT MISREPRESENTATION/OMISSION**

78.    Claimants reallege and incorporate by reference paragraphs 1 through 77, above.

79.    Respondent supplied, and was in the business of supplying, information to guide others such as Claimants in making their investment decisions.    Respondent holds itself out as being capable of providing certain services to clients, including helping investors set investment objectives and determine proper asset allocation.

30

80.    Respondent was negligent in making the foregoing representations, as they failed to provide Claimants with advice and guidance in accordance with their investment objectives and financial situation.  The Claimants reasonably relied on Respondent's representations and omissions, and suffered financial losses as a direct and proximate cause thereof.

## F.    FAILURE TO SUPERVISE AND CONTROL

81.    Claimants reallege and incorporate paragraphs 1 through 80, above.

82.    By reason of the fact that Respondent Raymond James employed, controlled, supervised, licensed, and allowed Chappell to hold herself out as an agent that was registered and authorized to sell securities, Respondent owed Claimants a duty to properly supervise Chappell, including but not limited to, the duty to control the representations Chappell made to Claimants, to control Chappell's dealings with Claimants, and to prevent Chappell from effectuating unsuitable transactions in Claimants' accounts

83.    Respondent breached it duty to Claimants by failing to properly supervise Chappell.  Specifically, Respondent knew or should have know that Chappell was engaging in wrongful and illegal conduct by selling Claimants unsuitable investments.

84.    As a result of Respondent's breach, Claimants have been damaged in an amount according to proof.

85.    In committing the acts described in this claim, Respondent acted in conscious disregard of their duty to Claimants in that Respondent, through its agent Chappell, misrepresented, deceived, and/or concealed from Claimants, facts known or facts that should have been known to them with the intention on the part of Respondents

31

of generating commissions, profits and other remuneration.  The conduct of Respondent warrants an assessment of exemplary and punitive damages in an amount appropriate to punish Respondent and to deter others from engaging in similar wrongful conduct.

**G.    VIOLATION OF FEDERAL AND STATE SECURITIES LAWS; NASD RULES OF FAIR PRACTICE**

86.    Claimants reallege and incorporate by reference paragraphs 1 through 85, above.

87.    Respondent's wrongful conduct, as alleged above, constitutes violations of the federal securities laws, including but not limited to, Sections 10 and 20 of the Securities and Exchange Act of 1934 and Rule 10(b)-5 promulgated thereunder; Section 12(2) and Section 15 of the Securities Act of 1933; Section 8-6-19 of the Alabama Code; and Sections 2110, 2120, 2310 and 3010 of the National Association of Securities Dealers, Inc. Rules of Fair Practice.

88.    As a result of the wrongful conduct engaged in by Respondent, Claimants have suffered damages in an amount according to proof, plus interest at the legal rate from the date of the wrongful conduct to the date of payment if an arbitration award is made.

**VI.    CONCLUSION**

89.    Chappell and Raymond James had a duty to the Claimants.  By placing the Claimants in unsuitable variable annuity products, Chappell and Raymond James breached their duty to the Claimants and caused them to lose the money that was necessary to support them for the remainder of their lives.  The loss of much of their savings has not only caused the Claimants financial hardship, but it has also caused them extreme emotional distress.

90.    As a result of Respondent's breach of fiduciary duties, fraud, negligence, violations of state and federal securities laws, violations of NASD rules, and failure to supervise, Claimants request an award against Respondents as follows:

a.    Compensatory damages in an amount according to proof, but not less than $2,000,000;

b.    All consequential damages, including but not limited to, professional costs and adverse tax consequences;

c.    Disgorgement and restitution of all earnings, profits, compensation and benefits received by Respondent as a result of its unlawful acts and practices in an amount according to proof;

d.    Lost opportunity cost of what the investments would have earned if suitably invested;

e.    Costs of proceedings

f.    Attorney's fees and costs;

g.    Pre-judgment and post-judgment interest at the legal rate;

h.    Punitive damages in an amount according to proof;

i.    Rescission of the annuities; and

j.    Such other relief as this panel may deem just and equitable.

Respectfully submitted,

Richard S. Frankowski
Ala. State Bar No. ASB-1734H70F

33

**OF COUNSEL**

**WHATLEY DRAKE, LLC**
2323 2nd Avenue North
P.O. Box 10647
Birmingham, Alabama 35202-0647
Tel:    (205) 328-9576
Fax:    (205) 328-9669

34

# EXHIBIT "A"

Kiplinger.com: Basics: Why Variable Annuities Are Just For a Few, page 2: Don't Let the Bells and Whistles Distract You





BASICS

# Don't Let the Bells and Whistles Distract You

Although variable annuities can pay off in very limited circumstances (discussed below), most investors will do better buying and holding mutual funds outside rather than inside this tax shelter.

**Why Variable Annuities Are Just For a Few**
▶ Don't Let the Bells and Whistles Distract You
When Annuities Can Work
Dealing With a Bad Situation

**Transforming capital gains to ordinary income is harder to justify.** The widening gulf between the regular tax rates -- as high as 39.6% -- that ultimately apply to annuity earnings and the 20% rate for profits from straight mutual funds means it takes longer for the benefits of tax deferral inside the annuity to overcome the loss of capital-gains treatment.

**Fees are much higher than for mutual funds.** A few companies, including Fidelity and Vanguard, have cut fees, but the average variable annuity still charges 2.09%, according to Morningstar. That's $2,090 each year on a $100,000 account. The average mutual fund claims 1.4%.

**The death benefit isn't worth the money.** A large chunk of the fees pays for the death benefit, which typically pays off only if you die when your account has fallen below the minimum guarantee. But chances are slim that you'll lose money over the long haul.

Bill Klipp, president of Charles Schwab Investment Management, points out that "there are far cheaper ways to insure against an event of that sort." Consider, for example, that the average annuity charges 1.11% per year primarily for this death benefit -- $1,110 per year on a $100,000 account. Yet a healthy 60-year-old man would



Kiplinger.com: Basics: Why Variable Annuities Are Just For a Few, page 2: Don't Let the Bells and Whistles Distract You



pay about the same amount -- $1,100 a year -- for a $200,000 20-year level-term policy, which would provide his heirs protection that would in no way be connected with the market.

**You don't need a variable annuity to guarantee income for life.** One of the most frequently promoted but seldom-used benefits of annuities is *annuitization* -- which guarantees you set payments for the rest of your life, no matter how long you live. The reason annuitization is relatively unpopular is that it is inflexible: Once the payments begin, you can't change your mind. Much more common is systematic withdrawal of funds, which allows you to decide how much to withdraw at any time. You don't get the lifetime-payments guarantee, but neither do you guarantee that payments end with your death (or the death of a survivor if you choose a joint annuity). With systematic withdrawals, your heirs get what's left in the account when you die.

If lifetime payments are important to you, realize that you don't need a variable annuity to get them. You can invest in stocks or mutual funds until you're ready to start tapping your nest egg, then sell them and use the proceeds to buy an immediate annuity. Yes, you'll have to pay tax on capital gains at that time, leaving you less to invest in the annuity. But because only after-tax money goes into the annuity, less of each payment you receive will be taxed than if you had built up your account inside a tax-deferred annuity.

**You need to hold an annuity for at least 15 years.** It takes at least a decade and a half for the benefits of tax deferral to make up for the higher taxes and fees. The break-even point depends on your tax bracket, the fees, whether you withdraw the money in a lump sum or gradually over the years, and what you're comparing the annuity with -- particularly, how often you trade taxable mutual funds and how well they perform.

Beware of sales pitches that show a closer break-even point. They're probably based on an assumption that if you buy mutual funds, you'll trade frequently and invest in funds that make significant capital-gains distributions each year. Such assumptions stack the deck in favor of annuities and ignore the advantage of tax-deferred growth, which is yours if you buy and hold funds that make relatively small year-end distributions. That's important because when funds pay out their gains, you have to pay taxes on your share. As gains build up inside a fund, though, you get the same tax-deferral benefit you would inside an annuity and the benefit of a 20% capital-gains rate



when you do    .

"Why pay the cost of a variable annuity just to get tax advantages when you can invest in long-term-growth funds with few or no year-end distributions--in effect, converting ordinary income to capital gains?" asks Ricky Grunden, a financial planner in Dallas.

*Variable Annuity Analyzer* software offered by T. Rowe Price (free; 800-469-5304, or by e-mail) lets you compare the performance of low-fee variable annuities with no-load mutual funds bought to save for retirement. In most scenarios, you'll end up about even if you buy a variable annuity or a mutual fund, hold it for 15 years and withdraw a lump sum. Beyond 15 years, the variable annuity begins to pull ahead, particularly if you plan to withdraw some money each year and leave the rest inside the tax-deferred account.

If you invest $100,000 in a variable annuity or mutual fund at age 50, for example, then withdraw the money between ages 65 and 90, you'll receive $379,000 with the variable annuity versus about $341,000 with the mutual fund--assuming your investments return 8% per year and your tax bracket drops from 31% to 28% in retirement. (If your bracket doesn't drop, the advantage of the annuity does.) If you invest at age 40 and make withdrawals between ages 65 and 90, you'll get $684,000 from the variable annuity versus $543,000 from the mutual fund.

**[ Top ]**

◄ Why Variable Annuities Are Just For a Few

When Annuities Can Work ►

Recommend This Page to a Friend

© 2001 The Kiplinger Washington Editors, Inc.

# EXHIBIT "B"



# The great annuity rip-off

DO YOU WANT PROOF POSITIVE that investors are irrational? Here it is: Sales of variable annuities went up 16% last year, to $85 billion.

A variable annuity is a mutual fund-type account wrapped in a thin veneer of insurance that renders the investment earnings tax-deferred.

The tax deferral is just about the only good thing you can say about these investment products. Almost everything else about them is bad: the high -- sometimes outlandishly high -- costs, the lack of liquidity, the fact that the annuity converts low-taxed capital gains into high-taxed ordinary income. That tax deferral comes at a very high price.

The last of those three drawbacks just became bigger. The 1997 tax law cut capital gains tax rates while leaving ordinary income tax rates high. So the benefit of wrapping an annuity around your stock portfolio has just about vanished.

That tax change should have stopped annuity sales cold. The salespeople who push these things should have moved on to products more suitable for their clients, like plain old mutual funds. Shares of the leading variable annuity vendors -- such as Hartford Life, Nationwide Financial Services and SunAmerica -- should have collapsed.

None of these things has happened. Their shares are up 30% and more over the last year. What on earth is going on?

Its the old story: Annuities are sold, not bought. And a good salesman can get a lot of mileage out of the apparent tax advantages of a tax-deferred annuity. This investment product, he will tell you, is like an IRA, except that there is no $2,000 limit on contributions. You can put in $1 million if you want. Leave the money in as long as you want. It compounds tax-deferred.

The statement is true, up to a point. But unlike a deductible IRA or a 401(k), which is bought with pretax dollars from your paycheck, a deferred annuity gives you no tax deduction when you buy it.

Nor is an annuity anything like one of those new Roth IRAs. The Roth IRA is tax-exempt (if you meet certain criteria). An annuity is merely tax-deferred -- meaning that you have to reckon with the tax collector someday on your earnings.

In a typical transaction a stockbroker (or financial planner or insurance salesman) persuades you to salt away, say, $20,000 in an annuity policy that is a mutual fund in all but name. Indeed, the portfolio choices for your account will often be clones of popular mutual funds (like Fidelity Contrafund). Your choice of portfolios is usually wide: stocks, bonds, money markets, foreign securities.

But with an annuity theres an extra layer of fees. In addition to the investment fee on the portfolio theres a "mortality and expense risk" charge, typically 1% or more a year. This covers the cost of the "insurance" you are getting.

Insurance? Its there, a pale imitation of life insurance. The insurance guarantees that when you die, the value of your account will be at least as great as the money you originally put in -- unless you get a contract that steps up the insurance coverage over time, all you are insured for is the starting value. If the account has indeed grown, you still get only the value of the account, no more, no less; the insurance pays nothing. To collect on the insurance, that is, you have to pick a rotten investment -- and then drop dead before the investment recovers. Is that what you had in mind? We doubt it.

What is the actuarial value of that life insurance? (See box, p.109.) It is safe to say that with the vast majority of annuities sold today, almost all the money you are assessed for "mortality and expenses" winds up in either the

salesmans or the insurance companys pocket.

Assuming you dont die, the account accumulates. Say it grows to $32,000 and you decide to cash out. The $12,000 increase in value is taxed as ordinary income, at federal rates of up to 41% (taking into account a surcharge that relates to itemized deductions) plus state and local levies; for a New York City taxpayer that can add up to higher than 50%. Thats true even if much of the gain is from stock price appreciation. If those same stocks were held in a mutual fund the price appreciation would be taxed at about half those rates, assuming the fund shares are held for at least 18 months.

Annuities are costly to own. Expenses -- portfolio management fees, plus that "mortality" charge -- average a hefty 2.1% a year. Thats half again what it costs to own the average mutual fund, and ten times what it costs to own the Vanguard Index 500 fund. Surrender charges are common, starting out typically at 7% if you cash out in the first year and declining to 0% in the seventh year. Also, if you cash out before you reach 591/2, you have to pay a tax penalty, except under certain narrow circumstances.

There are a handful of exceptions to the rule that annuities are costly. The College Retirement Equities Fund sells very low-cost annuities, but only to schoolteachers and professors in the TIAA-CREF pension system. Vanguard, T. Rowe Price and Jack White sell annuities with no surrender fees and low annual expenses -- but they dont sell very many.

The rest of the business pretty much belongs to people who live on commissions: insurance agents, stockbrokers and commission-paid financial planners. They get a payout of up to 7%, which they share with their firm. Where else can they pocket that kind of money? Not in load mutual funds, where the average commission is something like 4%.

Certainly not in stocks or bonds, where commissions are facing stiff competition. "The salesman has a new hammer, and everybody starts looking like a nail," says Charles Haines, a fee-only financial planner in Birmingham, Ala.

If the terms are so terrible, then why do people buy the salesmans pitch? Because they are mesmerized by the words "tax deferral." Does this sound familiar? A generation ago a different crop of investors was mesmerized by the words "tax shelter" -- and ended up with worthless railcar leases and cattle farms.

But just what is this tax deferral worth? Get out a pencil and do some arithmetic. Say youve got $20,000 to salt away for retirement in 20 years and you want to put it in stocks. If you own the Vanguard Index 500 fund, most of your return takes the form of unrealized appreciation in the funds shares. You will get income dividends of only 1.5% a year, which will create a tax burden equal to maybe 0.7% of assets annually.

Capital gains payouts on the Vanguard fund have been extremely modest.

When you cash out, the accumulated gain in fund shares is taxed at low capital gains rates.

Now look at the Prudential Discovery Select stock index account. Sure enough, this will spare you the 0.7% tax bill. But at what cost! The annuitys total expenses run 1.8% of assets annually. That is 1.6 percentage points above the cost of the Vanguard fund, more than wiping out your current tax savings.

If this were the end of the matter, the annuity mightnt be too bad.

But now look at what happens when you cash out. Lets assume an average annual return of about 7%; the account quadruples in 20 years, to $80,000. In the ordinary Vanguard index fund you would have a long-term capital gain of a bit less than $60,000 (less, because your reinvested dividends get counted in your purchase price). On that you would owe federal tax of $12,000. At Prudential the whole gain is ordinary income.

Youd owe something close to $24,000.

The taxable mutual fund has another advantage over the supposedly tax-favored annuity. You could escape the $12,000 capital-gain tax altogether by either giving the fund shares to charity or leaving them in your estate. No such option is available to an annuity holder.

Transfer or bequeath an annuity to anyone but your spouse and you trigger recognition of the full appreciation as income.

Any prospective customer who takes the time to understand annuities runs away screaming. A recent report by consulting firm Cerulli Associates puts the matter as delicately as it can: "Information about variable annuity purchases reveals that they do not appear to be based on educated decisions."

Consider the experience no-load fund giant T.Rowe Price had when it sent potential customers software to help them determine whether variable annuities were right for them. The program factored in the investors age, income, tax bracket and investment horizon -- and it regularly told potential buyers that they would be better off in a plain old fund. An educated consumer, as it turned out, was not a good prospect for annuities.

If folks really knew what they were buying, how could you explain the $21 billion of annuities sold in 1996 that went into IRAs? IRAs, already tax-sheltered, benefit not a whit from the annuities deferral feature.

A case can be made for buying one particular kind of variable annuity inside an IRA. This is the kind that converts a lump sum into a monthly payout that lasts only as long as you do; what you are paying for is not a tax shelter, which is already there, but rather an assurance that you wont outlive your capital. But of that $21 billion worth of IRAannuities sold in 1996, only 1% were these monthly payout contracts.

"This is one of the biggest disgraces in the entire securities industry," fumes investment adviser Joseph Ludwig of Tandem Financial Services, in Canton, Mass. One of the victims: Ludwigs own son-in-law, Barry Joseph. Before marrying, Joseph bought a Metropolitan Life annuity inside his IRA. "I honestly thought I bought a mutual fund," says Joseph. "The salesman never mentioned the word annuity to me."

After Congress lowered the tax rate on capital gains, the annuity industry commissioned a study by Price Waterhouse on the implications. A stunning specimen of spin, the study concluded that the new tax rates would have a negligible impact on the number of years it takes for the benefits of tax deferral to overcome the higher costs of variable annuities relative to mutual funds.

But Patrick Reinkemeyer, editor of Morningstars variable annuity report, says Price Waterhouse made some dubious base assumptions. Among them: that variable annuity investors will be taxed at the rock-bottom 15% federal income tax rate when they withdraw their money in retirement, and that the investments will earn 13.6% per year, the average for mutual funds from 1987 to 1996.

Richard Toolson, an accounting professor at Washington State University, has done his own calculation of break-even points. For someone in the 36% income tax bracket who has to choose between a low- turnover index fund and an annuity portfolio earning the same pretax return, it would take more than 40 years for the annuity to earn back even a low 0.5% mortality charge. Yes, the salesman is right when he says that "annuitizing" your investment when you retire (taking monthly payouts over a long period) keeps the taxman at bay a while longer.

Still, 40 years is a long time.

And a 0.5% fee is not easy to find. The average mortality charge in the annuity industry is 1.3%; with that kind of fee, says Toolson, the annuity buyer never comes out ahead, even if his tax bracket has gone way down by the time he cashes in the annuity. Toolson didnt even figure in the freebie that owners of stocks or fund shares get when they donate or bequeath the property.

Not counting academics lucky enough to be eligible for CREF, is there anybody who in his right mind should even consider owning an annuity?

Glenn Daily, a fee-only insurance consultant in New York City, offers a few examples.

Case one: Someone who owns an underwater cash value life insurance policy. Say you have poured $100,000 into a universal life policy and it now has a cash value of $85,000. Insurance policy losses are almost never tax-deductible, but if you transfer the $85,000 to an annuity, the first $15,000 of profit you make on the annuity is tax-free.

Case two: a retiree who has just barely enough money to live on and needs one of those monthly payout annuities.

Case three: potential targets of lawsuits. Three-quarters of the states, among them New York, Washington, Florida and Texas, protect assets in variable annuities from creditors, to one degree or another.

Doctors worried about malpractice suits, for example, might do well to stash some money in variable annuities.

If you fall into one of these three categories, look for a no-load annuity (see table, p. 108) and dont pay a penny more than you have to in expenses. What if youve bought a high-cost annuity already and regret it? Cut your losses. Wait until the surrender charge period is over and then roll your account into a no-load, low-expense annuity via a tax-free "Section 1035" exchange.

**Sidebars**
The performance game
What is this insurance worth?
Imprisoned

# EXHIBIT "C"

WSJ.com - Major Business News



July 2, 2002

## At Annuity University, Agents
## Learn How to Pitch to Seniors

**By ELLEN E. SCHULTZ and JEFF D. OPDYKE**
**Staff Reporters of THE WALL STREET JOURNAL**

DENVER -- At a training session on how to sell investments, Tyrone Clark offers a key piece of advice on how to sell to senior citizens: "Treat them like they're blind 12-year-olds," he says.

The 40 or so trainees attending this class in a hotel conference room scribble notes and occasionally laugh or applaud Mr. Clark. If they missed any of his selling tips, the points also are summarized in the course manual.

"You'll waste time if you think you can impress them with charts, graphs, printouts or use sophisticated words," the manual, written by Mr. Clark, says regarding seniors. "They buy based upon emotions! Emotions of fear, anger and greed."

Welcome to Annuity University, the name of a two-day seminar where budding sales people pay $375 to learn the ins and outs of getting seniors to buy annuities. Annuities are insurance contracts in which the earnings are tax-deferred. "Fixed" annuities have returns that are guaranteed for a year or so, while "variable" annuities are essentially a collection of mutual funds in a tax-sheltered wrapper.

At Annuity U., the explanation of an annuity is even simpler. "There's the technical answer," says Mr. Clark, 43, "and there's the senior answer. Tell them it's like a CD -- it's safe, it's guaranteed."

While that sounds pretty appealing, annuities are actually a lot more complex and have downsides that salesmen may not mention. The higher fees of most annuities can often cancel out their tax advantages; most annuities lock in investors for years; and annuities saddle heirs with higher taxes, unlike mutual funds or most other investments. For these reasons, many investment experts say annuities are usually unsuitable for most older investors. "Annuities are almost never appropriate for seniors," says J. J. MacNab, an independent insurance analyst in Bethesda, Md.

Mr. Clark disagrees. He says in an interview that he "wholeheartedly believes annuities are the best investment for seniors," while saying that his seminar also explains the negatives of annuities and when they aren't appropriate.

Mr. Clark maintains that his teachings at Annuity U. aren't designed to belittle seniors or to help sales agents

### ANNUITY 101

• Annuities 101: Finding Out All Are Not Created Equal[3]
05/22/02

• Gift Annuities Have Benefits, Risks, But Monitor Who Is Behind Pitch[4]
04/07/02

• Wild Swings in the Market Prompt Resurgence in Annuities' Popularity[5]
10/08/01

• Annuities Are a Draw to Some, but They Can Also Be a Rip-Off[6]
12/15/00

persuade older customers to mɑᴋe investments that they shouldn't. "It's just that agents can come across as too technical [when pitching an annuity] and people don't understand them," says Mr. Clark, who is president of Brokers' Choice of America Inc., the Glendale, Colo., company that runs Annuity U. as well as other classes on selling financial products. "I use metaphors to show them they have to oversimplify the information."

Seniors increasingly are the most likely to hear pitches for annuities because they are sitting on a growing sea of retirement money. A salesman who persuades a retiree to move $50,000 from bank certificates of deposit or an individual retirement account into an annuity will generate a commission of $3,000 to $4,000. Because annuity sales are so lucrative, regulators including the National Association of Securities Dealers have expressed concern that many of the sales are transacted merely to generate commissions.

Mr. Clark says he makes agents sign a code of ethics pledging that they won't misrepresent information when pitching to seniors. He adds, though, that "the problem is agents take the classes and abuse the information everyday. And I have no control over that. These [agents] are independent and want to pitch high-commission products, and we can't stop them."

Mr. Clark notes that many students rave about Annuity U., and provided comments that some wrote after they completed his course recently. "I see my DREAMS coming true in the next 10 years," wrote Randal Cade, a Lake Jackson, Texas, life-insurance agent who took the course last month. "My DESIRE is $1 million per year in income." John Rolfe, a tax lawyer and life-insurance agent near Philadelphia, wrote, "AU gave me the education I needed to start selling lots of annuities." He concluded: "Annuities -- great vehicle, especially for seniors."

In later interviews, Messrs. Cade and Rolfe confirmed their comments. Mr. Rolfe adds that the language Annuity U. instructors use "is just a colorful way of saying things. I never take it seriously; they're just trying to be the big guy in the room. It's all an exaggeration."

Annuity U., which a Wall Street Journal reporter attended last year with Mr. Clark's permission, runs sessions once a month in a Denver-area hotel ballroom. It has trained some 7,000 agents during the last 13 years, according to Mr. Clark.

**'They Like Freebies'**

The first step to wooing seniors is to get them to attend introductory seminars, and the best way to attract them, the trainees are told, is a free meal. "They like freebies," the Annuity U. training manual notes, and they "like to eat one major meal a day."

Trainees learn that the educational seminars can be used to generate fear among the attendees. "Toss hand grenades into the advice to disturb the seniors," Mr. Clark tells the trainees. He adds, "You're there to solve their problems, but you have to create those problems first. No problem, no sale. So at the seminars, you're creating problems, and you tease them with the solutions" to encourage a follow-up meeting with a salesman.

"They thrive on fear, anger and greed," Mr. Clark continues. "Show them their finances are all screwed up so that they think, 'Oh, no, I've done it all wrong.' This will make you money." The Annuity U. class learns that whatever the retiree's particular concern -- whether it's taxes, investment returns or asset protection -- the solution is almost always the same: an annuity.

Another Annuity U. lecturer, Mel Brandon of Memphis, Tenn., tells the class that educational seminars offer a good way to find out which seniors are well off and worth concentrating sales pitches on. When people arrive at his seminars, he says, he has "spotters" in the parking lot "checking out what kind of car each person drives. That way we'll know who has the money." The class chuckles.

Mr. Brandon also uses seminars to gather information on the chief financial concerns of prospective

customers. The retirees find a piece of paper waiting at their seat with a variety of topics represented -- taxes, Social Security, protection of assets -- and he encourages them to circle the subjects they're concerned about. Mr. Brandon says he uses the information when he calls potential customers to set up an appointment. "It's the hot button they're going to respond to," he says.

In a later interview, Mr. Brandon says these are just techniques to reach clients. "None of this is predatory," he says. "I don't consider any of what I talk about to be manipulative. This is the way to ID the clients, and strike a particular pose with a segment of the market. And [seniors are] our target market."

Selling techniques, starting with the moment that sales people drive up to the retiree's home, also receive careful attention at Annuity U. The first step is to leave the briefcase in the car because, according to the manual, "It might intimidate them and let them know you're a salesman."

There are more tips. "Don't walk on their grass." After you knock, have "one leg up on their step prepared to walk in ...Wipe your feet showing you respect their cleanliness. Now, look around: look for pictures of grandkids, children or the items of their pastimes and/or hobbies," the manual advises. Next, compliment the prospects on something or tell jokes. "Begin to get them to like and trust you," says the manual.

Another instructor, Roger Sierens, tells the class that such techniques have helped him sell millions of dollars worth of annuities a year. Pulling a man and woman from the audience for a bit of role-playing, Mr. Sierens launches into a typical presentation. He offers compliments such as "you have such a beautiful house."

Mr. Sierens gets prospective clients to go around the house to gather various financial documents. In his day planner, he records the date when bank certificates of deposit come due -- planning to call the seniors just before that date to get them to transfer the money into an annuity.

"You have to show them that you love them and care about them," he says. "Use words like protect, safety and guarantee of principal." Echoing that theme, the manual notes: "Make them feel they are the most important persons in your life."

In a later interview, Mr. Sierens says his techniques "are my method and manner of finding [a prospective client's] overall financial picture. This is information I need to know before making recommendations." Mr. Sierens adds: "I'm sure annuities are not sold properly all the time, but that's just like any other financial product. I have a lot of respect for seniors and treat them like I'd treat my parents."

### Locking Up the Sale

During a coffee break, Annuity U. attendees can shop for sales aids, some spending hundreds of dollars a pop. If the retirees' concern is taxes, tell them that changes in the tax law could leave them penniless, the trainees are advised.

If the seniors are worried about lawsuits for damages against them, Mr. Clark suggests telling them, "Would it bother you to learn that your life savings are not insured against someone suing you because perhaps you hit a child while driving to the grocery store?"

Mr. Clark adds another tip: "Tell them you can protect their life savings from nursing-home and Medicaid seizure of assets. They don't know what that is, but it sounds scary," he says. "It's about putting a pitchfork in their chest."

Mr. Clark, in a later interview, says such comments are taken out of context. "The position I'm coming from is as a teacher," Mr. Clark says. "I teach [salesmen] that you have to show people they have problems associated with their planning."

**Write to** Ellen E. Schultz at ellen.schultz@wsj.com[1] and Jeff D. Opdyke at jeff.opdyke@wsj.com[2]

URL for this article:
http://online.wsj.com/article/0,,SB1025561802229705600.djm,00.html

**Hyperlinks in this Article:**
(1) mailto:ellen.schultz@wsj.com
(2) mailto:jeff.opdyke@wsj.com
(3) http://online.wsj.com/article/0,,SB1021755007500669400,00.html
(4) http://online.wsj.com/article/0,,SB1018108049751091280,00.html
(5) http://online.wsj.com/article/0,,SB1002477086944999480,00.html
(6) http://online.wsj.com/article/0,,SB976901260299210420,00.html

*Updated July 2, 2002 12:22 a.m. EDT*

Copyright 2002 Dow Jones & Company, Inc. All Rights Reserved

Printing, distribution, and use of this material is governed by your Subscription agreement and Copyright laws.

For information about subscribing go to http://www.wsj.com

# EXHIBIT "D"

# Kiplinger.com

Last updated on March 30, 2003

License or reprint this article

SAVING FOR RETIREMENT
Why Variable Annuities Are Just For a Few
by Kimberly Lankford

Okay, class, here's today's Marketing 101 challenge: How do you sell a product valued for its tax advantages after Congress changes the rules so its earnings may be taxed at rates nearly twice as high as those that hit competing investments? Tough, huh?

Yet that's exactly the position variable-annuity marketers found themselves in when Congress cut the tax rate on long-term capital gains to 20% in 1997. That wasn't an assault on variable annuities. They still sport their tax advantages.

By putting an annuity wrapper around a group of mutual funds, insurance companies can offer a tax-favored environment. You can trade as much as you want inside the annuity without tax consequences, and annual earnings build up tax-free. But when money comes out, those earnings are taxed in your top tax bracket -- up to 35%. That's why cutting the rate on capital gains to 15% was such a body blow.

With characteristic resilience, the purveyors of annuities refused to throw in the towel. This investment has always been "sold probably more aggressively than any other financial product," says Jeff Lambert, a financial planner in Sacramento, Cal.

To fight back, insurance companies started adding and promoting features that have nothing to do with taxes.

- Some policies now guarantee that the death benefit will include a minimum 5% annual gain. Historically, the death benefit -- which is the hint of insurance that earns annuities their tax-advantaged status -- simply guaranteed that if you died with the plan in force, your heirs would get at least as much as you had invested, even if your investments declined in value.

- The death benefit in other policies now promises that one year's gains can't be lost to a later market dip. If, for example, a $100,000 investment grew to $110,000 during the first year, $110,000 would become the minimum death benefit.

- Some companies offer a death-benefit-type guarantee to the living, making up the difference if your balance drops below your investment after ten years.

- Many policies now let you access your money without a surrender charge if you enter a nursing home.

Whipped into a frenzy yet? That seems to be the goal of these sales sleights of hand. But such features fall short.

The death benefit, which usually costs more than $1,000 for a $100,000 account, isn't going to help you if the market tumbles while you're still alive. Companies that guarantee your principal while you are

alive often charge another $1,000 a year on a $100,000 account. Yet the chances of your benefiting are almost nil. Large-company stocks have had negative returns over a ten-year period only twice since 1926 (the worst period was from 1929 to 1938, when they lost 0.89%).

Surrender-charge waivers won't protect you from the 10% tax penalty if you withdraw money before age 59½, and unless you buy the annuity after you retire, it's unlikely you'll enter a nursing home while the surrender period is in effect (often only seven years).

Don't Let the Bells and Whistles Distract You ►

This page printed from:

All contents © 2005 The Kiplinger Washington Editors

# EXHIBIT "E"



**THE WALL STREET JOURNAL.**
O N L I N E

FORMAT FOR
PRINTING
sponsored by

**XEROX.**
**Color.**

February 18, 2005

## MUTUAL FUNDS

# State's Annuity Investigation Widens

By DAVID ARMSTRONG
Staff Reporter of THE WALL STREET JOURNAL
February 18, 2005; Page C13

*(See Corrections & Amplications item below[0].)*

BOSTON -- Massachusetts securities regulators have subpoenaed
a dozen financial institutions as part of an expanding investigation
into the promotion of variable annuities to elderly bank customers.

**DOW JONES REPRINTS**

This copy is for your personal,
non-commercial use only. To order
presentation-ready copies for
distribution to your colleagues,
clients or customers, use the Order
Reprints tool at the bottom of any
article or visit:
www.djreprints.com.

• See a sample reprint in PDF
format.
• Order a reprint of this article now.

The subpoenas, issued by the office of Massachusetts Secretary of Commonwealth William
Galvin, seek the names of customers age 75 or older who purchased annuity products since
January 2003.

Mr. Galvin said he broadened the probe of annuity marketing to the elderly after his office filed a
civil fraud complaint earlier this month against the brokerage unit of Citizens Financial Group Inc.
Mr. Galvin's office accused the company of "unethical and dishonest conduct" in promoting the
sales of variable annuities to elderly customers on Cape Cod.

"We were overwhelmed by the response from the original Citizens case," he said, putting the
number of new complaints his office received at about 30. "It's quite obvious this is a pervasive
problem of older customers being targeted as perspective customers for variable annuities, which
in most cases is not a good deal for them."

Many experts view variable annuities, a tax-deferred investment vehicle with an insurance
contract, as inappropriate for elderly clients because of high fees and because the products' tax
benefits generally are realized only over decades. Customers also pay steep "surrender" fees for
taking money out early.

According to Mr. Galvin's office, Citizens received a new and broader subpoena as part of the
widened probe. A Citizens spokeswoman said the bank is a "highly ethical company" and will
"cooperate fully" with the probe.

The other institutions subpoenaed, according to Mr. Galvin's office, include: **Morgan Stanley**,
which declined comment; **Sovereign Bancorp**, which said it would comply with the subpoena
and was "fully comfortable" with its policies related to annuity sales; **Prudential Financial Inc.**,
which was unaware of a subpoena from Mr. Galvin but said it would cooperate if it did receive
one; UBS Financial Services Inc., which said it was unaware of a subpoena; Eastern Bank, which
said it would comply with the request; and Brookline Savings Bank, which said it doesn't offer

variable annuity products.

Another firm that received a subpoena was Infinex Investments Inc., a brokerage firm owned by several small banks and bank trade associations. A spokesman said he was unaware of any complaints regarding the company's annuity products. He said the firm would comply with the subpoena.

**Write to David Armstrong at david.armstrong@wsj.com[1]**

Corrections & Amplifications

**ARTICLES PUBLISHED** in the Online Journal on Feb. 11 and Feb. 18 regarding Citizens Financial Group Inc., a Providence, R.I., unit of Royal Bank of Scotland Group PLC, incorrectly included a stock symbol for Citizens Financial Corp. of Louisville, Ky. The Kentucky corporation is unrelated to Citizens Financial Group.

**URL for this article:**
http://online.wsj.com/article/0,,SB110867802743158185,00.html

**Hyperlinks in this Article:**
**(1)** mailto:david.armstrong@wsj.com

Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com.**

# EXHIBIT "F"



FORMAT FOR PRINTING sponsored by

**XEROX. Color.**

March 6, 2005

**LOVE & MONEY**

By JEFF OPDYKE



# An Annuity For Grandma? Say It Isn't So.
*March 6, 2005*

My grandmother called me to her house recently to dig through her insurance and financial documents. She has named me executor of her modest estate, and she wants me to 1) know exactly what she has; and, 2) know what she wants to happen when the time comes.

Going through her records, however, I noticed something that set off alarm bells: What was once a $20,000 certificate of deposit at a local bank is now a $20,000 deferred annuity that the local banker sold her.

I immediately recognized it for what it was: a disaster. As a personal-finance writer, I've seen too many older people enticed into buying these investments, typically without understanding what they're getting talked into.

I probably can't do anything to help my grandmother; she bought her annuity a year ago and the grace period to cancel the contract ended 10 days later. She signed all the appropriate documents stating she understood the transaction, though as she told me recently, "I don't know a damn thing about this stuff; the guy at the bank just told me to sign these papers."

So I write this in hopes that when an annuity salesman approaches you, your parents or your grandparents with a compelling pitch -- and their pitches are always compelling, if not entirely honest -- you will remember my grandmother's story.

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

**ABOUT JEFF OPDYKE**

Jeff Opdyke, a personal-finance writer for The Wall Street Journal, writes Love & Money every Sunday for The Wall Street Journal Sunday supplement that runs in newspapers across the country. He has written about personal finance, investments and the markets for 10 years from Journal bureaus in Dallas, Seattle and New York. He currently writes for the Journal's Personal Journal section.

During a writing sabbatical, Jeff earned a Series 7 license, required of financial professionals, and served as a trader and analyst for a hedge fund.

A native of Baton Rouge, La., Jeff is a graduate of Louisiana State University's Manship School of Journalism and is the author of "Love & Money: A Life Guide to Financial Success," recently published by John Wiley & Sons.

\* \* \*

I am not against annuities. In fact, in the right situation, an annuity can accomplish a host of beneficial things: It can be a great vehicle for accumulating wealth before you retire. After you retire, some annuities can be the perfect tool for creating a stream of income you can never outlive. And in some circumstances it can help with estate-planning needs.

But too many annuities are sold for the wrong reasons. And those reasons typically have to do with the commission the salesman is pocketing rather than the financial needs of the investor.

Just to be clear, I'm complaining largely about variable annuities and deferred annuities, both of which allow money to grow tax-deferred. Basically, you invest your money, say, $20,000, with an insurance company that guarantees some level of income in the future, either through a lump-sum or a monthly payout that lasts for years or until you die.



But to me, buying such an annuity in retirement generally makes little sense, especially for those who are much older, like my grandmother. That's because these are simply not short-term savings vehicles. Not to be morbid, but older savers generally don't have the number of years remaining that might make an annuity practical. Often, they'll never even benefit from it.

Annuities have two phases: accumulation, which can last for years, and then the distribution. At her age, my grandmother has no need to accumulate; her only worry is living off of what she has. Thus, it's absurd for an older retiree to invest the bulk of her liquid assets in an instrument that locks away money for years, which most annuities do because of the so-called surrender period. That essentially blocks you from touching your money for seven to 15 years or more -- and if you do, you lose a hefty chunk in the form of a surrender penalty.

Here's where this diverges away from the purely financial and into the personal: Buying investments late in retirement often creates tensions in a family. Retirees either panic immediately after signing up for an investment they're unsure of, or they find out too late that they've been duped. Often, they're too embarrassed to admit they didn't know what they were doing, or too proud to approach their kids for advice. But when they finally do announce the problem, family members get livid that Mom or Dad or a grandparent invested foolishly without seeking anyone's counsel.

When I asked my grandmother why she just didn't call me for advice, she replied: "Well, you were still living in New Jersey." I reminded her that they do have phones there, and she just looked at me sheepishly.

Of course, I can't blame my grandmother for not understanding what she bought. These are complex insurance contracts larded with bells and whistles that make them enticing and expensive, and often misunderstood by the very people selling them.

This is where families come in.

* * *

My grandmother is 84 years old and, as she says herself, doesn't know an annuity from a Portobello mushroom. She's very trusting of people like bankers. Yet her $20,000 CD represented two-thirds of her liquid assets, reason enough for any conscientious investment peddler to steer her away from a contract that imposes an eight-year surrender penalty that will suck away as much as 8% of her account if she needs her money early.

What's worse is that the salesman was, at best, clueless about what he sold. My grandmother invested for one reason only: to keep her spendthrift daughter from accessing all the $20,000 upon my grandmother's death.

"The banker assured me she wouldn't get all the money at once," my grandmother told me when I questioned her.

Imagine her surprise when I read this line, from the very first paragraph of the contract summary: "Upon the annuitant's death, the cash balance will be paid out in full to the beneficiary." To put that even more plainly, the beneficiary, my mom, gets a lump-sum payout when my grandmother passes away. Thus, the annuity does nothing to accomplish my grandmother's wants.

Moreover, the fat interest rate my grandmother thought was so impressive -- 5.25% -- lasts for just one year. Then, as the contract notes, it falls to the minimum 2% for the duration. To put that into perspective, I just stashed the $900 my son has in his savings in a one-year CD that pays 3.15%.

Unfortunately, I may have discovered my grandmother's purchase much too late to fight for her -- though I'm currently trying.

But others out there can still fight for their parents and grandparents. Talk to them now; implore them to speak to you before investing in an annuity. If they tell you they recently bought one, rush over to examine the contract, and if it looks onerous have it annulled. You generally have 10 days to cancel.

If you don't understand how the annuity works, talk to a trusted lawyer about the contract's provisions before signing anything.

Annuities can be good. But too often they're tools of greed that fatten the seller's wallet at the expense of trusting people like my grandmother, who never needed the investment in the first place.

• E-mail Jeff Opdyke at lovemoney@wsj.com[1]

**URL for this article:**
http://online.wsj.com/article/0,,SB111006649527271447,00.html

**Hyperlinks in this Article:**
(1) mailto:lovemoney@wsj.com

**Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

# EXHIBIT "G"

said.

Consumer advocates argue that financial and noncash rewards encourage brokers to push unsuitable annuities on senior citizens. They say salespeople should disclose to investors whether they are in a contest or receiving financial incentives.

Sales contests create "a conflict of interest," said Ron Marron, a California lawyer who is spearheading several lawsuits against some of the largest U.S. brokerage firms and insurance companies for selling unsuitable annuities to seniors. Mr. Marron said the lack of full disclosure has become the impetus for steering sales. "I believe under current law it might be legal, but it's certainly not ethical," Mr. Marron said of sales contests.

Tracy Stoneman, a lawyer who represents investors in Colorado on securities issues, says annuity-sales guidelines should also include disclosure rules. Suitability and full disclosure in some ways "are mutually exclusive." She said that a sale could be unsuitable in part because of what wasn't disclosed to an investor.

**Write to Angela Pruitt at angela.pruitt@dowjones.com[1]**

URL for this article:
http://online.wsj.com/article/0,,SB111145227531485723,00.html

Hyperlinks in this Article:
(1) mailto:angela.pruitt@dowjones.com

Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

# EXHIBIT "H"



# What's Wrong With Variable Annuities

**VARIABLE ANNUITIES** are sold more aggressively than fake Gucci handbags on the streets of New York City. Thanks in part to commissions around 5%, sales of variable annuities have soared over the past decade.

But popularity is no indicator of practicality. The truth is, annuities only make sense for a tiny fraction of the population. (See story[1].) The rest of us should be buying plain old mutual funds. Of course, that's not easy to say to your dark-suited cousin who keeps taking you out for steak and Lafitte-Rothschild Bordeaux in hopes that you will sign on the dotted line. But, next time he invites you, you can bring along this article. Just make sure he pays the bill before you give it to him.

## The Basics
First, a primer. A variable annuity is basically a tax-deferred investment vehicle that comes with an insurance contract, usually designed to protect you from a loss in capital. Thanks to the insurance wrapper, earnings inside the annuity grow tax-deferred, and the account isn't subject to annual contribution limits like those on other tax-favored vehicles like IRAs and 401(k)s. Typically you can choose from a menu of mutual funds, which in the variable annuity world are known as "subaccounts." Withdrawals made after age 59 1/2 are taxed as income. Earlier withdrawals are subject to tax and a 10% penalty.

Variable annuities can be immediate or deferred. With a deferred annuity the account grows until you decide it's time to make withdrawals. And when that time comes (which should be after age 59 1/2, or you owe an early withdrawal penalty) you can either annuitize your payments (which will provide regular payments over a set amount of time) or you can withdraw money as you see fit.

## Fees, Fees and More Fees
Variable annuities are notorious for the fees they charge. Indeed, the average annual expense on variable annuity subaccounts has been on the rise and currently stands at 2.3% of assets, according to Morningstar. (This figure includes fund expenses plus insurance expenses.) The average mutual fund, on the other hand, charges just 1.44%. Unfortunately, variable annuity fees don't stop there. Many variable annuities also have loads on their subaccounts, surrender charges for selling within, say, seven years and an annual contract charge of about $25.

## What Death Benefit?
The death benefit basically guarantees that your account will hold a certain value should you die before the annuity payments begin. With basic accounts, this typically means that your beneficiary will at least receive the total amount invested — even if the account has lost money. For an added fee, this figure can be periodically "stepped-up" or earn a small amount of interest. (If you opt not to annuitize, then the death benefit typically expires at a certain age, often around 75 years old.) Well, given the fact that stocks have returned an average of 12% annually (assuming dividends are reinvested) from 1926 to 2003, according to the Center for Research in Security Prices, over the long haul you need this insurance about as much as a duck needs a paddle to swim.

OK, investors who bought annuities and then died within the next two months probably got their money's worth. But currently only three out of every 1,000 variable annuities are surrendered due to death or disabilities, according to Limra International, an insurance-industry research group. And this report doesn't even measure whether those four accounts were made whole by the death benefit!

The price of this questionable feature: an annual 1.18%, according to Morningstar.

## Surrender Fees
Another problem with most variable annuities is that your money is often locked up for several years — typically five. Trying to withdraw funds during this time will result in huge fines. These fees typically decrease as the years tick by. For example, you might be charged a 7% surrender fee for a withdrawal during your first year of ownership. After seven years, however, that could be just 1%. The average fee is a steep 5.6%, according to Morningstar.

## Early Withdrawal Penalty
As with most retirement accounts, if you withdraw funds before age 59 1/2, you'll be hit with a 10% early withdrawal

tax penalty.

**The Taxes**
Gains in variable annuities are taxed at ordinary income tax rates, which go as high as 35%. For most investors, that's a whole lot higher than the maximum 15% rate they now pay on their long-term mutual fund gains and dividend income. And that tax difference can easily eat up the advantage of an annuity's tax-free compounding. "You're generally going to have to wait 15 to 20 years before these suckers become more tax efficient than a mutual fund," says CFP Dee Lee of Harvard, Mass.

Residents of California, Florida, Maine, Nevada, South Dakota, West Virginia and Wyoming and Puerto Rico pay even more taxes — an additional 1% to 3.5% tax on nonqualified variable annuity accounts. (That is, accounts that are not purchased within an IRS-approved retirement plan like a 401(k), 403(b) or IRA.) Some additional states also add a tax for variable annuities purchased within a qualified account.

**The World's Lousiest Estate Planning Vehicle**
There's no getting around the income tax due on annuities. In fact, if you die with money remaining in your annuity, your beneficiary will inherit all the taxes that you have deferred. Compare this to a mutual fund, whose basis is stepped-up at death. In that case, your beneficiary would owe no taxes on the gains. Both types of accounts — annuities and mutual funds — are liable for federal estate taxes on anything over the federal estate tax exemption ($1.5 million for 2004 and 2005).

**Switch to a Low-Fee Variable Annuity**
Now, if you've read all this and still want to buy an annuity, do yourself a favor and buy one with low costs and good investment options. These are available from mutual fund companies like Vanguard[2] (average total expenses, 0.67%, including mortality and expense risk charges) and T. Rowe Price[3] (0.76% average mutual fund expenses, plus an additional 0.55% mortality and expense risk charge). Investors who already own run-of-the-mill high-priced annuities should consider a tax-free transfer — called a 1035 exchange — to a better quality, low-fee annuity. Just be sure to confirm that your surrender charges have expired before you make the switch.

[1]http://www.smartmoney.com/retirement/investing/index.cfm?story=buyannuities
[2]http://www.vanguard.com
[3]http://www.troweprice.com

Customer Service | Magazine Customer Service | Your Profile | Contact Us | Corrections
Custom Publishing | License Our Content | Media Kit | Press Room | RSS

SmartMoney.com © 2005 SmartMoney. SmartMoney is a joint publishing venture of Dow Jones & Company, Inc. and Hearst Communications, Inc. All Rights Reserved. By accessing and using this page, you agree to our terms and conditions and our PRIVACY STATEMENT. All quotes delayed by 20 minutes. Delayed quotes provided by ComStock. Historical prices and fundamental data provided by CoreData, LLC. Mutual fund data provided by Lipper. Mutual Fund NAVs are as of previous day's close. Earnings estimates provided by Zacks Investment Research. Insider trading data provided by Thomson Financial. Upgrades and downgrades provided by Briefing.com.

# EXHIBIT "I"



FORMAT FOR
PRINTING
sponsored by

XEROX.
Color.

**March 30, 2005**

GETTING GOING

# When Putting Your Nest Egg Into an Annuity Makes Sense

By JEFF D. OPDYKE
Staff Reporter of THE WALL STREET JOURNAL
*March 30, 2005; Page D1*

State and federal regulators are clamping down on the sales practices of annuities, specifically, the "variable" and "fixed deferred" varieties that insurers and banks constantly pitch to retirees.

Last month, Massachusetts securities regulators cracked down on "unethical and dishonest" sales practices at a local bank, which convinced a man in his 80s to fund a variable annuity with the proceeds from the sale of his house -- money needed to finance his assisted-living requirements. The annuity kept him from accessing the entire sum for seven years without first paying a large penalty.

Anytime anyone criticizes such shenanigans, annuity sellers rush to counter with claims that variable and fixed deferred annuities help retirees defer taxes and their heirs avoid probate. Both claims are true. But does that mean retirees should put their nest eggs in an annuity?

In general, no, say financial planners and independent insurance consultants. And annuity experts at TIAA-CREF, the New York retirement-services company that created the variable annuity in 1952, agree.

In short, the tax consequences and long holding periods necessary to make a variable annuity attractive don't make sense for retirees. (Also, many annuities often pay big commissions to brokers, who often aren't forthcoming about their financial interests.)

"I can't even contemplate a situation where it makes sense for someone 75 or 85," says Robert Nestor, principal of retiree services at Vanguard Group, the Malvern, Pa., investment-services giant. "And there are only very narrow situations where it makes sense for a 65-year-old."

**DOW JONES REPRINTS**

(R) This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

**CHOOSING AN ANNUITY**
A look at three types of annuities and for whom they're appropriate:

**Immediate:** Good for retirees who want income now and the guarantee that they won't outlive their money. Go with the lowest-cost annuity that provides the greatest income for your investment.

**Fixed deferred:** Good for retirees who work part time and don't need the money now, but want a stream of income later. For most, though, a CD can be just as effective for saving.

**Variable:** Generally never a good choice for most retirees because of the long holding periods and tax consequences.

**ABOUT THE AUTHOR**
Jonathan Clements has written The Wall Street Journal's Getting Going personal-finance column since October 1994. Born in London, Jonathan is a graduate of Emmanuel College, Cambridge University, where he edited the student newspaper. He was a writer and researcher for Euromoney magazine in London before moving to the New York area in 1986. Prior to joining the Journal in January 1990, he covered mutual funds for Forbes magazine.

Jonathan is the author of "You've Lost It, Now What? How to Beat the

In some situations, certai⸱ ⸱ferred fixed annuities can benefit some retirees, but not mosɩ. As for probate, in many cases it isn't the headache it used to be, says John Wesley, TIAA-CREF'S product manager for after-tax annuities.

Bear Market and Still Retire on Time," published in 2003. His earlier books include "25 Myths You've Got to Avoid -- If You Want to Manage Your Money Right" and "Funding Your Future: The Only Guide to Mutual Funds You'll Ever Need." He has two children and lives in Metuchen, N.J.

It's important to note that not all kinds of annuities are wrong for retirees. An immediate annuity "can be a very appropriate investment for someone who's afraid of outliving their money," says Linda Lubitz, a Miami financial planner. With immediate annuities, you put in a sum of money now for monthly payments that begin immediately and last for as long as you live.

However, once you get into deferred annuities, the usefulness wanes rapidly.

· **Variable annuities.** The idea is that you invest, tax-deferred, for many years -- 10, 15 or more. Then you annuitize the account to create a lifetime stream of income. The underlying investments are mutual-fund-like subaccounts owning stocks or bonds. Typically, investors pick stocks since these annuities are often pitched as safe exposure to the stock market, because the death benefit built into the contract generally protects your principal.

But a variable annuity is simply not appropriate for someone in retirement. "You don't want to get into volatile, equity kinds of instruments late in life because you can't earn back your mistakes," says Peter Katt, a fee-only insurance consultant in Mattawan, Mich.

But let's just say your account doesn't fall. You start with $50,000 at 65 and, through some miracle on Wall Street, earn a 15% return every year for 20 years and find yourself sitting atop an annuity worth more than $1.1 million at age 85. What have you really accomplished?

Well, if you're still alive and start drawing on the account, you've turned capital gains into ordinary income, which is taxed at higher rates, meaning the annuity ultimately provides less money.

And what if you die first? You've subjected your heirs to a big tax bill. When heirs receive from your estate shares of stock or mutual funds, their tax bill is based on the value of those shares at your death. In other words, if you paid $1 and it's now worth $1 million, your heirs will pay no capital-gains taxes on any of the profits. With a variable annuity, they pay taxes on every penny of profit.

· **Fixed deferred annuities.** With these, you put in money with the promise that you'll earn a roughly certificate-of-deposit-like return over a set period, after which you can take your money or annuitize it. Just like CDs, there's a penalty for exiting early, and this surrender period generally lasts for years.

Retirees who might want a deferred fixed annuity: Someone who works part-time and doesn't need the income at the moment, but who wants an assured stream of money later. Still, the gains are taxable at death. And the taxes you pay on withdrawal are the same rates as with a bond or a CD.

Moreover, many deferred fixed annuities are sold with teaser rates, higher-than-market rates that entice retirees into investing, and that generally last one year, then tumble. You're locked in for often eight to 10 years or more, and have no clue what the effective yield will be because the

annuity company will usu  'ly just commit to a minimum rate. The   ual rate will depend on
market rates.

That's like signing up for a 10-year CD without knowing what the bank will pay you. "That
doesn't make any sense," says Vanguard's Mr. Nestor. "I'd go with a CD -- the penalties are less
than with an annuity."

*Jonathan Clements is on vacation.*

**Write to Jeff Opdyke at jeff.opdyke@wsj.com**[1]

**URL for this article:**
http://online.wsj.com/article/0,,SB111214174128692593,00.html

**Hyperlinks in this Article:**
(1) mailto:jeff.opdyke@wsj.com

**Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our
**Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones
Reprints at 1-800-843-0008 or visit **www.djreprints.com.**

# EXHIBIT "J"

**The New York Times**
nytimes.com



PRINTER-FRIENDLY FORMAT
SPONSORED BY

May 15, 2005

# Who's Preying on Your Grandparents?

By GRETCHEN MORGENSON

BACK in February, Jose and Gloria Aquino received a flier in the mail inviting them to a free seminar on one of their favorite topics: protecting their financial assets. As retirees, they were always on the lookout for safe investment strategies as well as tips on how to make sure they didn't outlive their savings. Besides, the flier promised a free lunch for anyone attending the workshop, so what did they have to lose?

Potentially plenty, they would soon discover.

On March 1, Mr. and Mrs. Aquino stepped into the Coral House restaurant, not far from their home in North Baldwin, N.Y., on Long Island. They found themselves surrounded by about 50 like-minded retirees, most in their 70's and 80's, they said.

Over lunch, the crowd listened to a presentation by two investment executives from Diversified Concepts Inc. of Manhattan. Using charts and graphs, the men gave advice on how to invest wisely during retirement. Then they passed out forms and asked the retirees to list all their assets and financial holdings.

The Aquinos filled out theirs and left. Two days later, they said, one of the executives came to their home and described an investment with the American Equity Investment Life Insurance Company that would provide 7 percent interest on their money - immediately.

"When somebody tells you he will give you a 7 percent upfront bonus on your money and that you'll get that 7 percent even if the market goes down, you get interested," said Mr. Aquino. He said he signed the necessary documents and the executive left, handing a brochure to the couple.

That evening, the Aquinos told their daughter, Caroline, about their investment. "She said, 'Oh, don't invest like that before searching farther,' " Mr. Aquino recalled. "Then she went on the Internet and found these lawsuits going on in California against the company and we realized that we were not making a good decision."

The investment the Aquinos had chosen was an annuity, an insurance product that not only tends to carry high fees but also requires that most of the money stay locked up for years, making it especially inappropriate for many older investors, regulators say. In fact, the one they bought carried a staggering 17.5 percent surrender charge if it was cashed in during the first year, their daughter explained. Exit charges were not scheduled to disappear until 17 years after the purchase.

This meant that Mr. Aquir   who is 65, and Mrs. Aquino, 63, coul   ot cash in the annuity without paying a surrender fee until they were in their 80's. The executive had not told them about the lockup requirement, the Aquinos said, although the brochure he left with them described the fees in small print.

Thanks to their daughter, they were able to phone the company in time to cancel their purchase. Others, however, have wound up stuck in an investment that they cannot liquidate without severe penalties.

Meetings like the one attended by the Aquinos take place thousands of times a year in restaurants, American Legion halls and senior centers across the nation - and are a growing problem, securities regulators say. The seminars are usually described as a way for retirees to receive free advice on estate planning, asset protection and tax reduction. After a short presentation, the attendees are approached by a sales representative, who almost invariably encourages them to liquidate their stocks, bonds and 401(k)'s and to buy an annuity.

"We started getting all these complaints from children of seniors who found out that their stock portfolios or other investments had been transferred into these annuities," said Joseph A. Ragazzo, deputy attorney general of California. "We see this investment abuse as a real problem. These cases are metastasizing all over the country."

David J. Noble, chief executive of American Equity Investment Life Insurance, the company that wrote the Aquinos' policy, said: "I deeply differ with anyone saying we have serious problems. We have over 200,000 annuity policy holders, and the percentage of complaints we have is 0.002. We are extremely market-conduct aware."

Mr. Noble also said that annuities' guaranteed rates of return and protection of principal make them attractive to people worried about how they are going to pay their bills.

The president of Diversified Concepts did not return several phone calls.

WHILE prosecutors in New York and Washington investigate questionable accounting practices in the insurance industry, regulators elsewhere say they are fielding more and more complaints about aggressive sales practices by insurance companies that design annuity products and by the people who sell them. Under the guise of estate planning, regulators say, retirees are being pushed into annuities that carry commissions of up to 12 percent and that require their holders to keep them for as long as 15 years, or to pay big penalties.

It is easy to see why older people find such investments attractive. Annuities produce higher income than other investments and can provide payments for life. They are often sold as a way to allay retirees' fears of outliving their assets.

There are several kinds of annuities. Fixed annuities guarantee that a set amount of money will be

paid regularly, regardless c   ow the underlying investments perfoı    Variable annuities, by contrast, are based on a poruolio of stocks that rise and fall, so their payments can fluctuate.

With interest rates near historical lows, the first-year rates of 7 percent to 9 percent on some annuities make them alluring to people on fixed incomes. And with the stock market going sideways, people are looking for investment alternatives, giving annuity sales representatives a ready audience.

But because of the fees associated with these products and the restrictions on cashing them in, they are hardly ideal for investors who may need the money quickly, or who die before the investment matures. In many cases, if the holder dies during the annuity period, the beneficiaries cannot redeem the annuity without paying a surrender charge.

Companies that sell annuities say that the higher rates they pay justify the surrender charges. Most investors, they add, are happy with their purchases.

But last February, Bill Lockyer, the attorney general of California, and John Garamendi, the state's insurance commissioner, filed a lawsuit against a group of companies and individuals that state officials said had tricked retirees into using their retirement investments to buy annuities. The suit said that the companies employed up to 300 sales agents and 80 telemarketers and sold annuities worth "hundreds of millions of dollars."

The defendants in the case included American Investors Life Insurance of Kansas, a unit of the AmerUs Group in Des Moines; and Family First Advanced Estate Planning and Family First Insurance Services, both of Woodland Hills, Calif. The complaint seeks $110 million in civil penalties, consumer restitution and damages.

AmerUs said that it does not comment on pending litigation; however, the company said that it was taking the accusations very seriously and that it has strong sales and compliance practices. The Family First companies could not be reached.

Increasingly aggressive marketing has made annuities one of the hottest investments around. Money invested in variable annuities totaled $994 billion at the end of 2003, up from $771 billion in 1998, according to the Insurance Information Institute. Although total annuity sales fell slightly in 2003, they have almost doubled since 1997.

The growing ranks of the nation's retirees are a main focus of annuity sales agents. Next week, the Senior Market Expo opens at the San Diego Convention Center. "Now in its fifth year, Senior Market Expo is the only place you'll find the powerful strategies and ideas you need to boost your sales of life insurance, annuities, long-term care insurance and more," its Web site says. "This sales-centric event focuses on giving you - the senior market adviser - sales and marketing skills to earn more money selling to seniors."

Annuity sales can be highly lucrative. Commissions can reach 12 percent of the money invested, far greater than fees typically generated on stocks and other investments. Mr. Ragazzo, the deputy attorney general of California, said his office had found that some companies selling annuities sponsored trips to Hawaii and Europe for top agents. "Some of these guys are former used-car salesmen bringing in $600,000 a year," he said.

Ads for asset-preservation seminars often use scare tactics. "Your family's assets are in danger!" reads one; "Trust me! You need a living trust!" goes another.

As sales of annuities have grown, so have investor complaints related to them. According to the N.A.S.D., annuities were at issue in about 600 arbitration cases in 2004, more than twice the number from three years earlier. Of the seven types of securities typically involved in arbitrations, annuities were the third most common last year, behind stocks and mutual funds.

Sellers of annuities are also the subjects of civil lawsuits. The American International Group, the insurance company whose accounting practices are under investigation by regulators and federal prosecutors, has been sued recently in California by elderly investors who bought annuities the company issued. The investors are also suing Estate Preservation Inc. of El Segundo, Calif., which sold the annuities.

One plaintiff is Beverly Buhs, 80, of Millbrae, Calif. In 1997, Ms. Buhs, then 73, and her husband Art, then 76, attended a seminar at an American Legion hall. Like the Aquinos, the Buhs filled out a form detailing their assets; it was supplied by the seminar leader, an agent from Estate Preservation.

Mr. Buhs had previously invested in mutual funds, but he and his wife had never bought an annuity. With the agent's help, the Buhs set up a living trust, which they believed would help them avoid probate costs, according to the lawsuit. Shortly after setting up the trust, according to the lawsuit, the agent came to their home and persuaded them to sell their investments and to put them into a fixed annuity issued by SunAmerica, a financial services company bought by A.I.G. in 1999.

In December 2002, Mr. Buhs died of complications from an aneurysm. Only then did Ms. Buhs learn that the living trust did not protect her from probate costs and that she could not cash in the annuity without significant penalties, she said.

Ms. Buhs said she had to hire an estate lawyer to restructure the trust and wound up losing $20,000 of a $90,000 death benefit. Now she is still dealing with tax problems associated with the trust. "I tried to talk to SunAmerica, but I get so stressed out," Ms. Buhs said. "I don't know how to talk the jargon and don't know where to go. It's sad to think the world is like this. How many other seniors are being taken and deceived?"

Ms. Buhs's lawyer, Ingrid M. Evans of Renne Sloan Holtzman & Sakai in San Francisco, said: "The majority of annuity policies are going to seniors because those are people who have the money and are scared of the stock market and most susceptible to fear. But over a certain age it's not acceptable

to sell someone a deferred    uity because they are going to pass a    / before it annuitizes," or matures.

Ms. Evans said Ms. Buhs had sued A.I.G. because SunAmerica "implicitly or explicitly ratifies the sales agents' unlawful and unfair schemes."

Chris Winans, an A.I.G. spokesman, said that the company would not comment on the litigation but said that the claims in the suits were unfounded. Ms. Buhs' annuity provided good returns - almost 20 percent from 1997 to 2002, after surrender charges, he said.

Mr. Winans added that A.I.G. has suitability policies and procedures that it monitors and enforces and that it requires the same of the brokers who sell its products.

Estate Preservation did not return a phone call seeking comment.

A.I.G. is the nation's top seller of fixed annuities through banks and the fifth-largest seller of variable annuities, according to the Insurance Information Institute. The company sold $8.8 billion in fixed annuities in 2004 and sold $8 billion of new variable annuities in 2003, the most recent figures.

In the first nine months of 2004, A.I.G.'s life insurance and retirement services group, which includes its SunAmerica unit, accounted for 45 percent of the company's total revenue. Sales at the group rose 24 percent from the corresponding period a year earlier and its operating income rose 23 percent, the fastest growth registered by any of A.I.G.'s four business segments. Premiums from annuities sold domestically rose 20 percent in the first nine months of 2004.

TYPICALLY, the people pushing annuities are registered only as insurance agents and not with government securities regulators who have large staffs to root out dubious practices. As a result, many fall through the regulatory cracks.

Last July, the California Department of Corporations filed a "desist and refrain order" against the Gentry Group, a Dallas company that sells annuities. The company had induced an elderly woman in Oroville, Calif., to authorize the sale of $98,470 of securities without her knowledge and to buy two American Equity annuities with the money, according to the order. The Gentry Group, the American Equity Life Insurance Company and the saleswoman who sold the annuities were not authorized to conduct business as investment advisers in California, so the desist order was issued.

The Gentry Group did not return a phone call seeking comment. American Equity said that it was resisting the order in court.

Mary L. Schapiro, the vice chairwoman of N.A.S.D., said that her agency had proposed new rules related to the selling of annuities to the elderly; they await approval by the Securities and Exchange Commission.

"Some of the worst advert' g we've seen has been in equity-linke nnuities," she said, "very promotional, talking about growth without any risk, all the kinds of push-button expressions that really resonate with senior citizens." But, she said, she oversees only a small percentage of the firms and people selling these annuities.

Alas, not every retiree can rely, as the Aquinos did, on a daughter to help them steer clear of an investment they might later regret.

Copyright 2005 The New York Times Company  | Home  | Privacy Policy  | Search  | Corrections  | RSS  | Help  | Contact Us  | Back t

2

**AXA EQUITABLE**

*Be Life Confident*

AXA Equitable Accumulat[...]
P.O. Box 1567
Secaucus, NJ 07096-1547

AXA Distributors, LLC., acts as [...]tor for AXA Equitable
Life Insurance Company in connection with the distribution
of Separate Account units under your contract or
certificate. AXA Distributors, LLC. and AXA Equitable are
affiliated companies.

September 15, 2004
No. 04259 01180
Page 1 of 2

01007008



DOUGLAS M CHERRY
3847 N UNION AVE
OZARK AL 36360

### Accumulator (Rollover IRA)

| | |
|---|---|
| Contract Number: | **99 631 766** |
| Contract Date: | September 24, 1999 |
| Name of Annuitant | DOUGLAS M CHERRY |
| Contract Owner: | DOUGLAS M CHERRY |
| Your Representative: | MAXINE CHAPPELL |
| Telephone: | (334)677-2812 |

If you need assistance, please call your representative at the
phone number above, or call our processing office toll free at
1-800-789-7771, or visit our website at www.axa-equitable.com.

## CONFIRMATION NOTICE

**THIS IS YOUR NOTICE THAT THE AXA EQUITABLE PROCESSING OFFICE:**

| | Amount | Effective Date |
|---|---|---|
| Processed a scheduled payment. | $3,300.00 | September 15, 2004 |
| less Federal Income Tax Withheld | $325.00 | |
| **Amount Payable** | $2,975.00 | |
| Last Reported Account Balance: | $92,778.65 | on August 31, 2004 |
| Current Account Balance: | $91,635.67 | on September 15, 2004 |

### DETAIL OF ACTIVITY BY INVESTMENT OPTION

| Investment Fund | Last Reported Balance | Investment Results | Transaction Information — Amount Withdrawn | Number of Units | 2004/09/15 Unit Value | Account Information as of September 15, 2004 — Number of Units | Unit Value | Account Balance |
|---|---|---|---|---|---|---|---|---|
| EQ/Alliance Common Stock | $8,493.07 | $249.26+ | $303.89- | 1.4115 | $215.292695 | 39.1952 | $215.292695 | $8,438.44 |
| EQ/Lazard Small Cap Value | $8,017.35 | $208.53+ | $285.93- | 19.1371 | $14.941120 | 531.4161 | $14.941120 | $7,939.95 |
| EQ/Small Company Index | $7,037.98 | $265.65+ | $253.88- | 20.2206 | $12.555542 | 561.4852 | $12.555542 | $7,049.75 |
| AXA Premier VIP International Equity | $8,296.75 | $137.84+ | $293.19- | 27.8944 | $10.510718 | 774.5811 | $10.510718 | $8,141.40 |
| AXA Premier VIP Large Cap Core Equity | $6,622.80 | $117.47+ | $234.29- | 24.3671 | $9.615016 | 676.6483 | $9.615016 | $6,505.98 |
| AXA Premier VIP Large Cap Growth | $7,016.96 | $214.79+ | $251.38- | 29.5921 | $8.494848 | 821.7185 | $8.494848 | $6,980.37 |
| EQ/Alliance Premier Growth | $10,982.58 | $325.38+ | $393.07- | 68.5462 | $5.734384 | 1,903.4105 | $5.734384 | $10,914.89 |
| EQ/Capital Guardian Research | $17,490.28 | $236.20+ | $616.18- | 59.8511 | $10.295216 | 1,661.9665 | $10.295216 | $17,110.30 |
| EQ/Capital Guardian U.S. Equity | $9,916.56 | $147.75+ | $349.84- | 34.4622 | $10.151425 | 956.9566 | $10.151425 | $9,714.47 |
| EQ/FI Mid Cap | $8,904.32 | $254.15+ | $318.35- | 33.3113 | $9.556803 | 925.0079 | $9.556803 | $8,840.12 |
| **Grand Total** | $92,778.65 | $2,157.02+ | $3,300.00- | | | | | $91,635.67 |

### PLEASE BE ADVISED

Access your annuity account information, at your convenience. Visit us at www.axa-equitable.com (24 hours a day, 7 days a week), and select "Customers" to enroll or log in to "EQAccess". Once you have registered and received a password, you can Check Account Details - Make Transfers Among Investment Options - Review Investment Performance - Change your Address - Get answers to Frequently Asked Questions about your AXA Equitable Annuity and much more!
GE 28456



You're in good hands.

Allstate Life Insurance Company
PO Box 94036
Palatine IL 60094-4036
Telephone: 1-800-390-1277
Fax: 1-866-487-8538

www.putnaminvestments.com

# PUTNAM ALLSTATE ADVISOR
## QUARTERLY STATEMENT
### OCTOBER 1, 2004-DECEMBER 31, 2004

0097898 01 AB 0.301  **AUTO  T8 2 2004 36360-730547    2L    21

DOUGLAS M CHERRY
3847 N UNION AVE
OZARK AL 36360-7305

YOUR REPRESENTATIVE
MAXINE H CHAPPELL
RAYMOND JAMES FINANCIAL SVCS, INC
2464 W MAIN ST STE 2
DOTHAN AL 36301-6413

(334) 677-2812

Contract Number: PA00051159
Contract Effective Date: 02/28/01
Type: IRA
Annuitant: DOUGLAS M CHERRY

*If you turn 70 on or prior to June 30, 2005, there is an RMD requirement for this qualified annuity that we will report to the IRS. We will calculate the RMD for you upon request. Your 12/31 value will be furnished to the IRS on Form 5498.*

## VARIABLE ANNUITY CONTRACT SUMMARY

|  | Quarter<br>10/01/04-12/31/04 | Last 12 Months<br>01/01/04-12/31/04 | Since Inception<br>02/28/01-12/31/04 |
|---|---|---|---|
| Beginning Value | $66,856.11 | $77,586.40 | $116,603.49 |
| Additions | $0.00 | $0.00 | $27,368.60 |
| Investment Performance | $7,124.67 | $8,034.89 | ($14,759.89) |
| Withdrawals/Fees | ($3,780.00) | ($15,420.51) | ($59,011.42) |
| Ending Value* | $70,200.78 | $70,200.78 | $70,200.78 |

## CURRENT INVESTMENT ALLOCATION



| | | |
|---|---|---|
| ■ | NEW VALUE | 23.8% |
| ▨ | VISTA | 17.6% |
| ▨ | SMALL CAP VALUE | 17.0% |
| ▨ | VOYAGER | 16.7% |
| ▨ | RESEARCH | 16.6% |
| ▨ | NEW OPPORTUNITIES | 8.3% |
| | **Total** | **100.0%** |

*This is not necessarily the amount available for withdrawal. The amount available for withdrawal is the ending value less any withdrawal charges, maintenance fees and applicable premium taxes.

**The Putnam Allstate Advisor variable annuity is issued by Allstate Life Insurance Company.** This statement is provided on behalf of Allstate Distributors, L.L.C., as principal underwriter. The principal underwriter is not, and is not required to be, a member of the Securities Investor Protection Corporation ("SIPC"). Annuities are not insured by the FDIC, nor are they deposits or other obligations or guaranteed by the depository institution. Variable annuities are subject to investment risk, including the possible loss of the principal invested. Annuities are not protected by SIPC as to the loss of the principal invested.

3

*Equitable Accumulator (Traditional) IRA*

## DATA

<u>PART A</u> -- This part lists your personal data.

**Owner:**      Lance K Dyess

**Annuitant:**   Lance K Dyess                          Age: 42       Sex: Male

**Contract:  Group Annuity Contract No. AC 6727**

**Certificate Number:**            98 684 790

**Endorsements Attached:**  Minimum Income Benefit Endorsement
Endorsement Applicable to IRA Certificates
Endorsement Applicable to Market Value Adjustment Terms
Rider to Endorsement Applicable to Market Value
Adjustment Terms

**Issue Date:**             November 23, 1998

**Contract Date:**          November 23, 1998

**Annuity Commencement Date:**   November 23, 2046

**The maximum maturity age is age 90 -- see Section 7.03.**
The Annuity Commencement Date may not be later than the Processing Date which
follows your 90th birthday.

However, if you choose a date later than age 70 1/2, distribution of at least the minimum
payments required must commence by April 1 of the calendar year following the calendar
year in which you attain age 70 1/2 (see item 2 of the Endorsement Applicable to IRA
Certificates).

**Guaranteed Benefits:**    Combined Guaranteed Minimum Income Benefit
and Guaranteed Minimum Death Benefit (6% Roll Up to Age 80)

**Beneficiary:**  Benita F Dyess

No. 94ICB                              Data page 1          (1/98)

4



# LANCE K. DYESS, M.D.

918 DRAYTON AVE.                                              TELEPHONE 334/897-2207
ELBA, ALABAMA 36323                                           FAX 334/897-3476

12/02/04

Maxine Chappell
2464 West Main Street
Suite 2
Dothan, AL  36301

RE:  THREE-WAY CONVERSATION REGARDING THE PAYOUT OF MY RETIREMNT ANNUITY

Dear Maxine:

As per our phone conversation of last week, I am giving my permission for you to arrange a three-way conversation between yourself, AXA's representative, and Earnest Clark at Jackson Thornton.  Hopefully then I can get a straight answer to my questions about the way in which AXA will payout the monies I have invested with their guaranteed 6% interest (as the market return has been well below the 6% rate of return).

I cannot make any significant retirement plan without the information.  I invested $420,000.00 over 6 years ago, and expect to receive that amount plus the 6% guaranteed compounded interest at the conclusion of the 7 years of this annuity.  As you told me when I purchased this annuity, it would provide a safe haven for the financially-wary investor.  Following the Market's collapse of a few years ago, I am proud you provided me with such an insulated investment vehicle to preserve (and grow) my retirement.

Please give Earnest a call in a few days, and we can get this matter resolved .

Happy Holidays:

*Lance K. Dyess, MD*

Lance K. Dyess, MD

cc:  Earnest Clark

*Earnest — Give me a call if we need to discuss this prior to the 3-way call*

*—Doc*



# LANCE K. DYESS, M.D.

918 DRAYTON AVE.
ELBA, ALABAMA 36323

TELEPHONE 334/897-2207
FAX 334/897-3476

4/3/04

Marci Uhl
Customer Service Representative
AXA Financial
The Equitable Life Assurance Society of the US
P.O. Box 1547
Secaucus, NJ  07096-1547

RE:  Equitable Accumulator Account #98684790

Dear Ms. Uhl:

In response to your letter of December 9, 2003; let me ask as to why you cannot give me a current value of the account above.  My investment counselor assures me that at maturity;  I will receive the current market value of my account, or the amount of my initial investment + 6% compounded interest (on the initial investment over the 7 year life of this product).....whichever is greater.

Please elaborate also on the pay-out procedure.  I understood it would all be available at maturity  (7 years from purchase date), but now my investment counselor states that I can only get 90% of the above at maturity.....with the balance to be paid out over another year.  Please explain.

Sincerely:

Lance K. Dyess, MD

5



**EQUITABLE**
ACCUMULATOR
P.O. BOX 1547, SECAUCUS, NEW JERSEY 07096-1547

**Annual Account Review**
July 05, 2003- July 05, 2004

300 611 540
0000779 01 MB 0.309 **AUTO  T8 0 4135 36311  0

IRA J Edmondson
2004 West County Rd 19
Ariton AL 36311-6612

Contract Number: 300 611 540
Contract Type: Equitable
    Accumulator® (Rollover IRA)
GMDB Election: Roll up
Contract Date: July 05, 2000
Contract Owner: IRA J Edmondson
Annuitant Name: IRA J Edmondson

Introducing enhanced internet access features.  Now you can do interfund transfers among investment options and change the allocation for new contributions online.  Just go to www.equitable.com and click on EQAccess

| Account Activity Summary | Contract Year 7/5/2003-7/5/2004 | Since Purchase 7/5/2000-7/5/2004 |
|---|---|---|
| Account Value as of  7/5/2003 | $60,432.95 | |
| Contributions | $0.00 | $206,217.79 |
| Requested Withdrawals | ($23,400.00) | ($99,278.99) |
| Net Investment Option Results | | |
| Variable Investment Option Results | $6,435.89 | |
| Current Total Account Value | $43,368.84 | |

## *Your Account Allocation*

Your Account Value is currently invested among the asset classes below. Totals may not be exact due to rounding. To review your investment strategy, contact your registered representative.





69% Large Company Stocks     29% Small/Mid Company Stocks
2% International Stocks

### For Assistance, Contact:

Your Financial Professional:
Maxine Chappell
Raymond James Financial Svcs.
Raymond James Financial Servic
2464 West Main St
Suite 2
Dothan AL 36301
334-677-2812

You can obtain current account information, including balances and unit values, any time you wish.

• Call our TOPS voice response system
  1-888-909-7770, or
• Visit our Website: www.equitable.com and
  click on EQAccess

If you want to speak to one of our Customer Service Representatives please call 800-789-7771 8:30 - 5:30 ET Monday - Friday

6



# Scudder Destinations™

○ Statement Of Value

| Account Number | Reporting Period |
|---|---|
| KI11015009 | 10/01/2004 through 12/31/2004 |

Prepared for:

642243 B 6 0010 01 01204011-0001 00885 A - (IBD)
IRA EDMONDSON
2004 WEST COUNTY RD 19
ARITON,AL 36311

**Financial Representative:**

MAXINE H CHAPPELL
PLANNING CORP OF AMERICA
2464 W MAIN STREET #2
DOTHAN,AL 36301

| Owner: | Ira Edmondson |
|---|---|
| Annuitant: | Ira Edmondson |
| Issue Date: | 07/20/2000 |
| Plan Type: | IRA |

**Representative Phone Number: (334) 677-2812**
*If you have any questions regarding this statement, or need additional service, please call your financial representative or our Customer Service number at 1-800-449-0523.*

## Activity
## CONTRACT SUMMARY

| | Quarter Ending 12/31/2004 | | Year-To-Date 12/31/2004 |
|---|---|---|---|
| Inception-to-Date Deposits | $210,288.42 | | |
| Beginning Contract Value | $29,607.83 | Beginning Contract Value | $43,988.80 |
| Withdrawals | $1,653.35 | Withdrawals | $15,752.76 |
| Change in Value* | $3,601.31 | Change in Value* | $3,319.75 |
| Ending Contract Value | $31,555.79 | Ending Contract Value | $31,555.79 |
| Surrender Value | $25,661.89 | | |
| Death Benefit Value | $160,671.05 | | |

* Includes any investment results and/or any interest earnings net of any contract fees or charges.

**Your Current Allocation**
This chart is representative of your current allocation as of 12/31/2004.





| | |
|---|---|
| Small Cap Equities | 30% |
| Large Cap Growth Equities | 16% |
| Mid Cap Equities | 16% |
| Large Cap Value Equities | 14% |
| Global Equities | 7% |
| Sector/Specialty Equities | 6% |
| Multi-Cap Equities | 6% |
| International Equities | 5% |

Kemper Investors Life Insurance Company
Administrative Office:
PO Box 19097
Greenville, SC 29602-9097

Page   1 of   6



7



# PUTNAM HARTFORD
# CAPITAL MANAGER
## VARIABLE ANNUITY QUARTERLY STATEMENT
## JANUARY 1, 2003 - MARCH 31, 2003
### PAGE 1 OF 3



Is your portfolio's allocation still tailored to your goals? Given last year's economic environment, an 80% stock/20% bond mix would have finished 2002 with 73% in stocks and 27% in bonds. Left unattended, an 80/20 ratio in 2000 would have changed to 64% stocks/36% bonds by the end of 2002, much different from the mix that you and your investment representative customized to your specific goals. With the start of a new year, this is a good time to meet with your investment representative to review your financial situation. (Stocks represented by the S&P 500 Index. Bonds represented by the Lehman Bros. Aggregate Bond Index. Indexes are not available for direct investment.)

#BWNGSGR
#Vl9ESRERJXHR4#
V1A14743  2 AB  0.526  AUTO  T70 200 0401 36330-143001 1 3

 

Jimmy E Jones
501 Dixie Drive
Enterprise AL  36330-1430

CONTRACT NUMBER 710702480
PURCHASE DATE November 11, 1999
CONTRACT TYPE IRA

OWNER NAME Jimmy E Jones
ANNUITANT Jimmy E Jones

## SUMMARY

|  | QUARTER 1/1/03 - 3/31/03 | YEAR-TO-DATE 1/1/03 - 3/31/03 | SINCE PURCHASE 11/11/99 - 3/31/03 |
|---|---|---|---|
| Beginning Value | 90,674.96 | 90,674.96 |  |
| Premium Payment | 0.00 | 0.00 | 207,495.63 |
| Total Surrenders * | 4,800.00- | 4,800.00- | 60,800.00- |
| Annuity Performance | 2,859.47- | 2,859.47- | 63,680.14- |
| **Ending Value** | **$83,015.49** | **$83,015.49** | **$83,015.49** |

## YOUR ANNUITY AT A GLANCE



| | |
|---|---|
| 32.7% | Health Sciences |
| 24.8% | Growth & Income |
| 17.0% | Voyager |
| 13.7% | Investors |
| 11.8% | Global Equity |

## FOR ASSISTANCE, CONTACT EITHER:

**Your Investment Professional**
John J Hughes
SYNOVUS SECURITIES
3680 West Main
Dothan      AL 36305

**The Hartford**
Attn: Investment Products Services
PO Box 5085
Hartford CT 06102-5085
www.putnaminvestments.com
**1-800-992-8610**      Automated Annuity Information
                                **(Toll-Free 24 hours a day)**
1-800-521-0538      Service Representative

* Total Surrenders include Contingent Deferred Sales Charges and Annual Maintenance Fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. If you have any further questions, or for information on fixed interest rates or crediting, call 1-800-521-0538 Monday - Friday 8:30am to 8:00pm (Eastern time).

8



## PUTNAM HARTFORD CAPITAL MANAGER

**VARIABLE ANNUITY QUARTERLY STATEMENT**
**JANUARY 1, 2005 - MARCH 31, 2005**
PAGE 1 OF 4



Annual IRA contribution limits have increased this year to $4,000 and $4,500 for those aged 50 and above. Are you taking full advantage? Talk to your investment professional about increasing your contributions to take full advantage of the tax benefits that variable annuities provide.

#BWNGSGR
#VI9ESRERJXHR4#
V1A19355 2 MB  0.534 00 AUTO T108 453 0421 36330-143001 12

||ull|ul|mull|ull|l|lllmmll|ulull|ll|ll|ull||llul

JIMMY E JONES
501 DIXIE DRIVE
ENTERPRISE AL 36330-1430

CONTRACT NUMBER 710702480
PURCHASE DATE November 11, 1999
CONTRACT TYPE IRA

OWNER Jimmy E Jones
ANNUITANT Jimmy E Jones

## SUMMARY

|  | QUARTER<br>1/1/05 - 3/31/05 | YEAR-TO-DATE<br>1/1/05 - 3/31/05 | SINCE PURCHASE<br>11/11/99 - 3/31/05 |
|---|---|---|---|
| Beginning Value | 2,865.11 | 2,865.11 |  |
| Premium Payment | 0.00 | 0.00 | 207,495.63 |
| Total Surrenders * | 0.00 | 0.00 | -153,958.72 |
| Annuity Performance | -38.16 | -38.16 | -50,709.96 |
| **Ending Value** | **$2,826.95** | **$2,826.95** | **$2,826.95** |

## YOUR ANNUITY AT A GLANCE



- 20.0% George Putnam
- 17.0% Income
- 16.3% American Govt Incm
- 16.0% Research Fund
- 12.3% Intnat'l Equity
- 10.9% Discovery Growth
- 7.5% Small Cap Value

## FOR ASSISTANCE, CONTACT EITHER:

**Your Investment Professional**
John J Hughes
SYNOVUS SECURITIES
3680 West Main
Dothan AL 36305

**The Hartford**
Attn: Investment Products Services
PO Box 5085
Hartford, CT 06102-5085
www.putnaminvestments.com
**1-800-992-8610**   Automated Voice Services
1-800-521-0538   Client Services
1-800-521-0963   Producer Services



* Total Surrenders include Contingent Deferred Sales Charges and Annual Maintenance Fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. Our hours of operation are Monday - Friday 8:30am to 8:00pm (Eastern time).

V1A19355 00076137 00002

9

 **AIG** SunAmerica

0004490

RACHEL MCKINNEY
515 GOLF VIEW DR
DOTHAN, AL 36301-7817

**Polaris II
Variable Annuity
Quarterly Statement**
October 1, 2004 to December 31, 2004



*Dalbar, Inc. Ranks Your
AIG SunAmerica Statement #1!*

## Your Account Summary

☎ Customer Service: 1-800-445-SUN2

Owner: RACHEL MCKINNEY
Annuitant: RACHEL MCKINNEY

Account #: P3799510481
Account Type: IRA

*The 12/31/04 value will be provided to the Internal Revenue Service as the fair market value of your annuity. If you made qualified contributions to your account during 2004, Tax Form 5498 will be mailed by May 31, 2005.*

| | Since Issue Date 03/11/1999 | Year to Date | This Quarter |
|---|---|---|---|
| Account Value on 09/30/2004 | | | |
| Contributions | $418,964.92 | $0.00 | |
| Withdrawals/Charges | -$229,892.68 | -$39,861.75 | |
| Change in Market Value* | -$54,379.34 | $9,486.30 | |
| Account Value on 12/31/2004 | | | |

*\*Change in market value represents the change in your account value, from the end of the last period to the end of this quarter, adjusted for contributions and/or withdrawals/charges during this quarter.*

## Allocation by Asset Class as of 12/31/2004

*Asset allocation is an important consideration for many investors. Your investment representative is uniquely qualified to help you determine the asset allocation strategy that is right for you.*



▨ 100% Stocks

Percentages may not be exact due to rounding.

*Issued by:*
**AIG SunAmerica Life Assurance Company**

10

*Equitable  :umulator (Rollover) IRA*

## DATA

__PART A -- This part lists your personal data.__

**Owner:**      Linda J Middleton

**Annuitant:**   Linda J Middleton                    Age: 52        Sex: Female

**Contract:  Group Annuity Contract No. AC 6727**

**Certificate Number:**          99 629 647

**Endorsements Attached:**   Minimum Income Benefit Endorsement
Endorsement Applicable to IRA Certificates
Endorsement Applicable to Market Value Adjustment Terms
Rider to Endorsement Applicable to Market Value
Adjustment Terms

**Issue Date:**            October 7, 1999

**Contract Date:**         October 7, 1999

**Annuity Commencement Date:**      October 7, 2037

**The maximum maturity age is age 90 -- see Section 7.03.**
The Annuity Commencement Date may not be later than the Processing Date which
follows your 90th birthday.

However, if you choose a date later than age 70 1/2, distribution of at least the minimum
payments required must commence by April 1 of the calendar year following the calendar
year in which you attain age 70 1/2 (see item 2 of the Endorsement Applicable to IRA
Certificates).

**Guaranteed Benefits:**    Combined Guaranteed Minimum Income Benefit
and Guaranteed Minimum Death Benefit (5% Roll Up to Age 80)

**Beneficiary:**  Lauren Kathryn Smyth/Matthew Eric Smyth

No. 94ICB                          Data page 1          (5/99)

11

 **AXA EQUITABLE**

**ACCUMULATOR**
P.O. BOX 1547, SECAUCUS, NEW JERSEY 07096-1547

 

**Quarterly Account Review**
**Statement Period:**
October 01, 2004 - December 31, 2004

300 610 913
0090012 01 AT 0.292 **AUTO  T2 0 9101 36311  0

Victor E Stafford
644 River Road
Ariton AL 36311-7508

**Contract Number: 300 610 913**
**Contract Type: Accumulator (Rollover IRA)**
**GMDB Election: Roll up**
**Contract Date: April 05, 2000**
**Contract Owner: Victor E Stafford**
**Annuitant Name: Victor E Stafford**

---

Safety in Diversity! Are your assets properly allocated to help you ride out the market's ups and downs?  It is important to make sure your retirement assets are diversified and allocated according to your risk tolerance and individual situation.  Call your financial professional today; he or she can help you review your portfolio and develop an asset allocation plan designed to help meet your needs. GE-24807

| Account Activity Summary | Quarter 10/1/2004-12/31/2004 | Year-To-Date 1/1/2004-12/31/2004 | Since Purchase 4/5/2000-12/31/2004 |
|---|---|---|---|
| Account Value as of  9/30/2004 | $149,400.37 | | |
| Contributions | $0.00 | $0.00 | $241,058.71 |
| Requested Withdrawals | $0.00 | $0.00 | $0.00 |
| Net Investment Option Results: | | | |
| Variable Investment Option Results | $17,610.85 | | |
| Current Total Account Value | $167,011.22 | | |

---

## *Your Account Allocation*

**Your Account Value** is currently invested among the asset classes below. Totals may not be exact due to rounding. To review your investment strategy, contact your registered representative.



▨ 40% Small/Mid Company Stocks    ⊡ 38% Large Company Stocks
▧ 22% International Stocks

## For Assistance, Contact:

**Your Financial Professional:**
Maxine Chappell
Raymond James Financial Svcs.
Raymond James Financial Servic
2464 West Main St
Suite 2
Dothan AL 36301
334-677-2812

You can obtain current account information, including balances and unit values, any time you wish.

• Call our TOPS voice response system 1-888-909-7770, or
• Visit our Website: www.axa-equitable.com and click on EQAccess

If you want to speak to one of our Customer Service Representatives please call 800-789-7771 8:30 - 5:30 ET Monday - Friday





# PUTNAM HARTFORD CAPITAL MANAGER

## VARIABLE ANNUITY QUARTERLY STATEMENT
### APRIL 1, 2004 - JUNE 30, 2004
#### PAGE 1 OF 3



Adding to your variable annuity can be an effective way to help you reach your goals. And while there are no guarantees to investing, even small additions can potentially have a significant effect over time. Ask your investment representative about programs available in your contract that can make adding to your annuity easy and convenient.

#BWNGSGR
#VI9ESRHRXJBA4#
V1A19085 2 MB 0.534 02 AUTO T86 329 0701 36311-750844 1

Victor E Stafford
644 River Road
Ariton AL 36311-7508

| | |
|---|---|
| CONTRACT NUMBER | 710804263 |
| PURCHASE DATE | April 17, 2000 |
| CONTRACT TYPE | IRA |
| OWNER NAME | Victor E Stafford |
| ANNUITANT | Victor E Stafford |

## SUMMARY

| | QUARTER<br>4/1/04 - 6/30/04 | YEAR-TO-DATE<br>1/1/04 - 6/30/04 | SINCE PURCHASE<br>4/17/00 - 6/30/04 |
|---|---|---|---|
| Beginning Value | 9,969.95 | 10,898.80 | |
| Premium Payment | 0.00 | 0.00 | 55,072.30 |
| Total Surrenders * | 1,326.00- | 2,622.00- | 21,720.00- |
| Annuity Performance | 94.95 | 462.10 | 24,613.40- |
| **Ending Value** | **$8,738.90** | **$8,738.90** | **$8,738.90** |

## YOUR ANNUITY AT A GLANCE



60.9% Growth
39.1% Growth & Income

## FOR ASSISTANCE, CONTACT EITHER:

**Your Investment Professional**
Maxine H Chappell
RAYMOND JAMES FINANCIAL SRVCS
2464 West Main Street # 2
Dothan       AL 36301

**The Hartford**
Attn: Investment Products Services
PO Box 5085
Hartford CT 06102-5085
www.putnaminvestments.com
1-800-992-8610    Automated Voice Services
1-800-521-0538    Client Services
1-800-521-0963    Producer Services



\* Total Surrenders include Contingent Deferred Sales Charges and Annual Maintenance Fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. Our hours of operation are Monday - Friday 8:30am to 8:00pm (Eastern time).

12

## 3000. RESPONSIBILITIES RELATING TO ASSOCIATED PERSONS, EMPLOYEES, AND OTHERS' EMPLOYEES

### 3010. Supervision

#### (a) Supervisory System

Each member shall establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with the Rules of this Association. Final responsibility for proper supervision shall rest with the member. A member's supervisory system shall provide, at a minimum, for the following:

(1) The establishment and maintenance of written procedures as required by paragraphs (b) and (c) of this Rule.

(2) The designation, where applicable, of an appropriately registered principal(s) with authority to carry out the supervisory responsibilities of the member for each type of business in which it engages for which registration as a broker/dealer is required.

(3) The designation as an office of supervisory jurisdiction (OSJ) of each location that meets the definition contained in paragraph (g) of this Rule. Each member shall also designate such other OSJs as it determines to be necessary in order to supervise its registered representatives and associated persons in accordance with the standards set forth in this Rule, taking into consideration the following factors:

(A) whether registered persons at the location engage in retail sales or other activities involving regular contact with public customers;

(B) Whether a substantial number of registered persons conduct securities activities at, or are otherwise supervised from, such location;

(C) whether the location is geographically distant from another OSJ of the firm;

(D) whether the member's registered persons are geographically dispersed; and

(E) whether the securities activities at such location are diverse and/or complex.

(4) The designation of one or more appropriately registered principals in each OSJ, including the main office, and one or more appropriately registered representatives or principals in each non-OSJ branch office with authority to carry out the supervisory responsibilities assigned to that office by the member.

(5) The assignment of each registered person to an appropriately registered representative(s) and/or principal(s) who shall be responsible for supervising that person's activities.

(6) Reasonable efforts to determine that all supervisory personnel are qualified by virtue of experience or training to carry out their assigned responsibilities.

(7) The participation of each registered representative, either individually or collectively, no less than annually, in an interview or meeting conducted by persons designated by the member at which compliance matters relevant to the activities of the representative(s) are discussed. Such interview or meeting may occur in conjunction with the discussion of other matters and may be conducted at a central or regional location or at the representative's(') place of business.

(8) Each member shall designate and specifically identify to the Association one or more principals who shall review the supervisory system, procedures, and inspections implemented by the member as required by this Rule and take or recommend to senior management appropriate action reasonably designed to achieve the member's compliance with applicable securities laws and regulations, and with the Rules of this Association.

## (b) Written Procedures

(1) Each member shall establish, maintain, and enforce written procedures to supervise the types of business in which it engages and to supervise the activities of registered representatives and associated persons that are reasonably designed to achieve compliance with applicable securities laws and regulations, and with the applicable Rules of this Association.

(2) *Tape recording of conversations*

(i) Each member that either is notified by NASD Regulation or otherwise has actual knowledge that it meets one of the criteria in paragraph (b)(2)(viii) relating to the employment history of its registered persons at a Disciplined Firm as defined in paragraph (b)(2)(x) shall establish, maintain, and enforce special written procedures for supervising the telemarketing activities of all of its registered persons.

(ii) The member must establish the supervisory procedures required by this paragraph within 30 days of receiving notice from NASD Regulation or obtaining actual knowledge that it is subject to the provisions of this paragraph.

(iii) The procedures required by this paragraph shall include tape-recording all telephone conversations between the member's registered persons and both existing and potential customers.

(iv) The member shall establish reasonable procedures for reviewing the tape recordings made pursuant to the requirements of this paragraph to ensure compliance with applicable securities laws and regulations and applicable rules of this Association. The procedures must be appropriate for the member's business, size, structure, and customers.

(v) All tape recordings made pursuant to the requirements of this paragraph shall be retained for a period of not less than three years from the date the tape was created, the first two years in an easily accessible place. Each member shall catalog the retained tapes by registered person and date.

(vi) Such procedures shall be maintained for a period of two years from the date

that the member establishes the procedures required by the provisions of this paragraph.

(vii) By the 30th day of the month following the end of each calendar quarter, each member firm subject to the requirements of this paragraph shall submit to the Association a report on the member's supervision of the telemarketing activities of its registered persons.

(viii) The following members shall be required to adopt special supervisory procedures over the telemarketing activities of their registered persons:

> • A firm with at least five but fewer than ten registered persons, where 40% or more of its registered persons have been employed by one or more Disciplined Firms within the last three years;

> • A firm with at least ten but fewer than twenty registered persons, where four or more of its registered persons have been employed by one or more Disciplined Firms within the last three years;

> • A firm with at least twenty registered persons, where 20% or more of its registered persons have been employed by one or more Disciplined Firms within the last three years.

(ix) For purposes of this Rule, the term "registered person" means any person registered with the Association as a representative, principal, or assistant representative pursuant to the Rule 1020, 1030, 1040, and 1110 Series or pursuant to Municipal Securities Rulemaking Board ("MSRB") Rule G-3.

(x) For purposes of this Rule, the term "disciplined firm" means a member that, in connection with sales practices involving the offer, purchase, or sale of any security, has been expelled from membership or participation in any securities industry self-regulatory organization or is subject to an order of the Securities and Exchange Commission revoking its registration as a broker/dealer.

(xi) Pursuant to the Rule 9600 Series, the Association may exempt any member unconditionally or on specified terms and conditions from the requirements of this paragraph upon a satisfactory showing that the member's supervisory procedures ensure compliance with applicable securities laws and regulations and applicable rules of the Association.

(3) The member's written supervisory procedures shall set forth the supervisory system established by the member pursuant to paragraph (a) above, and shall include the titles, registration status and locations of the required supervisory personnel and the responsibilities of each supervisory person as these relate to the types of business engaged in, applicable securities laws and regulations, and the Rules of this Association. The member shall maintain on an internal record the names of all persons who are designated as supervisory personnel and the dates for which such designation is or was effective. Such record shall be preserved by the member for a period of not less than three years, the first two years in an easily accessible place.

(4) A copy of a member's written supervisory procedures, or the relevant portions

thereof, shall be kept and maintained in each OSJ and at each location where supervisory activities are conducted on behalf of the member. Each member shall amend its written supervisory procedures as appropriate within a reasonable time after changes occur in applicable securities laws and regulations, including the Rules of this Association, and as changes occur in its supervisory system, and each member shall be responsible for communicating amendments through its organization.

## (c) Internal Inspections

Each member shall conduct a review, at least annually, of the businesses in which it engages, which review shall be reasonably designed to assist in detecting and preventing violations of and achieving compliance with applicable securities laws and regulations, and with the Rules of this Association. Each member shall review the activities of each office, which shall include the periodic examination of customer accounts to detect and prevent irregularities or abuses and at least an annual inspection of each office of supervisory jurisdiction. Each branch office of the member shall be inspected according to a cycle which shall be set forth in the firm's written supervisory and inspection procedures. In establishing such cycle, the firm shall give consideration to the nature and complexity of the securities activities for which the location is responsible, the volume of business done, and the number of associated persons assigned to the location. Each member shall retain a written record of the dates upon which each review and inspection is conducted.

## (d) Review of Transactions and Correspondence

### (1) Supervision of Registered Representatives

Each member shall establish procedures for the review and endorsement by a registered principal in writing, on an internal record, of all transactions and for the review by a registered principal of incoming and outgoing written and electronic correspondence of its registered representatives with the public relating to the investment banking or securities business of such member. Such procedures should be in writing and be designed to reasonably supervise each registered representative. Evidence that these supervisory procedures have been implemented and carried out must be maintained and made available to the Association upon request.

### (2) Review of Correspondence

Each member shall develop written procedures that are appropriate to its business, size, structure, and customers for the review of incoming and outgoing written (*i.e.* non-electronic) and electronic correspondence with the public relating to its investment banking or securities business, including procedures to review incoming, written correspondence directed to registered representatives and related to the member's investment banking or securities business to properly identify and handle customer complaints and to ensure that customer funds and securities are handled in accordance with firm procedures. Where such procedures for the review of correspondence do not require review of all correspondence prior to use or distribution, they must include provision for the education and training of associated persons as to the firm's procedures governing correspondence; documentation of such education and training; and surveillance and follow-up to ensure that such procedures are implemented and adhered to.

**(3) Retention of correspondence**

Each member shall retain correspondence of registered representatives relating to its investment banking or securities business in accordance with Rule 3110. The names of the persons who prepared outgoing correspondence and who reviewed the correspondence shall be ascertainable from the retained records and the retained records shall be readily available to the Association, upon request.

## (e) Qualifications Investigated

Each member shall have the responsibility and duty to ascertain by investigation the good character, business repute, qualifications, and experience of any person prior to making such a certification in the application of such person for registration with this Association. Where an applicant for registration has previously been registered with the Association, the member shall obtain from the Central Registration Depository or from the applicant a copy of the Uniform Termination Notice of Securities Industry Registration (Form U-5) filed with the Association by such person's most recent previous NASD member employer, together with any amendments thereto that may have been filed pursuant to Article V, Section 3 of the Association's By-Laws. The member shall obtain the Form U-5 as required by this Rule no later than sixty (60) days following the filing of the application for registration or demonstrate to the Association that it has made reasonable efforts to comply with the requirement. A member receiving a Form U-5 pursuant to this Rule shall review the Form U-5 and any amendments thereto and shall take such action as may be deemed appropriate.

## (f) Applicant's Responsibility

Any applicant for registration who receives a request for a copy of his or her Form U-5 from a member pursuant to this Rule shall provide such copy to the member within two (2) business days of the request if the Form U-5 has been provided to such person by his or her former employer. If a former employer has failed to provide the Form U-5 to the applicant for registration, such person shall promptly request the Form U-5, and shall provide it to the requesting member within two (2) business days of receipt thereof. The applicant shall promptly provide any subsequent amendments to a Form U-5 he or she receives to the requesting member.

13

## 2310. Recommendations to Customers (Suitability)

(a) In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b) Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

    (1) the customer's financial status;

    (2) the customer's tax status;

    (3) the customer's investment objectives; and

    (4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

(c) For purposes of this Rule, the term "non-institutional customer" shall mean a customer that does not qualify as an institutional account" under Rule 3110(c)(4).

[Amended May 2, 1990 eff. for accounts opened and recommendations made after Jan. 1, 1991; amended by SR-NASD-95-39 eff. Aug. 20, 1996.]

14

## IM-2310-2. Fair Dealing with Customers

(a)

(1) Implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

(2) This does not mean that legitimate sales efforts in the securities business are to be discouraged by requirements which do not take into account the variety of circumstances which can enter into the member-customer relationship. It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed, rather than on the argument that they result in profits to customers.

(b) District Business Conduct Committees and the Board of Governors have interpreted the Rules, taken disciplinary action and imposed penalties in many situations where members' sales efforts have exceeded the reasonable grounds of fair dealing. Some practices that have resulted in disciplinary action and that clearly violate this responsibility for fair dealing are set forth below, as a guide to members:

### (1) Recommending Speculative Low-Priced Securities

Recommending speculative low-priced securities to customers without knowledge of or attempt to obtain information concerning the customers' other securities holdings, their financial situation and other necessary data. The principle here is that this practice, by its very nature, involves a high probability that the recommendation will not be suitable for at least some of the persons solicited. This has particular application to high pressure telephone sales campaigns.

### (2) Excessive Trading Activity

Excessive activity in a customer's account, often referred to as "churning" or "overtrading." There are no specific standards to measure excessiveness of activity in customer accounts because this must be related to the objectives and financial situation of the customer involved.

### (3) Trading in Mutual Fund Shares

Trading in mutual fund shares, particularly on a short-term basis. It is clear that normally these securities are not proper trading vehicles and such activity on its face may raise the question of Rule violation.

### (4) Fraudulent Activity

(A) Numerous instances of fraudulent conduct have been acted upon by the Association and have resulted in penalties against members. Among some of these activities are:

### (i) Fictitious Accounts

Establishment of fictitious accounts in order to execute transactions which otherwise would be prohibited, such as the purchase of hot issues, or to disguise transactions which are against firm policy.

### (ii) Discretionary Accounts

Transactions in discretionary accounts in excess of or without actual authority from customers.

### (iii) Unauthorized Transactions

Causing the execution of transactions which are unauthorized by customers or the sending of confirmations in order to cause customers to accept transactions not actually agreed upon.

### (iv) Misuse of Customers' Funds or Securities

Unauthorized use or borrowing of customers' funds or securities.

(B) In addition, other fraudulent activities, such as forgery, non-disclosure or misstatement of material facts, manipulations and various deceptions, have been found in violation of Association Rules. These same activities are also subject to the civil and criminal laws and sanctions of federal and state governments.

### (5) Recommending Purchases Beyond Customer Capability

Recommending the purchase of securities or the continuing purchase of securities in amounts which are inconsistent with the reasonable expectation that the customer has the financial ability to meet such a commitment.

(c) While most members are fully aware of the fairness required in dealing with customers, it is anticipated that the practices enumerated in paragraph (b), which are not all inclusive, will be of future assistance in the training and education of new personnel.

(d) The Commission has also recognized that brokers and dealers have an obligation of fair dealing in actions under the general anti-fraud provisions of the federal securities laws. The Commission bases this obligation on the principle that when a securities dealer opens his business he is, in effect, representing that he will deal fairly with the public. Certain of the Commission's cases on fair dealing involve practices not covered in the foregoing illustrations. Usually, any breach of the obligation of fair dealing as determined by the Commission under the anti-fraud provisions of the securities laws could be considered a violation of the Association's Rules.

(e) Fair Dealing with Customers with Regard to Derivative Products or New Financial Products

The Board emphasizes members' obligations for fair dealing with customers when

making recommendations or accepting orders for new financial products. As new products are introduced from time to time, it is important that members make every effort to familiarize themselves with each customer's financial situation, trading experience, and ability to meet the risks involved with such products and to make every effort to make customers aware of the pertinent information regarding the products. Members must follow specific guidelines, set forth below, for qualifying the accounts to trade the products and for supervising the accounts thereafter.

### (1) Index Warrants

Members are obliged to comply with the Rules, regulations and procedures applicable to index warrants and foreign currency warrants contained in the <u>Rule 2840</u> Series.

### (2) Hybrid Securities and Selected Equity-Linked Debt Securities ("SEEDS") Designated as Nasdaq National Market Securities Pursuant to the <u>Rule 4400</u> Series

Members are obliged to comply with any Rules, regulations, or procedures applicable to such securities pursuant to the <u>Rule 4420</u> Series, as well as any other applicable Rule, regulation, or procedure of the Association.

[Amended eff. June 11, 1992; amended by SR-NASD-94-49 eff. Sept. 30, 1994; amended by SR-NASD-95-37 eff. Sept. 28, 1995.]

Selected <u>Notices to Members: 85-26</u>, <u>86-35</u>, <u>86-46</u>, <u>91-57</u>, <u>92-17</u>, <u>95-45</u>.

15

NASD Notice to Members 96-86

NASD Regulation Reminds Members And Associated Persons That Sales
Of Variable Contracts Are Subject To NASD Suitability Requirements

Executive Summary

NASD Regulation, Inc. (NASD Regulation) reminds NASD members and
their associated persons who sell variable life insurance contracts and
variable annuity contracts (Variable Contracts) of their obligations with
respect to the suitability requirements of the NASD Conduct Rules.
Variable Contracts are regulated as securities under federal securities laws
and NASD rules. Members and their associated persons are reminded that
the suitability requirements of NASD Conduct Rule 2310 (formerly Article
III, Section 2 of the NASD Rules of Fair Practice) apply to the
recommendation of any security, including a Variable Contract. Thus, a
member and its associated persons must have reasonable grounds for
believing that a Variable Contract recommended to a customer is suitable
for that customer.

Questions concerning this Notice may be directed to Robert J. Smith,
Office of General Counsel, NASD Regulation, at (202) 728-8176.

Discussion

Variable Contracts are issued by insurance companies and are insurance
contracts subject to regulation under state law. Because owners of Variable
Contracts assume certain investment risks, the contracts are also considered
securities and are registered as such under the Securities Act of 1933. The
contracts are funded by a separate account of a life insurance company
registered as an investment company under the Investment Company Act of
1940. The distributor of the contracts is a broker/dealer under the
Securities Exchange Act of 1934. Thus, an individual who sells a Variable
Contract registered with the Securities and Exchange Commission (SEC)
must not only be licensed under the applicable state jurisdictions to sell
insurance, but must also be appropriately affiliated with a member and
registered as a securities representative with the NASD.

NASD Regulation recently took a disciplinary action against a registered
representative for making unsuitable recommendations of variable life
insurance contracts to public customers. The registered representative
submitted an Offer of Settlement and, without admitting or denying the
alleged violations, consented to NASD Regulation's findings that he did not
have reasonable grounds for believing that his recommendations to certain
public customers to purchase variable life insurance contracts were suitable
for the customers based on the facts disclosed to him by the customers
relating to their investment objectives, financial situation, and needs.
Pursuant to the Offer, NASD Regulation fined the registered representative
$75,000, suspended him for 90 days from the securities industry, required
him to return commissions to eight public customers, and required him to
requalify before re-entering the securities industry by taking and passing
an appropriate qualifying examination. In taking this action, NASD
Regulation applied the existing suitability standards enunciated in Rule
2310 to the recommendation of variable life insurance policies.

As securities, the sales and distribution of Variable Contracts are fully
subject to the NASD's sales practice rules. The issue of suitability under
Rule 2310 arises when a Variable Contract is recommended and sold to a
public customer. Rule 2310 requires that, in recommending to a customer
the purchase, sale, or exchange of any security, a member shall have

reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by the customer regarding his or her other securities holdings and financial situation and needs.

In making such recommendations, the member and its registered representatives are required to make reasonable efforts to obtain information concerning the customer's financial and tax status, the customer's financial objectives, and such other information used or considered to be reasonable by the member or registered representative in making recommendations to the customer. Thus, for example, specific factors regarding a recommendation to purchase Variable Products that could be considered under the NASD's suitability rule include: (i) a representation by a customer that his or her life insurance needs were already adequately met; (ii) the customer's express preference for an investment other than an insurance product; (iii) the customer's inability to fully appreciate how much of the purchase payment or premium is allocated to cover insurance or other costs, and a customer's ability to understand the complexity of Variable Products generally; (iv) the customer's willingness to invest a set amount on a yearly basis; (v) the customer's need for liquidity and short-term investment; (vi) the customer's immediate need for retirement income; and (vii) the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

Further, as articulated in NASD Conduct Rule IM-2310.2, members and registered representatives have a fundamental responsibility for dealing fairly with their customers. Subparagraph (a)(2) to Rule IM-2310.2 requires, in relevant part, that "...sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed, rather than E[whether] they result in profits to customers." One of the practices that has resulted in disciplinary action, and that clearly violates the responsibility for fair dealing, is recommending the purchase of securities in amounts that are inconsistent with the reasonable expectation that the customer has the financial ability to meet such a commitment.

Finally, NASD Regulation is aware of the practice whereby a registered representative replaces a customer's existing variable contract with a new variable contract that doesn't improve the customer's existing position, but generates a new sales commission for the registered representative. Such a replacement practice designed merely to generate new sales commissions for the registered representative would be prohibited by NASD Conduct Rules requiring that members and registered representatives deal fairly with customers. In other securities contexts, for example, excessive trading designed solely to generate commissions has resulted in disciplinary action against members for violating their responsibility for fair dealing under Subparagraph (b)(2) to Rule IM-2310.2. "Excessive Trading Activity" is identified as "[e]xcessive activity in a customer's account, often referred to as 'churning' or 'overtrading.' There are no specific standards to measure excessiveness of activity in customer accounts because this must be related to the objectives and financial situation of the customer involved."

copyright National Association of Securities Dealers, Inc. (NASD), December 1996. All rights reserved.

16

NASD Notice to Members 99-35

The NASD Reminds Members Of Their Responsibilities Regarding The Sales Of Variable Annuities

Executive Summary

National Association of Securities Dealers, Inc. (NASD®) Rule 3010 requires each member to establish and maintain a system to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules. Variable life insurance and variable annuities are securities and their distribution is subject to NASD rules. This Notice focuses on deferred variable annuity sales and provides a set of guidelines that are intended to assist members in developing appropriate procedures relating to variable annuity sales to customers.

The guidelines identify areas of concern that NASD Regulation, Inc. (NASD Regulation®) would expect to be addressed in the procedures of members that offer and sell variable annuities. Although the specific procedures described are not mandatory, members should consider supplementing their procedures to ensure that they will be adequately designed to achieve compliance with legal and regulatory requirements.

Questions concerning this Notice may be directed to Thomas M. Selman, Vice President, Investment Companies/Corporate Financing, NASD Regulation, at (202) 728-8068; Lawrence Kosciulek, Assistant Director, Advertising/Investment Companies, NASD Regulation, at (202) 728-8329; or Elliot R. Curzon, Assistant General Counsel, Office of General Counsel, NASD Regulation, at (202) 728-8451.

Background

A variable annuity is an insurance contract that is subject to regulation under stat insurance and securities laws. Although variable annuities offer investment features similar in many respects to mutual funds, a typical variable annuity offers three basic features not commonly found in mutual funds: (1) tax-deferred treatment of earnings; (2) a death benefit; and (3) annuity payout options that can provide guaranteed income for life.

A customer's premium payments to purchase a variable annuity are allocated to underlying investment portfolios, often termed subaccounts. The variable annuity contract may also include a guaranteed fixed interest subaccount that is part of the general account of the insurer. The general account is composed of the assets of the insurance company issuing the contract. The value of the underlying subaccounts that are not guaranteed will fluctuate in response to market changes and other factors. Because the contract owners assume these investment risks, variable annuities are securities and generally must be registered under the Securities Act of 1933.

The underlying subaccounts that are not guaranteed are funded by a separate account of a life insurance company that, absent an exemption, is required to be registered as an investment company under the Investment Company Act of 1940. Variable annuities assess various fees including fees related to insurance features, e.g., lifetime annuitization and the death benefit. The fees are typically deducted from customer assets in the separate account.

A distributor of variable annuity contracts to individuals is required to register a a broker/dealer under the Securities Exchange Act of 1934 and become a member of the NASD. The distribution of variable annuity contracts is subject to NASD rules.

Typically, variable annuities are designed to be long-term investments for retirement. Withdrawals before a customer reaches the age of 59 1/2 are generally subject to a 10 percent penalty under the Internal Revenue Code. In addition, many variable annuities assess surrender charges for withdrawals within a specified time period after purchase.

Generally, variable annuities have two phases: the "accumulation" phase when customer contributions are allocated among the underlying investment options and earnings accumulate; and the "distribution" phase when the customer withdraws money, typically as a lump-sum or through various annuity payment options.

The myriad features of variable insurance products make the suitability analysis required under NASD rules particularly complex. NASD Regulation has addressed suitability issues in variable insurance products sales in Notice to Members 96-86. In that Notice, NASD Regulation stated that when recommending variable annuities or variable life insurance, the member and its registered representatives are required to make reasonable efforts to obtain information concerning the customer's financial and tax status, investment objectives, and such information used or considered reasonable in making recommendations to the customer.1 In addition, a recent NASD disciplinary action discussed members' responsibilities under Rule 2310 (Suitability Rule) as they apply to the sale of variable life insurance. (See In the Matter of DBCC No. 8 v. Miguel Angel Cruz.2)

Discussion

NASD Regulation has developed the following guidelines that represent a compilation of industry practices in the supervision of the sale of variable annuities. The guidelines do not mandate any specific procedure. Rather, they are designed to assist members in developing appropriate procedures relating to variable annuity sales practices. The guidelines are not comprehensive and are not intended as a substitute for the member's responsibilities under NASD Rule 3010. Moreover, the Suitability Rule requires an associated person of a member to make an independent determination whether an investment is suitable for a particular customer, taking into account the customer's investment objectives and financial needs.

Customer Information

The Suitability Rule requires members and their registered representatives to make reasonable efforts to obtain information concerning a customer's financial and tax status, investment objectives, and such other information used or considered in making recommendations to the customer.

1. When recommending a variable annuity, members and their registered representatives should make reasonable efforts to obtain comprehensive customer information, including the customer's occupation, marital status, age, number of dependents, investment objectives, risk tolerance, tax status, previous investment experience, liquid net worth, other investments and savings, and annual income. Retention of this customer information can be made in conjunction with the maintenance of basic customer account information that is required in NASD Rule 3110.

2. A registered representative should discuss all relevant facts with the customer, including liquidity issues such as potential surrender charges and the Internal Revenue Service (IRS) penalty; fees, including mortality and expense charges, administrative charges, and investment advisory fees; any applicable state and local government premium taxes; and market risk.

3. The registered representative should seek to ensure that the variable annuity application and any other information provided by the customer to the member is complete and accurate, and promptly forwarded to a registered principal for review.

4. When a variable annuity transaction is recommended to a customer, the registered representative and a registered principal should review the customer's investment objectives, risk tolerance, and other information to determine that the variable annuity contract as a whole and the underlying subaccounts recommended to the customer are suitable. The registered principal should compare the information in the account application with other relevant information sources, e.g., an account information form, to check for apparent accuracy and consistency prior to approving the transaction.

Product Information

5. The registered representative should have a thorough knowledge of the specifications of each variable annuity that is recommended, including the death benefit, fees and expenses, subaccount choices, special features, withdrawal privileges, and tax treatment.

6. To the extent practical, a current prospectus should be given to the customer when a variable annuity is recommended. Prospectus information about important factors, such as fees and expenses and the illiquidity of the product, should be discussed with the customer.

7. Under NASD Rule 2210, the registered representative may only use sales material that is approved by a registered principal of the member.

Liquidity And Earnings Accrual

Lack of liquidity, which may be caused by surrender charges or penalties for early withdrawal under the Internal Revenue Code, may make a variable annuity an unsuitable investment for customers who have short-term investment objectives. Moreover, although a benefit of a variable annuity investment is that earnings accrue on a tax-deferred basis, a minimum holding period is often necessary before the tax benefits are likely to outweigh the often higher fees imposed on variable annuities relative to alternative investments, such as mutual funds.

8. The registered representative should inquire about whether the customer has a long-term investment objective and typically should recommend a variable annuity only if the answer to that question, with consideration of other product attributes, is affirmative. In general, the registered representative should make sure that the customer understands the effect of surrender charges on redemptions and that a withdrawal prior to the age of 59 1/2 could result in a withdrawal tax penalty. In addition, the registered representative should make sure that customers who are 59 1/2 or older are informed when surrender charges apply to withdrawals.

9. The member should develop special procedures to screen for any customer whose age may make a long-term investment inappropriate, such as any customer over a specific age. Based on certain contract features, some customers of advanced age may be unsuitable for a variable annuity investment.
Income, Net Worth, And Contract Size Thresholds

10. Members should establish procedures to require a principal's careful review of variable annuity investments that exceed a stated percentage of the customer's net worth, and any contract in which a customer is investing more than a stated dollar amount.

## Investment In Tax Qualified Accounts

Some tax-qualified retirement plans (e.g., 401(k) plans) provide customers with an option to make investment choices only among several variable annuities. While these variable annuities provide most of the same benefits to investors as variable annuities offered outside of a tax-qualified retirement plan, they do not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax-qualified retirement plan itself.

11. When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (e.g., 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary. The registered representative should recommend a variable annuity only when its other benefits, such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation.

12. A member should conduct an especially comprehensive suitability analysis prior to approving the sale of a variable annuity with surrender charges to a customer in a tax-qualified account subject to plan minimum distribution requirements.

## Variable Annuity Replacements

13. The member firm may decide to develop an exchange or replacement analysis document or utilize an existing form authorized by a state insurance commission or other regulatory agency. If such a document is used, then (consistent with the requirements of various states) it should be completed for all variable annuity replacements and should include an explanation of the benefits of replacing one contract for another variable contract. The document also should be signed by the customer, the registered representative, and the registered principal.

14. The registered representative and the registered principal should determine, based on the information provided by the customer and their own knowledge of the product features, that replacing the existing contract with a new contract is suitable for the customer. Consideration should be given to such matters as product enhancements and improvements, lower cost structures, and surrender charges.

15. The member firm should consider developing compliance systems, such as computer programs, when available, that can monitor and identify those registered representatives whose clients have a particularly high rate of variable annuity replacements or rollovers. These compliance systems should provide the firm with "red flags" that the firm can investigate to determine whether some of these replacements are unsuitable.

16. A retail member should adopt other measures reasonably designed to ensure that replacement sales activity by its registered representatives complies with NASD rules. Members that "wholesale" variable annuities are reminded that they are also subject to NASD rules, and that they should avoid marketing strategies that are designed primarily to encourage inappropriate replacement sales. Upon reasonable request and to the extent practical, wholesale members should assist retail broker/dealers in monitoring the replacement activity of their customers.

## Endnote

1Notice to Members 96-86 also listed specific factors that could be considered when recommending variable annuities and variable life insurance contracts.

These factors are:

• a representation by a customer that his or her life insurance needs were already met;

• the customer's express preference for an investment other than an insurance product, the customer's inability to appreciate fully how much of the purchase payment or premium is allocated to cover insurance or their costs, and a customer's ability to understand the complexity of variable products generally;

• the customer's willingness to invest a set amount on a yearly basis;

• the customer's need for liquidity and short-term investment;

• the customer's immediate need for retirement income; and

• the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

2Complaint No. C8A930048 (NBCC Oct. 31, 1997)

© 1999, National Association of Securities Dealers, Inc. (NASD). All rights reserved.

17

NASD Notice to Members 00-44

The NASD Reminds Members Of Their Responsibilities Regarding The Sale Of Variable Life Insurance

Executive Summary

Due to the growth in sales and the popularity of variable life insurance products, NASD Regulation, Inc. (NASD RegulationSM) has published this Notice to Members, which focuses on retail sales to individuals of variable life insurance. This Notice provides a set of guidelines to help members in developing supervisory procedures relating to the sales of variable life insurance. The guidelines identify areas of concern that NASD Regulation would expect to be considered in these procedures.

Questions/Further Information

Questions or comments concerning this Notice may be directed to Thomas M. Selman, Vice President, Investment Companies/Corporate Financing, NASD Regulation, at (202) 728-8330; Lawrence Kosciulek, Associate Director, Advertising/Investment Companies Regulation, NASD Regulation, at (202) 728-8329; or Robert J. Smith, Assistant General Counsel, Office of General Counsel, NASD Regulation, at (202) 728-8451.

Background

Variable life insurance and variable annuity contracts (Variable Contracts) are securities, and accordingly, their distribution is subject to National Association o Securities Dealers, Inc. (NASD®) rules. Of particular importance are:

- Rule 3010 (Supervision), which requires each member to establish and maintain systems to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules; and

- Rule 2310 (Suitability), which requires that a member, when recommending the purchase, sale, or exchange of any security to a customer, have reasonable grounds for believing that the recommendation is suitable for the customer upon the basis of the facts disclosed by the customer.

NASD has published other Notices to Members regarding Variable Contracts, including Notice to Members 99-35 (May 1999) which provides guidance to assist members in developing appropriate procedures relating to deferred variable annuity sales to customers, and Notice to Members 96-86 (December 1996) which reminds members that sales of Variable Contracts are subject to NASD suitability requirements.

This Notice focuses on retail sales of variable life insurance, including both scheduled premium and flexible premium products. The Notice provides a set of guidelines to assist members in developing sales-related supervisory procedures.

Description Of Variable Life Insurance

Variable life insurance is an insurance policy that is subject to regulation under state insurance and federal securities laws (unless otherwise indicated, references to variable life insurance include both scheduled premium variable life insurance and flexible premium variable universal life insurance).

Similar to traditional life insurance, variable life insurance offers a death benefi that represents the amount the life insurance company is obligated to pay upon the

death of the insured. In addition to the death benefit, variable life insurance generates an investment element usually termed the "cash value." However, the insurance company that issues the variable life insurance policy does not guarantee the cash value. The cash value and in some cases, the death benefit, can fluctuate based on the performance of investment portfolios maintained by the insurance company in a segregated or separate account, and the interest earned on balances in general account options, if any. Generally, the insurance company guarantees the original face amount of the policy as a death benefit as long as the policy holder's premiums are paid on schedule or the cash value is sufficient to meet each fee deduction.

A customer's variable life insurance premium payments typically are invested in an insurance company's separate account, though in some cases, premiums may also be allocated to one or more general account options. The separate account is distinct from the insurance company's general account, which comprises the assets of the insurance company that issues the policy.

The investment portfolios or investment divisions underlying the separate account are often called "subaccounts". The subaccounts are divisions of the separate account that invest in distinct underlying fund portfolios. A customer's policy premium payments, after deductions for any sales expense charges or premium tax charges, are applied to the subaccounts and any general account options in accordance with the customer's allocation election. The value of the subaccounts will fluctuate in accordance with the investment experience of the underlying funds. Because the policy owners assume investment risks, variable life insurance policies are securities within the meaning of the federal securities laws and must be registered under the Securities Act of 1933, and the separate account and the underlying funds must generally register as investment companies under the Investment Company Act of 1940.

The issuer of the variable life insurance policy is an insurance company. The wholesale or retail distributor of individual variable life insurance policies, whic may or may not be related to the insurance company, must register as a broker/dealer under the Securities Exchange Act of 1934 and become a member of the NASD. A person selling individual variable life insurance, in addition to maintaining current life insurance licenses under applicable state laws, must be a registered broker/dealer or a registered representative of a broker/dealer.

Typically the main charges associated with a variable life insurance policy are front-end sales loads, back-end sales loads, administrative charges, cost of insurance charges, mortality and expense risk charges, and various fees associated with each underlying fund option. The cost of insurance charges can vary significantly depending on the individual's personal circumstances (e.g., age, sex, health, smoker/non-smoker, face amount of policy).

Recent Disciplinary Action

In a recent NASD Regulation disciplinary action, an NASD member was found to have violated NASD Rule 3010 (Supervision) for failing to establish, maintain, and enforce reasonable supervisory procedures. The member's procedures failed to adequately differentiate between fixed and variable life insurance products. In addition, the member was found to have violated NASD Rule 2110 (Standards of Commercial Honor and Principles of Trade) for engaging in material misrepresentations and omissions, NASD Rule 2210 (Communications with the Public) for the use of misleading sales literature, and NASD Rule 2310 (Suitability Rule) for unsuitable recommendations and sales. (See Pruco Securities Corp. Letter of Acceptance Waiver and Consent1.) The violations included:
- Various misrepresentations, including statements that:
- New policies could be acquired by customers already owning the firm's life

insurance by using cash values or future dividends from customers' existing
policies, for little or no additional cash payment;
- Premium payments would end, or "vanish," after a certain number of years;
and
- Variable life policies were not insurance but were an investment, savings, or
retirement plan.
- Unsuitable sales to customers, including retirees and persons who did not know
that they were purchasing insurance or did not want life insurance.
- Failure to establish, maintain, and enforce adequate procedures with respect to
the review of variable life insurance purchases to determine whether sales were
suitable for customers and failure to obtain the customer information necessary
to make suitability determinations.
- Use of misleading sales literature.
- Failure to establish, maintain, and enforce reasonable supervisory procedures.
- Failure to register representatives and principals and permitting unregistered
persons to sell securities.

Guidelines For Supervision Of Variable Life Insurance Sales

Variable life insurance may be appropriate for a customer with a need for life
insurance and an ability to pay for permanent life insurance protection.
Nevertheless, since the cash value and death benefit may fluctuate due to the
performance of the investments in the separate account, a variable life insurance
customer should also be able to assume investment risk and understand the
implications of adverse investment performance.

The following guidelines represent a collection of industry practices regarding the
supervision of the sale of variable life insurance. Although these are only
guidelines, members are encouraged to refer to them in developing their own
policies and procedures relating to variable life insurance sales practices.

A.  Customer Information

NASD Rule 2310 requires that members and their registered representatives, prior
to the execution of a recommended transaction, make reasonable efforts to obtain
information concerning a customer's financial and tax status, investment
objectives, and such other information used or considered to be reasonable in
making recommendations to the customer. The NASD has recognized that
members have developed various practices and procedures in order to comply
with this rule.

When recommending a variable life insurance policy, members and their
registered representatives should make reasonable efforts to obtain comprehensive
customer information, such as the customer's age, annual income, net worth,
liquid net worth, number of dependents, investment objective, sources of funds
for investment, investment experience, existing investments and life insurance,
time horizon, and risk tolerance.

The registered representative should document this type of information in a
customer account information form and should submit it with every variable life
insurance application. A registered principal should review the account
information form and verify that the recommendation of both the policy and the
subaccount allocation is consistent with the customer's investment objectives and
risk tolerance. Some members have designed policy applications that also contain
comprehensive customer background information. Whatever the means by which
a member collects customer account information (e.g., in paper or electronic
form), appropriate customer account information should be reviewed and retained.

B.  Review Of Customer Information

The member should consider whether the customer desires and needs life insurance and whether the customer can afford the premiums likely needed to keep the policy in force.

A member may wish to establish internal percentage ratio guidelines, such as the ratio of scheduled or target premium to income or household income, or percentage scheduled or target premium to liquid net worth. While these ratio guidelines are no substitute for proper supervision, they may assist in the review for variable life insurance affordability and excessive amounts of coverage. If the ratio exceeds the member's parameters, an extra level of supervision and review may be warranted. If parameters are exceeded, the registered representative should submit additional supporting documentation or a written explanation. To assist principals in their review of variable life insurance applications, members may wish to provide a checklist of items for the principal to review.

Members may choose at the point of sale to utilize allocation percentage guidelines when underlying fund allocations are made.

Members may wish to establish special supervision requirements for sales to older customers. Life insurance is often appropriately purchased by older investors. However, variable life insurance may not be suitable for an older investor who is primarily seeking an investment rather than an insurance product. Additionally, members should carefully consider whether an older investor has the financial means to sustain the likely amount of policy premium payments.

C.   Product Information

Registered representatives should be thoroughly familiar with the features and costs associated with each recommended variable life insurance policy, including surrender charges, premium and cash value charges, separate account charges, underlying fund fees, subaccount investment options, loan provisions, free-look periods, and policy premium lapse periods. The registered representative also should be able to clearly convey such information to the customer so that the customer can make an informed investment decision regarding the recommendation.

Variable life insurance policies have features of both traditional insurance products and securities. Accordingly, members may provide their registered representatives with examples, such as lifestyle case studies, to illustrate what th member considers to be potentially unsuitable recommendations and what type of activity would warrant an extra level of supervisory review.

Members may also wish to provide customers with member-approved product information brochures, in addition to any required disclosure documents, that explain the features and principal risks associated with variable life insurance.

To the extent practical, registered representatives should provide customers with a current prospectus when recommending a variable life insurance policy. Registered representatives should be available to discuss with customers the information that is contained in the prospectus.

D.   Variable Life Insurance Replacements

Various states have issued rules governing variable life insurance replacement activity. While the definitions vary, the term "replacement" generally refers to the activity of a customer surrendering or altering existing insurance coverage in order to purchase a new variable life insurance policy. A replacement may not be in the best interests of a customer. For example, a customer may incur new fees, extended surrender charge periods, a possible higher insurance risk rating due to ill health, and new suicide and incontestability periods. There may also be

unfavorable tax consequences. Registered representatives should carefully consider whether a replacement is in the best interests of the customer.

Members should adopt procedures for the review of replacement recommendations to ensure that they are suitable. Members should either develop a replacement disclosure form or use an existing form authorized by a state insurance commission or other regulatory body. Consistent with any state requirements, the appropriate form should be completed for each replacement involving variable life insurance. The form should include the signatures of the customer and the registered representative. Members should provide their registered representatives and registered principals with appropriate procedures on replacements. Members should determine that the proposed replacement transaction is suitable and that the registered representative has complied with firm procedures and applicable state regulations regarding disclosure requirements.

A member should review a variable life insurance application to determine that any replacement question is answered. For example, if questions on whether the proposed policy replaces any existing annuity or policy are not completed, then the registered principal should request that the registered representative obtain a completed application.

The member may create a compliance report that tracks replacement activity by each registered representative. Replacement activity exceeding a certain percentage of the registered representative's total activity could trigger further review. The member may also decide to design a compliance system to flag unacknowledged replacement activity by utilizing background information such as surrenders, reduced face amounts, lapses, and modified surrenders. To assist in this review, a member could use quarterly 1035 exchange reports or other reports that may be provided by a number of insurance companies. Upon reasonable request and to the extent practical, wholesale members should also assist retail broker/dealers in monitoring the replacement activity of their customers.

E.  Life Insurance Financing

Members should not recommend that a customer finance a variable life insurance policy from the value of another life insurance policy or annuity, such as through the use of loans or cash values, unless the transaction is otherwise suitable for th customer. The NASD believes that the burden of demonstrating that such financed transactions are in the customer's best interests would generally be more difficult than for a routine sale of variable life insurance. In the Pruco case, many customers' existing cash values were depleted to pay the premiums of new policies. The new policies lapsed when the required premium for the new variable life insurance policy exceeded the dividend stream or cash value of the original policy.

When financing is recommended, registered representatives should disclose to the policy owner the potential consequences to both the existing and new policy. Members should provide a form to the registered representative that documents the customer's informed consent to the financing. The form should include the customer's acknowledgment, the registered representative's signature, and a registered principal's signature.

Members should monitor these arrangements so that they can prevent improper and excessive financed and replacement sales. For internalized activity, members could create a system that matches new policies with disbursements from existing policies for a set time period and track that activity. Members should consider whether to vary review and report periods in order to prevent registered representatives from timing financed or replaced transactions to escape detection.

F.  Advertising And Sales Literature

Under NASD Rule 2210, members must file with NASD Regulation's
Advertising/Investment Companies Regulation Department all variable life
insurance advertisements and sales literature within 10 days of first use or
publication. Members are also required to file the format for hypothetical
illustrations used in the promotion of variable life insurance policies, since these
formats qualify as sales literature. Members must have supervisory procedures in
place to ensure compliance with the rule's filing requirements. Members also
must ensure that all advertisements and sales literature regarding variable life
insurance are approved in writing by a registered principal and prior to use with
the public.

Any communication discussing the tax-deferral benefits of variable life insurance
should not obscure or diminish the importance of the life insurance features of the
product. Any variable life insurance communication that overemphasizes the
investment aspects of the policy or potential performance of the subaccounts may
be misleading.

G.  Members' Supervisory Systems And Procedures

Notice to Members 99-45 (June 1999) provides guidance on member supervisory
procedures. The Notice emphasizes that NASD Rule 3010 require members,
regardless of their size or complexity, to adopt and implement a supervisory
system that is tailored specifically to a member's business. Supervisory systems
must address the activities of all of the member's registered representatives and
associated persons and may include components such as automated exception
reports and surveillance programs that monitor unusual activity. Members must
adopt written supervisory procedures that document the supervisory system and
that are reasonably designed to achieve compliance with all applicable securities
laws and regulations and NASD rules.

Members may wish to design their own supervisory system to monitor variable
life insurance sales activities based upon the member's organization and structure.
For some members with geographically dispersed offices and personnel, a
decentralized supervisory system may be sufficient. For other members, a
centralized compliance supervisory system may be more appropriate.
Members should design systems that provide an easy and expeditious way for
customers to communicate complaints, and that ensure that customer complaints
are acted upon, analyzed, and researched.

Endnote
1Letter of Acceptance, Waiver and Consent No. CAF990010 (July 8, 1999).

© 2000, National Association of Securities Dealers, Inc. (NASD). All rights
reserved. Notices to Members attempt to present information to readers in a
format that is easily understandable. However, please be aware that, in case of any
misunderstanding, the rule language prevails.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DOUGLAS CHERRY, DR. LANCE DYESS, IRA EDMONDSON, JIMMY JONES, RACHEL MCKINNEY, LINDA MIDDLETON and VICTOR STAFFORD, | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. _____ |
| v. | ) ) | |
| AIG SUNAMERICA LIFE ASSURANCE COMPANY, f/k/a ANCHOR NATIONAL LIFE INSURANCE COMPANY, AXA EQUITABLE LIFE INSURANCE COMPANY, f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, AXA DISTRIBUTORS, LLC, f/k/a EQUITABLE DISTRIBUTORS, LLC, KEMPER INVESTORS LIFE INSURANCE COMPANY, HARTFORD LIFE INSURANCE COMPANY and MAXINE CHAPPELL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

EXHIBIT B TO
JOINT NOTICE OF REMOVAL

# Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

Names of the Claimants                          Case Number: 05-03030
Douglas M. Cherry, Lance K. Dyess,
Ira J. Edmundson, Jimmy E. Jones,
Rachel McKinney, Linda J. Middleton and
Victor E. Stafford

Name of the Respondent                          Hearing Site: Birmingham, Alabama
Raymond James & Associates, Inc.

Nature of the Dispute: Customer vs. Member.

## REPRESENTATION OF PARTIES

For Douglas M. Cherry ("Cherry"), Lance K. Dyess ("Dyess"), Ira J. Edmundson ("Edmundson"), Jimmy E. Jones ("Jones"), Rachel McKinney ("McKinney"), Linda J. Middleton ("Middleton") and Victor E. Stafford ("Stafford"), hereinafter collectively referred to as "Claimants": Richard S. Frankowski, Esq., Whatley Drake LLC, Birmingham, Alabama.

For Raymond James & Associates, Inc., hereinafter referred to as "Respondent": Luther M. Dorr, Esq. and Andrea Morgan Greene, Esq., Maynard, Cooper & Gale P.C., Birmingham, Alabama.

## CASE INFORMATION

Statement of Claim filed on or about:  June 13, 2005.
Claimant Cherry signed the Uniform Submission Agreement: January 27, 2005
Claimant Dyess signed the Uniform Submission Agreement: April 13, 2005
Claimant Edmundson signed the Uniform Submission Agreement: February 8, 2005
Claimant Jones signed the Uniform Submission Agreement: June 9, 2005
Claimant McKinney signed the Uniform Submission Agreement: April 7, 2005.
Claimant Middleton signed the Uniform Submission Agreement: May 18, 2005.
Claimant Stafford signed the Uniform Submission Agreement: May 5, 2005.
Statement of Answer filed by Respondent on or about:  September 16, 2005..
Motion to Sever filed by Respondent on or about: September 15, 2005.
Response to Motion to Sever filed on by Claimants or about: October 11, 2005.
Reply Brief in Support of its Motion to Sever filed by Respondent on or about: November 1, 2005.
Respondent signed the Uniform Submission Agreement: June 20, 2005.
Motion to Dismiss on Statute of Limitations Grounds filed by Respondent on or about: May 19, 2006.
Response to Motion to Dismiss on Statute of Limitations Grounds filed by Claimant s on or about: June 8, 2006.
Brief in Support of its Motion to Dismiss filed by Respondent on or about: July 6, 2006.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 2</u>

Motion to Amend the Statement of Answer filed by Respondent on or about: September 12, 2006.

## <u>CASE SUMMARY</u>

Claimants asserted the following causes of action: 1) breach of fiduciary duty; 2) breach of contract 3) common law fraud; 4) negligence; 5) negligent misrepresentation/omission; 6) failure to supervise and control; and, 7) violation of federal and state securities laws and NASD Rules of Fair Practice.. The causes of action relate to the purchase of various variable annuities including, but not limited to, AXA Equitable Accumulator, Putnam Allstate Advisor, Equitable Accumulator Rollover IRA, Scudder Destinations, Putnam Hartford Capital Manager and AIG Sun America Polaris II in Claimants' accounts.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## <u>RELIEF REQUESTED</u>

Claimants requested compensatory damages in the amount of $2,000,000.00, professional costs and adverse tax consequences, disgorgement and restitution, lost opportunity costs and costs of this proceeding, attorney's fees and costs, pre and post-judgment interest, punitive damages, rescission and such other relief as this Panel deemed just and equitable.

Respondent requested that the Statement of Claim be denied in its entirety, that all costs be assessed against Claimants and an award of such other and further relief as this Panel deemed just and proper

## <u>OTHER ISSUES CONSIDERED AND DECIDED</u>

On November 8, 2005, the Panel issued an Order that denied Respondent's Motion to Sever and, on or about July 13, 2006, the Panel issued an Order that denied Respondent's Motion to Dismiss based on Statute of Limitations Grounds however, the Order stated that Respondent could renew the motion at any time during the final hearing.

Respondent's Motion to Amend the Statement of Answer was not ruled on and deemed moot by the Panel.

During the evidentiary hearing for this matter, Respondent renewed its Motion to Dismiss based on Statute of Limitations Grounds and also made a Motion for a Directed Verdict as to Claimants' fraud claims. Claimants requested and were granted the opportunity to respond to the documentation presented with oral argument on the two motions. Respondent was also given the opportunity to reply. The Panel denied the Motion for Directed Verdict as to Claimants' fraud claims and reserved ruling on the Motion to Dismiss Based on Statute of Limitations Grounds until the conclusion of the hearing. As part of the post hearing deliberations, the Panel considered the Motion to Dismiss Based on Statute of Limitations Grounds, the oral arguments and the supporting documents from all parties and denied the motion.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 3</u>

Pursuant to the contract Claimants have with Respondent, the Panel determined that Florida law applies in this matter.

The parties have agreed that the Award in this matter may be entered in counterpart copies or that a signed handwritten Award may be entered.

<u>AWARD</u>

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

Respondent is found liable for breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control and violation of federal and state securities laws and NASD Rules of Fair Practice and shall pay to Claimants compensatory damages in the following amounts:

| | |
|---|---|
| 1) To Douglas Cherry | $124,000.00 |
| 2) To Lance K. Dyess | $ 52,000.00 |
| 3) To Ira J. Edmondson | $149,000.00 |
| 4) To Jimmy E. Jones | $ 51,000.00 |
| 5) To Rachel McKinney | $ 54,000.00 |
| 6) To Linda J. Middleton | $ 59,000.00 |
| 7) To Victor E. Stafford | $ 88,000.00 |

plus, interest on each amount at the statutory rate in the state of Florida per annum from the date of service of the Award until the date of payment.

Respondent is found liable and shall pay attorney's fees in the amount of $124,334.00 and costs in the amount of $26,946.05 pursuant to Florida Statutes, Chapter 517.211.

Any and all claims for relief not specifically addressed herein, including Claimants' request for punitive damages, are denied.

<u>FEES</u>

Pursuant to the NASD Code of Arbitration Procedure (the "Code"), the following fees are assessed:

**Filing Fees**
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
    Initial claim filing fee                = $ 500.00

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 4</u>

Accordingly, Respondent is a party to this dispute and was a member of NASD at the time the following fees were assessed:

| | |
|---|---|
| Member surcharge | = $ 2,800.00 |
| Pre-hearing process fee | = $  750.00 |
| <u>Hearing process fee</u> | <u>= $ 5,000.00</u> |
| Total Member Fees | = $ 8,550.00 |

## Adjournment Fees

No requests for adjournments were filed in this matter.

## Three-Day Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within three business days before the start of a scheduled hearing session:

No cancellation fees were assessed in this matter.

## Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary injunction in court.  Parties in these cases are also assessed arbitrator travel expenses and costs when an arbitrator is required to travel outside his or her hearing location and additional arbitrator honoraria for the hearing for permanent injunction.  These fees, except the injunctive relief surcharge, are assessed equally against each party unless otherwise directed by the panel.

No injunctive relief fees were incurred during this proceeding.

## Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted.  A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less.  Fees associated with these proceedings are:

Four (4) Pre-hearing sessions with the Panel @ $1,200.00                 = $ 4,800.00
Pre-hearing conferences:  November 7, 2005        1 session
                          November 8, 2005        1 session
                          November 11, 2005       1 session
                          July 11, 2006           1 session

Eighteen (18) Hearing sessions with the Panel @ $1,200.00                = $21,600.00
Hearing Dates:            October 2, 2006         2 sessions
                          October 3, 2006         2 sessions
                          October 4, 2006         2 sessions
                          October 5, 2006         2 sessions
                          October 6, 2006         2 sessions
                          October 9, 2006         2 sessions
                          October 10, 2006        2 sessions

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 5

|  |  |  |
|---|---|---|
| October 11, 2006 | 2 sessions | |
| October 12, 2006 | 2 sessions | |

| Total Forum Fees | = $26,400.00 |
|---|---|

The Panel has assessed $1,885.71 of the forum fees to Claimant Douglas Cherry.
The Panel has assessed $1,885.71 of the forum fees to Claimant Lance K. Dyess.
The Panel has assessed $1,885.71 of the forum fees to Claimant Ira J. Edmundson.
The Panel has assessed $1,885.71 of the forum fees to Claimant Jimmy E. Jones.
The Panel has assessed $1,885.71 of the forum fees to Claimant Rachel McKinney.
The Panel has assessed $1,885.71 of the forum fees to Claimant Linda J. Middleton.
The Panel has assessed $1,885.71 of the forum fees to Claimant Victor E. Stafford.
The Panel has assessed $13,200.03 of the forum fees to Respondent.

## Administrative Costs

Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

No administrative costs were incurred during this proceeding.

## Fee Summary

Claimants are jointly and severally liable for:

| | |
|---|---|
| Initial Filing Fee | = $   500.00 |
| Total Fees | = $   500.00 |
| Less payments | = $   500.00 |
| Balance Due NASD Dispute Resolution | = $       0.00 |

Claimant Cherry is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Dyess is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Edmondson is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 6</u>

Claimant Jones is solely liable for:

| | |
|---|---|
| <u>Forum Fees</u> | = $1,885.71 |
| <u>Total Fees</u> | = $1,885.71 |
| <u>Less payments</u> | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant McKinney is solely liable for:

| | |
|---|---|
| <u>Forum Fees</u> | = $1,885.71 |
| <u>Total Fees</u> | = $1,885.71 |
| <u>Less payments</u> | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Middleton is solely liable for:

| | |
|---|---|
| <u>Forum Fees</u> | = $1,885.71 |
| Total Fees | = $1,885.71 |
| <u>Less payments</u> | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Stafford is solely liable for:

| | |
|---|---|
| <u>Forum Fees</u> | = $1,885.71 |
| Total Fees | = $1,885.71 |
| <u>Less payments</u> | = $   171.42 |
| Balance Due NASD Dispute Resolution | = $1,714.29 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $  8,550.00 |
| <u>Forum Fees</u> | = $ 13,200.03 |
| Total Fees | = $ 21,750.03 |
| <u>Less payments</u> | = $  8,550.00 |
| Balance Due NASD Dispute Resolution | = $ 13,200.03 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Helen E. Huyler, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Benjamin F. Richards, Jr. | - | Public Arbitrator |
| Robert E. Graves | - | Non-Public Arbitrator |

## Concurring Arbitrators' Signatures

_____/s/_____          10/26/06_____
Helen E. Huyler, Esq.          Signature Date
Public Arbitrator, Presiding Chairperson

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 7</u>

_____/s/_____                          <u>10/26/06</u>_____
Benjamin F. Richards, Jr.                     Signature Date
Public Arbitrator


_____/s/_____                          <u>10/26/06</u>_____
Robert E. Graves                              Signature Date
Non-Public Arbitrator


_____<u>10/26/06</u>_____
Date of Service (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 6</u>

Claimant Jones is solely liable for:

| | |
|---|---|
| <u>Forum Fees</u> | = $1,885.71 |
| Total Fees | = $1,885.71 |
| <u>Less payments</u> | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant McKinney is solely liable for:

| | |
|---|---|
| <u>Forum Fees</u> | = $1,885.71 |
| Total Fees | = $1,885.71 |
| <u>Less payments</u> | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Middleton is solely liable for:

| | |
|---|---|
| <u>Forum Fees</u> | = $1,885.71 |
| Total Fees | = $1,885.71 |
| <u>Less payments</u> | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Stafford is solely liable for:

| | |
|---|---|
| <u>Forum Fees</u> | = $1,885.71 |
| Total Fees | = $1,885.71 |
| <u>Less payments</u> | = $  171.42 |
| Balance Due NASD Dispute Resolution | = $1,714.29 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $  8,550.00 |
| <u>Forum Fees</u> | = $ 13,200.03 |
| Total Fees | = $ 21,750.03 |
| <u>Less payments</u> | − $  8,550.00 |
| Balance Due NASD Dispute Resolution | = $ 13,200.03 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Helen E. Huyler, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Benjamin F. Richards, Jr. | - | Public Arbitrator |
| Robert E. Graves | - | Non-Public Arbitrator |

<u>**Concurring Arbitrators' Signatures**</u>

*Helen E. Huyler* (signature)

Helen E. Huyler, Esq.
Public Arbitrator, Presiding Chairperson

*10/26/06*

Signature Date

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 7

_Benjamin F. Richards, Jr._                          26 October 2006
_____                  _____
Benjamin F. Richards, Jr.                              Signature Date
Public Arbitrator



_____                  _____
Robert E. Graves                                          Signature Date
Non-Public Arbitrator



_____
Date of Service  (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 05-03030
**Award   Page 7**

_____                    _____
Benjamin F. Richards, Jr.                       Signature Date
Public Arbitrator

_____                    10/26/06
Robert E. Graves                                _____
Non-Public Arbitrator                           Signature Date


_____
Date of Service  (For NASD Dispute Resolution office use only)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

DOUGLAS CHERRY, DR. LANCE DYESS,   )
IRA EDMONDSON, JIMMY JONES,        )
RACHEL MCKINNEY, LINDA             )
MIDDLETON and VICTOR STAFFORD,     )
                                   )
     Plaintiffs,              )    CIVIL ACTION NO. _____
                                   )
v.                                 )
                                   )
AIG SUNAMERICA LIFE ASSURANCE      )
COMPANY, f/k/a ANCHOR NATIONAL     )
LIFE INSURANCE COMPANY, AXA        )
EQUITABLE LIFE INSURANCE           )
COMPANY, f/k/a THE EQUITABLE LIFE  )
ASSURANCE SOCIETY OF THE UNITED    )
STATES, AXA DISTRIBUTORS, LLC, f/k/a )
EQUITABLE DISTRIBUTORS, LLC,       )
KEMPER INVESTORS LIFE INSURANCE    )
COMPANY, HARTFORD LIFE             )
INSURANCE COMPANY and MAXINE       )
CHAPPELL,                          )
                                   )
     Defendants.              )

---

## EXHIBIT C TO
## JOINT NOTICE OF REMOVAL

---



MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW

ANDREA MORGAN GREENE
DIRECT 205.254.1229
EMAIL: agreene@Maynardcooper.com

October 31, 2006

**VIA HAND DELIVERY**
Richard S. Frankowski
WHATLEY DRAKE, LLC
2323 2nd Avenue North
Birmingham, Alabama  35202-0647

Re:     *Douglas M. Cherry, Lance K. Dyess, Ira J. Edmondson, Jimmy E. Jones, Rachel McKinney, Linda J. Middleton and Victor E. Stafford v. Raymond James and Associates, Inc.*
NASD Arbitration No. : 05-03030

Dear Richard:

In accordance with the NASD award entered in the above-referenced matter on October 26, 2006, please find enclosed Raymond James & Associates, Inc.'s check no. 33639 in the amount of $728,991.50 payable to Whatley Drake, LLC.

Please do not hesitate to call me should you have any questions.

Very truly yours,

Andrea Morgan Greene

AMG:vmt
04069-0029
01408430.1

cc:     A. Inge Selden III, Esq.
Luther M. Dorr, Jr., Esq.

Richard S. Frankowski, Esq.
October 31, 2006
Page 2 of 2

bcc:   Robert Rudnicki, Esq.
       Ms. Lisa Diwa
       Ms. Amber Steadman
       Justina Deloney

MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW



THE FACE OF THIS CHECK IS PRINTED BLUE - THE BACK CONTAINS A SIMULATED WATERMARK

RAYMOND JAMES
Raymond James Financial Services, Inc.
880 Carillon Parkway
St. Petersburg, FL 33716

Bank Of America
Bank Of America, N.A. - Texas

CHECK #
0000033639

32-1
1110

Amount          ****$728,991.50

Date: 10/30/06
NOT VALID AFTER 90 DAYS

PAY    Seven hundred twenty eight thousand nine hundred ninety one and 50/100 Dollars

TO THE
ORDER
OF      WHATLEY DRAKE LLC
        2323 2ND AVE N
        BIRMINGHAM   AL  35203

Raymond James Financial Services, Inc.

⑈0000033639⑈ ⑆11000012⑆ 375 000 1408⑈



MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW

Andrea Morgan Greene
DIRECT 205.254.1229
EMAIL  agreene@maynardcooper.com

October 31, 2006

**VIA FAX & U.S. MAIL**

Ms. Jennifer Kozielski
NASD Dispute Resolution
One Liberty Plaza
165 Broadway, 52nd Floor
New York, NY 10006

Re:    **Douglas M. Cherry, Lance K. Dyess, Ira J. Edmondson, Jimmy E. Jones, Rachel McKinney, Linda J. Middleton and Victor E. Stafford v. Raymond James & Associates, Inc.**
       **NASD Arbitration No. : 05-03030**

Dear Ms. Kozielski:

     This is to confirm that as of October 31, 2006, Respondent Raymond James & Associates, Inc. has complied with the Panel's October 26, 2006 Award in the above-referenced matter.

     Thank you for your attention to and assistance with this matter.  Please do not hesitate to contact me should you have any questions.

                                        Yours very truly,

                                        Andrea Morgan Greene

AMG/vmt
4069-029
01408590.1

Cc:    Richard S. Frankowski, Esq.
       A. Inge Selden, III, Esq.
       Luther M. Dorr, Jr., Esq.

Ms. Jennifer Kozielski
NASD Dispute Resolution
October 31, 2006
Page 2 of 2

Bcc:   Robert Rudnicki, Esq. (via e-mail)
       Ms. Lisa Diwa (via e-mail)
       Ms. Amber Steadman (via e-mail)
       Ms. Justina Deloney

MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DOUGLAS CHERRY, DR. LANCE DYESS, IRA EDMONDSON, JIMMY JONES, RACHEL MCKINNEY, LINDA MIDDLETON and VICTOR STAFFORD, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AIG SUNAMERICA LIFE ASSURANCE COMPANY, f/k/a ANCHOR NATIONAL LIFE INSURANCE COMPANY, AXA EQUITABLE LIFE INSURANCE COMPANY, f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, AXA DISTRIBUTORS, LLC, f/k/a EQUITABLE DISTRIBUTORS, LLC, KEMPER INVESTORS LIFE INSURANCE COMPANY, HARTFORD LIFE INSURANCE COMPANY and MAXINE CHAPPELL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

RECEIVED

2007 OCT 12  P 3: 33

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

CIVIL ACTION NO. _____

---

**EXHIBIT D TO
JOINT NOTICE OF REMOVAL**

---



FILED

SEP 0 5 2007

IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

DOUGLAS CHERRY, DR. LANCE          )
DYESS, IRA EDMONDSON, JIMMY        )
JONES, RACHEL MCKINNEY, LINDA )
MIDDLETON, and VICTOR              )
STAFFORD,                          )
                                   )
        Plaintiffs,                )        Civil Action No.: *CV-07 - 508A*
                                   )
AIG SUNAMERICA LIFE                )
ASSURANCE COMPANY, f/k/a           )
ANCHOR NATIONAL LIFE               )
INSURANCE COMPANY, AXA             )
EQUITABLE LIFE  INSURANCE          )
COMPLANY, f/k/a THE EQUTIABLE      )
LIFE ASSURANCE SOCIETY             )
OF THE UNITED STATES,              )
AXA DISTRIBUTORS, LLC, f/k/a       )
EQUITABLE DISTRIBUTORS, LLC.,      )
KEMPER INVESTORS LIFE              )
INSURANCE COMPANY,                 )
HARTFORD LIFE INSURANCE            )
COMPANY,  and MAXINE               )
CHAPPELL,                          )
                                   )
        Defendants.                )

*Carla Woodall*
Carla Woodall, Clerk
Houston County, AL

## COMPLAINT

### I.    PARTIES

1.    Plaintiff, Douglas Cherry, is an individual over the age of nineteen, who resides in Dale County, Alabama.

2.    Plaintiff, Dr. Lance Dyess, is an individual over the age of nineteen who resides in Coffee County, Alabama.

3.    Plaintiff, Ira Edmondson, is an individual over the age of nineteen, who resides in Dale County, Alabama.

1

4.    Plaintiff, Jimmy Jones, is an individual over the age of nineteen, who resides in Coffee County, Alabama.

5.    Plaintiff, Rachel McKinney, is an individual over the age of nineteen, who resides in Houston County, Alabama.

6.    Plaintiff Linda Middleton is an individual over the age of nineteen who resides in Houston County, Alabama.

7.    Plaintiff, Victor Stafford, is an individual over the age of nineteen, who resides in Dale County, Alabama.

8.    Defendant, Anchor National Life Insurance Company (hereinafter "Anchor National") was a foreign corporation duly authorized to do business in Alabama. At all times relevant to this Complaint, Anchor National did do business, by agent, in Houston County, Alabama.  Upon information and belief, Anchor National changed its name to AIG SunAmerica Life Assurance Company (hereinafter "AIG") on or around March 1, 2003.

9.    Defendant, AXA Equitable Life Insurance Company f/k/a Equitable Life Assurance Society of the United States (hereinafter "AXA"), is a foreign corporation authorized to do business in the State of Alabama.   At all times relevant to this Complaint, AXA did do business, by agent, in Houston County, Alabama.

10.    Defendant, AXA Distributors, LLC f/k/a Equitable Distributors, LLC (hereinafter "AXA Distributors"), is a foreign corporation authorized to do business in the State of Alabama.   At all times relevant to this Complaint, AXA Distributors did do business, by agent, in Houston County, Alabama.

2

11.    Defendant, Harford Life Insurance Company (hereinafter "Hartford") was a foreign corporation duly authorized to do business in Alabama. At all times relevant to this Complaint, Hartford did do business, by agent, in Houston County, Alabama.

12.    Defendant, Kemper Investors Life Insurance Company (hereinafter "Kemper"), is a foreign corporation duly authorized to do business in Alabama. At all times relevant to this Complaint, Kemper did do business, by agent, in Houston County, Alabama.

13.    Defendant, Maxine Chappell, is or was an agent of Anchor National, AXA, AXA Distributors, Hartford and Kemper at all times relevant to this Complaint, and is a resident of Houston County, Alabama.

## II.    JURISDICTION AND VENUE

14.    Plaintiffs' claims are joined under ARCP 20. Joinder is appropriate because Plaintiffs' claims arise out of or relate to a series of transactions and occurrences and present common questions of law and fact.

15.    This Court has subject matter jurisdiction over this action because it involves a controversy in excess of $10,000. Venue is proper as the agreement was negotiated and entered into in Houston County, Alabama and the representations upon which the Plaintiffs relied were made in Houston County, Alabama.

## III.    FACTUAL BACKGROUND

16.    Beginning as early as 1998, the Defendants made representations to Plaintiffs that Plaintiffs could purchase a seven year investment from Defendants which had a guaranteed rate of interest of either 5% or 6%, if held to maturity. The Defendants also represented that the return would be greater if the stock market out-performed this

3

minimum guaranteed rate. Defendants represented to Plaintiffs that Plaintiffs would receive "the best of both worlds" since they were guaranteed a 5% or 6% return even if the stock market were to decline. Finally, Defendants represented that Plaintiffs' principle would be protected.

17.    Defendants suppressed, concealed and omitted from Plaintiffs that there was no guaranteed interest rate associated with the variable annuity products, that Plaintiffs could not have complete access to their investment after the contract period, and that Plaintiffs' were investing in products that posed a risk to the Plaintiffs' principle.

18.    Defendants failed to timely provide Plaintiffs with a prospectus providing complete, meaningful disclosures of the investment, including its options, risks, fees, expenses, and method of assuring a lump sum pay out without penalty at the close of the maturity period.

19.    In reliance on the Defendants' representations, Plaintiffs invested their savings to Defendants.

20.    Throughout Plaintiffs' relationships with Defendants, Plaintiffs questioned Defendants regarding the true value of their accounts. On each such occasion, Defendants reassured Plaintiffs that the amounts shown on the statements did not accurately reflect the value of their investments.

21.    Plaintiffs have recently discovered that one of Defendants' former agents, Ann Holman (who is also Maxine Chappell's former partner) has filed a lawsuit against AXA Equitable claiming that they misrepresented to her the terms of their annuity products. The filing of Ann Holman's lawsuit was the first time that Plaintiffs actually knew that the Defendants had affirmatively misrepresented the products they sold.

4

A.    **DOUGLAS CHERRY**

22.    Mr. Douglas Cherry was born in 1942, and was raised on a farm in Martin, Tennessee. Cherry worked as a lineman and a foreman at Pea River for over thirty years.

23.    In 1999, Cherry retired from Pea River at the age of fifty-seven. During Cherry's employment at Pea River, he accumulated approximately $143,972 in his 401(k) account and approximately $375,000 in his retirement account. After retiring from Pea River Electric, Cherry rolled over both of these accounts to Maxine Chappell.

24.    Douglas Cherry first heard of Maxine Chappell through a presentation she made at "Wellness Day" at Pea River Electric. After hearing her presentation, Cherry set up a meeting to discuss his finances.

25.    The first meeting occurred in Chappell's office in Dothan, Alabama. Cherry and his friend, Ira Edmondson attended the meeting together. During this meeting, Chappell gained the trust of Cherry by telling him that she grew up on a farm, that she was a Christian, and that she knew how hard money was to earn.

26.    Chappell also promised that she could provide Cherry with an investment that would guarantee his principal investment and that would pay him a five-percent rate of return for seven years. Chappell specifically told Cherry that he could take out his entire principal after seven years. Based on Chappell's promises, Cherry rolled over his entire life savings to Raymond James and Chappell. Chappell placed Cherry's funds into Raymond James account # 88171358, funded with two variable annuities: (1) AXA Equitable Accumulator, Contract 99 631 766, and (2) Putnam Allstate Advisor, Contract number PA00051159.

5

27.    Approximately one year after Cherry purchased the variable annuities, he noticed the investments were not performing as Chappell had promised.  Cherry contacted Chappell and asked about the investments.  Chappell told Cherry that his principal was guaranteed and that the market fluctuations did not affect his investments because of the guarantee. Chappell also told Cherry not to worry about his investments.

**B.    DR. LANCE DYESS**

28.    Dr. Lance Dyess was born in 1956.  Dyess ultimately attended UAB, where he received his M.D.  Dr. Dyess currently practices medicine in Elba, Alabama.

29.    Around 1998, Dyess contacted Chappell to assist him with his investments. At the time, Dyess was concerned about market volatility and wanted more stability in his portfolio.  Dyess told Chappell that he wanted low risk because he thought the market was unstable.  Chappell told Dyess that she could provide him "with the best of both worlds."  In Dyess' initial meeting with Chappell, Chappell informed Dyess that she could invest his funds in a product that would provide him a guaranteed six-percent return, compounded annually.    Chappell also promised Dyess that if the market outperformed the guaranteed six-percent rate, Dyess would get the benefit of the greater rate of return.  Finally, Chappell informed Dyess that at the end of a seven-year period, he would get his entire principal back.  Dyess specifically asked about these guarantees and Chappell told him that the SEC would not let her sell a product that did not have such financial stability.

30.    During Dyess' meetings with Chappell, Chappell never discussed Dyess' insurance needs.  Chappell also failed to inform Dyess that the variable annuity was an insurance product that only guaranteed part of his funds through a death benefit.  Had

6

Dyess known this, he would not have purchased the annuity. In fact, at the time Chappell convinced Dyess to invest in the variable annuity, Dyess already had life insurance and had no need for additional coverage.

31.    Dr. Dyess invested approximately $435,419.00 with Chappell and Equitable in November of 1998. The funds were placed in an Equitable Accumulator Rollover IRA, Contract number 98 684 790. Contrary to Chappell's promises, Dyess received neither a six-percent rate of return, nor the return of his guaranteed principal.

## C.    IRA EDMONDSON

32.    Ira Edmondson was born in 1938. Edmondson worked at Pea Rive Electric for over thirty years. During this time, Edmondson was very conservative, and placed his money in the Pea River Electric retirement plan and his 401(k). At the time of his retirement in 2000, Edmondson had accumulated over $400,000 in retirement savings.

33.    Edmondson first heard of Maxine Chappell through a presentation she made at "Wellness Day" at Pea River Electric. After hearing her presentation, Edmondson set up a meeting to discuss his finances. Edmondson attended the first meeting with his friend Douglas Cherry. In the meeting, Chappell gained the trust of Edmondson by telling him that she was a Christian and that she would watch out for his life savings.

34.    During the meeting, Chappell specifically told Edmondson that she could invest his life savings in a product that would provide him with a guaranteed five-percent return without exposing his principal to any risk.

35.    Chappell sold Edmondson two variable annuities. The first was an Equitable Accumulator annuity, number 300 611 540, in which Edmondson placed

7

approximately $206,217.00. The second was a Scudder Destinations annuity, Contract number KI11015009, in which Edmondson placed approximately $210,288.00.

### D.    JIMMY JONES

36.    Jimmy Jones was born in April of 1950 in Enterprise, Alabama. Jones graduated from high school and attended three years of college. In 1971, prior to finishing college, Jones went to work for GTE. After working for GTE for almost thirty years, Jones retired November of 1999.

37.    Prior to retiring in 1999, Jones received a call from Maxine Chappell. Chappell told Jones that she had heard he was retiring, and she wanted to meet with him about his retirement planning. Jones had heard about Chappell and knew that Chappell's brother worked for GTE, so he made an appointment with her. Jones and his wife met with Chappell. In the meeting, Jones emphasized that he wanted an investment that would protect his retirement savings and provide him with some income. Chappell told Jones and his wife, that she could provide him with an investment that would guarantee his principal and provide him with a guaranteed six-percent return. Based on Chappell's promises, Jones rolled over his retirement savings of approximately $207,495.00 to Raymond James in November of 1999.

38.    Chappell placed Jones' funds in Raymond James account # 80962527 and funding the account with a Putnam Hartford Capital Manager annuity, Contract number 710702480. However, after Jones invested with Chappell and Raymond James, he began to see a decline in his investments. Jones called Chappell on multiple occasions to question her about these losses. Chappell consistently said that everything was fine and that no changes needed to be made. After hearing this same response on numerous

8

occasions, Jones realized that Chappell had misrepresented the product, so he moved his investments to another broker in 2003.

### E.     RACHEL MCKINNEY

39.     Rachel McKinney was born in Dale County, Alabama in 1948. McKinney graduated high school, but did not attend college. In 1967, McKinney began work with GTE and worked as an operator, wirer, and electronic technician for approximately thirty years. In 1999, McKinney retired from GTE at the age of 50. At the time of her retirement, McKinney had accumulated savings of approximately $424,000.00.

40.     McKinney learned of Maxine Chappell through other GTE employees. McKinney also knew that Chappell's brother worked at GTE. McKinney ultimately heard Chappell speak at a presentation at Wallace College. After the presentation, McKinney made an appointment with Chappell.

41.     In McKinney's meeting with Chappell, McKinney told Chappell that she was conservative, needed some income, and that she could not afford to lose her life savings. McKinney also informed Chappell that her husband had retired in 1993 and that the couple had no other income.

42.     Chappell promised McKinney that her principal investment would be guaranteed and that the annuity would provide a guaranteed six-percent rate of return.

43.     On or around March 1999, Chappell sold McKinney an AIG Sun America Polaris II variable annuity, Contract number P3799510481.

### F.     LINDA MIDDLETON

9

44.    Linda Middleton was born in Houston County, Alabama in 1947. Middleton completed high school and began working for GTE. Middleton worked at GTE for thirty years.

45.    Middleton learned of Chappell from Chappell's brother, Ronald Hughes, who also worked at GTE. Middleton called Chappell and set up a meeting. During their initial meeting, Middleton informed Chappell that she needed income and wanted very conservative investments that would not place her life savings at risk. Chappell promised Middleton that she could place her savings in a product which would produce a guaranteed 5% rate of return and that would further guarantee the return of Middleton's principal investment at the end of seven years.

46.    Middleton invested approximately $190,605.00 with Chappell and Chappell placed Middleton's life savings in an Equitable Accumulator Rollover IRA, Contract number 99 629 647.

### G.    VICTOR STAFFORD

47.    Victor Stafford was born in 1943 in Clio, Alabama. Stafford attended school until eighth grade, at which point he had to quit school in order to work on his family farm. In 1970, Stafford began working with Pea River Electric. Stafford retired in March of 2005.

48.    Stafford first met Maxine Chappell at "Wellness Day" held at Pea River. After Chappell's presentation, Stafford contacted her to set up a meeting. Stafford and his wife met with Chappell around the end of 2000, prior to Stafford's retirement. During their initial meeting, Chappell told Stafford that she could invest his life savings

10

in a product which would provide him with a guaranteed five-percent return without exposing his principal to any risk.

49.    Chappell placed Stafford's retirement savings in two variable annuities: (1) AXA Equitable Accumulator variable annuity, Contract number 300 610 913, and (2) Putnam Hartford Capital Manager, Contract number 710804263.

## COUNT ONE
## FRAUD

50.    Plaintiffs re-allege all allegations of this Complaint.

51.    Defendants, through its/their agents, servants, and employees, made one or more of the following misrepresentations of material fact to the Plaintiffs:

(a)    That Plaintiffs were guaranteed a return on their investment after seven years of either 5% or 6% (the guaranteed minimum interest rate);

(b)    That after seven years (the applicability period to maturity), Plaintiffs could receive a lump sum payout of their principal plus the guaranteed interest, compounded annually; and

52.    The above representations were false, and Defendants knew they were false; or the Defendants recklessly misrepresented the facts without true knowledge thereof; or Defendants misrepresented the facts by mistake but did so with the intention that Plaintiffs should rely upon them.

53.    In reliance on those representations, Plaintiffs invested monies with Defendants.

11

54.    Defendants authorized, ratified, and/or condoned the acts of its employees or agents, including Chappell and others, and were calculated to or did benefit Defendants.

55.    Defendants engaged in a fraudulent scheme whereby investors, including the Plaintiffs, were duped into investing into Defendants' variable annuities. Through common misrepresentation, Defendants deceitfully tricked Plaintiffs and others into purchasing annuities. Plaintiffs were prevented from learning about their investments because Defendants purposefully and fraudulently withheld such information and purposefully and fraudulently responded falsely to Plaintiffs' inquiries.

56.    As a proximate consequence of Defendants' fraud and misrepresentations, Plaintiffs were injured and damaged as follows:

(a)    Plaintiffs have paid monies for an investment which was not what they had bargained for;

(b)    Plaintiffs did not earn either the applicable 5% or 6% interest on their investments;

(c)    Plaintiffs cannot obtain a return of their principal;

(d)    Plaintiffs' investments have not performed as represented by Defendants;

(e)    Plaintiffs have lost the opportunity to make alternative investments with their funds;

(f)    Plaintiffs have suffered anxiety, worry, mental anguish and emotional distress, inconvenience, embarrassment, humiliation and other incidental damages; and

12

(g)    Plaintiffs will incur expenses necessitated by the filing of this lawsuit.

57.    Defendants consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to Plaintiffs, thereby entitling Plaintiffs to punitive damages from these defendants.

58.    WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, in an amount exceeding the jurisdictional minimum of this Court, plus interest and all costs of this proceeding.

## COUNT TWO
## SUPPRESSION

59.    Plaintiffs re-allege all allegations of this Complaint.

60.    At the foresaid times and places, Defendants fraudulently failed to disclose to Plaintiffs and suppressed from the Plaintiffs the following material misrepresentations:

(a)    That Plaintiffs could lose money on their investment;

(b)    That Plaintiffs were not guaranteed the applicable rate of return, either 5% or 6%;

(c)    That Plaintiffs would not have access to all of their principal at the end of the contract period; and

(d)    That Plaintiffs should have been provided with a prospectus regarding all aspects of their investments either before or at the time of sale, which document was not provided to Plaintiffs.

13

61.    Plaintiffs acted as a result of the non-disclosure/suppression and/or fraudulent concealment and purchased the investment product of the Defendants.

62.    As a proximate consequence, Plaintiffs were injured and damaged as set forth above.

63.    Defendants consciously or deliberately engaged in suppression, fraud, wantonness, or malice with regard to Plaintiffs, thereby entitling Plaintiffs to punitive damages from these Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, in an amount exceeding the jurisdictional minimum of this Court, plus interest and all costs of this proceeding.

## COUNT THREE
## NEGLIGENT/WANTON TRAINING AND SUPERVISION

64.    Plaintiffs re-allege all allegations of this Complaint.

65.    Plaintiffs allege that agents, servants, and/or employees or Defendants negligently, wantonly, and/or willfully failed to adequately regulate, audit, supervise and/or monitor the activities of their agents and that Defendants negligently failed to detect and/or deter the misrepresentations of their agents.

66.    Defendants knew of or should have known of the misrepresentations of their agents.

67.    Defendants impliedly authorized or ratified the conduct of their agents, and their agents were calculated to or did benefit Defendants.

68.    As a result of Defendants' actions, the Plaintiffs were injured and damaged as alleged above.

14

69.    Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to Plaintiffs, thereby depriving Plaintiffs of legal rights and entitling Plaintiffs to punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, in an amount exceeding the jurisdictional minimum of this Court, plus interest and all costs of this proceeding.

## COUNT FOUR
## BREACH OF CONTRACT

70.    Plaintiffs re-allege all previous allegations contained in this Complaint.

71.    Under the terms of their contracts, Plaintiffs were to have access to a lump sum pay out of their investment, including the 5% or 6% compounded annually after either seven years.

72.    Plaintiffs aver that under the terms of their contracts, plaintiffs were to have 90% access to a lump sum pay out of their investment, including the 5% or 6% guaranteed return compounded annually, without penalty after seven years.

73.    Plaintiffs allege that Defendants breached their contracts with Plaintiffs in that they did not provide Plaintiffs with the product they bargained for.

74.    As a proximate consequence of Defendants' breach of contract, Plaintiffs have been damages as set forth above.

75.    Plaintiffs allege that the contractual duty owed Plaintiffs by Defendants is so related with matters of mental concern or apprehensiveness or with feelings of Plaintiffs, that a breach of that duty reasonably resulted in mental anguish to Plaintiffs

15

and that Plaintiffs are entitled to recover for such mental anguish, physical suffering, annoyance, and inconvenience.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, in a mount exceeding the jurisdictional minimum of this Court, plus interest and all costs of this proceeding.

### COUNT FIVE
### CONVERSION

76.    Plaintiffs re-allege all allegations of this Complaint.

77.    Plaintiffs aver that Defendants converted monies from Plaintiff's accounts.

78.    Plaintiffs further aver that such conversion was wanton, willful, and/or malicious.

79.    As a proximate result of the aforementioned wrongful conduct of Defendants, Plaintiffs have been damaged as set forth herein.

80.    Plaintiffs further aver that Defendants are guilty of conduct evincing a pattern or practice of intentional misconduct, or are guilty of conduct involving actual malice.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, including interest and all costs of these proceedings, in an amount exceeding the jurisdictional minimum of this Court.

### COUNT SIX
### CIVIL LIABILITY FOR ILLEGAL SALE OF SECURITIES

81.    Plaintiffs re-allege all allegations of this Complaint,

16

82.     This claim is brought pursuant to Ala. Code, 1975 § 8-6-19.

The Contract and Certificate offered and sold to Plaintiffs was a "security" as defined by
Ala. Code, 1975 § 8-6-2(10).

83.     Each of the Defendants directly or indirectly through their agents
personally participated in the offering and sale of a security to Plaintiffs and acted as
either a "seller" or "offeror" of the Annuity Contract and Certificate.

84.     Defendants offered and sold a security to the Plaintiffs by means of untrue
statements of material facts and omissions of material facts.  Defendants knew, or in the
exercise of reasonable care, should have known the untruths and omissions.  Plaintiffs
were unaware of Defendants' misrepresentations and omissions at the time he purchased
the investment.

85.     As a proximate result of the aforementioned wrongful conduct of
Defendants, Plaintiffs have suffered damages as previously described herein.

WHEREFORE, Plaintiffs demand judgment against Defendants, and pursuant to
Ala. Code, 1975 § 8-6-19(a), seeks to recover the consideration paid for the security,
together with interest at six percent per year from the date of payment, court costs and
reasonable attorneys' fees.

### COUNT SEVEN
### VIOLATION OF ALABAMA SECURITIES LAW

86.     Plaintiffs re-allege all allegations of this Complaint.

87.     This cause of action is brought pursuant to Ala. Code, 1975 § 8-6-19 (a)
(1) and Rule 830-X-3-.12 of the Alabama Securities Commission.

Plaintiffs aver that Defendants violated the foresaid provision in that:

17

(a) Defendants did not have reasonable grounds to believe that their recommendations were suitable for the Plaintiffs;

(b) Defendants failed to make reasonable inquiry concerning the Plaintiffs' investment objectives, financial situation and needs; and

(c) Defendants acted in furtherance of their own gain at the expense and detriment of Plaintiffs.

88.    As a proximate result of the aforementioned wrongful conduct of Defendants, Plaintiffs have suffered damages as previously described herein.

WHEREFORE, Plaintiffs demand judgment against Defendants, and pursuant to Ala. Code, 1975 § 8-6-19(a), seeks to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees.

## COUNT EIGHT
## BREACH OF FIDUCIARY DUTY

89.    Plaintiffs re-allege all allegations of this Complaint.

90.    Because of the relationship of the parties, Defendants owed Plaintiffs a duty to act in fairness and utmost good faith by placing Plaintiffs' personal interests above Defendants' own gain.

91.    Defendants breached their duty owed Plaintiffs as set forth above.  In breaching these fiduciary duties, Defendants acted knowingly, deliberately and/or recklessly and place their own profit, objectives and success ahead of and to the detriment of the profit, success and objectives of Plaintiffs.

92.    At all times hereinafter mentioned, Defendant Chappell was acting within the line and scope of her employment or agency with the Defendants.

18

93.    As a proximate consequence of Defendants' breach of duty, Plaintiffs have suffered damages as previously described in this Complaint.

94.    Defendants consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to Plaintiffs, thereby depriving them of legal rights and entitling Plaintiffs to punitive damages.

95.    Plaintiffs further aver that Defendants are guilty of conduct evincing a pattern or practice of intentional misconduct or are guilty of conduct involving actual malice.

WHEREFORE, Plaintiffs demand judgment against Defendants for damage, including actual and punitive, in such a sum as a jury shall reasonably assess, including interest and all costs of these proceedings, in an amount exceeding the jurisdictional minimum of this Court.

## COUNT NINE
## NEGLIGENCE AND WANTONNESS

96.    Plaintiffs re-allege all allegations of this Complaint.

97.    Plaintiffs aver that Defendants negligently and/or wantonly failed to adhere to established policies and procedures regarding the selection of investment options, the determination of a customer's suitability for a variable annuity product, and the dissemination or disclosure of the risk, fees, and charges associated with a variable annuity.

98.    The negligence and/or wantonness of Defendants was a proximate cause of Plaintiffs' damages as set forth herein.

19

99.    Defendants consciously or deliberately engaged in oppression, fraud, wantonness or malice with regard to Plaintiffs, thereby depriving Plaintiffs of legal rights and entitling him to punitive damages against Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, including interest and all costs of these proceedings, in an amount exceeding the jurisdictional minimum of this Court.

Date:    September 4, 2007.


Respectfully submitted,



Richard S. Frankowski (ASB-1734-h70f)
*Attorney for Plaintiffs*


**OF COUNSEL:**
**BURKE HARVEY & FRANKOWSKI, LLC**
One Highland Place
2151 Highland Avenue
Suite 120
Birmingham, AL 35205
Tel:   205-930-9091
Fax:  205-930-9054
rfrankowski@bhflegal.com

## JURY DEMAND

Plaintiffs demand a trial by struck jury in the above entitled cause.


OF COUNSEL

20

**DEFENDANTS MAY BE SERVED BY CERTIFIED MAIL RETURN RECEIPT REQUESTED, AS FOLLOWS:**

AIG SunAmerica Life Assurance Company
1 SunAmerica Center
Los Angeles, CA 90067-6022

AXA Equitable Life Insurance Company
f/k/a Equitable Life Assurance Society of the United States
1290 Avenue of the Americas
New York, NY 10104

AXA Distributors, LLC
f/k/a Equitable Distributors, LLC
1290 Avenue of the Americas
7th Floor
New York, NY 10104

Hartford Life Insurance Companies
P.O. Box 5085
Hartford, CT 06102-5085

Kemper Investors Life Insurance Company
1600 McConnor Parkway
Schaumburg, Illinois 60196-6801

Maxine Chappell
4864 S. Beverley Road
Dothan, AL 36301

*Original*

AVSO350

ALABAMA JUDICIAL DATA CENTER
HOUSTON        COUNTY

SUMMONS

CV 2007 000508.00*A*

--------------------------------------------------------------------

IN THE CIRCUIT  COURT OF  HOUSTON        COUNTY

DOUGLAS CHERRY DR ET AL VS AIG SUNAMERICA LIFE ASSURANCE CO ET AL

SERVE ON: (D006)

SSN: 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                    PLAINTIFF'S ATTORNEY

CHAPPELL MAXINE                     FRANKOWSKI RICHARD SJR
4864 S. BEVERLEY ROAD               ONE HIGHLAND PLACE
                                    2151 HIGHLAND AVENUE
DOTHAN        ,AL 36301-0000        BIRMINGHAM      ,AL 35205-0000

--------------------------------------------------------------------

TO THE ABOVE NAMED DEFENDANT:

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST
TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE
REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER
ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFFS
ATTORNEY(S) SHOWN ABOVE OR ATTACHED:

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS
AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGEMENT BY DEFAULT MAY BE
ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

--------------------------------------------------------------------

( )    TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY EITHER RULES 4.1(B)(2) OR
       4.2(B)(2) OR 4.4(B)(2) OF THE ALABAMA RULES OF CIVIL PROCEDURE:
       YOU ARE HEREBY COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE
       COMPLAINT IN THIS ACTION UPON DEFENDANT.

       THIS SERVICE BY CERTIFIED MAIL OF THIS SUMMONS IS INITIATED UPON THE
       WRITTEN REQUEST OF                      PURSUANT TO RULE 4.1(C)
       OF THE ALABAMA RULES OF CIVIL PROCEDURE.    *Carla Woodall*

DATE: 09/13/2007                    CLERK:CARLA WOODALL
                                          114 NORTH OATES STREET
                                          DOTHAN  AL  36302
                                          (334)677-4859

*7006-2150-0002-6020-4576*
--------------------------------------------------------------------

RETURN ON SERVICE:

( )    CERTIFIED MAIL RETURN RECEIPT IN THIS OFFICE ON (DATE) _____
       (RETURN RECEIPT HERETO ATTACHED)

( )    I CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE SUMMONS AND
       COMPLAINT TO _____
       IN _____ COUNTY, ALABAMA ON (DATE) _____

DATE _____       SERVER SIGNATURE _____

SERVER ADDRESS _____       TYPE OF PROCESS SERVER _____

--------------------------------------------------------------------
OPERATOR: MAB
PREPARED: 09/13/2007



| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ ☐ Agent ☐ Addressee<br>B. Received by ( Printed Name)  C. Date of Delivery 9-14-07 |
| 1. Article Addressed to:<br><br>Maxine Chappell<br>4864 S. Beverley Rd.<br>Dothan, AL 36301 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No<br><br>SEP 17 2007<br><br>3. Service Type  Della Woodall, Clerk<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee) ☐ Yes |
| 2. Article Number<br>(Transfer from service label) | 7006 2150 0002 6020 4546 |
| PS Form 3811, February 2004   Domestic Return Receipt  CV-07-508A | 102595-02-M-1540 |

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE    FILED    508A

| | |
|---|---|
| Postage | $ 1.48 |
| Certified Fee | 2.65 |
| Return Receipt Fee (Endorsement Required) | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 6.2 |

SEP 1 2007
DOTHAN AL 36

Della Woodall, Clerk
Houston County, AL

Sent To Maxine Chappell
Street, Apt. No.; or PO Box No. 4864 S. Beverley Rd.
City, State, ZIP+4 Dothan, AL 36301

PS Form 3800, August 2006    See Reverse for Instructions

7006 2150 0002 6020 4546

*Original*

AVSO350                                ALABAMA JUDICIAL DATA CENTER
                                       HOUSTON           COUNTY
                                            SUMMONS
                                                              CV 2007 000508.00 A

-------------------------------------------------------------------------

                IN THE CIRCUIT   COURT OF   HOUSTON        COUNTY

DOUGLAS CHERRY DR ET AL VS AIG SUNAMERICA LIFE ASSURANCE CO ET AL

        SERVE ON: (D002)
        SSN: 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                        PLAINTIFF'S ATTORNEY
        AXA EQUIVABLE LIFE INSURANCE C          FRANKOWSKI RICHARD SJR
        LIFE ASSURANCE SOCIETY US               ONE HIGHLAND PLACE
        1290 AVENUE OF AMERICAS                 2151 HIGHLAND AVENUE
        NEW YORK        ,NY  10104-0000         BIRMINGHAM     ,AL  35205-0000
-------------------------------------------------------------------------

TO THE ABOVE NAMED DEFENDANT:

   THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST
TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE
REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER
ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFFS
ATTORNEY(S) SHOWN ABOVE OR ATTACHED:

   THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS
AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGEMENT BY DEFAULT MAY BE
ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

-------------------------------------------------------------------------

   ( )   TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY EITHER RULES 4.1(B)(2) OR
         4.2(B)(2) OR 4.4(B)(2) OF THE ALABAMA RULES OF CIVIL PROCEDURE:
         YOU ARE HEREBY COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE
         COMPLAINT IN THIS ACTION UPON DEFENDANT.

   (X)   THIS SERVICE BY CERTIFIED MAIL OF THIS SUMMONS IS INITIATED UPON THE
         WRITTEN REQUEST OF                          PURSUANT TO RULE 4.1(C)
         OF THE ALABAMA RULES OF CIVIL PROCEDURE.
                                              *Carla Woodall*
   DATE: 09/13/2007                    CLERK:CARLA WOODALL
                                             114 NORTH OATES STREET
                                             DOTHAN AL  36302
                                             (334)677-4859

*7006-2150-0002-6020-4508*
-------------------------------------------------------------------------

      RETURN ON SERVICE:

   ( )   CERTIFIED MAIL RETURN RECEIPT IN THIS OFFICE ON (DATE) _____
         (RETURN RECEIPT HERETO ATTACHED)

   ( )   I CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE SUMMONS AND
         COMPLAINT TO _____
         IN _____ COUNTY, ALABAMA ON (DATE) _____

   _____                    _____
   DATE                                   SERVER SIGNATURE

   _____                    _____
   SERVER ADDRESS                         TYPE OF PROCESS SERVER

-------------------------------------------------------------------------
OPERATOR: MAB
PREPARED: 09/13/2007

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

AXA Equitable Life
Insurance Company
1290 Avenue of the
Americas
New York, NY 10104

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

FILED    9/1/1/

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

SEP 2 8 2007

Carla Woodall
Carla Woodall, Clerk

3. Service Type  Houston Coun
   ☐ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7006 2150 0002 ____ 4508

PS Form 3811, February 2004    Domestic Return Receipt    CV-07-508A    102595-02-M-1540



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | 1.4 |
| Certified Fee | | 2.65 |
| Return Receipt Fee (Endorsement Required) | | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 6.28 |

Sent To
*AXA Equitable Life Ins. Co.*
Street, Apt. No.,
or PO Box No. *1290 Avenue of the Americas*
City, State, ZIP+4 *NY NY 10104*

PS Form 3800, August 2006                    See Reverse for Instructions

7006 2150 0002 4020 4508

*Original*

AVSO350

ALABAMA JUDICIAL DATA CENTER
HOUSTON          COUNTY

SUMMONS

CV 2007 000508.00 A

---

IN THE CIRCUIT  COURT OF  HOUSTON       COUNTY

DOUGLAS CHERRY DR ET AL VS AIG SUNAMERICA LIFE ASSURANCE CO ET AL

SERVE ON: (D003)

SSN: 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

AXA DISTRIBUTORS LLC FKA EQUIT
1290 AVE OF THE AMERICAS
7TH FLOOR
NEW YORK       ,NY 10104-0000

PLAINTIFF'S ATTORNEY

FRANKOWSKI RICHARD SJR
ONE HIGHLAND PLACE
2151 HIGHLAND AVENUE
BIRMINGHAM     ,AL 35205-0000

---

TO THE ABOVE NAMED DEFENDANT:

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST
TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE
REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER
ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFFS
ATTORNEY(S) SHOWN ABOVE OR ATTACHED:

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS
AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGEMENT BY DEFAULT MAY BE
ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

---

TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY EITHER RULES 4.1(B)(2) OR
4.2(B)(2) OR 4.4(B)(2) OF THE ALABAMA RULES OF CIVIL PROCEDURE:
YOU ARE HEREBY COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE
COMPLAINT IN THIS ACTION UPON DEFENDANT.

THIS SERVICE BY CERTIFIED MAIL OF THIS SUMMONS IS INITIATED UPON THE
WRITTEN REQUEST OF _____ PURSUANT TO RULE 4.1(C)
OF THE ALABAMA RULES OF CIVIL PROCEDURE.

DATE: 09/13/2007

CLERK: CARLA WOODALL
114 NORTH OATES STREET
DOTHAN  AL  36302
(334)677-4859

7006-2150-0002-6020-4515

---

RETURN ON SERVICE:

( )  CERTIFIED MAIL RETURN RECEIPT IN THIS OFFICE ON (DATE) _____
     (RETURN RECEIPT HERETO ATTACHED)

( )  I CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE SUMMONS AND

     COMPLAINT TO _____

     IN _____ COUNTY, ALABAMA ON (DATE) _____

DATE _____        SERVER SIGNATURE _____

SERVER ADDRESS _____        TYPE OF PROCESS SERVER _____

---

OPERATOR: MAB
PREPARED: 09/13/2007

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _Jubim_     ☐ Agent   ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery

**FILED**

SEP 2 8 2007

_Debra Woodall_

1. Article Addressed to:

AxA Distributors, LLC
1290 avenue of the
Americas, 7th Floor
New York, NY 10104

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type Debra Woodall, Clerk
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7006 2150 0002 6020 4515

PS Form 3811, February 2004     Domestic Return Receipt   CV-07-508A   102595-02-M-1540

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ 1.4 | CV-07-508A |
| Certified Fee | 2.05 | DOTHAN AL 36302 |
| Return Receipt Fee (Endorsement Required) | 2.15 | |
| Restricted Delivery Fee (Endorsement Required) | SEP 2007 | |
| Total Postage & Fees | $ 6.28 | |

FILED

7006 2150 0002 6020 4515

Sent To AXA Distributors Carla Woodall, CUSO

Street, Apt. No.; or PO Box No. 1290 Ave. of the Americas

City, State, ZIP+4 NY NY 10104

PS Form 3800, August 2006    See Reverse for Instructions

*Original*

AVS0350

ALABAMA JUDICIAL DATA CENTER
HOUSTON          COUNTY

SUMMONS

CV 2007 000508.00 A

------------------------------------------------------------

IN THE CIRCUIT  COURT OF  HOUSTON          COUNTY

DOUGLAS CHERRY DR ET AL VS AIG SUNAMERICA LIFE ASSURANCE CO ET AL

SERVE ON: (D001)

SSN: 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

AIG SUNAMERICA LIFE ASSURANCE          PLAINTIFF'S ATTORNEY
NATIONAL LIFE INSUR CO                 FRANKOWSKI RICHARD SJR
1 SUNAMERICA CENTER                    ONE HIGHLAND PLACE
LOS ANGELES     ,CA  90067-6022        2151 HIGHLAND AVENUE
                                       BIRMINGHAM      ,AL  35205-0000
------------------------------------------------------------

TO THE ABOVE NAMED DEFENDANT:

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST
TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS, YOU OR YOUR ATTORNEY ARE
REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER
ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFFS
ATTORNEY(S) SHOWN ABOVE OR ATTACHED:

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS
AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGEMENT BY DEFAULT MAY BE
ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.
------------------------------------------------------------

( )  TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY EITHER RULES 4.1(B)(2) OR
     4.2(B)(2) OR 4.4(B)(2) OF THE ALABAMA RULES OF CIVIL PROCEDURE:
     YOU ARE HEREBY COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE
     COMPLAINT IN THIS ACTION UPON DEFENDANT.

(X)  THIS SERVICE BY CERTIFIED MAIL OF THIS SUMMONS IS INITIATED UPON THE
     WRITTEN REQUEST OF _____ PURSUANT TO RULE 4.1(C)
     OF THE ALABAMA RULES OF CIVIL PROCEDURE.     *Carla Woodall*

DATE: 09/13/2007                    CLERK:CARLA WOODALL
                                          114 NORTH OATES STREET
                                          DOTHAN AL  36302
                                          (334)677-4859
*7006-2150-0002-6020-4492*
------------------------------------------------------------

RETURN ON SERVICE:

( )  CERTIFIED MAIL RETURN RECEIPT IN THIS OFFICE ON (DATE) _____
     (RETURN RECEIPT HERETO ATTACHED)

( )  I CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE SUMMONS AND

     COMPLAINT TO _____

     IN _____ COUNTY, ALABAMA ON (DATE) _____

DATE _____          SERVER SIGNATURE _____

SERVER ADDRESS _____          TYPE OF PROCESS SERVER _____
------------------------------------------------------------
OPERATOR: MAB
PREPARED: 09/13/2007

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

AIG SunAmerica Life
Assurance Co.
1 SunAmerica Center
Los Angeles, CA 90067-6022

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
9-17-07

FILED

SEP 2 8 2007

Carla Woodall, Clerk
Houston County, AL

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☐ Certified Mail  ☐ Express Mail
   ☐ Registered      ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number          7006 2150 0002 6020 4492
   (Transfer from service label)

PS Form 3811, February 2004    Domestic Return Receipt   CV-07-508A    102595-02-M-1540



**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | 1.48 |
| Certified Fee | | 2.65 |
| Return Receipt Fee (Endorsement Required) | | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 6.28 |

7006 2150 0002 6020 4492

Sent To *AIG Sun America Life Assuran*
Street, Apt. No.; or PO Box No. *1 SunAmerica Center*
City, State, ZIP+4 *Los Angeles, CA 90067-6022*

PS Form 3800, August 2006          See Reverse for Instructions

AVSO350

ALABAMA JUDICIAL DATA CENTER
HOUSTON          COUNTY

SUMMONS

CV 2007 000508.00

------------------------------------------------------------

IN THE CIRCUIT  COURT OF  HOUSTON        COUNTY

DOUGLAS CHERRY DR ET AL VS AIG SUNAMERICA LIFE ASSURANCE CO ET AL

SERVE ON: (D004)

SSN: 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                    PLAINTIFF'S ATTORNEY

KEMPER INVESTORS LIFE INSURANC      FRANKOWSKI RICHARD SJR
1600 MCCONNOR PARKWAY               ONE HIGHLAND PLACE
                                    2151 HIGHLAND AVENUE
SCHAUMBURG    ,IL  60196-6801       BIRMINGHAM    ,AL  35205-0000

------------------------------------------------------------

TO THE ABOVE NAMED DEFENDANT:

 THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST
TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS, YOU OR YOUR ATTORNEY ARE
REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER
ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFFS
ATTORNEY(S) SHOWN ABOVE OR ATTACHED:

 THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS
AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGEMENT BY DEFAULT MAY BE
ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

------------------------------------------------------------

 ( )  TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY EITHER RULES 4.1(B)(2) OR
      4.2(B)(2) OR 4.4(B)(2) OF THE ALABAMA RULES OF CIVIL PROCEDURE:
      YOU ARE HEREBY COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE
      COMPLAINT IN THIS ACTION UPON DEFENDANT.

      THIS SERVICE BY CERTIFIED MAIL OF THIS SUMMONS IS INITIATED UPON THE
      WRITTEN REQUEST OF                        PURSUANT TO RULE 4.1(C)
      OF THE ALABAMA RULES OF CIVIL PROCEDURE.

 DATE: 09/13/2007                  CLERK: CARLA WOODALL
                                          114 NORTH OATES STREET
                                          DOTHAN AL  36302
                                          (334)677-4859

7006-2150-0002-6030-4539
------------------------------------------------------------

    RETURN ON SERVICE:

 ( )  CERTIFIED MAIL RETURN RECEIPT IN THIS OFFICE ON (DATE) _____
      (RETURN RECEIPT HERETO ATTACHED)

 ( )  I CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE SUMMONS AND

      COMPLAINT TO _____

      IN _____ COUNTY, ALABAMA ON (DATE) _____

 DATE _____        SERVER SIGNATURE _____

 SERVER ADDRESS _____         TYPE OF PROCESS SERVER _____

------------------------------------------------------------
OPERATOR: MAB
PREPARED: 09/13/2007



U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | 1.4? |
| Certified Fee | | 2.45 |
| Return Receipt Fee (Endorsement Required) | | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 6.28 |

Sent To: Kemper Investors Life Insurance Co
Street, Apt. No.; or PO Box No. 1600 McConnor Parkway
City, State, ZIP+4 Schaumburg, IL 60196-0801

7006 2150 0002 6020 4531

PS Form 3800, August 2006                    See Reverse for Instructions

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Kanzer Investors Life
Insurance Co.
1600 McConnor Parkway
Schaumburg, IL 60196-6801

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

SEP 2 8 2007

FILED

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☐ Certified Mail ☐ Express Mail
   ☐ Registered ☐ Return Receipt for Merchandise
   ☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)

7006 2150 0002 6020 4539

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

CV-07-508 A



*Original /*

AVSO350

ALABAMA JUDICIAL DATA CENTER
HOUSTON          COUNTY
SUMMONS

CV 2007 000508.00A

--------------------------------------------------------------

IN THE CIRCUIT  COURT OF  HOUSTON       COUNTY

DOUGLAS CHERRY DR ET AL VS AIG SUNAMERICA LIFE ASSURANCE CO ET AL

SERVE ON: (D005)

SSN: 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                      PLAINTIFF'S ATTORNEY

HARTFORD LIFE INSURANCE COMPAN        FRANKOWSKI RICHARD SJR
P.O. BOX 5085                         ONE HIGHLAND PLACE
                                      2151 HIGHLAND AVENUE
HARTFORD       ,CT  06102-5085        BIRMINGHAM    ,AL  35205-0000

--------------------------------------------------------------

TO THE ABOVE NAMED DEFENDANT:

  THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST
TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS, YOU OR YOUR ATTORNEY ARE
REQUIRED TO MAIL OR HAND DELIVER A COPY OF A WRITTEN ANSWER, EITHER
ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT TO THE PLAINTIFFS
ATTORNEY(S) SHOWN ABOVE OR ATTACHED:

  THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS
AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGEMENT BY DEFAULT MAY BE
ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

--------------------------------------------------------------

( )   TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY EITHER RULES 4.1(B)(2) OR
      4.2(B)(2) OR 4.4(B)(2) OF THE ALABAMA RULES OF CIVIL PROCEDURE:
      YOU ARE HEREBY COMMANDED TO SERVE THIS SUMMONS AND A COPY OF THE
      COMPLAINT IN THIS ACTION UPON DEFENDANT.

      THIS SERVICE BY CERTIFIED MAIL OF THIS SUMMONS IS INITIATED UPON THE
      WRITTEN REQUEST OF                         PURSUANT TO RULE 4.1(C)
      OF THE ALABAMA RULES OF CIVIL PROCEDURE.

                                        *Carla Woodall*

DATE: 09/13/2007              CLERK:CARLA WOODALL
                                    114 NORTH OATES STREET
                                    DOTHAN  AL  36302
                                    (334)677-4859

*7006 - 2150 - 0002 - 6020 - 4520*

-----------------------------------------------

  RETURN ON SERVICE:

( )   CERTIFIED MAIL RETURN RECEIPT IN THIS OFFICE ON (DATE) _____
      (RETURN RECEIPT HERETO ATTACHED)

( )   I CERTIFY THAT I PERSONALLY DELIVERED A COPY OF THE SUMMONS AND

      COMPLAINT TO _____

      IN _____ COUNTY, ALABAMA ON (DATE) _____

  DATE                              SERVER SIGNATURE

  SERVER ADDRESS                    TYPE OF PROCESS SERVER

--------------------------------------------------------------
OPERATOR: MAB
PREPARED: 09/13/2007

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hartford Life Ins.
Companies
P.O. Box 5085
Hartford, CT 06102-5085

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X **Ben Blay**    ☐ Agent
                   ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

SEP 2 1 2007

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7006 2150 0002 6020 4522

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

CV-07-508A

FILED
SEP 13 2007

Houston, Texas



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

RECEIVED

DOUGLAS CHERRY, DR. LANCE DYESS,    2003 OCT 12  P 3: 34
IRA EDMONDSON, JIMMY JONES,
RACHEL MCKINNEY, LINDA              DEBRA P. HACKETT, CLK
MIDDLETON and VICTOR STAFFORD,      U.S. DISTRICT COURT
                                    MIDDLE DISTRICT ALA

        Plaintiffs,

v.

AIG SUNAMERICA LIFE ASSURANCE
COMPANY, f/k/a ANCHOR NATIONAL
LIFE INSURANCE COMPANY, AXA
EQUITABLE LIFE INSURANCE
COMPANY, f/k/a THE EQUITABLE LIFE
ASSURANCE SOCIETY OF THE UNITED
STATES, AXA DISTRIBUTORS, LLC, f/k/a
EQUITABLE DISTRIBUTORS, LLC,
KEMPER INVESTORS LIFE INSURANCE
COMPANY, HARTFORD LIFE
INSURANCE COMPANY and MAXINE
CHAPPELL,

        Defendants.

)
)
)
)
)
)  CIVIL ACTION NO. _____
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

---

**EXHIBIT E TO**
**JOINT NOTICE OF REMOVAL**

---

**Quarterly Portfolio Review**
Statement Period: April 01, 2000- June 30, 2000

300 610 913

Victor E Stafford
644 River Road
Ariton AL 36311

Statement Date : June 30, 2000
Contract Number : 300 610 913
Contract Type : Equitable
  Accumulator℠ (Rollover IRA)
Contract Date : April 05, 2000
Contract Owner : Victor E Stafford
Social Security # : 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
Annuitant Name : Victor E Stafford

---

Introducing enhanced internet access features. Now you can do interfund transfers among investment options and change the allocation for new contributions online. Just go to www.equitable.com and click on EQAccess.

| Portfolio Activity Summary | Quarter 4/ 5/2000 – 6/30/2000 | Year-To-Date 4/5/2000-6/30/2000 | Since Purchase 4/5/2000-6/30/2000 |
|---|---|---|---|
| Contributions | $241,058.71 | $241,058.71 | $241,058.71 |
| Requested Withdrawals | $0.00 | $0.00 | $0.00 |
| Net Investment Portfolio Results: | | | |
| Net Investment Fund Results | ($5,753.25) | | |
| **Current Total Portfolio Account Value** | **$235,305.46** | | |

---

## Your Portfolio Allocation

**Your Portfolio Account Value** is currently invested among the asset classes below. Totals may not be exact due to rounding. To review your investment strategy, contact your registered representative.





- 30 % Asset Allocation
- 24 % International Equity
- 25 % U.S. Equity
- 21 % Aggressive Equity

### For Assistance, Contact:

**Your Registered Representative:**
Ann S. Holman
Raymond James Financial Svcs.
Raymond James Financial
2431 W. Main
Westwood Park    Suite 603
Dothan AL 36301
334-677-2812

You can obtain current account information, including balances and unit values, any time you wish.

- Call our TOPS voice response system
  1-888-909-7770, or
- Visit our Website: www.equitable.com and
  click on EQAccess

If you want to speak to one of our Customer Service Representatives please call 800-789-7771 8:30 - 5:30 ET Monday - Friday

Cherry(RJFS)07106

Contract Owner:  Victor E Stafford
Contract Number:  300 610 913

## Contract Values and Benefits

|  | Prior Period Ending 4/5/2000 | Current Period Ending 6/30/2000 |
|---|---|---|
| Annuity Account Value | $241,058.72 | $235,305.46 |
| Cash Value | $224,184.61 | $218,431.35 |
| Death Benefit | $241,058.72 | $243,845.85 |

## Your Portfolio Summary As Of June 30, 2000

| Fund # | Investment Fund | Accumulation Units | Unit Value | Annuity Account Value |
|---|---|---|---|---|
| 083 | Alliance Small Cap Growth | 715.420 | $19.105 | $13,668.20 |
| 084 | Alliance Common Stock | 121.499 | $283.363 | $34,428.45 |
| 262 | EQ/Putnam Investor Growth | 1,694.864 | $20.705 | $35,092.63 |
| 265 | EQ/Putnam Int'l Equity | 1,210.937 | $19.710 | $23,867.93 |
| 267 | MFS Emerging Growth Comp. | 1,271.118 | $26.939 | $34,242.91 |
| 270 | Morgan Stanley Emerg. Mkt Eqty | 1,082.406 | $10.256 | $11,101.72 |
| 276 | BT International Equity | 1,684.301 | $13.815 | $23,268.94 |
| 641 | EQ/Alliance Premier Growth | 2,932.670 | $12.145 | $35,617.89 |
| 643 | Capital Guardian Research | 2,154.265 | $11.148 | $24,016.79 |

| Total Portfolio Account Value: | $235,305.46 |
|---|---|

## Your Transactions Processed During This Period

| Transaction Date | Transaction Type | Fund # | Fund Name | Transaction Units | Unit Value | Fund Amount |
|---|---|---|---|---|---|---|
| 4/5/2000 | Contribution | | $241,058.71 | | | |
| | | 083 | Alliance Small Cap Growth | 715.420 | $16.847 | $12,052.94 |
| | | 084 | Alliance Common Stock | 121.499 | $297.605 | $36,158.81 |
| | | 262 | EQ/Putnam Investor Growth | 1,694.864 | $21.334 | $36,158.81 |
| | | 265 | EQ/Putnam Int'l Equity | 1,210.937 | $19.906 | $24,105.87 |
| | | 267 | MFS Emerging Growth Comp. | 1,271.118 | $28.446 | $36,158.80 |
| | | 270 | Morgan Stanley Emerg. Mkt Eqty | 1,082.406 | $11.135 | $12,052.94 |
| | | 276 | BT International Equity | 1,684.301 | $14.312 | $24,105.87 |
| | | 641 | EQ/Alliance Premier Growth | 2,932.670 | $12.329 | $36,158.80 |
| | | 643 | Capital Guardian Research | 2,154.265 | $11.189 | $24,105.87 |

Cherry(RJFS)07107

Financial Information Continued on Next Page

2

## Description of Terms

Portfolio Activity Summary indicates the transactions, for the period being reported, which affected those values. (All numbers in parenthesis are negative).

Portfolio Value shows the Account Value at the beginning of the reporting period.

Net Investment Portfolio Results shows the amount by which the Annuity Account Value has changed due to investment results and/or market value adjustments during the period.

Net Investment Fund Results is the investment return associated with the variable investment funds, net of any applicable contract level charges. Investment management expenses charged to the fund are reflected in the Unit Value.

Total Portfolio Account Value shows the Account Value at the end of the reporting period.

Contract Values and Benefits is the Annuity Account Value, Cash Value, and Death Benefit for the end of the prior and current periods being reported.

Annuity Account Value shows the value of the Investment Funds.

Cash Value shows the amount payable to the Owner should the owner elect to surrender the contract.

Death Benefit shows the amount payable on the death of the annuitant.

Portfolio Summary shows the Annuity Account Value and the Investment Option(s) that are in effect at the end of the period. For each Investment Fund, Accumulation Units, Unit Value, and the Annuity Account Value of the Investment Fund are shown.

Putnam Hartford
Capital Manager
Variable Annuity Quarterly Statement
April 1, 2000 - June 30, 2000
Page 1 of 2

Invest Smart. A little more now could mean a lot later. Investing in Putnam Hartford Capital Manager variable annuity was a wise decision. Adding to your existing contract could be even wiser. Additional investments: create the opportunity to generate more income and earnings, increasing the potential income you may receive from your annuity contract; may increase the value of your annuity contract and the death benefit available to your beneficiaries; can accumulate on a tax-deferred basis over time. Talk to your financial advisor today about adding to your annuity contract.

Contract Number 710804263
Purchase Date April 17, 2000
Contract Type IRA

Victor E Stafford
644 River Road
Ariton AL  36311-7508

Owner Name Victor E Stafford
Annuitant Victor E Stafford

Summary

| | Quarter 4/1/00 - 6/30/00 | Year-To-Date 1/1/00 - 6/30/00 | Since Purchase 4/17/00 - 6/30/00 |
|---|---|---|---|
| Beginning Value | 0.00 | 0.00 | 0.00 |
| Premium Payments | 55,072.30 | 55,072.30 | 55,072.30 |
| Total Surrenders * | 864.00- | 864.00- | 864.00- |
| Annuity Performance | 8,772.03 | 8,772.03 | 8,772.03 |
| Ending Value | $62,980.33 | $62,980.33 | $62,980.33 |

Your Annuity at a Glance

23.3% OTC & Emerging Gro
20.2% Vista
20.0% New Opportunities
19.0% Voyager
17.5% Intl New Opportuns

For Assistance, Contact Either:
Your Investment Professional
Ann S Holman
RAYMOND JAMES FIN SVCS
2431 West Main Ste 603
Dothan          AL 36301 1250

Hartford Life, Inc.
Attn: Investment Products Services
PO Box 5085
Hartford CT 06102-5085
www.putnaminv.com
1-800-521-0538  Service Representative
1-800-992-8610  Automated Annuity Information
(24 hours a day)

* Total Surrenders include contingent deferred sales charges and annual maintenance fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. If you have any further questions, or for information, free of charge, on Fixed interest rates or crediting, call 1-800-521-0538 Monday - Friday 8:30am to 8:00pm (Eastern).

Cherry(RJFS)006266

Page 2 of 2

Purchase Date April 17, 2000                                    Owner Victor E Stafford
Contract Type IRA                              Contract Number 710804263
Product Version Putnam 6
Issuing Company Hartford Life and Annuity

Additional Information
YTD 2000 Taxable Distributions......................................................864.00
YTD 2000 State & Federal Taxes Withheld.............................................0.00

Value By Sub-Account

| | Future Contribution Allocation | Quarterly Sub-Account Performance | Units | X | Unit Value | = | Total Value |
|---|---|---|---|---|---|---|---|
| Intl New Opportuns | 20% | $150.61 | 582.650 | | 18.865989 | | 10,992.27 |
| OTC & Emerging Gro | 20% | $3,828.17 | 752.420 | | 19.496857 | | 14,669.83 |
| New Opportunities | 20% | $1,759.18 | 287.690 | | 43.800065 | | 12,600.84 |
| Vista | 20% | $1,880.83 | 510.520 | | 24.920641 | | 12,722.49 |
| Voyager | 20% | $1,153.24 | 137.775 | | 87.061538 | | 11,994.90 |
| Total | 100% | $8,772.03 | | | | | $62,980.33 |

Service Options

| | Enrollment Status | Amount or Date | Frequency | Next Occurrence |
|---|---|---|---|---|
| Dollar Cost Averaging | Not Elected | | | |
| Interest Averaging | Not Elected | | | |
| Asset Allocation | Not Elected | | | |
| Putnam Automatic Rebalancing | Not Elected | | | |
| Automatic Income* | Active | $432.00 | Monthly | 07/12/00 |
| InvestEase Contribution | Not Elected | | | |
| Optional Death Benefit | Not Elected | | | |

Please review the information on this statement carefully and report any discrepancies within 30 days.
*You have the option to change your income tax withholding election on future distributions. If you would like to do so, please contact Hartford Life in writing. Withholding too little tax may result in tax penalties. Hartford Life recommends that you consult a tax advisor for additional tax related questions.

Transaction Detail

| Date | Transaction | Units | Unit Value | Sub-Account Amount | Total Amount |
|---|---|---|---|---|---|
| 4/17/00 | Initial Contribution | | | | 55,072.30 |
| | Voyager | 139.857 | 78.755324 | 11,014.46 | |
| | New Opportunities | 291.992 | 37.721848 | 11,014.46 | |
| | Intl New Opportuns | 591.582 | 18.618640 | 11,014.46 | |
| | Vista | 518.039 | 21.261836 | 11,014.46 | |
| | OTC & Emerging Gro | 762.761 | 14.440256 | 11,014.46 | |
| 5/12/00 | Automatic Income Payment | | | | 432.00- |
| | Voyager | 1.068- | 80.933743 | 86.40- | |
| | New Opportunities | 2.251- | 38.378554 | 86.40- | |
| | Intl New Opportuns | 4.528- | 19.081678 | 86.40- | |
| | Vista | 3.882- | 22.259411 | 86.40- | |
| | OTC & Emerging Gro | 5.530- | 15.624450 | 86.40- | |
| 6/12/00 | Automatic Income Payment | | | | 432.00- |
| | Voyager | 1.014- | 85.223137 | 86.40- | |
| | New Opportunities | 2.051- | 42.119976 | 86.40- | |
| | Intl New Opportuns | 4.404- | 19.619379 | 86.40- | |
| | Vista | 3.637- | 23.753156 | 86.40- | |
| | OTC & Emerging Gro | 4.811- | 17.960320 | 86.40- | |

Cherry(RJFS)006267

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DOUGLAS CHERRY, DR. LANCE DYESS, IRA EDMONDSON, JIMMY JONES, RACHEL MCKINNEY, LINDA MIDDLETON and VICTOR STAFFORD, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| AIG SUNAMERICA LIFE ASSURANCE COMPANY, f/k/a ANCHOR NATIONAL LIFE INSURANCE COMPANY, AXA EQUITABLE LIFE INSURANCE COMPANY, f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, AXA DISTRIBUTORS, LLC, f/k/a EQUITABLE DISTRIBUTORS, LLC, KEMPER INVESTORS LIFE INSURANCE COMPANY, HARTFORD LIFE INSURANCE COMPANY and MAXINE CHAPPELL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

RECEIVED

2007 OCT 12 P 3: 33

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

CIVIL ACTION NO. _____

---

EXHIBIT F TO
JOINT NOTICE OF REMOVAL

---

# Cherry, Dyess, Edmondson, Jones, McKinney, Middleton, Stafford

## v.

# Raymond James and Associates

## NASD Case No. 05-03030

WHATLEY DRAKE KALLAS

Copyright Whatley Drake & Kallas LLC, 2006

Equity is justice in that it goes beyond the written law. And it is equitable to prefer arbitration to the law court, for the arbitrator keeps equity in view, whereas the judge looks only to the law, and the reasons why arbitrators were appointed was that equity might prevail.

*The Arbitrator's Manual at 1, citing Domke on Aristotle.*

Copyright Whatley Drake & Kallas LLC, 2006



# Claimants' Allegations

1) Breach of Fiduciary Duty

2) Breach of Contract

3) Fraud

4) Negligence

5) Negligent Misrepresentation/Omission

6) Negligent Supervision

7) Violation of Federal and State Securities Laws/ Violation of NASD Rules of Practice

**WHATLEY DRAKE KALLAS** LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Respondent's Choice of Law Provisions

## Raymond James's Client Agreement 12/98

*"Choice of Law: This agreement shall be construed in accordance with the laws of the State of Florida."*

RJFS/CHERRY02266-67

**WHATLEY DRAKE & KALLAS** LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Respondent's Choice of Law Provisions

## Raymond James's Client Agreement 11/99

*"Choice of Law: This agreement and any accounts opened hereunder shall be construed, interpreted and the rights of the parties shall be determined in accordance with the internal laws of the State of Florida (without referencing Choice of Law provisions of Florida or any other state)."*

RJFS/CHERRY02262-63

Copyright Whatley Drake & Kallas LLC, 2006

# Respondent's Choice of Law Provisions

## Raymond James's Client Agreement 04/01

*"Choice of Law: This agreement and any accounts opened hereunder shall be construed, interpreted and the rights of the parties shall be determined in accordance with the internal laws of the State of Florida (without referencing Choice of Law provisions of Florida or any other state)."*

RJFS/CHERRY02260-61



Copyright Whatley Drake & Kallas LLC, 2006

# Respondent's Choice of Law Provisions

▶ Any ambiguity in a contract is construed against the drafter.

*Brewbaker Motors, Inc. v. Belser*, 776 So.2d 110 (Ala. 2000)

▶ Rules of construction require that contracts be construed against the drafter.

*Vargas v. Schweitzer-Ramras*, 878 So.2d 415 (Fla.App. 3 Dist. 2004)

WHATLEY DRAKE & KALLAS LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Breach of Fiduciary Duty

## These duties include:

▼ (1) duty to recommend investment only after studying it sufficiently to become informed as to its nature, price, and financial prognosis;

▼ (2) duty to perform customer's orders promptly in a manner best suited to serve customer's interests;

▼ (3) duty to inform customer of risks involved in purchasing or selling a particular security;

▼ (4) duty to refrain from self-dealing;

Copyright Whatley Drake & Kallas LLC, 2006

**WHATLEY DRAKE & KALLAS** LLC

# Breach of Fiduciary Duty

## These duties include: (cont.)

▶ (5) duty not to misrepresent any material fact to transaction; and

▶ (6) duty to transact business only after receiving approval from customer.

*Ward v. Atlantic Sec. Bank, 777 So.2d 1144 (Fla. App. 3. Dist. 2001).*

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE KALLAS LLC

# Breach of Fiduciary Duty

**Respondent breached its fiduciary duty to Claimants:**

▶ Chappell placed Claimants' portfolios in 90-100% equities.

▶ Chappell did not inform customers of the risks involved in the annuity subaccounts.

▶ Chappell misrepresented material facts in that she did not mention annuities, annuitization, or insurance.

WHATLEY DRAKE KALLAS LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Breach of Contract

## The elements of an action for breach of contract are:

▼ (1) the existence of a contract,

▼ (2) a breach of the contract, and

▼ (3) damages resulting from the breach.

*Rollins, Inc. v. Butland,* 932 So.2d 1172, 1187 (Fla. App. 2 Dist. 2006) citing *Knowles v. C.I.T. Corp.,* 346 So.2d 1042, 1043 (Fla. 1st DCA 1977).

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS LLC

# Breach of Contract

## Raymond James's Client Agreements

"Applicable Regulations: (a) I understand and agree that every transaction in my account is subject to the rules or customs in effect at the time of the transaction which, by the terms of the rule or custom, applies to the transaction. These rules or customs include state and federal laws, rules and regulations established by state or federal agencies, the Constitution, rules, customs and usages of the applicable exchange, association, market or clearinghouse or customs and usages of individuals transacting business on the applicable exchange, market or clearinghouse."



Copyright Whatley Drake & Kallas LLC, 2006

# Breach of Contract

## Respondent breached its contracts with Claimants:

▶ Claimants entered into contracts with Raymond James.

▶ Respondent, through Chappell, violated state tort laws, federal and state securities laws, and NASD rules and regulations.

▶ Claimants sustained significant financial losses as a result of the breach.

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS LLC

# Fraud

## The essential elements of a fraud claim are:

▼ (1) a false statement, or intentional omission, concerning a specific material fact;

▼ (2) maker's knowledge that representation is false;

▼ (3) an intention that representation induces another's reliance; and

▼ (4) consequent injury by other party acting in reliance on interpretation.

*Ward v. Atlantic Sec. Bank* 777 So.2d 1144 (Fla.App. 3 Dist. 2001).

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS LLC

# Fraud and Justifiable Reliance

▼ Determinations of whether an investor's reliance is justified requires the consideration of all relevant factors, including:

▼ 1.   the sophistication and expertise of the plaintiff in financial and security matters;

▼ 2.   the existence of a long standing business or personal relationship between the plaintiff and defendant;

▼ 3.   the plaintiff's access to relevant information;

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS LLC

# Justifiable Reliance (cont.)

▼ 4.  the existence of a fiduciary relationship owed by the defendant to the plaintiff;

▼ 5.  concealment of fraud by the defendant;

▼ 6.  whether the plaintiff initiated the stock transaction; and

▼ 7.  the generality or specificity of the misrepresentations.

*Bruschi v. Brown,* 876 F.2d 1526 (11th Cir. 1989)

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE KALLAS LLC

# Fraud – Justifiable Reliance (cont.)

▼ One to whom a positive, distinct, and definite representation has been made need not make further inquiry concerning particular facts involved, and he is entitled to rely on such representations.

*Shepard v. Wyse*, 374 So.2d 1173 (Fla.App. 1Dist., 1979)

▼ A party who relies on misrepresentations must show it exercised some diligence in investigating the misrepresentation, unless it is shown that the fraudulent party had superior knowledge.

*Adams v. Prestressed Systems, Industries*, 625 So.2d 895 (Fla.App. 1Dist. 1993)

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE KALLAS LLC

# Fraud

## Respondent defrauded Claimants:

▼ Guaranteed Claimants principle plus between 5% and 6%

▼ Chappell knew or should have known this was a false representation

▼ Chappell made false statements and omitted material facts in her presentation to Claimants to fraudulently induce their reliance.

▼ Claimants suffered significant financial losses because of Respondent's fraud.

Copyright Whatley Drake & Kallas LLC, 2006

**WHATLEY DRAKE & KALLAS** LLC

# Negligence

## The elements of negligence are:

▼ (1) the existence of a duty recognized by law requiring the defendant to conform to a certain standard of conduct for the protection of others including the plaintiff;

▼ (2) a failure on the part of the defendants to perform that duty; and

▼ (3) an injury or damage proximately caused by such a failure.

*Superior Garlic Intern. v. E & A Corp.*, 913 So.2d 645, (Fla. App. 3. Dist. 2005).

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS

# Negligence
## Respondent negligently breached duties owed Claimants:

▶ Chappell possessed superior knowledge to Claimants regarding investments and owed a duty to Claimants to provide sound, individualized investment advice.

▶ Chappell breached her duty to Claimants by failing to explain or even mention essential features of the investment products.

▶ Claimants suffered significant financial losses due to Chappell's breach.

Copyright Whatley Drake & Kallas LLC, 2006

**WHATLEY DRAKE KALLAS** LLC

# Negligent Misrepresentation/Omission

## To state a cause of action for negligent misrepresentation:

▼ (1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false;

▼ (2) the defendant was negligent in making the statement because he should have known the representation was false;

Copyright Whatley Drake & Kallas LLC, 2006

# Negligent Misrepresentation/Omission

## To state a cause of action for negligent misrepresentation:

▼ (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and

▼ (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresentation.

*Romo v. Amedex Ins. Co.*, 31 Fla. L. Weekly D571 (Fla.App.3.Dist. 2006)

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE KALLAS LLC

# Negligent Misrepresentation/Omission

**Respondent negligently misrepresented essential facts to Claimants:**

▶ Chappell stated that Claimants' principle was guaranteed and knew or should have known that such a statement was false.

▶ Chappell omitted essential facts regarding Respondent's investment products and made promises to Claimants which she knew or should have known were false to induce their reliance on her investment advice.

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS LLC

# Negligent Supervision

**To prevail on a theory of negligent supervision, appellant must prove the basic elements of negligence:**

▶ (1) a legal duty to supervise;

▶ (2) a negligent breach of that duty; and

▶ (3) proximate causation of the Plaintiff's injury by the negligence.

*Roberson v. Duval County School Bd.* 618 So.2d 360, 362 (Fla.App. 1 Dist. 1993).

WHATLEY DRAKE KALLAS LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Violation of Florida Securities Laws

## I. Violation of the Florida Securities Investors Protection Act § 517.301:

▶ 1. To employ any device, scheme, or artifice to defraud;

▶ 2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

**WHATLEY DRAKE & KALLAS**™

Copyright Whatley Drake & Kallas LLC, 2006

# Violation of Florida Securities Laws

## I. Violation of the Florida Securities Investors Protection Act § 517.301: *(cont.)*

▼ 3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

WHATLEY DRAKE & KALLAS LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Violation of NASD Rules & Regulations

## II. NASD Rule 2310 (Suitability Rule)

The rule provides that a member shall have reasonable grounds for believing that [a] recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS

# Violation of NASD Rules & Regulations

## II. NASD Rule 2310 (Suitability Rule) *(cont.)*

The Suitability Rule also provides that a member shall make reasonable efforts to obtain information concerning: (a) the customer's financial status; (b) the customer's tax status; (c) the customer's investment objectives; and (d) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

WHATLEY DRAKE KALLAS LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Violation of NASD Rules & Regulations

## III. NASD Conduct Rule IM-2310.2 (Fair Dealing)

This NASD rule provides that members and registered representatives have a fundamental responsibility for dealing fairly with their customers. Respondents failed to follow this rule. They failed to deal fairly with Claimants by misrepresenting the terms, risks and benefits of the annuities they recommended, by omitting material facts about the annuities they recommended and by placing Claimants in unsuitable investments.

Copyright Whatley Drake & Kallas LLC, 2006

# Violation of NASD Rules & Regulations

**WHATLEY DRAKE KALLAS** LLC

## IV. NASD Rule 3010 (Failure to Supervise)

The National Association of Securities Dealers, Inc. (NASD) Rule 3010 requires each member to establish and maintain a system to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules. Raymond James failed to supervise Chappell. As a result of this failure, Claimants lost much of their retirement savings.

Copyright Whatley Drake & Kallas LLC, 2006

# Damages

▼ Compensatory
▼ Consequential
▼ Benchmark
▼ Punitive
▼ Rescission
▼ Attorneys' Fees and Costs
▼ Pre & Post Judgment Interest
▼ Such other relief as the Panel deems just and equitable.



Copyright Whatley Drake & Kallas LLC, 2006

# Damages
# Compensatory

## Summary of Market Adjusted Losses



|  | Out-of-Pocket Profit or Loss | Benchmark Allocation to Bonds | | | | |
|---|---|---|---|---|---|---|
|  |  | 0% | 50% | 60% | 70% | 100% |
| Cherry | ($13,663) | ($128,002) | ($215,172) | ($232,606) | ($250,039) | ($302,341) |
| Dyess | ($56,803) | ($128,829) | ($193,201) | ($206,075) | ($218,950) | ($257,573) |
| Edmondson | ($156,505) | ($81,831) | ($182,454) | ($202,578) | ($222,703) | ($283,076) |
| Jones | ($43,477) | ($25,488) | ($70,601) | ($79,623) | ($88,646) | ($115,713) |
| McKinney | ($54,193) | ($41,360) | ($114,670) | ($129,332) | ($143,993) | ($187,979) |
| Middleton | ($61,555) | ($53,368) | ($96,555) | ($105,193) | ($113,830) | ($139,743) |
| Stafford | ($90,366) | ($69,054) | ($136,828) | ($150,383) | ($163,937) | ($204,602) |
| | ($595,562) | ($527,934) | ($1,009,480) | ($1,105,790) | ($1,202,099) | ($1,491,027) |

Copyright Whatley Drake & Kallas LLC, 2006

# Damages

## Compensatory

**NASD Arbitrator's Manual**

"The recovery of compensatory damages is the primary reason a party brings a claim. An award of compensatory damages may include the party's actual dollar loss and any other damages."

**WHATLEY DRAKE KALLAS** LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Damages

## Benchmark – Well Managed Accounts

Under Florida law, investors may recover out-of-pocket damages, and in an appropriate case, benefit-of-the-bargain damages, which consist of investor's well managed account losses.

*Laney v. American Equity Inv. Life Ins. Co.,* 243 F.Supp.2d 1347 (M.D.Fla. 2003)

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE KALLAS LLC

# Damages

## Benchmark – Well Managed Accounts

### Summary of Market Adjusted Losses

**WHATLEY DRAKE & KALLAS** LLC

|  | Out-of-Pocket Profit or Loss | Benchmark Allocation to Bonds | | | | |
|---|---|---|---|---|---|---|
|  |  | 0% | 50% | 60% | 70% | 100% |
| Cherry | ($132,663) | ($128,002) | ($215,172) | ($233,606) | ($250,039) | ($302,341) |
| Dyess | ($56,803) | ($128,829) | ($193,201) | ($206,075) | ($218,950) | ($257,573) |
| Edmondson | ($156,505) | ($81,831) | ($182,454) | ($202,578) | ($222,703) | ($283,076) |
| Jones | ($43,477) | ($25,488) | ($70,601) | ($79,623) | ($88,646) | ($115,713) |
| McKinney | ($54,193) | ($41,360) | ($114,670) | ($129,332) | ($143,993) | ($187,979) |
| Middleton | ($61,555) | ($53,368) | ($96,555) | ($105,193) | ($113,830) | ($139,743) |
| Stafford | ($591,366) | ($69,054) | ($136,828) | ($150,383) | ($163,937) | ($204,602) |
|  | ($595,562) | ($527,934) | ($1,009,480) | ($1,105,790) | ($1,202,099) | ($1,491,027) |

Copyright Whatley Drake & Kallas LLC, 2006

# Damages

## Punitive

Punitive damages are recoverable where the tortious act complained of is fraud.

*Tinker v. De Maria Porsche Audi, Inc.*, 459 So.2d 487 (Fla.App. 3 Dist. 1984)

**WHATLEY DRAKE & KALLAS LLC**

Copyright Whatley Drake & Kallas LLC, 2006

# Damages

## Punitive

### NASD Arbitrator's Manual

"Arbitrators may consider punitive damages as a remedy. Generally, in court proceedings, punitive damages consist of compensation in excess of actual damages and are awarded as a form of punishment against the wrongdoer."

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS LLC

# Recsission

▶ The prime object of rescission is to undo the original transaction and restore the former status of the parties.

*Walker v. Eris*, 29, Fla. App. 1Dist., 2004

Copyright Whatley Drake & Kallas LLC, 2006



WHATLEY DRAKE & KALLAS LLC

# Rescission (cont.)

▶ In order that there be a contract, the parties must have a definite and distinct intention, common to both, and without doubt or difference. Until all understand alike, there can be no assent, and therefore no contract. Both parties must assent to the same thing in the same sense, and there minds must meet as to all the terms. Without a meeting of the minds, there can be no contract of any kind.

*David v. Richman,* So.2d 25 (Fla. 3d DCA 1988).

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE & KALLAS LLC

# Damages

## Attorneys' Fees

The Florida Securities statute, F.S.A. § 517.211 provides:

"In any action brought under this section, including an appeal, the court shall award reasonable attorneys' fees to the prevailing party unless the court finds that the award of such fees would be unjust."

WHATLEY DRAKE KALLAS LLC

Copyright Whatley Drake & Kallas LLC, 2006

# Damages
## Attorneys' Fees and Costs

455 hours x $200 = $91,000

+ Expenses = $34,900

$125,900

Copyright Whatley Drake & Kallas LLC, 2006

WHATLEY DRAKE KALLAS LLC

# Damages

## Pre & Post Judgment Interest

Florida statutory law provides for pre and post judgment interest at a rate of 9% per annum.

F.S.A. § 55.03

**WHATLEY DRAKE KALLAS** LLC

Copyright Whatley Drake & Kallas LLC, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

DOUGLAS CHERRY, DR. LANCE DYESS,
IRA EDMONDSON, JIMMY JONES,
RACHEL MCKINNEY, LINDA
MIDDLETON and VICTOR STAFFORD,

       Plaintiffs,

v.

AIG SUNAMERICA LIFE ASSURANCE
COMPANY, f/k/a ANCHOR NATIONAL
LIFE INSURANCE COMPANY, AXA
EQUITABLE LIFE INSURANCE
COMPANY, f/k/a THE EQUITABLE LIFE
ASSURANCE SOCIETY OF THE UNITED
STATES, AXA DISTRIBUTORS, LLC, f/k/a
EQUITABLE DISTRIBUTORS, LLC,
KEMPER INVESTORS LIFE INSURANCE
COMPANY, HARTFORD LIFE
INSURANCE COMPANY and MAXINE
CHAPPELL,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO. _____

---

**EXHIBIT G TO**
**JOINT NOTICE OF REMOVAL**

---

# BADDLEY & MAURO, L.L.C.
### TRIAL & APPELLATE COUNSEL

THOMAS E. BADDLEY, JR.                                    EMAIL: tbaddley@baddleymauro.com

October 11, 2007

John N. Bolus, Esq.
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North
Suite 2400
Birmingham, Alabama 35203

Re:    *Cherry v. AIG SunAmerica, AXA, et al.*

Dear John:

On behalf of my client Maxine Chappell, I write to confirm that she joins in and consents to the notice of removal to be filed by all of the remaining defendants in the above-referenced case.

Sincerely,

Thomas E. Baddley, Jr.
Attorney for Maxine Chappell

```
Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602000735
Cashier ID: kalandra
Transaction Date: 10/12/2007
Payer Name: MAYNARD COOPER AND GALE
-----------------------------------
CIVIL FILING FEE
 For: MAYNARD COOPER AND GALE
 Case/Party: D-ALM-1-07-CV-000923-001
 Amount:         $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 1080352
 Amt Tendered:  $350.00
-----------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00

Douglas Cherry et al v. AIG
Sunamerica et al
```