IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DOUGLAS CHERRY, DR. LANCE DYESS, IRA EDMONDSON, JIMMY JONES, RACHEL MCKINNEY, LINDA MIDDLETON and VICTOR STAFFORD, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | CIVIL ACTION NO. 1:07-CV-923-MEF |
| v. | ) ) | |
| AIG SUNAMERICA LIFE ASSURANCE COMPANY, f/k/a ANCHOR NATIONAL LIFE INSURANCE COMPANY, AXA EQUITABLE LIFE INSURANCE COMPANY, f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, AXA DISTRIBUTORS, LLC, f/k/a EQUITABLE DISTRIBUTORS, LLC, KEMPER INVESTORS LIFE INSURANCE COMPANY, HARTFORD LIFE INSURANCE COMPANY and MAXINE CHAPPELL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendant.** | ) | |

DEFENDANTS' RESPONSE
TO PLAINTIFFS' MOTION TO REMAND

Defendants AIG SunAmerica Life Assurance Company ("AIG SunAmerica"), AXA Equitable Life Insurance Company ("AXA Equitable"), AXA Distributors, LLC ("AXA Distributors"), Kemper Investors Life Insurance Company ("Kemper") and Hartford Life Insurance Company ("Hartford") (collectively referred to as "Defendants") hereby submit this Response to Plaintiffs' Motion to Remand. As set forth below, Plaintiffs' Motion to Remand is without basis in fact or law and should be denied. As stated in Defendants' Joint Notice of Removal and Maxine Chappell's Motion to Dismiss, Maxine Chappell ("Chappell") has been fraudulently joined in this action because all of Plaintiffs' claims against her are completely barred by the doctrine of res judicata and the "one satisfaction" and "one cause of action" rules.

While Plaintiffs' Motion to Remand asserts through various defective arguments that res judicata does not apply, the Motion wholly fails to address the fact that the "one satisfaction" and "one cause of action" rules completely bar Plaintiffs' claims against Chappell. Defendants' submission and arguments under these rules are unrebutted. Because Plaintiffs prevailed on the same causes of action against Raymond James and accepted satisfaction of the arbitration panel's award, Plaintiffs are now barred from splitting their cause of action to seek additional damages against Chappell. *See* Notice of Removal at p. 14; Motion to Dismiss at pp. 12-14.

Moreover, Plaintiffs' claims against Chappell are also barred by the clear doctrine of res judicata, because Chappell stands in direct privity with Raymond James and the claims in this action are the same as those in Plaintiffs' first action. Plaintiffs' meritless arguments to the contrary must be rejected. Because Chappell has been fraudulently joined in this action, this Court's jurisdiction is proper.

## I.     PLAINTIFFS' CLAIMS AGAINST CHAPPELL ARE BARRED BY THE "ONE SATISFACTION" AND "ONE CAUSE OF ACTION" RULES.

Plaintiffs have wholly failed to even address the conclusion that their claims against Chappell are barred by the "one satisfaction" and "one cause of action" rules. Plaintiffs' claims in this action arise out of the same cause of action as Plaintiffs' arbitration proceeding against Raymond James. *See* Notice of Removal at ¶¶ 25-27; Brief in Support of Motion to Dismiss at pp. 10-12; Section II, infra. Because Plaintiffs prevailed on the same cause of action in the arbitration proceeding and accepted satisfaction of the panel's award, Plaintiffs are now barred from splitting their cause of action to seek additional damages against Chappell.

Under long-established Alabama law, "where there has been a judgment against one of two joint tort-feasors, followed by an acceptance of satisfaction of such judgment by the plaintiff," a further action against the second joint tort-feasor is barred. *See Shepherd v. Maritime*

2

*Overseas Corp.*, 614 So.2d 1048, 1050 (Ala. 1993)(quoting *Jones v. Russell*, 206 Ala. 215, 218, 89 So. 660, 662-63 (1921); *see Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 220 F. Supp. 2d 1249, 1253 (N.D. Ala. 2002) ("If a plaintiff recovers judgment against one of the joint tort-feasors and obtains satisfaction, this operates as a discharge of the others."); *Wilbourn v. Ray*, 603 So. 2d 969, 972 (Ala. 1992) ("If a plaintiff recovers judgment against one joint defendant and obtains satisfaction of that judgment, this operates as a discharge of the other defendant."). "The conclusive presumption is that the full damages were awarded the plaintiff in the judgment that was satisfied." *Jones*, 89 So. at 663. "This age-old rule is 'founded on the principle that an injured party should not be allowed to recover more than once for the same wrong.'" *Ruiz de Molina*, 220 F. Supp. 2d at 1254 (quoting 47 Am. Jur. 2d Judgments §§ 1008, 1009 (1995)). The plaintiffs herein received an award against Raymond James based upon the alleged conduct of Chappell and its supervision of Chappell. Raymond James has satisfied that judgment, as evidenced by the correspondence to the NASD Dispute Resolution dated October 31, 2006, attached hereto as Exhibit A. Based upon that satisfaction, no further action based upon Chappell's conduct will lie.

The well-established "one satisfaction" rule is based on the premise that where joint tort-feasors cause a single injury, only one indivisible cause of action results from the injury, "[r]egardless of how the plaintiff seeks to couch the cause of action or damages claimed." *Ruiz de Molina*, 220 F. Supp. 2d at 1253 (citing *Shepherd*, 614 So.2d at 1050 (quoting *Jones*, 89 So. at 663)). This prevents a plaintiff from splitting a single cause of action into multiple actions in pursuit of the same wrong. As the Alabama Supreme Court has stated:

> Where one has received an injury at the hands of two or more
> persons acting in concert, or acting independently of each other, if
> their acts unite in causing a single injury, all of the wrongdoers are
> liable for the damages occasioned by the injury. It is also manifest

3

> that this single injury, in itself or of itself, indivisibly constitutes an
> indivisible cause of action. This is true, notwithstanding the fact
> that the party injured could maintain separate suits on this cause of
> action against the tort-feasors at the same time, and could have
> sued them jointly . . . But when she successfully prosecuted her
> single cause of action against one of the tort-feasors, and received
> satisfaction in full of the judgment, that was satisfaction for the
> entire injury, for the single cause of action, and after satisfaction,
> although it moved from only one of the tort-feasors no foundation
> remained for a suit against anyone. Her cause of action was
> extinguished.

*Jones*, 89 So. at 662-63 (quoted in *Ruiz de Molina*, 220 F. Supp. 2d at 1254-55). In addition,

"the fact that the plaintiff recovered only part of the damages to which he was entitled is

immaterial." *Ruiz de Molina*, 220 F. Supp. 2d at 1255 (holding that the fact that a plaintiff might

be able to recover a larger amount or different type of damages from a different tort-feasor "does

not alter the fact that the satisfaction of the prior final judgment extinguished his single cause of

action.").

Here, the Plaintiffs suffered a single alleged injury as a result of the variable annuity

contracts they purchased through Chappell. This alleged single injury created an indivisible

cause of action, which Plaintiffs successfully pursued in arbitration. Plaintiffs' acceptance of the

satisfaction of the panel's award extinguished any and all claims resulting from their cause of

action, whether against Raymond James or any other person or entity, and regardless of the

nature or amount of damages claimed. *See Jones*, 89 So. at 662-63; *Ruiz de Molina*, 220 F.

Supp. 2d at 1255. As such, Plaintiffs' current action against Chappell is barred by the "one

satisfaction" and "one cause of action" rules. Because Plaintiffs do not dispute these clear

conclusions of law, Plaintiffs can not possibly establish any grounds for recovery against

Chappell in this case.

## II. PLAINTIFFS' CLAIMS AGAINST CHAPPELL ARE COMPLETELY BARRED BY RES JUDICATA.

As a wholly separate and independent ground for finding fraudulent joinder, Plaintiffs' claims are barred by res judicata.

### A. Chappell shares privity with Raymond James, satisfying res judicata's identity of parties requirement.

Essentially ignoring the fact that Raymond James and Chappell stand in privity with one another for res judicata purposes, Plaintiffs allege that Chappell was properly joined in this case because she was not a party to Plaintiffs' first proceeding. This argument completely ignores the well established law of res judicata. Under the law of res judicata (which is quoted and underlined in the memorandum supporting Plaintiffs' Motion to Remand), complete identity of parties is not required. *See* Memorandum in Support of Motion to Remand at p. 13 (quoting *Baltimore S. S. Co. v. Phillips*, 274 U.S. 316, 319 (1927) ("the judgment or decree upon the merits in the first case is an absolute bar to the subsequent action or suit <u>between the same parties or those in privity with them</u>") (emphasis added by Plaintiffs)). As Plaintiffs acknowledge, the law is clear that persons in privity with a party to the initial action satisfy the "same parties" requirement. *Id.*; *see also Mangrum v. Alabama Medicaid Agency*, No. 3:06-cv-952-MEF, 2007 WL 779732 slip op. at *1 (M.D. Ala. March 13, 2007) (citing *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986)).

It is abundantly clear that Chappell and Raymond James share privity with each other for res judicata purposes. The agency relationship between Chappell and Raymond James alone, which served as the very basis for Raymond James' liability in Plaintiffs' first action, satisfies the privity requirement. *See* Arbitration Statement of Claim at ¶ 85, attached hereto as Exhibit E ("In committing the acts described in this claim, Respondent acted in conscious disregard of their

duty to Claimants in that Respondent, through its agent Chappell, misrepresented, deceived, and/or concealed from Claimants facts known or facts that should have been known to them"); Award at p. 3, attached hereto as Exhibit D (finding Raymond James liable for common law fraud and failure to supervise and control). It is undisputed that, during the time period at issue in Plaintiffs' first action (the same time period at issue in this action) Chappell was a registered representative of Raymond James, and that <u>Chappell was the selling and servicing agent for each of the Plaintiffs' annuity investments purchased through Raymond James.</u> Chappell's agency relationship with Raymond James, as pled in the prior proceeding and made a basis of the award, therefore satisfies res judicata's privity requirement. *See e.g.*, *Gonzalez, LLC v. DiVincenti*, 844 So. 2d 1196, 1203 (Ala. 2002).

In fact, the United States District Court for the Eastern District of Louisiana recently confirmed a finding of privity between a brokerage firm and its agents in a case strikingly similar to this one. In *Tortorich v. Musso*, No. 07-3912, 2007 WL 3244396, slip op. at *1 (E.D. La. Nov. 1, 2007), the court rejected Plaintiffs' attempt to do precisely what the Plaintiffs seek to do in the instant action. Plaintiffs filed an NASD arbitration proceeding against Morgan Stanley Dean Witter Inc. ("Morgan Stanley") seeking damages as a result of alleged unsuitable recommendations, negligence and fraud on the part of their Morgan Stanley brokers, Dominick Musso and Mary Horan. *Tortorich*, 2007 WL 3244396 at *1. Plaintiffs prevailed against Morgan Stanley in the arbitration proceeding and were awarded compensatory damages of $304,000. *Id*. Approximately seven months after the conclusion of the arbitration proceeding, Plaintiffs filed a second arbitration proceeding against Musso and Horan, asserting similar fraud and negligence based claims involving the same brokerage accounts, the same investments, the same representations, and the same investment advice at issue in the first arbitration proceeding.

Plaintiffs did not name Morgan Stanley in the second arbitration. *Id.* The second arbitration panel held that Plaintiffs' action against Musso and Horan was barred on the basis of res judicata, finding privity between Morgan Stanley and its agents, Musso and Horan. *Id.* Plaintiffs filed a motion to vacate the arbitration award with the United States District Court for the Eastern District of Louisiana, arguing that the panel manifestly disregarded the law by finding privity between Musso and Horan and Morgan Stanley. *Id.* In its order confirming the panel's arbitration award and the finding of privity between the plaintiffs' brokers and brokerage firm, the Court cited *Russell v. SunAmerica Securities, Inc.*, 962 F.2d 1169, 1173 (5th Cir. 1992) and *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1289 (5th Cir. 1989) for the established proposition that privity exists between employers and employees for res judicata purposes.

Just like *Tortorich v. Musso*, the instant case involves the same brokerage accounts, the same variable annuity investments, the same representations, and the same investment advice at issue in Plaintiffs' prior arbitration proceeding. *See id.* It also involves the same claims which would be subject to proof by the same evidence presented in Plaintiffs' first action. Moreover, just like the *Tortorich* Plaintiffs, Plaintiffs here seek to impermissibly split their cause of action by first seeking damages against their brokerage firm, and then pursuing the same claims against their broker, Chappell. As held by the second arbitration panel in the *Tortorich* case and confirmed by the Louisiana District Court, a brokerage firm and its agent stand in privity with each other for purposes of res judicata, and therefore Plaintiffs' attempt to re-litigate their claims against Chappell is barred.

Nonetheless, Plaintiffs make a failed attempt to cast doubt on the fact that the "identity of parties" element of res judicata is satisfied by citing a written statement by Chappell regarding the arbitration award. Chappell's statement was made at the request of a Dothan Eagle

representative, and was published in the Dothan Eagle alongside an article summarizing the arbitration award. The article summarizing the award, authored by Lance Griffin, was based primarily on a press release authored by Richard Frankowski. *See* Article, attached hereto as Exhibit B; Press Release, attached hereto as Exhibit C.

The fact that Chappell's statement reflects her disagreement with the arbitration award should come as no surprise to Plaintiffs, as all of the claims in their first action were asserted against Raymond James solely on the basis of Chappell's actions, and Chappell's extensive testimony during the arbitration proceeding directly contradicted Plaintiffs' claims. *See* Press Release, at p. 1. ("The National Association of Securities Dealers (NASD) recently awarded damages to seven Dothan-area residents who lost much of their life savings after being defrauded by Raymond James and Associates, Inc. Raymond James, through its agent, Maxine Chappell, wrongfully sold each of the investors a product called a variable annuity."); *see also* Complaint at ¶¶ 26, 29, 34, 37, 42, 45, 48. Chappell's disagreement with the award only confirms the fact that Chappell's interests were aligned with Raymond James' in the arbitration proceeding, and further establishes the parties' privity with one another. *See N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1560-61 (11th Cir. 1990) ("Privity also exists where a party to the original suit is 'so closely aligned to a nonparty's interest as to be his virtual representative.'").

**B.    Both of Plaintiffs' cases involve the same cause of action.**

       i.     The addition of facts not at issue in Plaintiffs' first proceeding does not convert Plaintiffs' instant claims into a different cause of action.

In an attempt to argue that the cause of action in this case is different from the cause of action in their first case, Plaintiffs allege that this case involves facts that were not at issue in the arbitration proceeding. Plaintiffs assert that the facts alleged by a separate complaint attached to the Motion to Remand (the "*Arant* Complaint") "go directly to the claims of the Plaintiffs in this

action" and somehow convert their claims into a different cause of action. Memorandum in Support of Motion to Remand at p. 4. Plaintiff's citation to a complaint in a different case involving a different broker, different plaintiffs, different investment accounts, different investments and different investment advice has no bearing on the facts of this case. Nonetheless, Plaintiffs claim that because the facts alleged in the *Arant* Complaint were not at issue in their first case, but are at issue here, the cause of action in their first case is not the same as that in their second case. However, even if the unproven allegations of failure to train and supervise against AXA Distributors were relevant to this case (they are not), they have no bearing whatsoever on Plaintiffs' claims against Chappell in the case presently before this court.

More importantly, Plaintiffs' claims in this regard ignore the established principle that "under both Alabama law and federal law, the doctrine of res judicata prohibits the relitigation of all matter which was or could have been litigated in the prior action." *Families Concerned About Nerve Gas Incineration v. U.S. Dep't. of the Army*, 380 F. Supp. 2d 1233, 1261 (N.D. Ala. 2005). Plaintiffs could literally point to hundreds of complaints filed in other cases around the country and make the same allegation: because certain additional facts alleged in those complaints were not known to Plaintiffs at the time that they filed their first case, they are entitled to the re-litigation of their claims in light of those facts. This very issue has been addressed by the United Stated Supreme Court:

> A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. The mere multiplication of grounds of negligence alleged as causing the same injury does not result in multiplying the causes of action. The facts are merely the means, and not the end. They do not constitute the cause of action, but they show its existence by making the wrong appear. The thing, therefore, which in

> contemplation of law as its cause, becomes a ground for action, is not the group of facts alleged in the declaration, bill or indictment, but the result of these in a legal wrong, the existence of which, if true, they conclusively evince.
>
> The injured respondent was bound to set forth in his first action for damages every ground of negligence which he claimed to exist and upon which he relied, and cannot be permitted, as was attempted here, to rely on them by piecemeal in successive actions for the same wrong or injury.

*Baltimore S. S. Co. v. Phillips*, 274 U.S. 316, 321 (1927) (internal citations omitted). The fact that a complaint in another case raises facts which were not adjudicated in Plaintiffs' first case does not entitle Plaintiffs to the relitigation of their claims. *See Baltimore*, 274 U.S. at 321. As highlighted by the Supreme Court in *Baltimore*, the facts alleged in the *Arant* Complaint do not change the core legal wrong alleged in both of Plaintiffs' cases. *Id.* As such, Plaintiffs cannot rely on the facts of the *Arant* Complaint as grounds for the initiation of a new action involving the same wrong at issue in their first action. *Id.*

ii.    Plaintiffs' allegations regarding a guaranteed rate of return were litigated and decided in their first action.

Plaintiffs also claim that this case involves different issues from their first case because "the issue whether Plaintiffs were guaranteed between 5% and 6% on the AXA product was not litigated in the arbitration proceeding." Memorandum in Support of Motion to Remand at p. 15; *see also Id.* at p. 4 ("The arbitration award had absolutely nothing to do with the central issue in this litigation – did Chappell and the defendants present their products to the Plaintiffs as providing a guaranteed rate of return."). **This statement is absolutely false.** At the core of Plaintiffs' Statement of Claim in arbitration was the allegation that Chappell misrepresented that the annuities Plaintiffs purchased (including the AXA Equitable annuities) provided them with a guarantee of principal plus a 5% or 6% rate of return:

a. "Chappell also promised that she could provide Cherry with an investment that would guarantee his principal investment and that would pay him a five-percent rate of return for seven years." Arbitration Statement of Claim at ¶ 19.

b. Chappell informed Dyess that she could invest his funds in a product that would provide him a guaranteed six-percent return, compounded annually. . . Chappell informed Dyess that at the end of a seven-year period, he would get his entire principal back." Arbitration Statement of Claim at ¶ 25.

c. "Chappell specifically told Edmondson that she could invest his life savings in a product that would provide him with a guaranteed five-percent return without exposing his principal to any risk." Arbitration Statement of Claim at ¶ 30.

d. "Chappell told Jones and his wife that she could provide him with and [sic] investment that would guarantee his principal and provide him with a guaranteed six-percent return." Arbitration Statement of Claim at ¶ 35.

e. "Chappell promised McKinney that the investment principal would be guaranteed and that the annuity would provide a guaranteed six-percent rate of return." Arbitration Statement of Claim at ¶ 42.

f. "Chappell promised Middleton that she could place her savings in a product that would produce a guaranteed 5% rate of return and that would also guarantee the return of Middleton's principal at the end of seven years." Arbitration Statement of Claim at ¶ 46.

g. "Chappell specifically told Stafford that she could invest his life savings in a product that would provide him with a guaranteed five-percent return without exposing his principal to any risk." Arbitration Statement of Claim at ¶ 50.

Moreover, the arbitration panel's award itself notes that the panel entered its decision "in full and final resolution of the issues submitted for determination," "[a]fter considering the pleadings, the testimony and evidence presented at the hearing." *See* Award at p. 2, attached hereto as Exhibit D. Thus, the panel's award necessarily included their consideration of the issue of whether Plaintiffs were guaranteed a specific rate of return in connection with their

investments.[1]

In the face of undisputed facts refuting their claims that rate of return allegations were not at issue in their first action, Plaintiffs attempt to support this claim by citing one of the damages calculations that was presented to the panel in the first proceeding. Memorandum in Support of Motion to Remand at pp. 3-4. Plaintiffs allege that their calculations, which identify Plaintiffs' out of pocket losses as $595,562, demonstrate that the panel's compensatory award of $577,000 had nothing to do with their claims of an alleged guaranteed rate of return. *Id.* Plaintiffs allege that because the award only compensated them for their out of pocket losses, the panel did not consider the issue of their rate of return claims. As the Exhibit clearly demonstrates, however, Plaintiffs presented the panel with a range of potential damages. That is, although the arbitration panel chose the smallest amount of proposed damages, Plaintiffs' own submission establishes that the damages that they are seeking in this action were actually litigated in that arbitration. [2]

> iii.    Plaintiffs' choice of law argument does not change the fact that their claims are the same for res judicata purposes.

Plaintiffs further allege that the law of Alabama governs this dispute, and therefore, their claims in this case are not the same as the claims in their first case, which were decided under Florida law. This incredulous assertion is made despite Plaintiffs' initial choice of Alabama law in their arbitration proceeding and their last minute rejection of Alabama law in favor of Florida

---

[1] Plaintiffs' citation to the Restatement (Second) of Judgments § 27 (1982) is misplaced. That section only applies to subsequent cases involving the same parties, not to cases involving parties in privity with one another. Restatement (Second) of Judgments § 27, comment a (1982). If, however, that section did apply here, it would serve to completely bar Plaintiffs' claims, which have already been litigated. *See* Restatement (Second) of Judgments § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action . . .").

[2] Moreover, Plaintiffs can present no concrete evidence of the panel's alleged failure to award damages based on Plaintiffs' rate of return claims. NASD arbitrators are not required to provide a breakdown of the award by the claims asserted, nor are they required to provide an explanation of the award. The allegation that the award did not include damages for this alleged misrepresentation is solely a product of guesswork on Plaintiffs' part.

law (apparently in order to preserve their claims, which were completely barred by Alabama statutes of limitations). *See* Arbitration Statement of Claim at ¶ 87, attached hereto as Exhibit E; Raymond James' Answer at p. 21-23, attached hereto as Exhibit F; Plaintiffs' Pre Hearing Brief at ¶ 2, attached hereto as Exhibit G. Because Plaintiffs initially pled their claims under Alabama law, then deliberately abandoned Alabama law, they cannot now claim that they have been prejudiced by the panel's failure to apply Alabama law. Moreover, the fact that Plaintiffs pled their claims under both Alabama and Florida law in their first proceeding demonstrates that a change in substantive law does not convert their allegations into "different claims." Despite their alternating theories of governing law, Plaintiffs' claims in their first case remained the same, and those claims are the same claims presented here: "the primary right and duty or wrong are the same in each action," and arise "out of the same nucleus of operative fact." *Families Concerned About Nerve Gas Incineration v. U.S. Dep't. of the Army*, 380 F. Supp. 2d 1233, 1261 (N.D. Ala. 2005); *see also Gustafson v. Johns*, No. 06-13508, 2007 WL 63999 at *4 (11th Cir. Jan. 9, 2007); *Mangrum v. Alabama Medicaid Agency*, No. 3:06-cv-952-MEF, 2007 WL 779732 slip op. at *2 (M.D. Ala. March 13, 2007). Therefore, because Plaintiffs specifically rejected the remedies available to them under Alabama law in their first proceeding, and because Plaintiffs' choice of law does not alter the fact that their claims are the same for res judicata purposes, Plaintiffs' claims are barred by res judicata.

> iv.   Plaintiffs had a full and fair opportunity to litigate all of their claims in the first action.

Plaintiffs purport to cite comment d to the Restatement (Second) of Judgments § 29 (1982) for the proposition that this Court should consider the fact that the current action is in a court of law, while the previous action was an NASD arbitration, when deciding whether preclusion should apply. (Plaintiffs actually quote from the Reporter's Note to comment d of the

Restatement.) Section 29 of the Restatement (Second) of Judgments (1982) provides that "[a] party precluded from relitigating an issue with an opposing party, in accordance with §§ 27 and 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue."

Plaintiffs, however, make no allegation that they were denied any opportunity to fully and fairly litigate their claims in their first case. The mere fact that their first proceeding was conducted in an arbitration as opposed to a court of law is irrelevant to the res judicata determination. As the Eleventh Circuit has clearly held, "[a]n arbitration proceeding can have res judicata or collateral estoppel effect." *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir. 1985). "When an arbitration proceeding affords basic elements of adjudicatory procedure, such as an opportunity for presentation of evidence, the determination of issues in an arbitration proceeding should generally be treated as conclusive in subsequent proceedings, just as determinations of a court would be treated." *Greenblatt*, 763 F.2d at 1360. In the present case, Plaintiffs had a full nine days to present their case to the arbitration panel in the prior action, and the arbitration panel entered an award in favor of the Plaintiffs after considering all of the evidence presented during the hearing. *See* Award at p. 2-5, attached hereto as Exhibit D. Moreover, the arbitration was held pursuant to the rules of the NASD, which provide for discovery and other procedural safeguards akin to those in a judicial proceeding. In fact, each of the Plaintiffs voluntarily submitted their claims to the NASD and signed Uniform Submission Agreements explicitly accepting the NASD as the forum authorized to decide the dispute. *See* Plaintiffs' Uniform Submission Agreements, attached hereto as Exhibit H; *see also* Award at p. 1. Thus, there is no basis for the implication that Plaintiffs were

denied any opportunity to fully and fairly litigate their claims in their first case.

Plaintiffs also fail to identify any "other circumstances" which would merit the relitigation of their claims. *See* Restatement (Second) of Judgments § 29 (1982). It is clear that the panel's decision to apply Florida law instead of Alabama law was at the express request of the Plaintiffs. Plaintiffs' own choice of Florida law (made after first asserting that Alabama law applied) demonstrates that Plaintiffs were not prejudiced in pursuing their claims in arbitration, but rather, exercised the option to choose the law which they felt best supported their claims. Moreover, at the conclusion of the arbitration hearing, Plaintiffs, through their counsel, acknowledged that the proceeding was fair and that they were provided with a full opportunity to be heard. *See* Transcript Excerpt from *Cherry v. Raymond James Financial Services, Inc.*, NASD Arbitration No. 05-03030, attached hereto as Exhibit I.

## III. THIS COURT IS VESTED WITH THE AUTHORITY TO EXAMINE THE MERITS OF PLAINTIFFS' CLAIMS IN CONNECTION WITH THE ISSUE OF FRAUDULENT JOINDER.

Plaintiffs allege that this Court may not adjudicate the merits of their claims in connection with deciding their Motion to Remand. Plaintiffs' arguments in this regard imply that this Court should not examine the merits of their claims in order to determine whether removal is proper. This Court, however, is charged with examining Plaintiffs' claims in order to determine whether there is a "reasonable possibility" that the Plaintiffs may prevail against Chappell. *Gordon v. Pfizer*, No. CV-06-RRA-703-E, 2006 WL 2337002 at * 2 (N. D. Ala. May 22, 2006). This duty necessarily includes an examination of the legal arguments and factual basis supporting Plaintiffs' claims. *See, e.g. Crowe v. Coleman*, 113 F.3d 1536, 1539-42 (11th Cir. 1997) (analyzing the facts of the claims presented in light of the governing law); *Legg v. Wyeth*, 428 F. 3d 1317 (11th Cir. 2005) (same); *see also Gordon*, 2006 WL 2337002 at *2 ("The

removal process was created by Congress to protect defendants. Congress did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it. Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court....").

Plaintiffs cite *Crowe v. Coleman* for the proposition that this Court should not "delve into the merits of Plaintiffs' claims" in connection with resolving their motion to remand. Memorandum in Support of Motion to Remand at pp. 9-11. In *Crowe*, the Defendants alleged that Coleman, the non-diverse defendant, was fraudulently joined because the Plaintiffs could not state a valid nuisance claim against him. *Crowe*, 113 F.3d at 1539. The court noted that the relevant Georgia case law appeared to be in conflict on this issue. *Id*. The court stated as follows:

> [i]n this case, the arguable confusion in Georgia law itself supports remanding this case to state court. *See* Parks, 308 F.2d at 477 (noting in fraudulent joinder case that, "doubtful issues of law due to absence of definite procurements by the state supreme court are to be tried in the court having original jurisdiction of the case and are not to be determined in a removal proceeding.").

*Id*. at 1540.

Unlike *Crowe*, the issues of law in this case are abundantly clear. As the cases cited in Plaintiffs' Motion to Remand demonstrate, there is no doubt as to the law of res judicata in Alabama. Similarly, Plaintiffs point to no ambiguity in the "one satisfaction" and "one cause of action" rules under Alabama law. Because these legal doctrines are sound and irrefutable, this Court's analysis of the factual grounds for the fraudulent joinder issues in light of those laws is appropriate, and the unclear legal issues presented in *Crowe* distinguish it from this case.

Plaintiffs also cite *Glass Molders, Pottery, Plastics and Allied Workers Intern. Union v.*

*Wickes Cos.*, 707 F. Supp. 174 (D. N. J. 1989) for the proposition that a court should not try the merits of the Plaintiffs' claims in the context of a removal petition. Memorandum in Support of Motion to Remand at p. 12. *Glass Molders*, however, is readily distinguishable because the resolution of the fraudulent joinder issue in that case would have involved the court's examination of complicated factual inquiries which were necessary to evaluate novel legal grounds for relief. *See* 707 F. Supp. at 181-82. The detailed factual inquiries facing the court, which were complicated by the "sparseness of the present record," required an analysis of the causation element of the plaintiff's tortious interference claim. *Id.* at 181. Further complicating the issues in the case, the court acknowledged that in asserting their tortious interference claim, the plaintiffs were "attempting to place a new spin upon an exceedingly open-ended state law cause of action." *Id.* The court further noted the possible existence of "compelling reasons of law and policy to bar the maintenance of th[e] action." *Id.* at 181-82. The court ultimately held that "[g]iven the novelty of this state-law based cause of action, we think that decisions affecting its viability rest, quite properly, with the state courts." *Id.* at 182.

Unlike *Glass Molders*, all of the facts relevant to the fraudulent joinder issue in this case are readily obtained from the record. In addition, the analysis of the legal issues in this case does not present any unique or "open ended" questions. Rather, the three simple legal principles which completely bar Plaintiffs' claims against Chappell are straightforward and well established. Moreover, this case presents no compelling policy reasons for remand.

Here, a "full scale hearing on the merits" is not necessary to determine that Plaintiffs can not possibly state a valid claim against Chappell. Rather, the undisputed facts and applicable law clearly and unambiguously reveal that Plaintiffs' claims against Chappell are completely barred, thus establishing this Court's jurisdiction over this case and the grounds for dismissal of

Plaintiffs' claims.

## IV.    CONCLUSION

There can be no uncertainty or doubt about the propriety of removal in this case.  As made clear by the Notice of Removal and the arguments above, Plaintiffs' claims against Chappell are completely barred by the doctrine of res judicata and the "one satisfaction" and "one cause of action" rules.  Where, as here, the Plaintiffs' claims against the resident defendant are completely barred, there is no possibility that the Plaintiffs can establish a cause of action against the non-diverse defendant.  As such, Chappell has been fraudulently joined in this case and her presence must be disregarded for jurisdictional purposes.  *See Legg v. Wyeth*, 428 F.3d 1317, 1324-25 (11th Cir. 2005).  Plaintiffs' Motion to Remand is therefore due to be denied.

Respectfully submitted,


/s/ Andrea Morgan Greene
A. Inge Selden III (SEL003)
John N. Bolus (BOL022)
Andrea Morgan Greene (GRE102)
Attorneys for Defendants AIG SunAmerica Life
Assurance Company, AXA Equitable Life
Insurance Company, AXA Distributors, LLC,
Kemper Investors Life Insurance Company and
Hartford Life Insurance Company


**OF COUNSEL:**

**MAYNARD, COOPER & GALE, P.C.**
Attorneys at Law
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203-2602
(205) 254-1000
Fax: (205) 254-1999

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon the following listed persons by placing a copy of the same in the United States mail, first-class postage prepaid and properly addressed as follows:

Peter H. Burke
Richard S. Frankowski
BURKE, HARVEY and FRANKOWSKI, LLC
One Highland Place
2151 Highland Avenue
Suite 120
Birmingham, Alabama 35205


on this the 5th day of December, 2007.


/s/ Andrea Morgan Greene
OF COUNSEL

.

**EXHIBIT E**

Richard S. Frankowski, Esq.
(Ala. Bar #ASB-1734H70F)
**WHATLEY DRAKE LLC**
2323 2nd Avenue North
Birmingham, Alabama 35203
Tel: (205) 328-9576
Fax: (205) 328-9669

Attorney for Claimants

## IN ARBITRATION BEFORE

## NASD DISPUTE RESOLUTION

| | |
|---|---|
| DOUGLAS M. CHERRY, LANCE K. DYESS, IRA J. EDMONDSON, JIMMY E. JONES, RACHEL MCKINNEY, LINDA J. MIDDLETON, and VICTOR E. STAFFORD, | ) ) ) ) |
| Claimants, | ) ) |
| v. | ) CASE NO.: _____ ) |
| RAYMOND JAMES AND ASSOCIATES, INC., | ) ) |
| Respondent. | ) |

## STATEMENT OF CLAIM

## STATEMENT OF CLAIM

### I.     PARTIES

1.     Claimants Douglas Cherry, Dr. Lance Dyess, Ira Edmonson, Jimmy Jones, Rachel McKinney, Linda Middleton, and Victor Stafford (hereinafter "Claimants") are residents of Alabama.

2.     Raymond James and Associates, Inc. (hereinafter "Raymond James" or "Respondent") is a Florida corporation doing business in the state of Alabama through its representative, Maxine Chappell (hereinafter "Chappell"). The Claimants paid for, and used the services of Chappell and Raymond James.

### II.     NATURE OF THE CASE

3.     This is a claim seeking redress for the wrongful conduct of Chappell and Raymond James, relating to the sale of variable annuities to Claimants. The variable annuities were unsuitable for each of the Claimants. Not only did each of the Claimants already have a tax-deferred plan in their IRAs, but they all had expressed a need for conservative investments that would provide interest income and not diminish their invested principal. At the time of the variable annuity sales, four of the Claimants had retired. Chappell advised each of the Claimants to purchase the annuity despite their retirement status and age.

4.     Plaintiffs seek compensatory and punitive damages, attorney's fees and expenses, and other remedies for unlawful and unconscionable conduct of Raymond James and Chappell in connection with the sale of the unsuitable variable annuity vehicles, as well as for the poor training and supervision of the Raymond James representative.

5.      Raymond James and Chappell have behaved in an unlawful and unconscionable manner in order to increase their own revenues to the detriment of the Claimants.  By selling variable annuity products to the Claimants, who had already invested in qualified plans, Respondents pushed unsuitable products upon the Claimants that provided little or no benefit to the investors, but very large benefits to Raymond James and Chappell.

6.      Because all of the Claimants are either elderly or ill, and because of the particularly egregious nature of Raymond James' behavior, Claimants request an expedited arbitration schedule in a location convenient for the Claimants.

A.    **VARIABLE ANNUITY CONTRACTS**

7.      Variable annuities are investment vehicles designed for retirement savings. They are essentially contracts between the contract owner ("owner") and a life insurance company.  In return for the owner's payment(s), the insurance company agrees to provide either a regular stream of income or a lump sum distribution at some future time.  The owner's premiums generally are invested in one or more securities portfolios, where they may earn interest and/or capital appreciation.  No taxes are due on any earnings until the earnings are actually paid out.

8.      Variable annuity contracts have two stages, the accumulation stage and the distribution stage.  The accumulation period begins as soon as the owner invests.  The investment may be in the form of a single premium, or it may be in the form of multiple premium payments.  In either case, once payment is made, the funds begin to accumulate tax-deferred earnings.  The principal and interest can later be distributed to the owner in the form of a regular income or as a lump sum.  The invested funds usually purchase

"accumulation units" in the insurance company's separate account, which is separate from the company's regular portfolio of investments. This separate account is used to purchase shares of professionally managed securities portfolios.

9. The underlying securities in which the funds are invested have the potential to earn interest and/or dividends. However, the securities also have the potential to decline in value. The downside risk of variable annuity products is often brushed over while the benefit of the product, its ability to compound funds in a tax-deferred environment, is often promoted. While the tax-deferred character of these products can allow the value of the annuity to grow faster than a comparable taxable investment, this benefit is useless when the investor already has invested via a tax-deferred account/plan such as an IRA or 401(k).

**B.    ALLEGED BENEFITS OF VARIABLE ANNUITIES**

10. One of the most commonly touted advantages of the variable annuity is its tax-deferred benefit. This tax-deferred benefit, however, cannot provide any advantages to an investor who has already invested in a tax-deferred account/plan such as an IRA or a 401(k). In fact, the only situation in which a variable annuity would provide any benefit whatsoever to an investor whose money is growing tax-deferred in an IRA or 401(k) occurs when the investor has already invested the maximum amount allowable for the IRA or 401(k). Even in this situation, however, a variable annuity may not be the most beneficial product because they require the investor to maintain them for a number of years or else surrender a substantial percentage of the value of any withdrawal. The Claimants had not invested the maximum amount allowable into their IRA account, and had no need for a variable annuity product.

3

11.    A second frequently cited benefit of the variable annuity is its death benefit. Variable annuity products typically provide a so-called guaranteed death benefit. The insurance company typically guarantees that in the event of death before the annuity begins to pay money back to the owner, the beneficiary will receive the greater of either: a) entire amount of the premiums paid, less withdrawals, charges and fees, or b) the current contract value. While investment representatives may claim that this is a "benefit", it is actually just a return of a portion of the fees invested plus or minus any market growth or decline. The guaranteed death benefit certainly does not provide a set policy value payable upon death to a beneficiary. Rather, it only pays if the investment declines in value and the investor dies before annuitization (when the owner chooses to take the guaranteed income for life). As such, a simple term life insurance policy would be a much wiser and cheaper investment for someone wanting this type of benefit.

## C.    DETRIMENTS OF VARIABLE ANNUITIES

12.    The detriments associated with variable annuity vehicles far outweigh any alleged benefits conferred upon the investor.

    a.    Income deferral is utterly irrelevant when the annuity is held in an IRA or 401(k).

    b.    The growth of an annuity is fully taxable as income. When the owner decides to begin taking money, either as a stream of income or as a lump sum payment, the income will be taxed at ordinary income rates. This is the case for the owner or his or her heirs. When compared to the growth of index funds, which are taxable as capital gains to the investor and subject to zero income tax to heirs, the detriment of the variable annuity becomes obvious.

    c.    Variable annuities are very expensive investment vehicles, and have fees, as well as charges for mortality insurance associated with them. Typically, variable annuities have an investment management charge of .25 to 1 percent (or higher) per year. They also have a Mortality and Expense (M&E) fee of 1 to 1.5 percent.

4

Furthermore, the mortality insurance only pays if the investment diminishes in value AND the investor dies before he or she annuitizes. The annuities that defendants recommended for the Claimants included contingent deferred sales charges, administrative charges, mortality and expense risk fees, service charges, and other portfolio expenses.

d.    Annuities promise a guaranteed income for life, however, if the investor chooses to annuitize the contract, two things happen. First, the investor sacrifices the principal, and when he or she dies, zero will be left to his or her heirs unless special coverage is purchased at additional costs. Also, if the investor wants to take cash out for any reason, he or she can't because the money belongs to the insurance company, and is no longer the investor's. Second, in exchange for giving the insurance company all of the investor's money, the insurance company promises to pay the investor a certain amount for a long as he or she lives. However, the amount the insurance company pays is typically extremely small.

e.    Beneficiary designations are irrelevant when the variable annuity is inside an IRA or 401(k) plans because these plans already provide for beneficiary designations outside of probate.

f.    The fees, charges, and expenses associated with variable annuities typically are not detailed on monthly, quarterly, or annual statements. In fact, many firms include a line item for "fees" and fail to include the fees that are associated with the variable annuity. The reason these fees are not included is due to the fact that firms take the fees and charges out of the vehicle's growth prior to distribution. In other words, the charges are netted out of the gross amount of growth, whatever is left is then detailed on performance statements. Because of this procedure, the fees associated with variable annuities are hidden, and investors are unable to see the actual costs associated with the variable annuities.

g.    The sub-accounts that make up the investments in a variable annuity have their own fee/expense structures that further increase the costs associated with variable annuities.

13.    The financial press has also highlighted the detriments of variable annuities:

5

a.      "Although variable annuities can pay off in very limited
        circumstances…, most investors will do better buying and holding
        mutual funds outside rather than inside this tax shelter."

        - *Don't Let the Bells and Whistles Distract You*, Kiplinger.com,
        December 3, 2001 (Ex. 1A)

b.      "Do you want proof positive that investors are irrational? Here it
        is:  Sales of variable annuities went up 16% last year, to $85
        billion.  A variable annuity is a mutual fund-type account wrapped
        in a thin veneer of insurance that renders the investment earnings
        tax-deferred.  The tax deferral is just about the only good thing you
        can say about these investment products.  Almost everything else
        about them is bad: the high – sometimes outlandishly high – costs,
        the lack of liquidity, the fact that the annuity converts low-taxed
        capital gains into high-taxed ordinary income.  That tax deferral
        comes at a very high price."

        - *The Great Annuity Rip-Off*, Forbes Magazine, December 6, 2001
        (Ex. 1B)

c.      "…[A]nnuities are actually a lot more complex and have
        downsides that salesmen may not mention.  The higher fees of
        most annuities can often cancel out their tax advantages; most
        annuities lock in investors for years; and annuities saddle heirs
        with higher taxes, unlike mutual funds or most other investments.
        For these reasons, many investment experts say annuities are
        usually unsuitable for most older investors."

        - *At Annuity University, Agents Learn How to Pitch to Seniors*,
        Wall Street Journal, July 2, 2002 (Ex. 1C)

d.      "The death benefit, which usually costs more than $1000 for a
        $100,000 account, isn't going to help you if the market tumbles
        while you're still alive.  Companies that guarantee your principal
        while you are alive often charge another $1000 a year on a
        $100,000 account.  Yet the chances of your benefiting are almost
        nil."

        - *Why Variable Annuities Are Just For a Few*, Kiplinger.com,
        March 30, 2003 (Ex. 1D)

e.      "Many experts view variable annuities, a tax-deferred investment
        vehicle with an insurance contract, as inappropriate for elderly
        clients because of high fees and because the products' tax benefits

generally are realized only over decades. Customers also pay steep 'surrender' fees for taking money out early."

- *State's Annuity Investigation Widens*, The Wall Street Journal, February 18, 2005 (Ex. 1E)

f.     "Of course, I can't blame my grandmother for not understanding what she bought. These are complex insurance contracts larded with bells and whistles that make them enticing and expensive, and often misunderstood by the very people selling them."

- *An Annuity For Grandma? Say It Isn't So*, The Wall Street Journal, March 6, 2005. (Ex. 1F)

g.     As annuity sales practices come under greater scrutiny, the National Association of Securities Dealers is taking a closer look at its policy on sales contests, a common promotional tactic for the insurance product. To encourage the sale of annuities, financial-services companies and insurers often offer salespeople financial rewards and other prized through contests. As long as the contests are conducted within NASD guidelines, broker-dealers don't have to disclose to their clients that they're participating in a contest based on generating the most annuity sales."

- *NASD Rethinks Its Policy On Annuity Sales Practices*, The Wall Street Journal, March 22, 2005. (Ex. 1G)

h.     "The    World's    Lousiest    Estate    Planning    Vehicle    - There's no getting around the income tax due on annuities. In fact, if you die with money remaining in your annuity, your beneficiary will inherit all the taxes that you have deferred. Compare this to a mutual fund, whose basis is stepped-up at death. In that case, your beneficiary would owe no taxes on the gains."

- *What's Wrong With Variable Annuities*, SmartMoney.com, 2005 (Ex. 1H)

i.     "Anytime anyone criticizes such shenanigans, annuity sellers rush to counter with claims that variable and fixed deferred annuities help retirees defer taxes and their heirs avoid probate. Both claims are true. But does that mean retirees should put their nest eggs in an annuity? In general, no, say financial planners and independent insurance consultants. And annuity experts at TIAA-CREF, the New York retirement-services company that created the variable annuity in 1952, agree. In short, the tax consequences and long holding periods necessary to make a variable annuity attractive

don't make sense for retirees. (Also, many annuities often pay big commissions to brokers, who often aren't forthcoming about their financial interests.)"

- *When Putting Your Nest Egg Into an Annuity Makes Sense*, The Wall Street Journal, March 30, 2005 (Ex. 1I )

j.   "Annuity sales can be highly lucrative. Commissions can reach 12 percent of the money invested, far greater than fees typically generated on stocks and other investments. Mr. Ragazzo, the deputy attorney general of California, said his office had found that some companies selling annuities sponsored trips to Hawaii and Europe for top agents. 'Some of these guys are former used-car salesmen bringing in $600,00 a year,' he said."

- *Who's Preying on Your Grandparents?* The New York Times, May 15, 2005 (Ex. 1J)

## D.    COMMISSION STRUCTURES

14.    The primary factor that drives investment representatives to push expensive and useless products on their unsuspecting clients is an extremely profitable commission structure for the broker/dealer, as well as the investment representative. Commissions are paid directly to broker/dealers, who then transfer a percentage of the commission to the selling investment representative. The commissions are usually based upon a percentage of the contract sold. Beyond the up-front commission, the representative may also receive "trails", or a percentage of the premiums paid by the owner throughout the duration of the annuity contract. In order to recoup the commissions and trails paid to the investment representative, insurance companies force the investor to maintain the contract for a number of years. If the investor chooses to withdraw from the variable annuity he or she will often be required to pay a substantial surrender fee or contingent deferred sales charge. This charge is frequently as high as 7% of the value of the withdrawal. As such, variable annuities are not prudent, short-term

8

investments nor are they appropriate for elderly investors and for those who require liquidity.

### III.    FACTUAL BACKGROUND

A.    **DOUGLASS CHERRY**

**Background**

15.    Mr. Douglas Cherry was born in 1942, and was raised on a farm in Martin, Tennessee.  Cherry never finished high school.  At the age of sixteen, he left home and began working in a factory.  After working in a number of factories, Cherry ultimately came to Alabama and began working at Pea River Electric in 1969. Cherry worked as a lineman and a foreman at Pea River for over thirty years.

16.    In 1999, Cherry retired from Pea River at the age of fifty-seven.  During Cherry's employment at Pea River, he accumulated approximately $143,972 in his 401(k) account and approximately $375,000 in his retirement account.  Throughout his career at Pea River, Cherry only invested in his retirement plan and IRA.  After retiring from Pea River Electric, Cherry rolled over both of these accounts to Maxine Chappell and Raymond James.  These funds accounted for Cherry's entire life savings.

**Chappell's Investment Advice To Cherry**

17.    Douglass Cherry first heard of Maxine through a presentation she made at "Wellness Day" at Pea River Electric.  After hearing her presentation, Cherry set up a meeting to discuss his finances.

18.    The first meeting occurred in Chappell's office in Dothan, Alabama. Cherry and his friend, Ira Edmonson attended the meeting together.  During this meeting,

9

Chappell gained the trust of Cherry by telling him that she grew up on a farm, that she was a Christian, and that she knew how hard money was to earn.

19.     Chappell also promised that she could provide Cherry with an investment that would guarantee his principal investment and that would pay him a five-percent rate of return for seven years. Chappell specifically told Cherry that he could take out his entire principal after seven years. This appealed to Cherry. Cherry had a very conservative investment history, and had specifically told Chappell that he wanted conservative investments that would provide some income and not put his life savings at risk. Based on Chappell's promises, Cherry rolled over his entire life savings to Raymond James and Chappell. Chappell placed Cherry's funds into Raymond James account # 88171358, funded with two variable annuities: (1) AXA Equitable Accumulator, contract 99 631 766, and (2) Putnam Allstate Advisor, contract number PA00051159. (Ex. 2) Unfortunately, Chappell's promises to Cherry, and to each of the other Claimants, were totally false.

20.     During this initial meeting and in subsequent meetings, Chappell failed to ask questions about Cherry's background and needs in order to determine whether a variable annuity was suitable for him. Chappell also failed to inform Cherry that the variable annuities were insurance products that only guaranteed part of his funds through a death benefit. Had Cherry known this, he would not have purchased the annuities. Indeed, Cherry already owned a life insurance policy at the time of the annuity sales and had no need for additional life insurance.

10

**Cherry's Portfolio and Losses**

21.    Approximately one year after Cherry purchased the variable annuities, he noticed that the investments were not performing as Chappell had promised.  Cherry contacted Chappell and asked about the investments.  Chappell told Cherry that his principal was guaranteed and that the market fluctuations did not affect his investments because of the guarantee.  Chappell also told Cherry not to worry about his investments.

22.    Chappell and Raymond James' supervisors knew or should have known that variable annuity products were not appropriate for Cherry, or for any other individual that had already invested in an IRA or 401(k), who wanted conservative investments, who was elderly, who needed income, and who wanted to protect their life savings.  Furthermore, Chappell funded both of these annuities with 100% equities, an asset allocation that was wholly unsuitable for Cherry.

23.    Since the time that Chappell placed Cherry in the unsuitable variable annuity products, Cherry has lost approximately $134,980 and has paid thousands in fees and expenses.  This figure does not include Cherry's lost opportunity costs.

**B.    DR. LANCE DYESS**

**Background**

24.    Dr. Dyess was born in 1956.  Dyess ultimately attended UAB, where he received his M.D.  Dr. Dyess currently practices medicine in Elba, Alabama.

**Chappell's Investment Advice to Dyess**

25.    Around 1998, Dyess contacted Chappell to assist him with his investments.  At the time, Dyess was concerned about market volatility and wanted more stability in his portfolio.  Dyess told Chappell that he wanted low risk because he thought

11

the market was unstable. Chappell told Dyess that she could provide him "with the best of both worlds." In Dyess's initial meeting with Chappell, Chappell informed Dyess that she could invest his funds in a product that would provide him a guaranteed six-percent return, compounded annually. Chappell also promised Dyess that if the market outperformed the guaranteed six-percent rate, Dyess would get the benefit of the greater rate of return. Finally, Chappell informed Dyess that at the end of a seven-year period, he would get his entire principal back. Dyess specifically asked about these guarantees and Chappell told him that the SEC would not let her sell a product that didn't have such financial stability.

26.    During Dyess's meetings with Chappell, Chappell never discussed Dyess's insurance needs. Chappell also failed to inform Dyess that the variable annuity was an insurance product that only guaranteed part of his funds through a death benefit. Had Dyess known this, he would not have purchased the annuity. In fact, at the time Chappell convinced Dyess to invest in the variable annuity, Dyess already had life insurance and had no need for additional coverage.

### Dyess's Portfolio and Losses

27.    Dr. Dyess invested approximately $435,419.00 with Chappell and Raymond James in November of 1998. The funds were placed in an Equitable Accumulator Rollover IRA, contract number 98 684 790. (Ex. 3) Contrary to Chappell's promises, Dyess received neither a six-percent rate of return, nor the return of his guaranteed principal. Dyess's concerns were memorialized in letters he wrote to Raymond James and to The Equitable. (Ex. 4). Ultimately, neither The Equitable nor Chappell provided Dyess or his accountant, Ernest Clark, with an explanation of the false

12

promises Chappell had made. As a result of Chappell's negligence and/or fraud, Dyess sustained net out of pocket losses of approximately $75,000. This figure does not include Dyess's lost opportunity costs.

C.    **IRA EDMONSON**

**Background**

28.    Ira Edmonson was born in 1938. He, like Mr. Cherry, did not graduate from high school, but did receive a GED. Edmonson worked at Pea River Electric for over thirty years. During this time, Edmonson was very conservative, and placed his money in the Pea River Electric retirement plan and in his 401(k). At the time of his retirement in 2000, Edmonson had accumulated over $400,000 in retirement savings.

**Chappell's Investment Advice to Edmonson**

29.    Edmonson first heard of Maxine through a presentation she made at "Wellness Day" at Pea River Electric. After hearing her presentation, Edmonson set up a meeting to discuss his finances. Edmonson attended the first meeting with his friend Douglas Cherry. In the meeting, Chappell gained the trust of Edmonson by telling him that she was a Christian and that she would watch out for his life savings.

30.    During the meeting, Chappell specifically told Edmonson that she could invest his life savings in a product that would provide him with a guaranteed five-percent return without exposing his principal to any risk. This is the exact same statement Chappell made to Cherry. Edmonson was very clear with Chappell that he needed some income, that he could not afford to lose his life savings and that he did not want any risky investments. Despite Edmonson's desire for safe investments, Chappell funded

Edmonson's portfolio with two annuities that held 100% equities. This asset allocation was wholly unsuitable for Edmonson.

31.    During this initial meeting and in subsequent meetings, Chappell failed to ask questions about Edmonson's background and needs in order to determine whether variable annuities were suitable for him. Chappell also failed to inform Edmonson that the variable annuities were insurance products that only guaranteed part of his funds through a death benefit. Had Edmonson known this, he would not have purchased the annuities.

32.    After investing with Chappell, Edmonson went to her for advice about building a new log cabin. Edmonson wanted to make sure that he could afford the new home. Chappell advised him to build it. She also told him that he had enough money to last twenty years. This advice was incorrect and exposed Edmonson's life savings to additional risks.

### Edmonson's Portfolio and Losses

33.    Chappell sold Edmonson two variable annuities. The first was an Equitable Accumulator annuity, number 300 611 540, in which Edmonson placed approximately $206,217. (Exhibit 5). The second was a Scudder Destinations annuity, contract number KI11015009, in which Edmonson placed approximately $210,288. (Exhibit 6). Chappell funded both of these annuities with 100%, an asset allocation that was wholly unsuitable for Edmonson. As a result of Chappell and Raymond James's negligence, fraud, and state and federal securities law violations, Edmonson has sustained net out of pocket losses of approximately $193,000. This figure does not include Edmonson's lost opportunity costs.

14

### D.     JIMMY JONES

#### Background

34.     Jimmy Jones was born in April of 1950 in Enterprise, Alabama. Jones graduated from high school and attended three years of college. In 1971, prior to finishing college, Jones went to work for GTE. After working for GTE for almost thirty years, Jones retired November of 1999. During this time, Jones accumulated approximately $207,495 in retirement savings.

#### Chappell's Investment Advice to Jones

35.     Prior to retiring in 1999, Jones received a call from Chappell. Chappell told Jones that she heard he was retiring and that she wanted to meet with him about his retirement planning. Jones had heard about Chappell and also knew that Chappell's brother worked at GTE, so he made an appointment. Jones and his wife met with Chappell. In the meeting, Jones emphasized that he wanted an investment that would protect his retirement savings and provide him with some income. Chappell told Jones and his wife that she could provide him with and investment that would guarantee his principal and provide him with a guaranteed six-percent return. Based on Chappell's promises, Jones rolled over his retirement savings of approximately $207,495 to Raymond James in November of 1999.

36.     During this initial meeting, Chappell failed to ask Jones questions about his background and needs in order to determine whether a variable annuity was suitable for him. Chappell also failed to inform Jones that the variable annuity was an insurance product that only guaranteed part of his funds through a death benefit. Had Jones known this, he would not have purchased the annuity. Like the other claimants, Jones already

15

owned a life insurance policy at the time of the annuity sale and had no need for additional life insurance.

### Jones' Portfolio and Losses

37.    Chappell placed Jones' funds in Raymond James account # 80962527 and funding the account with a Putnam Hartford Capital Manager annuity, contract # 710702480 (Ex. 7)  However, after Jones invested with Chappell and Raymond James, he began to see a decline in his investments.  Jones called Chappell on multiple occasions to question her about the losses.  Chappell consistently said that everything was fine and that no changes needed to be made.  After hearing this same response on numerous occasions, Jones realized that Chappell had misrepresented the product, so he moved his investments to another broker in 2003.

38.    As of March, 2005, Jones had lost approximately $50,709 in his Raymond James account.  (Ex. 8)  This figure does not include Jones' lost opportunity costs.

### E.    RACHEL MCKINNEY

### Background

39.    Rachel McKinney was born in Dale County, Alabama in 1948.  McKinney graduated high school, but did not go to college.  In 1967, McKinney began work with GTE and worked as an operator, wirer, and electronic technician for approximately thirty years.  In 1999, McKinney retired from GTE at age 50.  At the time of her retirement, McKinney had retirement savings of around $424,000.

**Chappell's Investment Advice to McKinney**

40.     McKinney learned of Chappell through other GTE employees.  McKinney also knew that Chappell's brother worked at GTE.  McKinney ultimately heard Chappell speak at a presentation at Wallace College.  After the presentation, McKinney made an appointment with Chappell.

41.     In McKinney's meeting with Chappell, McKinney told Chappell that she was conservative, needed some income, and that she could not afford to lose her life savings.  McKinney also informed Chappel that McKinney's husband had retired in 1993 and that the McKinney's had no other income.

42.     Despite McKinney's needs for a conservative investment, Chappell sold McKinney a variable annuity.  Just as she had promised the other claimants, Chappell promised McKinney that the investment principal would be guaranteed and that the annuity would provide a guaranteed six-percent rate of return.

43.     Chappell, once again, failed to ask questions about McKinney's background and needs in order to determine whether a variable annuity was suitable for her.  Chappell also failed to inform McKinney that the variable annuity was an insurance product that only guaranteed part of her funds through a death benefit.  Had McKinney known this, she would not have purchased the annuity.  Indeed, McKinney already owned a life insurance policy at the time of the annuity sale and had no need for additional life insurance.

**McKinney's Portfolio and Losses**

44.     On or around March of 1999, Chappell placed McKinney in Raymond James account # 80550852 and funded it with an AIG Sun America Polaris II variable

annuity, contract # P3799510481. (Ex. 9)  Despite McKinney's need for conservative investments, Chappell funded the annuity with 100% equities.  As of December of 2004, McKinney had sustained net out of pocket losses of approximately $54,379. (Ex. 9)  This figure does not include McKinney's lost opportunity costs.

**F.    LINDA MIDDLETON**

<u>Background</u>

45.    Linda Middleton was born in Houston County, Alabama in 1947. Middleton did complete high school and began to work at GTE.  Middleton worked at GTE for 30 years.    While employed at GTE, Middleton worked as a long-distance operator, dispatcher, and supply operator driving trucks and forklifts.  Throughout her career, Middleton only invested in the GTE retirement plan.

<u>Chappell's Investment Advice to Middleton</u>

46.    Middleton learned of Chappell from Chappell's brother, Ronald Hughes, who also worked at GTE.   Middleton called Chappell and set up a meeting.  During the meeting with Chappell, Middleton stated that she needed income and wanted very conservative investments that would not place her life savings at any risk.  Chappell promised Middleton that she could place her savings in a product that would produce a guaranteed 5% rate of return and that would also guarantee the return of Middleton's principal at the end of seven years.

47.    Chappell failed to ask Middleton questions about her background and needs in order to determine whether a variable annuity was suitable for her.  Chappell also failed to inform Middleton that the variable annuity was an insurance product that only guaranteed part of her funds through a death benefit.  Had Middleton known this,

18

she would not have purchased the annuity. Like the other claimants, Middleton already owned a life insurance policy at the time of the annuity sale and had no need for additional life insurance.

**Middleton's Portfolio and Losses**

48.    Middleton invested approximately $190,605 with Chappell and Raymond James in Raymond James account # 80916088. Chappell placed Middleton's life savings in an Equitable Accumulator Rollover IRA, contract number 99 629 647 (Ex. 10) Contrary to Chappell's promises, Middleton received neither a five-percent rate of return, nor the return of her guaranteed principal. As a result of Chappell's negligence and/or fraud, Middleton sustained net out of pocket losses of approximately $75,000. This figure does not include Middleton's lost opportunity costs.

**G.    VICTOR STAFFORD**

**Background**

49.    Mr. Victor Stafford was born in 1943, in Clio, Alabama. Stafford attended school until eighth grade, at which point he had to quit to work on his family farm. In 1970, Stafford began working with Pea River Electric. For most of his time there, he performed service work. Stafford retired in March of 2005.

**Chappell's Investment Advice to Stafford**

50.    Stafford first met Chappell at "Wellness Day" held at Pea River. After Chappell's presentation, Stafford contacted her to set up a meeting. Stafford and his wife met with Chappell around the end of 2000 prior to Stafford's retirement. During the meeting, Chappell specifically told Stafford that she could invest his life savings in a product that would provide him with a guaranteed five-percent return without exposing

his principal to any risk. This is the exact same statement Chappell made to Cherry and to Edmonson. Stafford specifically said to Chappell that he needed some income, that he could not afford to lose his life savings and that he wanted conservative investments. Despite Stafford's desire for safe investments, Chappell funded Stafford's portfolio with annuity that held 100% equities.

51.    During this initial meeting and in subsequent meetings, Chappell failed to ask questions about Stafford's background and needs in order to determine whether a variable annuity was suitable for him. Chappell also failed to inform Stafford that the variable annuity was an insurance product that only guaranteed part of his funds through a death benefit. Had Stafford known this, he would not have purchased the annuity. Indeed, Stafford already owned a life insurance policy at the time of the annuity sale and had no need for additional life insurance.

**Stafford's Portfolio and Losses**

52.    Chappell placed Stafford's retirement savings in Raymond James account and funded the account with two variable annuities: (1) AXA Equitable Accumulator variable annuity, contract number 300 610 913, and (2) Putnam Hartford Capital Manger, contract # 710804263 (Exhibit 11). Contrary to Chappell's promises, Stafford received neither a five-percent rate of return, nor the return of her guaranteed principal. As a result of Chappell's negligence and/or fraud, Stafford sustained net out of pocket losses of approximately $100,000. This figure does not include Stafford's lost opportunity costs.

## IV.    NASD REGULATIONS

53.    The National Association of Securities Dealers has attempted to regulate the improper sale of variable annuities by developing rules and by providing notices to its members.  Since Raymond James is required by law to register as a broker/dealer and to become a member of the NASD, its representatives knew or should have known of the numerous rules and notices the NASD sent to its members.

### A.    NASD RULES AND NOTICES TO MEMBERS

54.    Variable annuities are securities and their distribution is subject to NASD rules.

55.    The National Association of Securities Dealers, Inc. (NASD) Rule 3010 (Exhibit 12) requires each member to establish and maintain a system to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules.

56.    NASD Rule 2310 (Suitability Rule) (Exhibit 13) prescribes the basic requirements of performing suitability reviews.  The rule provides that a member shall have reasonable grounds for believing that [a] recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.  The Suitability Rule also provides that a member shall make reasonable efforts to obtain information concerning: (a) the customer's financial status; (b) the customer's tax status; (c) the customer's investment objectives; and (d) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

21

57.    NASD Conduct Rule IM-2310.2 (Exhibit 14) provides that members and registered representatives have a fundamental responsibility for dealing fairly with their customers.

58.    In Notice to Members 96-86 (Exhibit 15), the NASD stated that when recommending variable annuities or variable life insurance, the member and its registered representative are required to make reasonable efforts to obtain information concerning the customer's financial and tax status, investment objectives, and such information used or considered reasonable in making recommendations to the customer. This same Notice also listed specific factors that could be considered when recommending variable annuities and variable life insurance contracts.  These factors include:

    a.  a representation by a customer that his or her life insurance needs were already met;

    b.  the customer's express preference for an investment other than an insurance product, the customer's inability to appreciate fully how much of the purchase payment or premium is allocated to cover insurance or their costs, and a customer's ability to understand the complexity of variable products generally;

    c.  the customer's willingness to invest a set amount on a yearly basis;

    d.  the customer's need for liquidity and short-term investment;

    e.  the customer's immediate need for retirement income; and

    f.  the customer's investment sophistication and whether he or she is able to monitor the investment experience of the separate account.

59.    In Notice to Members 99-35 (Exhibit 16), the NASD further reminded members of their responsibilities regarding the sales of variable annuities.  Specifically, NTM 99-35 provided the following instructions for registered representatives:

    a.  Customer Information

1)      Members should make reasonable efforts to obtain comprehensive customer information, including the customer's occupation, marital status, age, number of dependents, investment objective, risk tolerance, tax status, previous investment experience, liquid net worth, other investment savings, and annual income.

2)      Registered representatives should discuss all relevant facts with the customer, including liquidity issues such as potential surrender charges, tax penalties, fees associated with the product, including mortality and expense risk charges, administrative charges, investment advisory fees, applicable premium taxes and market risk.

3)      Registered representatives should make certain that the application and any other information provided by the customer to the member is complete and accurate, and that the material is promptly forwarded to a registered principal for review.

4)      The registered representative and a registered principal should review the customer's investment objectives, risk tolerance and other information to determine that the variable annuity contract and the underlying subaccounts recommended to the customer are suitable. The registered principal should compare the information in the account application with other relevant information sources to check for apparent accuracy and consistency prior to approving the transaction.

b.    Product Information

1)      The registered representative should have a thorough knowledge of the specifications of each variable annuity that is recommended, including the death benefit, fees and expenses, subaccount choices, special features, withdrawal privileges, and tax treatment.

2)      A current prospectus should be given to the customer when a variable annuity is recommended. Prospectus information about important factors, such as fees and expenses and the illiquidity of the product, should be discussed with the customer.

c.    Liquidity and Earnings Accrual

23

1)   Lack of liquidity, which may be caused by surrender charges or penalties for early withdrawal under the Internal Revenue Code, may make a variable annuity an unsuitable investment for customers who have short-term investment objectives. Moreover, although a benefit of a variable annuity investment is that earnings accrue on a tax-deferred basis, a minimum holding period is often necessary before the tax benefits are likely to outweigh the often higher fees imposed on variable annuities relative to alternative investments, such as mutual funds.

2)   The registered representative should inquire about whether the customer has a long-term investment objective and typically should recommend a variable annuity only if the answer to that question, with consideration of other product attributes, is affirmative. In general, the registered representative should make sure that the customer understands the effect of surrender charges on redemptions and that a withdrawal prior to the age 59 ½ could result in a withdrawal tax penalty. In addition, the registered representative should make sure that customers who are 59 ½ or older are informed when surrender charges apply to withdrawals.

3)   The member should develop special procedures to screen for any customer whose age may make a long-term investment inappropriate, such as any customer over a specific age. Based on certain contract features, some customers of advanced age may be unsuitable for a variable annuity investment.

d.   Income, Net Worth, and Contract Size Thresholds

1)   Members should establish procedures to require a principal's careful review of variable annuity investments that exceed a stated percentage of the customer's net worth, and any contract in which a customer is investing more than a stated dollar amount.

e.   Investment in Tax-Qualified Accounts

1)   Some tax-qualified retirement plans (e.g., 401(k) plans) provide customers with an option to make investment choices only among several variable annuities. While these variable annuities provide most of the same benefits to investors as variable annuities offered outside of a tax-

qualified retirement plan, they do not provide any additional tax deferred treatment of earnings beyond the treatment provided by the tax-qualified retirement plan itself.

2)   When a registered representative recommends the purchase of a variable annuity for any tax-qualified retirement account (e.g., 401(k) plan, IRA), the registered representative should disclose to the customer that the tax deferred accrual feature is provided by the tax-qualified retirement plan and that the tax deferred accrual feature of the variable annuity is unnecessary.   The registered representative should recommend a variable annuity only when its other benefits such as lifetime income payments, family protection through the death benefit, and guaranteed fees, support the recommendation.

3)   A member should conduct an especially comprehensive suitability analysis prior to approving the sale of a variable annuity with surrender charges to a customer in a tax-qualified account subject to plan minimum distribution requirements.

60.   In Notice to Members 00-44 (Exhibit 17), the NASD continued its efforts to prevent broker/dealers and their representatives from pushing variable annuity products onto unwary and unsuspecting individuals.   In NTM 00-44, the NASD provided in part the following:

a.  Guidelines For Supervision of Variable Life Insurance Sales

1)   Variable life insurance products may be appropriate for a customer with a need for life insurance and an ability to pay for permanent life insurance protection.   Nevertheless, since the cash value and death benefit may fluctuate due to the performance of the investments in the separate account, a variable life insurance customer should also be able to assume investment risk and understand the implications of adverse investment performance.

b.  Customer Information

1)   When recommending a variable life insurance policy, members and their registered representatives should make

25

reasonable efforts to obtain comprehensive customer information, such as the customer's age, annual income, net worth, liquid net worth, number of dependents, investment objective, sources of funds for investment, investment experience, existing investments and life insurance, time horizon, and risk tolerance.

2)    The registered representative should document this type of information in a customer account information form and should submit it with every variable life insurance application.    A registered principal should review the account information form and verify that the recommendation of both the policy and the subaccount allocation is consistent with the customer's investment objectives and risk tolerance.

c.  Review of Customer Information

1)    The member should consider whether the customer desires and needs life insurance and whether the customer can afford the premiums likely needed to keep the policy in force.

2)    A member may wish to establish internal percentage ratio guidelines, such as the ratio of scheduled or target premium to income or household income, or percentage scheduled or target premium to liquid net worth.    While these ratio guidelines are no substitute for proper supervision, they may assist in the review for variable life insurance affordability and excessive amounts of coverage.    If the ratio exceeds the member's parameters, an extra level of supervision and review may be warranted.    If parameters are exceeded, the registered representative should submit additional supporting documentation or a written explanation.    To assist principals in their review of variable life insurance applications, members may wish to provide a checklist of items for the principal to review.

3)    Members may wish to establish special supervision requirements for sales to older customers.  Life insurance is often appropriately purchased by older investors.  However, variable life insurance may not be suitable for an older investor who is primarily seeking an investment rather than an insurance product.  Additionally, members should carefully consider whether and older investor has

26

the financial means to sustain the likely amount of policy premium payments.

d.  Product Information

1)  Registered representatives should be thoroughly familiar with the features and costs associated with each recommended variable life insurance policy, including surrender charges, premium and cash value charges, separate account charges, underlying fund fees, subaccount investment options, loan provisions, fee-look periods, and policy premium lapse periods. The registered representative also should be able to clearly convey such information to the customer so that the customer can make an informed decision regarding the recommendation.

2)  Variable life insurance policies have features of both traditional insurance products and securities. Accordingly, members may provide their registered representatives with examples, such as lifestyle case studies, to illustrate what the member considers to be potentially unsuitable recommendations and what type of activity would warrant an extra level of supervisory review.

3)  Members may also wish to provide customers with member-approved product information brochures, in addition to any required disclosure documents, that explain the features and principal risks associated with variable life insurance.

4)  Registered representatives should provide customers with a current prospectus when recommending a variable life insurance policy. Registered representatives should be available to discuss with customers the information that is contained in the prospectus.

61.  Given the rules and Notices to Members, Chappell and Raymond James knew or should have known that variable annuity products were not appropriate for the Claimants or any other individuals who already benefited from a tax-deferred investment, who were elderly and/or sick, who needed income, and who wanted to maintain conservative positions without exposure to their principal.

## V.    CLAIMS

### A.    BREACH OF FIDUCIARY DUTY

62.    Claimants reallege and incorporate paragraphs 1 through 61, above.

63.    By reason of the fact that Chappell and Raymond James acted as Claimants' broker, Respondents owed a fiduciary duty to Claimants to act in the utmost good faith and in dealing with Claimants, including, but not limited to, the following:

    a.    The duty to recommend an investment only after studying it sufficiently to become informed as to its nature, price and financial volatility;

    b.    The duty to inform the customer of the risks involved in purchasing or selling a particular security or insurance product;

    c.    The duty to refrain from self dealing;

    d.    The duty not to misrepresent or omit any fact material to a transaction; and

    e.    The duty to act in the best interests of Claimants.

64.    Respondent breached each of the above duties.

65.    As a result of Respondent's breaches, Claimants have been damaged in an amount according to proof.

66.    The aforementioned acts of Respondent were willful, wanton, malicious and oppressive and justify the awarding of exemplary and punitive damages against Respondent in an amount according to proof.

67.    In addition, Claimants seek all consequential damages proximately caused by Respondent's wrongful conduct, including, but not limited to lost opportunity costs, interest, adverse tax consequences, professional and attorneys fees.

28

**B.    BREACH OF CONTRACT**

68.    Claimants reallege and incorporate paragraphs 1 through 67, above.

69.    Respondent is obligated to provide Claimants with competent and professional services in accordance with applicable industry rules, regulations, customs and practices.  Such obligations were mandated by the very nature of Respondent's business, business affiliations and undertakings for Claimants.  By the conduct outlined above, Respondent breached its contract with Claimants.

**C.    COMMON LAW FRAUD**

70.    Claimants reallege and incorporate by reference paragraphs 1 through 69, above.

71.    By reason of the fact that Respondent acted as Claimants' broker and agent, Respondent owed a duty of good faith and fair dealing to Claimants.

72.    Respondent breached its duty to Claimants by misleading Claimants to their prejudice and to Respondent's advantage.  Specifically, Respondent's advantage consisted of compensation in the form of commissions, profits or other remuneration it received by misleading Claimants into believing that the variable annuities at issue guaranteed Claimants' principal, provided a guaranteed rate of return, and were suitable for the Claimants.  Claimants reasonably relied upon Respondent's misrepresentations and material omissions, and as a result, Claimants were damaged.  Furthermore, had Claimants known the true facts, they would never have purchased the variable annuities.

73.    Claimants have been damaged in an amount according to proof.

74.     The aforementioned acts of Respondent were willful, wanton, malicious and oppressive and justify the awarding of exemplary and punitive damages against Respondent in an amount according to proof.

**D.     NEGLIGENCE**

75.     Claimants reallege and incorporate by reference paragraphs 1 through 74, above.

76.     Respondent owed a duty to the Claimants to manage their investments with their best interests in mind, including a duty to provide them with accurate advice. Further, Respondent owed the Claimants a duty to accurately and adequately explain the risks inherent in the particular investments strategies that they recommended.

77.     Additionally, Respondent violated its duties under NASD and NYSE rules, such as the "know your customer rule" by recommending unsuitable securities for the Claimants in disregard of the Claimants' risk tolerances, needs, and financial situations. To the extent that Respondent violated and/or disregarded its own internal compliance guidelines, they are liable to the Claimants for their losses resulting from such negligence.

**E.     NEGLIGENT MISREPRESENTATION/OMISSION**

78.     Claimants reallege and incorporate by reference paragraphs 1 through 77, above.

79.     Respondent supplied, and was in the business of supplying, information to guide others such as Claimants in making their investment decisions. Respondent holds itself out as being capable of providing certain services to clients, including helping investors set investment objectives and determine proper asset allocation.

80.     Respondent was negligent in making the foregoing representations, as they failed to provide Claimants with advice and guidance in accordance with their investment objectives and financial situation. The Claimants reasonably relied on Respondent's representations and omissions, and suffered financial losses as a direct and proximate cause thereof.

**F.     FAILURE TO SUPERVISE AND CONTROL**

81.     Claimants reallege and incorporate paragraphs 1 through 80, above.

82.     By reason of the fact that Respondent Raymond James employed, controlled, supervised, licensed, and allowed Chappell to hold herself out as an agent that was registered and authorized to sell securities, Respondent owed Claimants a duty to properly supervise Chappell, including but not limited to, the duty to control the representations Chappell made to Claimants, to control Chappell's dealings with Claimants, and to prevent Chappell from effectuating unsuitable transactions in Claimants' accounts

83.     Respondent breached it duty to Claimants by failing to properly supervise Chappell. Specifically, Respondent knew or should have know that Chappell was engaging in wrongful and illegal conduct by selling Claimants unsuitable investments.

84.     As a result of Respondent's breach, Claimants have been damaged in an amount according to proof.

85.     In committing the acts described in this claim, Respondent acted in conscious disregard of their duty to Claimants in that Respondent, through its agent Chappell, misrepresented, deceived, and/or concealed from Claimants, facts known or facts that should have been known to them with the intention on the part of Respondents

of generating commissions, profits and other remuneration. The conduct of Respondent warrants an assessment of exemplary and punitive damages in an amount appropriate to punish Respondent and to deter others from engaging in similar wrongful conduct.

## G.     VIOLATION OF FEDERAL AND STATE SECURITIES LAWS; NASD RULES OF FAIR PRACTICE

86.     Claimants reallege and incorporate by reference paragraphs 1 through 85, above.

87.     Respondent's wrongful conduct, as alleged above, constitutes violations of the federal securities laws, including but not limited to, Sections 10 and 20 of the Securities and Exchange Act of 1934 and Rule 10(b)-5 promulgated thereunder; Section 12(2) and Section 15 of the Securities Act of 1933; Section 8-6-19 of the Alabama Code; and Sections 2110, 2120, 2310 and 3010 of the National Association of Securities Dealers, Inc. Rules of Fair Practice.

88.     As a result of the wrongful conduct engaged in by Respondent, Claimants have suffered damages in an amount according to proof, plus interest at the legal rate from the date of the wrongful conduct to the date of payment if an arbitration award is made.

## VI.     CONCLUSION

89.     Chappell and Raymond James had a duty to the Claimants. By placing the Claimants in unsuitable variable annuity products, Chappell and Raymond James breached their duty to the Claimants and caused them to lose the money that was necessary to support them for the remainder of their lives. The loss of much of their savings has not only caused the Claimants financial hardship, but it has also caused them extreme emotional distress.

90.    As a result of Respondent's breach of fiduciary duties, fraud, negligence, violations of state and federal securities laws, violations of NASD rules, and failure to supervise, Claimants request an award against Respondents as follows:

a.    Compensatory damages in an amount according to proof, but not less than $2,000,000;

b.    All consequential damages, including but not limited to, professional costs and adverse tax consequences;

c.    Disgorgement and restitution of all earnings, profits, compensation and benefits received by Respondent as a result of its unlawful acts and practices in an amount according to proof;

d.    Lost opportunity cost of what the investments would have earned if suitably invested;

e.    Costs of proceedings

f.    Attorney's fees and costs;

g.    Pre-judgment and post-judgment interest at the legal rate;

h.    Punitive damages in an amount according to proof;

i.    Rescission of the annuities; and

j.    Such other relief as this panel may deem just and equitable.

Respectfully submitted,

Richard S. Frankowski
Ala. State Bar No. ASB-1734H70F

33

**OF COUNSEL**

**WHATLEY DRAKE, LLC**
2323 2nd Avenue North
P.O. Box 10647
Birmingham, Alabama 35202-0647
Tel:    (205) 328-9576
Fax:    (205) 328-9669

# EXHIBIT "A"







BASICS

# Don't Let the Bells and Whistles Distract You

Although variable annuities can pay off in very limited circumstances (discussed below), most investors will do better buying and holding mutual funds outside rather than inside this tax shelter.



**Transforming capital gains to ordinary income is harder to justify.** The widening gulf between the regular tax rates -- as high as 39.6% -- that ultimately apply to annuity earnings and the 20% rate for profits from straight mutual funds means it takes longer for the benefits of tax deferral inside the annuity to overcome the loss of capital-gains treatment.

**Fees are much higher than for mutual funds.** A few companies, including Fidelity and Vanguard, have cut fees, but the average variable annuity still charges 2.09%, according to Morningstar. That's $2,090 each year on a $100,000 account. The average mutual fund claims 1.4%.

**The death benefit isn't worth the money.** A large chunk of the fees pays for the death benefit, which typically pays off only if you die when your account has fallen below the minimum guarantee. But chances are slim that you'll lose money over the long haul.

Bill Klipp, president of Charles Schwab Investment Management, points out that "there are far cheaper ways to insure against an event of that sort." Consider, for example, that the average annuity charges 1.11% per year primarily for this death benefit -- $1,110 per year on a $100,000 account. Yet a healthy 60-year-old man would



pay about th     ne amount -- $1,100 a year -- for a $200,000 20-year level-term policy, which would provide his heirs protection that would in no way be connected with the market.

**You don't need a variable annuity to guarantee income for life.** One of the most frequently promoted but seldom-used benefits of annuities is *annuitization* -- which guarantees you set payments for the rest of your life, no matter how long you live. The reason annuitization is relatively unpopular is that it is inflexible: Once the payments begin, you can't change your mind. Much more common is systematic withdrawal of funds, which allows you to decide how much to withdraw at any time. You don't get the lifetime-payments guarantee, but neither do you guarantee that payments end with your death (or the death of a survivor if you choose a joint annuity). With systematic withdrawals, your heirs get what's left in the account when you die.

If lifetime payments are important to you, realize that you don't need a variable annuity to get them. You can invest in stocks or mutual funds until you're ready to start tapping your nest egg, then sell them and use the proceeds to buy an immediate annuity. Yes, you'll have to pay tax on capital gains at that time, leaving you less to invest in the annuity. But because only after-tax money goes into the annuity, less of each payment you receive will be taxed than if you had built up your account inside a tax-deferred annuity.

**You need to hold an annuity for at least 15 years.** It takes at least a decade and a half for the benefits of tax deferral to make up for the higher taxes and fees. The break-even point depends on your tax bracket, the fees, whether you withdraw the money in a lump sum or gradually over the years, and what you're comparing the annuity with -- particularly, how often you trade taxable mutual funds and how well they perform.

Beware of sales pitches that show a closer break-even point. They're probably based on an assumption that if you buy mutual funds, you'll trade frequently and invest in funds that make significant capital-gains distributions each year. Such assumptions stack the deck in favor of annuities and ignore the advantage of tax-deferred growth, which is yours if you buy and hold funds that make relatively small year-end distributions. That's important because when funds pay out their gains, you have to pay taxes on your share. As gains build up inside a fund, though, you get the same tax-deferral benefit you would inside an annuity and the benefit of a 20% capital-gains rate

when you do    *.

"Why pay the cost of a variable annuity just to get
tax advantages when you can invest in
long-term-growth funds with few or no year-end
distributions--in effect, converting ordinary
income to capital gains?" asks Ricky Grunden, a
financial planner in Dallas.

*Variable Annuity Analyzer* software offered by T.
Rowe Price (free; 800-469-5304, or by e-mail)
lets you compare the performance of low-fee
variable annuities with no-load mutual funds
bought to save for retirement. In most scenarios,
you'll end up about even if you buy a variable
annuity or a mutual fund, hold it for 15 years and
withdraw a lump sum. Beyond 15 years, the
variable annuity begins to pull ahead, particularly
if you plan to withdraw some money each year
and leave the rest inside the tax-deferred account.

If you invest $100,000 in a variable annuity or
mutual fund at age 50, for example, then
withdraw the money between ages 65 and 90,
you'll receive $379,000 with the variable annuity
versus about $341,000 with the mutual
fund--assuming your investments return 8% per
year and your tax bracket drops from 31% to 28%
in retirement. (If your bracket doesn't drop, the
advantage of the annuity does.) If you invest at
age 40 and make withdrawals between ages 65
and 90, you'll get $684,000 from the variable
annuity versus $543,000 from the mutual fund.

[ Top ]

◄ Why Variable
Annuities Are Just
For a Few

When Annuities
Can Work ►

Recommend This Page to a Friend

© 2001 The Kiplinger Washington Editors, Inc.

# EXHIBIT "B"



# The great annuity rip-off

DO YOU WANT PROOF POSITIVE that investors are irrational? Here it is: Sales of variable annuities went up 16% last year, to $85 billion.

A variable annuity is a mutual fund-type account wrapped in a thin veneer of insurance that renders the investment earnings tax-deferred.

The tax deferral is just about the only good thing you can say about these investment products. Almost everything else about them is bad: the high -- sometimes outlandishly high -- costs, the lack of liquidity, the fact that the annuity converts low-taxed capital gains into high-taxed ordinary income. That tax deferral comes at a very high price.

The last of those three drawbacks just became bigger. The 1997 tax law cut capital gains tax rates while leaving ordinary income tax rates high. So the benefit of wrapping an annuity around your stock portfolio has just about vanished.

That tax change should have stopped annuity sales cold. The salespeople who push these things should have moved on to products more suitable for their clients, like plain old mutual funds. Shares of the leading variable annuity vendors -- such as Hartford Life, Nationwide Financial Services and SunAmerica -- should have collapsed.

None of these things has happened. Their shares are up 30% and more over the last year. What on earth is going on?

Its the old story: Annuities are sold, not bought. And a good salesman can get a lot of mileage out of the apparent tax advantages of a tax-deferred annuity. This investment product, he will tell you, is like an IRA, except that there is no $2,000 limit on contributions. You can put in $1 million if you want. Leave the money in as long as you want. It compounds tax-deferred.

The statement is true, up to a point. But unlike a deductible IRA or a 401(k), which is bought with pretax dollars from your paycheck, a deferred annuity gives you no tax deduction when you buy it.

Nor is an annuity anything like one of those new Roth IRAs. The Roth IRA is tax-exempt (if you meet certain criteria). An annuity is merely tax-deferred -- meaning that you have to reckon with the tax collector someday on your earnings.

In a typical transaction a stockbroker (or financial planner or insurance salesman) persuades you to salt away, say, $20,000 in an annuity policy that is a mutual fund in all but name. Indeed, the portfolio choices for your account will often be clones of popular mutual funds (like Fidelity Contrafund). Your choice of portfolios is usually wide: stocks, bonds, money markets, foreign securities.

But with an annuity theres an extra layer of fees. In addition to the investment fee on the portfolio theres a "mortality and expense risk" charge, typically 1% or more a year. This covers the cost of the "insurance" you are getting.

Insurance? Its there, a pale imitation of life insurance. The insurance guarantees that when you die, the value of your account will be at least as great as the money you originally put in -- unless you get a contract that steps up the insurance coverage over time, all you are insured for is the starting value. If the account has indeed grown, you still get only the value of the account, no more, no less; the insurance pays nothing. To collect on the insurance, that is, you have to pick a rotten investment -- and then drop dead before the investment recovers. Is that what you had in mind? We doubt it.

What is the actuarial value of that life insurance? (See box, p.109.) It is safe to say that with the vast majority of annuities sold today, almost all the money you are assessed for "mortality and expenses" winds up in either the

salesmans or the insurance companys pocket.

Assuming you dont die, the account accumulates. Say it grows to $32,000 and you decide to cash out. The $12,000 increase in value is taxed as ordinary income, at federal rates of up to 41% (taking into account a surcharge that relates to itemized deductions) plus state and local levies; for a New York City taxpayer that can add up to higher than 50%. Thats true even if much of the gain is from stock price appreciation. If those same stocks were held in a mutual fund the price appreciation would be taxed at about half those rates, assuming the fund shares are held for at least 18 months.

Annuities are costly to own. Expenses -- portfolio management fees, plus that "mortality" charge -- average a hefty 2.1% a year. Thats half again what it costs to own the average mutual fund, and ten times what it costs to own the Vanguard Index 500 fund. Surrender charges are common, starting out typically at 7% if you cash out in the first year and declining to 0% in the seventh year. Also, if you cash out before you reach 59 1/2, you have to pay a tax penalty, except under certain narrow circumstances.

There are a handful of exceptions to the rule that annuities are costly. The College Retirement Equities Fund sells very low-cost annuities, but only to schoolteachers and professors in the TIAA-CREF pension system. Vanguard, T. Rowe Price and Jack White sell annuities with no surrender fees and low annual expenses -- but they dont sell very many.

The rest of the business pretty much belongs to people who live on commissions: insurance agents, stockbrokers and commission-paid financial planners. They get a payout of up to 7%, which they share with their firm. Where else can they pocket that kind of money? Not in load mutual funds, where the average commission is something like 4%.

Certainly not in stocks or bonds, where commissions are facing stiff competition. "The salesman has a new hammer, and everybody starts looking like a nail," says Charles Haines, a fee-only financial planner in Birmingham, Ala.

If the terms are so terrible, then why do people buy the salesmans pitch? Because they are mesmerized by the words "tax deferral." Does this sound familiar? A generation ago a different crop of investors was mesmerized by the words "tax shelter" -- and ended up with worthless railcar leases and cattle farms.

But just what is this tax deferral worth? Get out a pencil and do some arithmetic. Say youve got $20,000 to salt away for retirement in 20 years and you want to put it in stocks. If you own the Vanguard Index 500 fund, most of your return takes the form of unrealized appreciation in the funds shares. You will get income dividends of only 1.5% a year, which will create a tax burden equal to maybe 0.7% of assets annually.

Capital gains payouts on the Vanguard fund have been extremely modest.

When you cash out, the accumulated gain in fund shares is taxed at low capital gains rates.

Now look at the Prudential Discovery Select stock index account. Sure enough, this will spare you the 0.7% tax bill. But at what cost! The annuitys total expenses run 1.8% of assets annually. That is 1.6 percentage points above the cost of the Vanguard fund, more than wiping out your current tax savings.

If this were the end of the matter, the annuity mightnt be too bad.

But now look at what happens when you cash out. Lets assume an average annual return of about 7%; the account quadruples in 20 years, to $80,000. In the ordinary Vanguard index fund you would have a long-term capital gain of a bit less than $60,000 (less, because your reinvested dividends get counted in your purchase price). On that you would owe federal tax of $12,000. At Prudential the whole gain is ordinary income.

Youd owe something close to $24,000.

The taxable mutual fund has another advantage over the supposedly tax-favored annuity. You could escape the $12,000 capital-gain tax altogether by either giving the fund shares to charity or leaving them in your estate. No such option is available to an annuity holder.

Transfer or bequeath an annuity to anyone but your spouse and you trigger recognition of the full appreciation as income.

Any prospective customer who takes the time to understand annuities runs away screaming. A recent report by consulting firm Cerulli Associates puts the matter as delicately as it can: "Information about variable annuity purchases reveals that they do not appear to be based on educated decisions."

Consider the experience no-load fund giant T.Rowe Price had when it sent potential customers software to help them determine whether variable annuities were right for them. The program factored in the investors age, income, tax bracket and investment horizon -- and it regularly told potential buyers that they would be better off in a plain old fund. An educated consumer, as it turned out, was not a good prospect for annuities.

If folks really knew what they were buying, how could you explain the $21 billion of annuities sold in 1996 that went into IRAs? IRAs, already tax-sheltered, benefit not a whit from the annuities deferral feature.

A case can be made for buying one particular kind of variable annuity inside an IRA. This is the kind that converts a lump sum into a monthly payout that lasts only as long as you do; what you are paying for is not a tax shelter, which is already there, but rather an assurance that you wont outlive your capital. But of that $21 billion worth of IRAannuities sold in 1996, only 1% were these monthly payout contracts.

"This is one of the biggest disgraces in the entire securities industry," fumes investment adviser Joseph Ludwig of Tandem Financial Services, in Canton, Mass. One of the victims: Ludwigs own son-in-law, Barry Joseph. Before marrying, Joseph bought a Metropolitan Life annuity inside his IRA. "I honestly thought I bought a mutual fund," says Joseph. "The salesman never mentioned the word annuity to me."

After Congress lowered the tax rate on capital gains, the annuity industry commissioned a study by Price Waterhouse on the implications. A stunning specimen of spin, the study concluded that the new tax rates would have a negligible impact on the number of years it takes for the benefits of tax deferral to overcome the higher costs of variable annuities relative to mutual funds.

But Patrick Reinkemeyer, editor of Morningstars variable annuity report, says Price Waterhouse made some dubious base assumptions. Among them: that variable annuity investors will be taxed at the rock-bottom 15% federal income tax rate when they withdraw their money in retirement, and that the investments will earn 13.6% per year, the average for mutual funds from 1987 to 1996.

Richard Toolson, an accounting professor at Washington State University, has done his own calculation of break-even points. For someone in the 36% income tax bracket who has to choose between a low- turnover index fund and an annuity portfolio earning the same pretax return, it would take more than 40 years for the annuity to earn back even a low 0.5% mortality charge. Yes, the salesman is right when he says that "annuitizing" your investment when you retire (taking monthly payouts over a long period) keeps the taxman at bay a while longer.

Still, 40 years is a long time.

And a 0.5% fee is not easy to find. The average mortality charge in the annuity industry is 1.3%; with that kind of fee, says Toolson, the annuity buyer never comes out ahead, even if his tax bracket has gone way down by the time he cashes in the annuity. Toolson didnt even figure in the freebie that owners of stocks or fund shares get when they donate or bequeath the property.

Not counting academics lucky enough to be eligible for CREF, is there anybody who in his right mind should even consider owning an annuity?

Glenn Daily, a fee-only insurance consultant in New York City, offers a few examples.

Case one: Someone who owns an underwater cash value life insurance policy. Say you have poured $100,000 into a universal life policy and it now has a cash value of $85,000. Insurance policy losses are almost never tax-deductible, but if you transfer the $85,000 to an annuity, the first $15,000 of profit you make on the annuity is tax-free.

Case two: a retiree who has just barely enough money to live on and needs one of those monthly payout annuities.

Case three: potential targets of lawsuits. Three-quarters of the states, among them New York, Washington, Florida and Texas, protect assets in variable annuities from creditors, to one degree or another.

Doctors worried about malpractice suits, for example, might do well to stash some money in variable annuities.

If you fall into one of these three categories, look for a no-load annuity (see table, p. 108) and dont pay a penny more than you have to in expenses. What if youve bought a high-cost annuity already and regret it? Cut your losses. Wait until the surrender charge period is over and then roll your account into a no-load, low-expense annuity via a tax-free "Section 1035" exchange.

**Sidebars**
The performance game
What is this insurance worth?
Imprisoned

# EXHIBIT "C"

# THE WALL STREET JOURNAL.
### ONLINE

July 2, 2002

At Annuity University, Agents
Learn How to Pitch to Seniors

By **ELLEN E. SCHULTZ** and **JEFF D. OPDYKE**
**Staff Reporters of THE WALL STREET JOURNAL**

DENVER — At a training session on how to sell investments, Tyrone
Clark offers a key piece of advice on how to sell to senior citizens: "Treat
them like they're blind 12-year-olds," he says.

The 40 or so trainees attending this class in a hotel conference room
scribble notes and occasionally laugh or applaud Mr. Clark. If they
missed any of his selling tips, the points also are summarized in the
course manual.

"You'll waste time if you think you can impress them with charts, graphs,
printouts or use sophisticated words," the manual, written by Mr. Clark,
says regarding seniors. "They buy based upon emotions! Emotions of
fear, anger and greed."

Welcome to Annuity University, the name of a two-day seminar where
budding sales people pay $375 to learn the ins and outs of getting seniors
to buy annuities. Annuities are insurance contracts in which the earnings
are tax-deferred. "Fixed" annuities have returns that are guaranteed for a
year or so, while "variable" annuities are essentially a collection of mutual
funds in a tax-sheltered wrapper.

At Annuity U., the explanation of an annuity is even simpler. "There's the
technical answer," says Mr. Clark, 43, and "there's the senior answer. Tell
them it's like a CD — it's safe, it's guaranteed."

While that sounds pretty appealing, annuities are actually a lot more
complex and have downsides that salesmen may not mention. The higher
fees of most annuities can often cancel out their tax advantages; most
annuities lock in investors for years; and annuities saddle heirs with
higher taxes, unlike mutual funds or most other investments. For these reasons, many investment experts say
annuities are usually unsuitable for most older investors. "Annuities are almost never appropriate for seniors,"
says J. J. MacNab, an independent insurance analyst in Bethesda, Md.

Mr. Clark disagrees. He says in an interview that he "wholeheartedly believes annuities are the best
investment for seniors," while saying that his seminar also explains the negatives of annuities and when they
aren't appropriate.

Mr. Clark maintains that his teachings at Annuity U. aren't designed to belittle seniors or to help sales agents

## ANNUITY 101

- Annuities 101: Finding Out
All Are Not Created Equal[3]
05/22/02

- Gift Annuities Have Benefits,
Risks, But Monitor Who Is
Behind Pitch[4]
04/07/02

- Wild Swings in the Market
Prompt Resurgence in
Annuities' Popularity[5]
10/08/01

- Annuities Are a Draw to
Some, but They Can Also Be a
Rip-Off[6]
12/15/00

persuade older customers to make investments that they shouldn't. "It's just that agents can come across as too technical [when pitching an annuity] and people don't understand them," says Mr. Clark, who is president of Brokers' Choice of America Inc., the Glendale, Colo., company that runs Annuity U. as well as other classes on selling financial products. "I use metaphors to show them they have to oversimplify the information."

Seniors increasingly are the most likely to hear pitches for annuities because they are sitting on a growing sea of retirement money. A salesman who persuades a retiree to move $50,000 from bank certificates of deposit or an individual retirement account into an annuity will generate a commission of $3,000 to $4,000. Because annuity sales are so lucrative, regulators including the National Association of Securities Dealers have expressed concern that many of the sales are transacted merely to generate commissions.

Mr. Clark says he makes agents sign a code of ethics pledging that they won't misrepresent information when pitching to seniors. He adds, though, that "the problem is agents take the classes and abuse the information everyday. And I have no control over that. These [agents] are independent and want to pitch high-commission products, and we can't stop them."

Mr. Clark notes that many students rave about Annuity U., and provided comments that some wrote after they completed his course recently. "I see my DREAMS coming true in the next 10 years," wrote Randal Cade, a Lake Jackson, Texas, life-insurance agent who took the course last month. "My DESIRE is $1 million per year in income." John Rolfe, a tax lawyer and life-insurance agent near Philadelphia, wrote, "AU gave me the education I needed to start selling lots of annuities." He concluded: "Annuities -- great vehicle, especially for seniors."

In later interviews, Messrs. Cade and Rolfe confirmed their comments. Mr. Rolfe adds that the language Annuity U. instructors use "is just a colorful way of saying things. I never take it seriously; they're just trying to be the big guy in the room. It's all an exaggeration."

Annuity U., which a Wall Street Journal reporter attended last year with Mr. Clark's permission, runs sessions once a month in a Denver-area hotel ballroom. It has trained some 7,000 agents during the last 13 years, according to Mr. Clark.

'They Like Freebies'

The first step to wooing seniors is to get them to attend introductory seminars, and the best way to attract them, the trainees are told, is a free meal. "They like freebies," the Annuity U. training manual notes, and they "like to eat one major meal a day."

Trainees learn that the educational seminars can be used to generate fear among the attendees. "Toss hand grenades into the advice to disturb the seniors," Mr. Clark tells the trainees. He adds, "You're there to solve their problems, but you have to create those problems first. No problem, no sale. So at the seminars, you're creating problems, and you tease them with the solutions" to encourage a follow-up meeting with a salesman.

"They thrive on fear, anger and greed," Mr. Clark continues. "Show them their finances are all screwed up so that they think, 'Oh, no, I've done it all wrong.' This will make you money." The Annuity U. class learns that whatever the retiree's particular concern -- whether it's taxes, investment returns or asset protection -- the solution is almost always the same: an annuity.

Another Annuity U. lecturer, Mel Brandon of Memphis, Tenn., tells the class that educational seminars offer a good way to find out which seniors are well off and worth concentrating sales pitches on. When people arrive at his seminars, he says, he has "spotters" in the parking lot "checking out what kind of car each person drives. That way we'll know who has the money." The class chuckles.

Mr. Brandon also uses seminars to gather information on the chief financial concerns of prospective

customers. The retirees find a piece of paper waiting at their seat with a variety of topics represented -- taxes, Social Security, protection of assets -- and he encourages them to circle the subjects they're concerned about. Mr. Brandon says he uses the information when he calls potential customers to set up an appointment. "It's the hot button they're going to respond to," he says.

In a later interview, Mr. Brandon says these are just techniques to reach clients. "None of this is predatory," he says. "I don't consider any of what I talk about to be manipulative. This is the way to ID the clients, and strike a particular pose with a segment of the market. And [seniors are] our target market."

Selling techniques, starting with the moment that sales people drive up to the retiree's home, also receive careful attention at Annuity U. The first step is to leave the briefcase in the car because, according to the manual, "It might intimidate them and let them know you're a salesman."

There are more tips. "Don't walk on their grass." After you knock, have "one leg up on their step prepared to walk in ...Wipe your feet showing you respect their cleanliness. Now, look around: look for pictures of grandkids, children or the items of their pastimes and/or hobbies," the manual advises. Next, compliment the prospects on something or tell jokes. "Begin to get them to like and trust you," says the manual.

Another instructor, Roger Sierens, tells the class that such techniques have helped him sell millions of dollars worth of annuities a year. Pulling a man and woman from the audience for a bit of role-playing, Mr. Sierens launches into a typical presentation. He offers compliments such as "you have such a beautiful house."

Mr. Sierens gets prospective clients to go around the house to gather various financial documents. In his day planner, he records the date when bank certificates of deposit come due -- planning to call the seniors just before that date to get them to transfer the money into an annuity.

"You have to show them that you love them and care about them," he says. "Use words like protect, safety and guarantee of principal." Echoing that theme, the manual notes: "Make them feel they are the most important persons in your life."

In a later interview, Mr. Sierens says his techniques "are my method and manner of finding [a prospective client's] overall financial picture. This is information I need to know before making recommendations." Mr. Sierens adds: "I'm sure annuities are not sold properly all the time, but that's just like any other financial product. I have a lot of respect for seniors and treat them like I'd treat my parents."

**Locking Up the Sale**

During a coffee break, Annuity U. attendees can shop for sales aids, some spending hundreds of dollars a pop. If the retirees' concern is taxes, tell them that changes in the tax law could leave them penniless, the trainees are advised.

If the seniors are worried about lawsuits for damages against them, Mr. Clark suggests telling them, "Would it bother you to learn that your life savings are not insured against someone suing you because perhaps you hit a child while driving to the grocery store?"

Mr. Clark adds another tip: "Tell them you can protect their life savings from nursing-home and Medicaid seizure of assets. They don't know what that is, but it sounds scary," he says. "It's about putting a pitchfork in their chest."

Mr. Clark, in a later interview, says such comments are taken out of context. "The position I'm coming from is as a teacher," Mr. Clark says. "I teach [salesmen] that you have to show people they have problems associated with their planning."

Write to Ellen E. Schultz at ellen.schultz@wsj.com[1] and Jeff D. Opdyke at jeff.opdyke@wsj.com[2]

URL for this article:
http://online.wsj.com/article/0,,SB1025561802229705600.djm,00.html

**Hyperlinks in this Article:**
(1) mailto:ellen.schultz@wsj.com
(2) mailto:jeff.opdyke@wsj.com
(3) http://online.wsj.com/article/0,,SB1021755007500669400,00.html
(4) http://online.wsj.com/article/0,,SB1018108049751091280,00.html
(5) http://online.wsj.com/article/0,,SB1002477086944999480,00.html
(6) http://online.wsj.com/article/0,,SB976901260299210420,00.html

*Updated July 2, 2002 12:22 a.m. EDT*

Copyright 2002 Dow Jones & Company, Inc. All Rights Reserved

Printing, distribution, and use of this material is governed by your Subscription agreement and Copyright laws.

For information about subscribing go to http://www.wsj.com

# EXHIBIT "D"

# Kiplinger.com

Last updated on March 30, 2003

License or reprint this article

SAVING FOR RETIREMENT
Why Variable Annuities Are Just For a Few
by Kimberly Lankford

Okay, class, here's today's Marketing 101 challenge: How do you sell a product valued for its tax advantages after Congress changes the rules so its earnings may be taxed at rates nearly twice as high as those that hit competing investments? Tough, huh?

Yet that's exactly the position variable-annuity marketers found themselves in when Congress cut the tax rate on long-term capital gains to 20% in 1997. That wasn't an assault on variable annuities. They still sport their tax advantages.

By putting an annuity wrapper around a group of mutual funds, insurance companies can offer a tax-favored environment. You can trade as much as you want inside the annuity without tax consequences, and annual earnings build up tax-free. But when money comes out, those earnings are taxed in your top tax bracket -- up to 35%. That's why cutting the rate on capital gains to 15% was such a body blow.

With characteristic resilience, the purveyors of annuities refused to throw in the towel. This investment has always been "sold probably more aggressively than any other financial product," says Jeff Lambert, a financial planner in Sacramento, Cal.

To fight back, insurance companies started adding and promoting features that have nothing to do with taxes.

- Some policies now guarantee that the death benefit will include a minimum 5% annual gain. Historically, the death benefit -- which is the hint of insurance that earns annuities their tax-advantaged status -- simply guaranteed that if you died with the plan in force, your heirs would get at least as much as you had invested, even if your investments declined in value.

- The death benefit in other policies now promises that one year's gains can't be lost to a later market dip. If, for example, a $100,000 investment grew to $110,000 during the first year, $110,000 would become the minimum death benefit.

- Some companies offer a death-benefit-type guarantee to the living, making up the difference if your balance drops below your investment after ten years.

- Many policies now let you access your money without a surrender charge if you enter a nursing home.

Whipped into a frenzy yet? That seems to be the goal of these sales sleights of hand. But such features fall short.

The death benefit, which usually costs more than $1,000 for a $100,000 account, isn't going to help you if the market tumbles while you're still alive. Companies that guarantee your principal while you are

alive often charge another $1,000 a year on a $100,000 account. Yet the chances of your benefiting are almost nil. Large-company stocks have had negative returns over a ten-year period only twice since 1926 (the worst period was from 1929 to 1938, when they lost 0.89%).

Surrender-charge waivers won't protect you from the 10% tax penalty if you withdraw money before age 59½, and unless you buy the annuity after you retire, it's unlikely you'll enter a nursing home while the surrender period is in effect (often only seven years).

Don't Let the Bells and Whistles Distract You ►

This page printed from:

All contents © 2005 The Kiplinger Washington Editors

# EXHIBIT "E"

Case 1:07-cv-00923-MEF-SRW    Document 25-2    Filed 12/05/2007    Page 55 of 100
WSJ.com - State's Annuity Investigation Widens
Page 1 of 2



February 18, 2005

**MUTUAL FUNDS**

# State's Annuity Investigation Widens

By DAVID ARMSTRONG
Staff Reporter of THE WALL STREET JOURNAL
February 18, 2005; Page C13

*(See Corrections & Amplications item below[0].)*

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit:
www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

BOSTON -- Massachusetts securities regulators have subpoenaed a dozen financial institutions as part of an expanding investigation into the promotion of variable annuities to elderly bank customers.

The subpoenas, issued by the office of Massachusetts Secretary of Commonwealth William Galvin, seek the names of customers age 75 or older who purchased annuity products since January 2003.

Mr. Galvin said he broadened the probe of annuity marketing to the elderly after his office filed a civil fraud complaint earlier this month against the brokerage unit of Citizens Financial Group Inc. Mr. Galvin's office accused the company of "unethical and dishonest conduct" in promoting the sales of variable annuities to elderly customers on Cape Cod.

"We were overwhelmed by the response from the original Citizens case," he said, putting the number of new complaints his office received at about 30. "It's quite obvious this is a pervasive problem of older customers being targeted as perspective customers for variable annuities, which in most cases is not a good deal for them."

Many experts view variable annuities, a tax-deferred investment vehicle with an insurance contract, as inappropriate for elderly clients because of high fees and because the products' tax benefits generally are realized only over decades. Customers also pay steep "surrender" fees for taking money out early.

According to Mr. Galvin's office, Citizens received a new and broader subpoena as part of the widened probe. A Citizens spokeswoman said the bank is a "highly ethical company" and will "cooperate fully" with the probe.

The other institutions subpoenaed, according to Mr. Galvin's office, include: **Morgan Stanley,** which declined comment; **Sovereign Bancorp,** which said it would comply with the subpoena and was "fully comfortable" with its policies related to annuity sales; **Prudential Financial Inc.,** which was unaware of a subpoena from Mr. Galvin but said it would cooperate if it did receive one; UBS Financial Services Inc., which said it was unaware of a subpoena; Eastern Bank, which said it would comply with the request; and Brookline Savings Bank, which said it doesn't offer

variable annuity products.

Another firm that received a subpoena was Infinex Investments Inc., a brokerage firm owned by several small banks and bank trade associations. A spokesman said he was unaware of any complaints regarding the company's annuity products. He said the firm would comply with the subpoena.

**Write to** David Armstrong at david.armstrong@wsj.com[1]

### Corrections & Amplifications

**ARTICLES PUBLISHED** in the Online Journal on Feb. 11 and Feb. 18 regarding Citizens Financial Group Inc., a Providence, R.I., unit of Royal Bank of Scotland Group PLC, incorrectly included a stock symbol for Citizens Financial Corp. of Louisville, Ky. The Kentucky corporation is unrelated to Citizens Financial Group.

**URL for this article:**
http://online.wsj.com/article/0,,SB110867802743158185,00.html

**Hyperlinks in this Article:**
(1) mailto:david.armstrong@wsj.com

**Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

# EXHIBIT "F"

# THE WALL STREET JOURNAL.
ONLINE

FORMAT FOR PRINTING
Sponsored by

**XEROX. Color.**

March 6, 2005

**LOVE & MONEY**

By JEFF OPDYKE



# An Annuity For Grandma? Say It Isn't So.
*March 6, 2005*

My grandmother called me to her house recently to dig through her insurance and financial documents. She has named me executor of her modest estate, and she wants me to 1) know exactly what she has; and, 2) know what she wants to happen when the time comes.

Going through her records, however, I noticed something that set off alarm bells: What was once a $20,000 certificate of deposit at a local bank is now a $20,000 deferred annuity that the local banker sold her.

I immediately recognized it for what it was: a disaster. As a personal-finance writer, I've seen too many older people enticed into buying these investments, typically without understanding what they're getting talked into.

I probably can't do anything to help my grandmother; she bought her annuity a year ago and the grace period to cancel the contract ended 10 days later. She signed all the appropriate documents stating she understood the transaction, though as she told me recently, "I don't know a damn thing about this stuff; the guy at the bank just told me to sign these papers."

So I write this in hopes that when an annuity salesman approaches you, your parents or your grandparents with a compelling pitch -- and their pitches are always compelling, if not entirely honest -- you will remember my grandmother's story.

* * *

I am not against annuities. In fact, in the right situation, an annuity can accomplish a host of beneficial things: It can be a great vehicle for accumulating wealth before you retire. After you retire, some annuities can be the perfect tool for creating a stream of income you can never outlive. And in some circumstances it can help with estate-planning needs.

**DOW JONES REPRINTS**

⟨R⟩ This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

**ABOUT JEFF OPDYKE**

Jeff Opdyke, a personal-finance writer for The Wall Street Journal, writes Love & Money every Sunday for The Wall Street Journal Sunday supplement that runs in newspapers across the country. He has written about personal finance, investments and the markets for 10 years from Journal bureaus in Dallas, Seattle and New York. He currently writes for the Journal's Personal Journal section.

During a writing sabbatical, Jeff earned a Series 7 license, required of financial professionals, and served as a trader and analyst for a hedge fund.

A native of Baton Rouge, La., Jeff is a graduate of Louisiana State University's Manship School of Journalism and is the author of "Love & Money: A Life Guide to Financial Success," recently published by John Wiley & Sons.

But too many annuities are sold for the wrong reasons. And those reasons typically have to do with the commission the salesman is pocketing rather than the financial needs of the investor.

Just to be clear, I'm complaining largely about variable annuities and deferred annuities, both of which allow money to grow tax-deferred. Basically, you invest your money, say, $20,000, with an insurance company that guarantees some level of income in the future, either through a lump-sum or a monthly payout that lasts for years or until you die.



But to me, buying such an annuity in retirement generally makes little sense, especially for those who are much older, like my grandmother. That's because these are simply not short-term savings vehicles. Not to be morbid, but older savers generally don't have the number of years remaining that might make an annuity practical. Often, they'll never even benefit from it.

Annuities have two phases: accumulation, which can last for years, and then the distribution. At her age, my grandmother has no need to accumulate; her only worry is living off of what she has. Thus, it's absurd for an older retiree to invest the bulk of her liquid assets in an instrument that locks away money for years, which most annuities do because of the so-called surrender period. That essentially blocks you from touching your money for seven to 15 years or more -- and if you do, you lose a hefty chunk in the form of a surrender penalty.

Here's where this diverges away from the purely financial and into the personal: Buying investments late in retirement often creates tensions in a family. Retirees either panic immediately after signing up for an investment they're unsure of, or they find out too late that they've been duped. Often, they're too embarrassed to admit they didn't know what they were doing, or too proud to approach their kids for advice. But when they finally do announce the problem, family members get livid that Mom or Dad or a grandparent invested foolishly without seeking anyone's counsel.

When I asked my grandmother why she just didn't call me for advice, she replied: "Well, you were still living in New Jersey." I reminded her that they do have phones there, and she just looked at me sheepishly.

Of course, I can't blame my grandmother for not understanding what she bought. These are complex insurance contracts larded with bells and whistles that make them enticing and expensive, and often misunderstood by the very people selling them.

This is where families come in.

* * *

My grandmother is 84 years old and, as she says herself, doesn't know an annuity from a Portobello mushroom. She's very trusting of people like bankers. Yet her $20,000 CD represented two-thirds of her liquid assets, reason enough for any conscientious investment peddler to steer her away from a contract that imposes an eight-year surrender penalty that will suck away as much as 8% of her account if she needs her money early.

What's worse is that the salesman was, at best, clueless about what he sold. My grandmother invested for one reason only: to keep her spendthrift daughter from accessing all the $20,000 upon my grandmother's death.

"The banker assured me she wouldn't get all the money at once," my grandmother told me when I questioned her.

Imagine her surprise when I read this line, from the very first paragraph of the contract summary: "Upon the annuitant's death, the cash balance will be paid out in full to the beneficiary." To put that even more plainly, the beneficiary, my mom, gets a lump-sum payout when my grandmother passes away. Thus, the annuity does nothing to accomplish my grandmother's wants.

Moreover, the fat interest rate my grandmother thought was so impressive -- 5.25% -- lasts for just one year. Then, as the contract notes, it falls to the minimum 2% for the duration. To put that into perspective, I just stashed the $900 my son has in his savings in a one-year CD that pays 3.15%.

Unfortunately, I may have discovered my grandmother's purchase much too late to fight for her -- though I'm currently trying.

But others out there can still fight for their parents and grandparents. Talk to them now; implore them to speak to you before investing in an annuity. If they tell you they recently bought one, rush over to examine the contract, and if it looks onerous have it annulled. You generally have 10 days to cancel.

If you don't understand how the annuity works, talk to a trusted lawyer about the contract's provisions before signing anything.

Annuities can be good. But too often they're tools of greed that fatten the seller's wallet at the expense of trusting people like my grandmother, who never needed the investment in the first place.

- **E-mail Jeff Opdyke at lovemoney@wsj.com**[1]

**URL for this article:**
http://online.wsj.com/article/0,,SB111006649527271447,00.html

**Hyperlinks in this Article:**
**(1)** mailto:lovemoney@wsj.com

**Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

# EXHIBIT "H"

`

# EXHIBIT "G"

said.

Consumer advocates argue that financial and noncash rewards encourage brokers to push unsuitable annuities on senior citizens. They say salespeople should disclose to investors whether they are in a contest or receiving financial incentives.

Sales contests create "a conflict of interest," said Ron Marron, a California lawyer who is spearheading several lawsuits against some of the largest U.S. brokerage firms and insurance companies for selling unsuitable annuities to seniors. Mr. Marron said the lack of full disclosure has become the impetus for steering sales. "I believe under current law it might be legal, but it's certainly not ethical," Mr. Marron said of sales contests.

Tracy Stoneman, a lawyer who represents investors in Colorado on securities issues, says annuity-sales guidelines should also include disclosure rules. Suitability and full disclosure in some ways "are mutually exclusive." She said that a sale could be unsuitable in part because of what wasn't disclosed to an investor.

**Write to Angela Pruitt at angela.pruitt@dowjones.com[1]**

**URL for this article:**
http://online.wsj.com/article/0,,SB111145227531485723,00.html

**Hyperlinks in this Article:**
(1) mailto:angela.pruitt@dowjones.com

Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

SmartMoney.com

# What's Wrong With Variable Annuities

**VARIABLE ANNUITIES** are sold more aggressively than fake Gucci handbags on the streets of New York City. Thanks in part to commissions around 5%, sales of variable annuities have soared over the past decade.

But popularity is no indicator of practicality. The truth is, annuities only make sense for a tiny fraction of the population. (See story[1].) The rest of us should be buying plain old mutual funds. Of course, that's not easy to say to your dark-suited cousin who keeps taking you out for steak and Lafitte-Rothschild Bordeaux in hopes that you will sign on the dotted line. But, next time he invites you, you can bring along this article. Just make sure he pays the bill before you give it to him.

## The Basics

First, a primer. A variable annuity is basically a tax-deferred investment vehicle that comes with an insurance contract, usually designed to protect you from a loss in capital. Thanks to the insurance wrapper, earnings inside the annuity grow tax-deferred, and the account isn't subject to annual contribution limits like those on other tax-favored vehicles like IRAs and 401(k)s. Typically you can choose from a menu of mutual funds, which in the variable annuity world are known as "subaccounts." Withdrawals made after age 59 1/2 are taxed as income. Earlier withdrawals are subject to tax and a 10% penalty.

Variable annuities can be immediate or deferred. With a deferred annuity the account grows until you decide it's time to make withdrawals. And when that time comes (which should be after age 59 1/2, or you owe an early withdrawal penalty) you can either annuitize your payments (which will provide regular payments over a set amount of time) or you can withdraw money as you see fit.

## Fees, Fees and More Fees

Variable annuities are notorious for the fees they charge. Indeed, the average annual expense on variable annuity subaccounts has been on the rise and currently stands at 2.3% of assets, according to Morningstar. (This figure includes fund expenses plus insurance expenses.) The average mutual fund, on the other hand, charges just 1.44%. Unfortunately, variable annuity fees don't stop there. Many variable annuities also have loads on their subaccounts, surrender charges for selling within, say, seven years and an annual contract charge of about $25.

## What Death Benefit?

The death benefit basically guarantees that your account will hold a certain value should you die before the annuity payments begin. With basic accounts, this typically means that your beneficiary will at least receive the total amount invested — even if the account has lost money. For an added fee, this figure can be periodically "stepped-up" or earn a small amount of interest. (If you opt not to annuitize, then the death benefit typically expires at a certain age, often around 75 years old.) Well, given the fact that stocks have returned an average of 12% annually (assuming dividends are reinvested) from 1926 to 2003, according to the Center for Research in Security Prices, over the long haul you need this insurance about as much as a duck needs a paddle to swim.

OK, investors who bought annuities and then died within the next two months probably got their money's worth. But currently only three out of every 1,000 variable annuities are surrendered due to death or disabilities, according to Limra International, an insurance-industry research group. And this report doesn't even measure whether those four accounts were made whole by the death benefit!

The price of this questionable feature: an annual 1.18%, according to Morningstar.

## Surrender Fees

Another problem with most variable annuities is that your money is often locked up for several years — typically five. Trying to withdraw funds during this time will result in huge fines. These fees typically decrease as the years tick by. For example, you might be charged a 7% surrender fee for a withdrawal during your first year of ownership. After seven years, however, that could be just 1%. The average fee is a steep 5.6%, according to Morningstar.

## Early Withdrawal Penalty

As with most retirement accounts, if you withdraw funds before age 59 1/2, you'll be hit with a 10% early withdrawal

tax penalty.

## The Taxes

Gains in variable annuities are taxed at ordinary income tax rates, which go as high as 35%. For most investors, that's a whole lot higher than the maximum 15% rate they now pay on their long-term mutual fund gains and dividend income. And that tax difference can easily eat up the advantage of an annuity's tax-free compounding. "You're generally going to have to wait 15 to 20 years before these suckers become more tax efficient than a mutual fund," says CFP Dee Lee of Harvard, Mass.

Residents of California, Florida, Maine, Nevada, South Dakota, West Virginia and Wyoming and Puerto Rico pay even more taxes — an additional 1% to 3.5% tax on nonqualified variable annuity accounts. (That is, accounts that are not purchased within an IRS-approved retirement plan like a 401(k), 403(b) or IRA.) Some additional states also add a tax for variable annuities purchased within a qualified account.

## The World's Lousiest Estate Planning Vehicle

There's no getting around the income tax due on annuities. In fact, if you die with money remaining in your annuity, your beneficiary will inherit all the taxes that you have deferred. Compare this to a mutual fund, whose basis is stepped-up at death. In that case, your beneficiary would owe no taxes on the gains. Both types of accounts — annuities and mutual funds — are liable for federal estate taxes on anything over the federal estate tax exemption ($1.5 million for 2004 and 2005).

## Switch to a Low-Fee Variable Annuity

Now, if you've read all this and still want to buy an annuity, do yourself a favor and buy one with low costs and good investment options. These are available from mutual fund companies like Vanguard[2] (average total expenses, 0.67%, including mortality and expense risk charges) and T. Rowe Price[3] (0.76% average mutual fund expenses, plus an additional 0.55% mortality and expense risk charge). Investors who already own run-of-the-mill high-priced annuities should consider a tax-free transfer — called a 1035 exchange — to a better quality, low-fee annuity. Just be sure to confirm that your surrender charges have expired before you make the switch.

[1] http://www.smartmoney.com/retirement/investing/index.cfm?story=buyannuities
[2] http://www.vanguard.com
[3] http://www.troweprice.com

Customer Service | Magazine Customer Service | Your Profile | Contact Us | Corrections
Custom Publishing | License Our Content | Media Kit | Press Room | RSS

SmartMoney.com © 2005 SmartMoney. SmartMoney is a joint publishing venture of Dow Jones & Company, Inc. and Hearst Communications, Inc. All Rights Reserved. By accessing and using this page, you agree to our terms and conditions and our PRIVACY STATEMENT. All quotes delayed by 20 minutes. Delayed quotes provided by ComStock. Historical prices and fundamental data provided by CoreData, LLC. Mutual fund data provided by Lipper. Mutual Fund NAVs are as of previous day's close. Earnings estimates provided by Zacks Investment Research. Insider trading data provided by Thomson Financial. Upgrades and downgrades provided by Briefing.com.

# EXHIBIT "I"



**THE WALL STREET JOURNAL.**
ONLINE

FORMAT FOR
PRINTING
sponsored by

**XEROX.
Color.**

March 30, 2005

**GETTING GOING**

# When Putting Your Nest Egg Into an Annuity Makes Sense

**By JEFF D. OPDYKE**
*Staff Reporter of THE WALL STREET JOURNAL*
*March 30, 2005; Page D1*

State and federal regulators are clamping down on the sales practices of annuities, specifically, the "variable" and "fixed deferred" varieties that insurers and banks constantly pitch to retirees.

Last month, Massachusetts securities regulators cracked down on "unethical and dishonest" sales practices at a local bank, which convinced a man in his 80s to fund a variable annuity with the proceeds from the sale of his house -- money needed to finance his assisted-living requirements. The annuity kept him from accessing the entire sum for seven years without first paying a large penalty.

Anytime anyone criticizes such shenanigans, annuity sellers rush to counter with claims that variable and fixed deferred annuities help retirees defer taxes and their heirs avoid probate. Both claims are true. But does that mean retirees should put their nest eggs in an annuity?

In general, no, say financial planners and independent insurance consultants. And annuity experts at TIAA-CREF, the New York retirement-services company that created the variable annuity in 1952, agree.

In short, the tax consequences and long holding periods necessary to make a variable annuity attractive don't make sense for retirees. (Also, many annuities often pay big commissions to brokers, who often aren't forthcoming about their financial interests.)

"I can't even contemplate a situation where it makes sense for someone 75 or 85," says Robert Nestor, principal of retiree services at Vanguard Group, the Malvern, Pa., investment-services giant. "And there are only very narrow situations where it makes sense for a 65-year-old."

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

**CHOOSING AN ANNUITY**

A look at three types of annuities and for whom they're appropriate:

**Immediate:** Good for retirees who want income now and the guarantee that they won't outlive their money. Go with the lowest-cost annuity that provides the greatest income for your investment.

**Fixed deferred:** Good for retirees who work part time and don't need the money now, but want a stream of income later. For most, though, a CD can be just as effective for saving.

**Variable:** Generally never a good choice for most retirees because of the long holding periods and tax consequences.

**ABOUT THE AUTHOR**

Jonathan Clements has written The Wall Street Journal's Getting Going personal-finance column since October 1994. Born in London, Jonathan is a graduate of Emmanuel College, Cambridge University, where he edited the student newspaper. He was a writer and researcher for Euromoney magazine in London before moving to the New York area in 1986. Prior to joining the Journal in January 1990, he covered mutual funds for Forbes magazine.

Jonathan is the author of "You've Lost It, Now What? How to Beat the

In some situations, certain deferred fixed annuities can benefit some retirees, but not most. As for probate, in many cases it isn't the headache it used to be, says John Wesley, TIAA-CREF'S product manager for after-tax annuities.

Bear Market and Still Retire on Time," published in 2003. His earlier books include "25 Myths You've Got to Avoid -- If You Want to Manage Your Money Right" and "Funding Your Future: The Only Guide to Mutual Funds You'll Ever Need." He has two children and lives in Metuchen, N.J.

It's important to note that not all kinds of annuities are wrong for retirees. An immediate annuity "can be a very appropriate investment for someone who's afraid of outliving their money," says Linda Lubitz, a Miami financial planner. With immediate annuities, you put in a sum of money now for monthly payments that begin immediately and last for as long as you live.

However, once you get into deferred annuities, the usefulness wanes rapidly.

· **Variable annuities.** The idea is that you invest, tax-deferred, for many years -- 10, 15 or more. Then you annuitize the account to create a lifetime stream of income. The underlying investments are mutual-fund-like subaccounts owning stocks or bonds. Typically, investors pick stocks since these annuities are often pitched as safe exposure to the stock market, because the death benefit built into the contract generally protects your principal.

But a variable annuity is simply not appropriate for someone in retirement. "You don't want to get into volatile, equity kinds of instruments late in life because you can't earn back your mistakes," says Peter Katt, a fee-only insurance consultant in Mattawan, Mich.

But let's just say your account doesn't fall. You start with $50,000 at 65 and, through some miracle on Wall Street, earn a 15% return every year for 20 years and find yourself sitting atop an annuity worth more than $1.1 million at age 85. What have you really accomplished?

Well, if you're still alive and start drawing on the account, you've turned capital gains into ordinary income, which is taxed at higher rates, meaning the annuity ultimately provides less money.

And what if you die first? You've subjected your heirs to a big tax bill. When heirs receive from your estate shares of stock or mutual funds, their tax bill is based on the value of those shares at your death. In other words, if you paid $1 and it's now worth $1 million, your heirs will pay no capital-gains taxes on any of the profits. With a variable annuity, they pay taxes on every penny of profit.

· **Fixed deferred annuities.** With these, you put in money with the promise that you'll earn a roughly certificate-of-deposit-like return over a set period, after which you can take your money or annuitize it. Just like CDs, there's a penalty for exiting early, and this surrender period generally lasts for years.

Retirees who might want a deferred fixed annuity: Someone who works part-time and doesn't need the income at the moment, but who wants an assured stream of money later. Still, the gains are taxable at death. And the taxes you pay on withdrawal are the same rates as with a bond or a CD.

Moreover, many deferred fixed annuities are sold with teaser rates, higher-than-market rates that entice retirees into investing, and that generally last one year, then tumble. You're locked in for often eight to 10 years or more, and have no clue what the effective yield will be because the

annuity company will us<sup>...</sup> 'y just commit to a minimum rate. The <sup>...</sup> ial rate will depend on market rates.

That's like signing up for a 10-year CD without knowing what the bank will pay you. "That doesn't make any sense," says Vanguard's Mr. Nestor. "I'd go with a CD -- the penalties are less than with an annuity."

*Jonathan Clements is on vacation.*

**Write to Jeff Opdyke at jeff.opdyke@wsj.com[1]**

**URL for this article:**
http://online.wsj.com/article/0,,SB111214174128692593,00.html

**Hyperlinks in this Article:**
**(1)** mailto:jeff.opdyke@wsj.com

Copyright 2005 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

# EXHIBIT "J"

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY

millions

May 15, 2005

# Who's Preying on Your Grandparents?

By GRETCHEN MORGENSON

BACK in February, Jose and Gloria Aquino received a flier in the mail inviting them to a free seminar on one of their favorite topics: protecting their financial assets. As retirees, they were always on the lookout for safe investment strategies as well as tips on how to make sure they didn't outlive their savings. Besides, the flier promised a free lunch for anyone attending the workshop, so what did they have to lose?

Potentially plenty, they would soon discover.

On March 1, Mr. and Mrs. Aquino stepped into the Coral House restaurant, not far from their home in North Baldwin, N.Y., on Long Island. They found themselves surrounded by about 50 like-minded retirees, most in their 70's and 80's, they said.

Over lunch, the crowd listened to a presentation by two investment executives from Diversified Concepts Inc. of Manhattan. Using charts and graphs, the men gave advice on how to invest wisely during retirement. Then they passed out forms and asked the retirees to list all their assets and financial holdings.

The Aquinos filled out theirs and left. Two days later, they said, one of the executives came to their home and described an investment with the American Equity Investment Life Insurance Company that would provide 7 percent interest on their money - immediately.

"When somebody tells you he will give you a 7 percent upfront bonus on your money and that you'll get that 7 percent even if the market goes down, you get interested," said Mr. Aquino. He said he signed the necessary documents and the executive left, handing a brochure to the couple.

That evening, the Aquinos told their daughter, Caroline, about their investment. "She said, 'Oh, don't invest like that before searching farther,' " Mr. Aquino recalled. "Then she went on the Internet and found these lawsuits going on in California against the company and we realized that we were not making a good decision."

The investment the Aquinos had chosen was an annuity, an insurance product that not only tends to carry high fees but also requires that most of the money stay locked up for years, making it especially inappropriate for many older investors, regulators say. In fact, the one they bought carried a staggering 17.5 percent surrender charge if it was cashed in during the first year, their daughter explained. Exit charges were not scheduled to disappear until 17 years after the purchase.

This meant that Mr. Aquir   who is 65, and Mrs. Aquino, 63, coul   ot cash in the annuity without paying a surrender fee until they were in their 80's. The executive had not told them about the lockup requirement, the Aquinos said, although the brochure he left with them described the fees in small print.

Thanks to their daughter, they were able to phone the company in time to cancel their purchase. Others, however, have wound up stuck in an investment that they cannot liquidate without severe penalties.

Meetings like the one attended by the Aquinos take place thousands of times a year in restaurants, American Legion halls and senior centers across the nation - and are a growing problem, securities regulators say. The seminars are usually described as a way for retirees to receive free advice on estate planning, asset protection and tax reduction. After a short presentation, the attendees are approached by a sales representative, who almost invariably encourages them to liquidate their stocks, bonds and 401(k)'s and to buy an annuity.

"We started getting all these complaints from children of seniors who found out that their stock portfolios or other investments had been transferred into these annuities," said Joseph A. Ragazzo, deputy attorney general of California. "We see this investment abuse as a real problem. These cases are metastasizing all over the country."

David J. Noble, chief executive of American Equity Investment Life Insurance, the company that wrote the Aquinos' policy, said: "I deeply differ with anyone saying we have serious problems. We have over 200,000 annuity policy holders, and the percentage of complaints we have is 0.002. We are extremely market-conduct aware."

Mr. Noble also said that annuities' guaranteed rates of return and protection of principal make them attractive to people worried about how they are going to pay their bills.

The president of Diversified Concepts did not return several phone calls.

WHILE prosecutors in New York and Washington investigate questionable accounting practices in the insurance industry, regulators elsewhere say they are fielding more and more complaints about aggressive sales practices by insurance companies that design annuity products and by the people who sell them. Under the guise of estate planning, regulators say, retirees are being pushed into annuities that carry commissions of up to 12 percent and that require their holders to keep them for as long as 15 years, or to pay big penalties.

It is easy to see why older people find such investments attractive. Annuities produce higher income than other investments and can provide payments for life. They are often sold as a way to allay retirees' fears of outliving their assets.

There are several kinds of annuities. Fixed annuities guarantee that a set amount of money will be

paid regularly, regardless of how the underlying investments perform. Variable annuities, by contrast, are based on a portfolio of stocks that rise and fall, so their payments can fluctuate.

With interest rates near historical lows, the first-year rates of 7 percent to 9 percent on some annuities make them alluring to people on fixed incomes. And with the stock market going sideways, people are looking for investment alternatives, giving annuity sales representatives a ready audience.

But because of the fees associated with these products and the restrictions on cashing them in, they are hardly ideal for investors who may need the money quickly, or who die before the investment matures. In many cases, if the holder dies during the annuity period, the beneficiaries cannot redeem the annuity without paying a surrender charge.

Companies that sell annuities say that the higher rates they pay justify the surrender charges. Most investors, they add, are happy with their purchases.

But last February, Bill Lockyer, the attorney general of California, and John Garamendi, the state's insurance commissioner, filed a lawsuit against a group of companies and individuals that state officials said had tricked retirees into using their retirement investments to buy annuities. The suit said that the companies employed up to 300 sales agents and 80 telemarketers and sold annuities worth "hundreds of millions of dollars."

The defendants in the case included American Investors Life Insurance of Kansas, a unit of the AmerUs Group in Des Moines; and Family First Advanced Estate Planning and Family First Insurance Services, both of Woodland Hills, Calif. The complaint seeks $110 million in civil penalties, consumer restitution and damages.

AmerUs said that it does not comment on pending litigation; however, the company said that it was taking the accusations very seriously and that it has strong sales and compliance practices. The Family First companies could not be reached.

Increasingly aggressive marketing has made annuities one of the hottest investments around. Money invested in variable annuities totaled $994 billion at the end of 2003, up from $771 billion in 1998, according to the Insurance Information Institute. Although total annuity sales fell slightly in 2003, they have almost doubled since 1997.

The growing ranks of the nation's retirees are a main focus of annuity sales agents. Next week, the Senior Market Expo opens at the San Diego Convention Center. "Now in its fifth year, Senior Market Expo is the only place you'll find the powerful strategies and ideas you need to boost your sales of life insurance, annuities, long-term care insurance and more," its Web site says. "This sales-centric event focuses on giving you - the senior market adviser - sales and marketing skills to earn more money selling to seniors."

Annuity sales can be highl·  ·crative. Commissions can reach 12 p·· ·nt of the money invested, far greater than fees typically generated on stocks and other investments. Mr. Ragazzo, the deputy attorney general of California, said his office had found that some companies selling annuities sponsored trips to Hawaii and Europe for top agents. "Some of these guys are former used-car salesmen bringing in $600,000 a year," he said.

Ads for asset-preservation seminars often use scare tactics. "Your family's assets are in danger!" reads one; "Trust me! You need a living trust!" goes another.

As sales of annuities have grown, so have investor complaints related to them. According to the N.A.S.D., annuities were at issue in about 600 arbitration cases in 2004, more than twice the number from three years earlier. Of the seven types of securities typically involved in arbitrations, annuities were the third most common last year, behind stocks and mutual funds.

Sellers of annuities are also the subjects of civil lawsuits. The American International Group, the insurance company whose accounting practices are under investigation by regulators and federal prosecutors, has been sued recently in California by elderly investors who bought annuities the company issued. The investors are also suing Estate Preservation Inc. of El Segundo, Calif., which sold the annuities.

One plaintiff is Beverly Buhs, 80, of Millbrae, Calif. In 1997, Ms. Buhs, then 73, and her husband Art, then 76, attended a seminar at an American Legion hall. Like the Aquinos, the Buhs filled out a form detailing their assets; it was supplied by the seminar leader, an agent from Estate Preservation.

Mr. Buhs had previously invested in mutual funds, but he and his wife had never bought an annuity. With the agent's help, the Buhs set up a living trust, which they believed would help them avoid probate costs, according to the lawsuit. Shortly after setting up the trust, according to the lawsuit, the agent came to their home and persuaded them to sell their investments and to put them into a fixed annuity issued by SunAmerica, a financial services company bought by A.I.G. in 1999.

In December 2002, Mr. Buhs died of complications from an aneurysm. Only then did Ms. Buhs learn that the living trust did not protect her from probate costs and that she could not cash in the annuity without significant penalties, she said.

Ms. Buhs said she had to hire an estate lawyer to restructure the trust and wound up losing $20,000 of a $90,000 death benefit. Now she is still dealing with tax problems associated with the trust. "I tried to talk to SunAmerica, but I get so stressed out," Ms. Buhs said. "I don't know how to talk the jargon and don't know where to go. It's sad to think the world is like this. How many other seniors are being taken and deceived?"

Ms. Buhs's lawyer, Ingrid M. Evans of Renne Sloan Holtzman & Sakai in San Francisco, said: "The majority of annuity policies are going to seniors because those are people who have the money and are scared of the stock market and most susceptible to fear. But over a certain age it's not acceptable

to sell someone a deferred      :uity because they are going to pass a    / before it annuitizes," or matures.

Ms. Evans said Ms. Buhs had sued A.I.G. because SunAmerica "implicitly or explicitly ratifies the sales agents' unlawful and unfair schemes."

Chris Winans, an A.I.G. spokesman, said that the company would not comment on the litigation but said that the claims in the suits were unfounded. Ms. Buhs' annuity provided good returns - almost 20 percent from 1997 to 2002, after surrender charges, he said.

Mr. Winans added that A.I.G. has suitability policies and procedures that it monitors and enforces and that it requires the same of the brokers who sell its products.

Estate Preservation did not return a phone call seeking comment.

A.I.G. is the nation's top seller of fixed annuities through banks and the fifth-largest seller of variable annuities, according to the Insurance Information Institute. The company sold $8.8 billion in fixed annuities in 2004 and sold $8 billion of new variable annuities in 2003, the most recent figures.

In the first nine months of 2004, A.I.G.'s life insurance and retirement services group, which includes its SunAmerica unit, accounted for 45 percent of the company's total revenue. Sales at the group rose 24 percent from the corresponding period a year earlier and its operating income rose 23 percent, the fastest growth registered by any of A.I.G.'s four business segments. Premiums from annuities sold domestically rose 20 percent in the first nine months of 2004.

TYPICALLY, the people pushing annuities are registered only as insurance agents and not with government securities regulators who have large staffs to root out dubious practices. As a result, many fall through the regulatory cracks.

Last July, the California Department of Corporations filed a "desist and refrain order" against the Gentry Group, a Dallas company that sells annuities. The company had induced an elderly woman in Oroville, Calif., to authorize the sale of $98,470 of securities without her knowledge and to buy two American Equity annuities with the money, according to the order. The Gentry Group, the American Equity Life Insurance Company and the saleswoman who sold the annuities were not authorized to conduct business as investment advisers in California, so the desist order was issued.

The Gentry Group did not return a phone call seeking comment. American Equity said that it was resisting the order in court.

Mary L. Schapiro, the vice chairwoman of N.A.S.D., said that her agency had proposed new rules related to the selling of annuities to the elderly; they await approval by the Securities and Exchange Commission.

"Some of the worst advert g we've seen has been in equity-link nnuities," she said, "very promotional, talking about growth without any risk, all the kinds of push-button expressions that really resonate with senior citizens." But, she said, she oversees only a small percentage of the firms and people selling these annuities.

Alas, not every retiree can rely, as the Aquinos did, on a daughter to help them steer clear of an investment they might later regret.

Copyright 2005 The New York Times Company  |  Home  |  Privacy Policy  |  Search  |  Corrections  |  RSS  |  Help  |  Contact Us  |  Back↑

2

# AXA EQUITABLE

*Be life confident*

AXA Equitable Accumulato
P.O. Box 1547
Secaucus, NJ 07096-1547

AXA Distributors, LLC., acts as ...utor for AXA Equitable
Life Insurance Company in connection with the distribution
of Separate Account units under your contract or
certificate. AXA Distributors, LLC. and AXA Equitable are
affiliated companies.

September 15, 2004
No. 04259 01180
Page 1 of 2

01007008

DOUGLAS M CHERRY
3847 N UNION AVE
OZARK AL 36360

## Accumulator (Rollover IRA)

| | |
|---|---|
| Contract Number: | 99 631 766 |
| Contract Date: | September 24, 1999 |
| Name of Annuitant | DOUGLAS M CHERRY |
| Contract Owner: | DOUGLAS M CHERRY |
| Your Representative: | MAXINE CHAPPELL |
| Telephone: | (334)677-2812 |

If you need assistance, please call your representative at the
phone number above, or call our processing office toll free at
1-800-789-7771, or visit our website at www.axa-equitable.com.

## CONFIRMATION NOTICE

**THIS IS YOUR NOTICE THAT THE AXA EQUITABLE PROCESSING OFFICE:**

| | Amount | Effective Date |
|---|---|---|
| Processed a scheduled payment. | $3,300.00 | September 15, 2004 |
| less Federal Income Tax Withheld | $325.00 | |
| Amount Payable | $2,975.00 | |
| Last Reported Account Balance: | $92,778.65 | on August 31, 2004 |
| Current Account Balance: | $91,635.67 | on September 15, 2004 |

## DETAIL OF ACTIVITY BY INVESTMENT OPTION

| Investment Fund | Last Reported Balance | Investment Results | Amount Withdrawn | Number of Units | 2004/09/15 Unit Value | Number of Units | Unit Value | Account Balance |
|---|---|---|---|---|---|---|---|---|
| EQ/Alliance Common Stock | $8,493.07 | $249.26+ | $303.89- | 1.4115 | $215.292695 | 39.1952 | $215.292695 | $8,438.44 |
| EQ/Lazard Small Cap Value | $8,017.35 | $208.53+ | $285.93- | 19.1371 | $14.941120 | 531.4161 | $14.941120 | $7,939.95 |
| EQ/Small Company Index | $7,037.98 | $265.65+ | $253.88- | 20.2206 | $12.555542 | 561.4852 | $12.555542 | $7,049.75 |
| AXA Premier VIP International Equity | $8,296.75 | $137.84+ | $293.19- | 27.8944 | $10.510718 | 774.5811 | $10.510718 | $8,141.40 |
| AXA Premier VIP Large Cap Core Equity | $6,622.80 | $117.47+ | $234.29- | 24.3671 | $9.615016 | 676.6483 | $9.615016 | $6,505.98 |
| AXA Premier VIP Large Cap Growth | $7,016.96 | $214.79+ | $251.38- | 29.5921 | $8.494848 | 821.7185 | $8.494848 | $6,980.37 |
| EQ/Alliance Premier Growth | $10,982.58 | $325.38+ | $393.07- | 68.5462 | $5.734384 | 1,903.4105 | $5.734384 | $10,914.89 |
| EQ/Capital Guardian Research | $17,490.28 | $236.20+ | $616.18- | 59.8511 | $10.295216 | 1,661.9665 | $10.295216 | $17,110.30 |
| EQ/Capital Guardian U.S. Equity | $9,916.56 | $147.75+ | $349.84- | 34.4622 | $10.151425 | 956.9566 | $10.151425 | $9,714.47 |
| EQ/FI Mid Cap | $8,904.32 | $254.15+ | $318.35- | 33.3113 | $9.556803 | 925.0079 | $9.556803 | $8,840.12 |
| **Grand Total** | $92,778.65 | $2,157.02+ | $3,300.00- | | | | | $91,635.67 |

## PLEASE BE ADVISED:

Access your annuity account information, at your convenience. Visit us at www.axa-equitable.com (24 hours a day, 7 days a
week), and select "Customers" to enroll or log in to "EQAccess". Once you have registered and received a password, you can
Check Account Details - Make Transfers Among Investment Options - Review Investment Performance - Change your
Address - Get answers to Frequently Asked Questions about your AXA Equitable Annuity and much more!
GE 28456

You're in good hands.

Allstate Life Insurance Company
PO Box 94036
Palatine IL 60094-4036
Telephone: 1-800-390-1277
Fax: 1-866-487-8538



www.putnaminvestments.com

# PUTNAM ALLSTATE ADVISOR
## QUARTERLY STATEMENT
### OCTOBER 1, 2004–DECEMBER 31, 2004

0097898 01 AB 0.301 **AUTO   T8 2 2004 36360-730547      2L        21

DOUGLAS M CHERRY
3847 N UNION AVE
OZARK AL 36360-7305

*UP 7100 DOLLARS*

YOUR REPRESENTATIVE
MAXINE H CHAPPELL
RAYMOND JAMES FINANCIAL SVCS, INC
2464 W MAIN ST STE 2
DOTHAN AL 36301-6413

(334) 677-2812

Contract Number: PA00051159
Contract Effective Date: 02/28/01
Type: IRA
Annuitant: DOUGLAS M CHERRY

If you turn 70 on or prior to June 30, 2005, there is an RMD
requirement for this qualified annuity that we will report
to the IRS. We will calculate the RMD for you upon request.
Your 12/31 value will be furnished to the IRS on Form 5498.

## VARIABLE ANNUITY CONTRACT SUMMARY

|  | Quarter 10/01/04-12/31/04 | Last 12 Months 01/01/04-12/31/04 | Since Inception 02/28/01-12/31/04 |
|---|---|---|---|
| Beginning Value | $66,856.11 | $77,586.40 | $116,603.49 |
| Additions | $0.00 | $0.00 | $27,368.60 |
| Investment Performance | $7,124.67 | $8,034.89 | ($14,759.89) |
| Withdrawals/Fees | ($3,780.00) | ($15,420.51) | ($59,011.42) |
| Ending Value* | $70,200.78 | $70,200.78 | $70,200.78 |

## CURRENT INVESTMENT ALLOCATION



| | | |
|---|---|---|
| ■ | NEW VALUE | 23.8% |
| ▨ | VISTA | 17.6% |
| ▦ | SMALL CAP VALUE | 17.0% |
| ▨ | VOYAGER | 16.7% |
| ▨ | RESEARCH | 16.6% |
| ▨ | NEW OPPORTUNITIES | 8.3% |
| | Total | 100.0% |

*This is not necessarily the amount available for withdrawal. The amount available for withdrawal is the ending value less any withdrawal charges, maintenance fees and applicable premium taxes.

The Putnam Allstate Advisor variable annuity is issued by Allstate Life Insurance Company. This statement is provided on behalf of Allstate Distributors, L.L.C., as principal underwriter. The principal underwriter is not, and is not required to be, a member of the Securities Investor Protection Corporation ("SIPC"). Annuities are not insured by the FDIC, nor are they deposits or other obligations or guaranteed by the depository institution. Variable annuities are subject to investment risk, including the possible loss of the principal invested. Annuities are not protected by SIPC as to the loss of the principal invested.

3

*Equitable Accumulator (Traditional) IRA*

# DATA

<u>PART A</u> — This part lists your personal data.

**Owner:**    Lance K Dyess

**Annuitant:**   Lance K Dyess                                 Age: 42      Sex: Male

**Contract:** Group Annuity Contract No. AC 6727

**Certificate Number:**          98 684 790

**Endorsements Attached:** Minimum Income Benefit Endorsement
Endorsement Applicable to IRA Certificates
Endorsement Applicable to Market Value Adjustment Terms
Rider to Endorsement Applicable to Market Value
Adjustment Terms

**Issue Date:**                November 23, 1998

**Contract Date:**             November 23, 1998

**Annuity Commencement Date:**    November 23, 2046

**The maximum maturity age is age 90 — see Section 7.03.**
The Annuity Commencement Date may not be later than the Processing Date which
follows your 90th birthday.

However, if you choose a date later than age 70 1/2, distribution of at least the minimum
payments required must commence by April 1 of the calendar year following the calendar
year in which you attain age 70 1/2 (see item 2 of the Endorsement Applicable to IRA
Certificates).

**Guaranteed Benefits:**   Combined Guaranteed Minimum Income Benefit
and Guaranteed Minimum Death Benefit (6% Roll Up to Age 80)

**Beneficiary:** Benita F Dyess

No. 94ICB                                Data page 1            (1/98)

4



# LANCE K. DYESS, M.D.

918 DRAYTON AVE.
ELBA, ALABAMA 36323

TELEPHONE 334/897-2207
FAX 334/897-3476

12/02/04

Maxine Chappell
2464 West Main Street
Suite 2
Dothan, AL 36301

RE: THREE-WAY CONVERSATION REGARDING THE PAYOUT OF MY RETIREMNT ANNUITY

Dear Maxine:

As per our phone conversation of last week, I am giving my permission for you to arrange a three-way conversation between yourself, AXA's representative, and Earnest Clark at Jackson Thornton. Hopefully then I can get a straight answer to my questions about the way in which AXA will payout the monies I have invested with their guaranteed 6% interest (as the market return has been well below the 6% rate of return).

I cannot make any significant retirement plan without the information. I invested $420,000.00 over 6 years ago, and expect to receive that amount plus the 6% guaranteed compounded interest at the conclusion of the 7 years of this annuity. As you told me when I purchased this annuity, it would provide a safe haven for the financially-wary investor. Following the Market's collapse of a few years ago, I am proud you provided me with such an insulated investment vehicle to preserve (and grow) my retirement.

Please give Earnest a call in a few days, and we can get this matter resolved.

Happy Holidays:

Lance K. Dyess, MD

cc: Earnest Clark

*Earnest — Give me a call if we need to discuss this prior to the 3-way call*

*— Doc*



# LANCE K. DYESS, M.D.

918 DRAYTON AVE.
ELBA, ALABAMA 36323

TELEPHONE 334/897-2207
FAX 334/897-3476

4/3/04

Marci Uhl
Customer Service Representative
AXA Financial
The Equitable Life Assurance Society of the US
P.O. Box 1547
Secaucus, NJ   07096-1547

RE:  Equitable Accumulator Account #98684790

Dear Ms. Uhl:

In response to your letter of December 9, 2003; let me ask as to why you cannot give me a current value of the account above.  My investment counselor assures me that at maturity;  I will receive the current market value of my account, or the amount of my initial investment + 6% compounded interest (on the initial investment over the 7 year life of this product).....whichever is greater.

Please elaborate also on the pay-out procedure.  I understood it would all be available at maturity  (7 years from purchase date), but now my investment counselor states that I can only get 90% of the above at maturity.....with the balance to be paid out over another year.  Please explain.

Sincerely:

Lance K. Dyess, MD

5

**EQUITABLE**
ACCUMULATOR
P.O. BOX 1547, SECAUCUS, NEW JERSEY 07096-1547

Annual Account Review
July 05, 2003 - July 05, 2004

300 611 540
0000779 02t MB 0.309  **AUTO  T3 0 4135 36311  0

IRA J Edmondson
2004 West County Rd 19
Ariton AL 36311-6612

Contract Number: 300 611 540
Contract Type: Equitable
Accumulator® (Rollover IRA)
GMDB Election: Roll up
Contract Date: July 05, 2000
Contract Owner: IRA J Edmondson
Annuitant Name: IRA J Edmondson

---

Introducing enhanced internet access features. Now you can do interfund transfers among investment options and change the allocation for new contributions online. Just go to www.equitable.com and click on EQAccess.

| Account Activity Summary | Contract Year 7/5/2003-7/5/2004 | Since Purchase 7/5/2000-7/5/2004 |
|---|---|---|
| Account Value as of  7/5/2003 | $57,333.05 | |
| Contributions | $0.00 | $206,217.79 |
| Requested Withdrawals | ($23,400.00) | ($99,278.99) |
| Net Investment Option Results | | |
| Variable Investment Option Results | $6,435.89 | |
| Current Total Account Value | $40,368.94 | |

---

## Your Account Allocation

Your Account Value is currently invested among the asset classes below. Totals may not be exact due to rounding. To review your investment strategy, contact your registered representative.



⬚ 69% Large Company Stocks     ⬚ 29% Small/Mid Company Stocks
⬚ 2% International Stocks

## For Assistance, Contact:

Your Financial Professional:
Maxine Chappell
Raymond James Financial Svcs.
Raymond James Financial Servic
2464 West Main St
Suite 2
Dothan AL 36301
334-677-2812

You can obtain current account information, including balances and unit values, any time you wish.

• Call our TOPS voice response system
  1-888-909-7770, or
• Visit our Website: www.equitable.com and
  click on EQAccess

If you want to speak to one of our Customer Service Representatives please call 800-789-7771 8:30 - 5:30 ET Monday - Friday

---

6

# Scudder Destinations℠

 Statement Of Value

| Account Number | Reporting Period |
|---|---|
| KI11015009 | 10/01/2004 through 12/31/2004 |

Prepared for:

642243 B 6 0010 01 01204011-0001 00885 A - (IMD)
IRA EDMONDSON
2004 WEST COUNTY RD 19
ARITON, AL 36311

**Financial Representative:**

**MAXINE H CHAPPELL**
**PLANNING CORP OF AMERICA**
**2464 W MAIN STREET #2**
**DOTHAN, AL 36301**

| | |
|---|---|
| Owner: | Ira Edmondson |
| Annuitant: | Ira Edmondson |
| Issue Date: | 07/20/2000 |
| Plan Type: | IRA |

**Representative Phone Number: (334) 677-2812**
*If you have any questions regarding this statement, or need additional service, please call your financial representative or our Customer Service number at 1-800-449-0523.*

# Activity
## CONTRACT SUMMARY

| | Quarter Ending 12/31/2004 | | Year-To-Date 12/31/2004 |
|---|---|---|---|
| Inception-to-Date Deposits | $210,288.42 | Beginning Contract Value | $43,988.80 |
| Beginning Contract Value | $29,607.83 | Withdrawals | $15,752.76 |
| Withdrawals | $1,653.35 | Change in Value* | $3,319.75 |
| Change in Value* | $3,601.31 | Ending Contract Value | $31,555.79 |
| Ending Contract Value | $31,555.79 | | |
| Surrender Value | $25,661.89 | | |
| Death Benefit Value | $160,671.05 | | |

* Includes any investment results and/or any interest earnings net of any contract fees or charges.

**Your Current Allocation**
This chart is representative of your current allocation as of 12/31/2004.



| | |
|---|---|
| Small Cap Equities | 30% |
| Large Cap Growth Equities | 16% |
| Mid Cap Equities | 16% |
| Large Cap Value Equities | 14% |
| Global Equities | 7% |
| Sector/Specialty Equities | 6% |
| Multi-Cap Equities | 6% |
| International Equities | 5% |

35941

Kemper Investors Life Insurance Company
Administrative Office:
PO Box 19097
Greenville, SC 29602-9097



7



# PUTNAM HARTFORD CAPITAL MANAGER

### VARIABLE ANNUITY QUARTERLY STATEMENT
### JANUARY 1, 2003 - MARCH 31, 2003
#### PAGE 1 OF 3

Is your portfolio's allocation still tailored to your goals? Given last year's economic environment, an 80% stock/20% bond mix would have finished 2002 with 73% in stocks and 27% in bonds. Left unattended, an 80/20 ratio in 2000 would have changed to 64% stocks/36% bonds by the end of 2002, much different from the mix that you and your investment representative customized to your specific goals. With the start of a new year, this is a good time to meet with your investment representative to review your financial situation. (Stocks represented by the S&P 500 Index. Bonds represented by the Lehman Bros. Aggregate Bond Index. Indexes are not available for direct investment.)

#BWNGSGR
#VI9ESRERJXHR4#
V1A14743  2 AB  0.526  AUTO  T70 200 0401 36330-143001 I 3

4/12/03

**CONTRACT NUMBER** 710702480
**PURCHASE DATE** November 11, 1999
**CONTRACT TYPE** IRA

Jimmy E Jones
501 Dixie Drive
Enterprise AL 36330-1430

**OWNER NAME** Jimmy E Jones
**ANNUITANT** Jimmy E Jones

## SUMMARY

|  | QUARTER 1/1/03 - 3/31/03 | YEAR-TO-DATE 1/1/03 - 3/31/03 | SINCE PURCHASE 11/11/99 - 3/31/03 |
|---|---|---|---|
| Beginning Value | 90,674.96 | 90,674.96 |  |
| Premium Payment | 0.00 | 0.00 | 207,495.63 |
| Total Surrenders * | 4,800.00- | 4,800.00- | 60,800.00- |
| Annuity Performance | 2,859.47- | 2,859.47- | 63,680.14- |
| **Ending Value** | **$83,015.49** | **$83,015.49** | **$83,015.49** |

## YOUR ANNUITY AT A GLANCE



32.7%  Health Sciences
24.8%  Growth & Income
17.0%  Voyager
13.7%  Investors
11.8%  Global Equity

## FOR ASSISTANCE, CONTACT EITHER:

**Your Investment Professional**
John J Hughes
SYNOVUS SECURITIES
3680 West Main
Dothan       AL 36305

**The Hartford**
Attn: Investment Products Services
PO Box 5085
Hartford CT 06102-5085
www.putnaminvestments.com
1-800-992-8610    Automated Annuity Information
                  **(Toll-Free 24 hours a day)**
1-800-521-0538    Service Representative

* Total Surrenders include Contingent Deferred Sales Charges and Annual Maintenance Fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. If you have any further questions, or for information on fixed interest rates or crediting, call 1-800-521-0538 Monday - Friday 8:30am to 8:00pm (Eastern time).

8




# PUTNAM HARTFORD
# CAPITAL MANAGER
### VARIABLE ANNUITY QUARTERLY STATEMENT
### JANUARY 1, 2005 - MARCH 31, 2005
PAGE 1 OF 4

Annual IRA contribution limits have increased this year to $4,000 and $4,500 for those aged 50 and above. Are you taking full advantage? Talk to your investment professional about increasing your contributions to take full advantage of the tax benefits that variable annuities provide.

#BWNGSGR
#VI9ESRERJXHR4#
V1A19355 2 MB  0.534 00 AUTO  T108 453 0421 36330-143001 12

JIMMY E JONES
501 DIXIE DRIVE
ENTERPRISE AL 36330-1430

CONTRACT NUMBER 710702480
PURCHASE DATE November 11, 1999
CONTRACT TYPE IRA

OWNER  Jimmy E Jones
ANNUITANT  Jimmy E Jones

## SUMMARY

|  | QUARTER 1/1/05 - 3/31/05 | YEAR-TO-DATE 1/1/05 - 3/31/05 | SINCE PURCHASE 11/11/99 - 3/31/05 |
|---|---|---|---|
| Beginning Value | 2,865.11 | 2,865.11 | |
| Premium Payment | 0.00 | 0.00 | 207,495.63 |
| Total Surrenders * | 0.00 | 0.00 | -153,958.72 |
| Annuity Performance | -38.16 | -38.16 | -50,709.96 |
| **Ending Value** | **$2,826.95** | **$2,826.95** | **$2,826.95** |

## YOUR ANNUITY AT A GLANCE



20.0% George Putnam
17.0% Income
16.3% American Govt Incm
16.0% Research Fund
12.3% Intnat'l Equity
10.9% Discovery Growth
7.5% Small Cap Value

## FOR ASSISTANCE, CONTACT EITHER:

**Your Investment Professional**
John J Hughes
SYNOVUS SECURITIES
3680 West Main
Dothan AL 36305

**The Hartford**
Attn: Investment Products Services
PO Box 5085
Hartford, CT  06102-5085
www.putnaminvestments.com
**1-800-992-8610**    Automated Voice Services
1-800-521-0538    Client Services
1-800-521-0963    Producer Services



* Total Surrenders include Contingent Deferred Sales Charges and Annual Maintenance Fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. Our hours of operation are Monday - Friday 8:30am to 8:00pm (Eastern time).

9



0004490

**Polaris II**
**Variable Annuity**
**Quarterly Statement**
October 1, 2004 to December 31, 2004

RACHEL MCKINNEY
515 GOLF VIEW DR
DOTHAN, AL 36301-7817





**Dalbar, Inc. Ranks Your**
**AIG SunAmerica Statement #1!**

☎ Customer Service: 1-800-445-SUN2

## Your Account Summary

Owner: RACHEL MCKINNEY          Account #: P3799510481
Annuitant: RACHEL MCKINNEY      Account Type: IRA

*The 12/31/04 value will be provided to the Internal Revenue Service as the fair market value of your annuity. If you made qualified contributions to your account during 2004, Tax Form 5498 will be mailed by May 31, 2005.*

|  | Since Issue Date 03/11/1999 | Year to Date |
|---|---|---|
| Account Value on 09/30/2004 |  |  |
| Contributions | $418,964.92 | $0.00 |
| Withdrawals/Charges | -$229,892.68 | -$39,861.75 |
| Change in Market Value* | -$54,379.34 | $9,486.30 |
| Account Value on 12/31/2004 |  |  |

*Change in market value represents the change in your account value, from the end of the last period to the end of this quarter, adjusted for contributions and/or withdrawals/charges during this quarter.*

## Allocation by Asset Class as of 12/31/2004

*Asset allocation is an important consideration for many investors. Your investment representative is uniquely qualified to help you determine the asset allocation strategy that is right for you.*



▨ 100% Stocks

Percentages may not be exact due to rounding.

Page 1 of 12

*Issued by:*
AIG SunAmerica Life Assurance Company

10

*Equitable Accumulator (Rollover) IRA*

# DATA

**PART A -- This part lists your personal data.**

**Owner:**      Linda J Middleton

**Annuitant:**  Linda J Middleton                    Age: 52        Sex: Female

**Contract:  Group Annuity Contract No. AC 6727**

**Certificate Number:**              99 629 647

       **Endorsements Attached:**  Minimum Income Benefit Endorsement
Endorsement Applicable to IRA Certificates
Endorsement Applicable to Market Value Adjustment Terms
Rider to Endorsement Applicable to Market Value
Adjustment Terms

       **Issue Date:**               October 7, 1999

       **Contract Date:**            October 7, 1999

**Annuity Commencement Date:**       October 7, 2037

       **The maximum maturity age is age 90 -- see Section 7.03.**
The Annuity Commencement Date may not be later than the Processing Date which
follows your 90th birthday.

       However, if you choose a date later than age 70 1/2, distribution of at least the minimum
payments required must commence by April 1 of the calendar year following the calendar
year in which you attain age 70 1/2 (see item 2 of the Endorsement Applicable to IRA
Certificates).

**Guaranteed Benefits:**    Combined Guaranteed Minimum Income Benefit
and Guaranteed Minimum Death Benefit (5% Roll Up to Age 80)

**Beneficiary:**  Lauren Kathryn Smyth/Matthew Eric Smyth

No. 94ICB                                       Data page 1           (5/99)

11



# AXA EQUITABLE

**Quarterly Account Review**
**Statement Period:**
October 01, 2004– December 31, 2004

ACCUMULATOR
P.O. BOX 1547, SECAUCUS, NEW JERSEY 07096-1547

300 610 913
0090012 01 AT 0.262 **AUTO  T2 0 9101 36311  0

Victor E Stafford
644 River Road
Ariton AL 36311-7508

**Contract Number: 300 610 913**
**Contract Type: Accumulator (Rollover IRA)**
**GMDB Election: Roll up**
**Contract Date: April 05, 2000**
**Contract Owner: Victor E Stafford**
**Annuitant Name: Victor E Stafford**

**Safety in Diversity!** Are your assets properly allocated to help you ride out the market's ups and downs? It is important to make sure your retirement assets are diversified and allocated according to your risk tolerance and individual situation. Call your financial professional today; he or she can help you review your portfolio and develop an asset allocation plan designed to help meet your needs. GE-24807

| Account Activity Summary | Quarter 10/1/2004-12/31/2004 | Year-To-Date 1/1/2004-12/31/2004 | Since Purchase 4/5/2000-12/31/2004 |
|---|---|---|---|
| Account Value as of 9/30/2004 | $149,400.37 | | |
| Contributions | $0.00 | $0.00 | $241,058.71 |
| Requested Withdrawals | $0.00 | $0.00 | $0.00 |
| Net Investment Option Results: | | | |
| Variable Investment Option Results | $17,610.85 | | |
| Current Total Account Value | $167,011.22 | | |

## _Your Account Allocation_

**Your Account Value** is currently invested among the asset classes below. Totals may not be exact due to rounding. To review your investment strategy, contact your registered representative.



▦ 40% Small/Mid Company Stocks     ⦂ 38% Large Company Stocks
▧ 22% International Stocks

## For Assistance, Contact:

**Your Financial Professional:**
Maxine Chappell
Raymond James Financial Svcs.
Raymond James Financial Servic
2464 West Main St
Suite 2
Dothan AL 36301
334-677-2812

You can obtain current account information, including balances and unit values, any time you wish.

- Call our TOPS voice response system 1-888-909-7770, or
- Visit our Website: www.axa-equitable.com and click on EQAccess

If you want to speak to one of our Customer Service Representatives please call 800-789-7771 8:30 - 5:30 ET Monday - Friday





# PUTNAM HARTFORD CAPITAL MANAGER
### VARIABLE ANNUITY QUARTERLY STATEMENT
### APRIL 1, 2004 - JUNE 30, 2004
#### PAGE 1 OF 3



Adding to your variable annuity can be an effective way to help you reach your goals. And while there are no guarantees to investing, even small additions can potentially have a significant effect over time. Ask your investment representative about programs available in your contract that can make adding to your annuity easy and convenient.

#BWNGSGR
#VI9ESRHRXJBA4#
V1A19085 2 MB  0.934 02 AUTO  T86 329 0701 36311-750844 1

Victor E Stafford
644 River Road
Ariton AL  36311-7508

CONTRACT NUMBER  710804263
PURCHASE DATE  April 17, 2000
CONTRACT TYPE  IRA

OWNER NAME  Victor E Stafford
ANNUITANT  Victor E Stafford

## SUMMARY

|  | QUARTER 4/1/04 - 6/30/04 | YEAR-TO-DATE 1/1/04 - 6/30/04 | SINCE PURCHASE 4/17/00 - 6/30/04 |
|---|---|---|---|
| Beginning Value | 9,969.95 | 10,898.80 | |
| Premium Payment | 0.00 | 0.00 | 55,072.30 |
| Total Surrenders * | 1,326.00- | 2,622.00- | 21,720.00- |
| Annuity Performance | 94.95 | 462.10 | 24,613.40- |
| **Ending Value** | **$8,738.90** | **$8,738.90** | **$8,738.90** |

## YOUR ANNUITY AT A GLANCE

 

60.9%  Growth
39.1%  Growth & Income

## FOR ASSISTANCE, CONTACT EITHER:

**Your Investment Professional**
Maxine H Chappell
RAYMOND JAMES FINANCIAL SRVCS
2464 West Main Street # 2
Dothan      AL 36301

**The Hartford**
Attn: Investment Products Services
PO Box 5085
Hartford CT 06102-5085
www.putnaminvestments.com
1-800-992-8610      Automated Voice Services
1-800-521-0538      Client Services
1-800-521-0963      Producer Services

* Total Surrenders include Contingent Deferred Sales Charges and Annual Maintenance Fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. Our hours of operation are Monday - Friday 8:30am to 8:00pm (Eastern time).

12

**EXHIBIT A**

& GALE PC

ATTORNEYS AT LAW

Andrea Morgan Greene
DIRECT 205.254.1229
EMAIL  agreene@maynardcooper.com

October 31, 2006

**VIA FAX & U.S. MAIL**

Ms. Jennifer Kozielski
NASD Dispute Resolution
One Liberty Plaza
165 Broadway, 52nd Floor
New York, NY  10006

> Re:  **Douglas M. Cherry, Lance K. Dyess, Ira J. Edmondson, Jimmy E. Jones, Rachel McKinney, Linda J. Middleton and Victor E. Stafford v. Raymond James & Associates, Inc.**
> **NASD Arbitration No. : 05-03030**

Dear Ms. Kozielski:

This is to confirm that as of October 31, 2006, Respondent Raymond James & Associates, Inc. has complied with the Panel's October 26, 2006 Award in the above-referenced matter.

Thank you for your attention to and assistance with this matter.  Please do not hesitate to contact me should you have any questions.

Yours very truly,

Andrea Morgan Greene

AMG/vmt
4069-029
01408590.1

Cc:  Richard S. Frankowski, Esq.
     A. Inge Selden, III, Esq.
     Luther M. Dorr, Jr., Esq.

---

**EXHIBIT B**

## Invest

continued from 1A

The NASD ruled Raymond James was liable for "breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control and violation of federal and state securities laws and NASD Rules of Fair Practice."

A variable annuity is basically a contract between the investor and an insurance company, in which the insurer agrees to make periodic payments to the investor, either immediately or beginning at some future date. They can be bought with a lump sum or a series of payments.

Financial professionals have a duty to advise the investor if the investment product (the annuity) is suitable to the investor's particular needs.

In this case, the NASD ruled the investment was not appropriate for this group.

"These detriments often far outweigh any alleged benefits conferred upon the investor," Frankowski said. "As a result, the investor may end up losing their life savings — their nest egg — while the broker makes a huge commission."

A spokesperson for Raymond James and Associates said the company was not allowed to discuss the specifics of the ruling, but did say Raymond James was disappointed with the finding.

## Full statement by Maxine Chappell

I was not named in the claims against Raymond James & Associates and I disagree totally with the findings of the panel. This was not a court of law and the people who made the claims invested in the stock market at the high and took a large percentage of money from the accounts on a monthly basis while the markets were declining, which accelerated their losses.

Each of the clients was advised to lower the distribution they were taking during this period of the bad markets but ignored the advice. It is my understanding from attorneys involved that clients from all local investment firms responded to advertisements placed by attorneys.

One such attorney from Birmingham placed ads across cities in the South that read, "Stock Market Losses? Call us." Less than 1/10 of one percent of investors in this area responded to the ads; however some of the clients that did respond have never been clients of mine. In fact, I don't even know them; but Mr. Frankowski used my name in his claims anyway.

The variable annuity investments that clients were put in were suitable and had met all state security requirements as well as NASD requirements. Market research shows that 23.2 billion dollars was invested in variable annuities in the second quarter of 2006, the highest quarter ever. As of March 2006, variable annuity investments totaled 847 billion dollars.

A review of our files by the NASD found no fault with any of these investments. Each investment placed by a Raymond James broker has to be approved by Raymond James Corporate Compliance before money can be invested. In addition Corporate compliance conducts an annual "unannounced audit" and this office maintained very high audit scores.

Unfortunately, all investors were hurt by the economic slowdown beginning in 2000 and the subsequent events that resulted from 9/11 attacks as well as corporate scandal. The clients that responded to the ads were clients who invested during this time with Raymond James through Chappell and (Ann) Holman.

And while brokers are paid a commission, it is not nearly as much as one-third or more of the awards that some attorneys charge clients to make claims for them.

Kathy Bustamante, director of corporate communications.

## Petition

continued from 1A

Volunteers will be at the nine polling sites in Dothan during the Nov. 7 general election. They will have to adhere to a 30-foot rule that applies to political campaigning outside polling places. The petition drive will end when polls close at 7 p.m.

The petition drive began after city commissioners adopted an additional 1-percent sales tax in September. The tax goes into effect on Jan. 1. The petition chastised commissioners for passing the tax without a vote of the people.

"There are lots of people out there who are eager to sign it," Everett said. "They want to hear the difference between the city manager form and the mayor-council form, and we want them to hear it and want the city — the elected officials — once they receive it to take the high road and go ahead and set that election so we can start the debate."

Once Everett submits the

petition to Dothan's city clerk, the city clerk's office will certify that 2,400 of the signatures are from registered voters who live in the city. The city clerk will then present the petition to commissioners, who will schedule a referendum on the proposed change.

Should the change pass, an election will be held and each member of the commission would have to run to retain his seat. Otherwise, the terms of the current members will expire after a new commission is elected.

"We expected there to be at least 2,600 people to sign a petition, and we think the petition is sort of clouded with the sales tax issue," Dothan Mayor Pat Thomas said. "We think the form of government and the sales tax issue are two independent matters, and we think they've been jumped together and sold."

Thomas said commissioners will operate under the law if a petition is brought to them.

The form of government, he said, wouldn't have changed the sales tax vote.

*"There are lots of people out there who are eager to sign it."*

**Kenneth Everett**
former Dothan mayor

"It doesn't matter what form of government you have. It's the people that you have in place," Thomas said.

Thomas said the petition is a barrier to progress at a time when the city is getting interest from outside companies.

"I think it's a black eye for the City of Dothan," Thomas said. "I think it effects the business climate of Dothan, and I think it's an anchor that's been thrown out to slow progress."

Everett said the city could have the referendum before the July 2007 municipal elections or time the referendum with that city election to cut costs. Bustamante, he said, deserves a constructive debate.

"And then let the people vote," Everett said. "I have always trusted the vote of the people. They may not get it right sometimes, but it's always right."

## Baxley: Riley continues use of no-bid contracts

**Bob Johnson**
Associated Press

MONTGOMERY — Republican Gov. Bob Riley and Democratic challenger Lt. Gov. Lucy Baxley continued to spar Thursday over the use of no-bid state contracts, as a legislative committee reviewed 25 contracts totaling more that $45 million that had not been put up for bids.

Baxley said the list of con-

tracts, including an $25 million computer contract for the state Department of Human Resources, shows that Riley did not tell the truth when he promised four years ago to cut out all no-bid contracts.

Riley's campaign shot back that many of the contracts reviewed Thursday were for agencies not controlled by Riley and included one contract for the Department of Agriculture and Industries

with a company that employs Baxley's husband, Jim Smith.

"How can he continue to say that he ended no-bid contracts?" Baxley asked at a news conference. It was held outside the Statehouse as the Legislature's Contract Review Committee was convening inside to review contracts for 25 state agencies, ranging from the Dry Cleaning Trust Fund Board to the Department of Public Safety.



REFRESH IN GOD

*A wonderfully Refreshing way to Prayerfully Consider*

HEALTH · WHOLENESS · RECONCILIATION

[Chapter] 5, 6:30 [...]

DOTHAN FIRST UNITED METHODIST CHURCH
1380 West Main Street · Dothan, Alabama · 793-3555
www.dothanfirst.org
Dr. R. Lawson Bryan, Senior Minister



# BIG weekend BBBGGG designer names. savings. selection.

New markdowns just taken on a huge assortment of fall fashion essentials.

  

**50% off**
Junior Fall Apparel
Jackets, knit tops, blouses, skirts, pants and more.
S-M., 3-13.
Orig. $19-$39.
now $9.50-$19.50.

**33-50% off**
Girls' Fall Dresses
Two-for sweater, empire-waist, bomber, drop-waist and more styles.
Girls' 2-16. Orig. $23.50-$55.
now $14.99-$38.49.

  

**50% off**
Boys' American
Designer Sportswear
Knit shirts, tees, pants and more. Boys' 2-20.
Orig. $25.50-$59.50.
now $12.75-$29.75.

**$17.99**
Girls' & Boys'
Denim Jeans
Girls' 2-16 styles feature genuine, embroidery, stars and more. Boys' 2-20 styles in assorted washes and fits.

   

Selected styles. Selection varies by store.

**$19.99**
orig. $39-$89
Junior Denim
Skirts, jeans and cropped pants, with back-pocket details, embroidery, studding and more.
Sizes 1-11, 25-32" waists.

# Dillard's

Make shopping more rewarding! Earn triple points* on all your Dillard's purchases when you use your Dillard's Card November 7, 2006 through November 11, 2006.
*Bonus points will appear within 1-2 billing statements. Not valid with other bonus points offers. Must be enrolled in the Dillard's Rewards program; see credit application for Rewards program terms. Points awarded for net purchases only; excluding credits, taxes and returns. American Express is a federally registered service mark of American Express and is used by GE Money Bank pursuant to a license. This credit card is issued by GE Money Bank.

USE YOUR DILLARD'S CHARGE. WE ALSO WELCOME VISA, MASTERCARD, AMERICAN EXPRESS, DINER'S CLUB & DISCOVER CARD.
WIREGRASS COMMONS, (334) 794-3300; Mon.-Sat. 10-9, Sun. 12-6 • Hair Salon, (334) 793-4311

©Copyright Dothan Eagle

Friday, November 3, 2006

# DOTHAN EAGLE

dothaneagle.com                    *Real people. Real news.*                    50 cents

©Copyright Dothan Eagle
©Copyright Dothan Eagle

| | |
|---|---|
| **Today:** Sunny<br>High 64°<br>Low 34° | **Bushes set out for Republican campaigning** 1B |

 **Persistence pays off in recipe contest** 1C

 **Abbeville runs past Wicksburg** 1D

## Everett: Petition contains enough signatures to request change

**Peggy Ussery**
ussery@dothaneagle.com

A petition drive to change Dothan's form of government will continue through Nov. 7, but a former mayor driving the petition said there are already enough signatures to request a referendum.

"We've got more than enough to call for the election, but we're going to finish it up Tuesday," Kenneth Everett said. "We're going to be at every one of the polling places. We'll be set up to give people an opportunity to sign the petition who have not had an opportunity to sign it because we didn't know where they were."

Everett, who served as Dothan's mayor from 1981 to 1985, wouldn't release the number of signatures but said he expects to have 5,000 to 6,000 signatures by the time the petition is turned in next week.

Dothan currently operates under a city manager-mayor-commission form of government with an appointed city manager to handle the day-to-day function of government. The mayor serves part-time. Under a mayor-council government, which is the proposed change, the mayor would be full-time and responsible for daily activities of city government.

Alabama code allows a referendum to change a city government if a petition of registered voters is submitted with the required number of signatures. The petition to change Dothan's government needs roughly 2,400 signatures.

*See PETITION, 3A*



**Kenneth Everett**

### Where will you go first?

Danny Tindell / dtindell@dothaneagle.com
North American Midway Entertainment employees put the finishing touches on the midway at the National Peanut Festival Fairgrounds on Thursday afternoon. Gates will open at 5 p.m. tonight.

# Festival fun

**Abbey Brown**
abrown@dothaneagle.com

The lights were flashing, the hum of the air pumps could be heard and the smell of livestock was in the crisp air at the National Peanut Festival grounds Thursday night. The Wiregrass' biggest yearly event hadn't started yet but everyone was in full gear for today's ribbon cutting ceremony and official opening.

The midway was only missing all of

the festival-goers as vendors were putting finishing touches on their brightly colored, stuffed animals, inflatable toys and fried, grilled and boiled festival food. The rides were getting their finishing touches and were inspected by Dothan Fire Department officials for safety. The fire department and Houston County Health Department inspectors also gave each of the food vendors their seal of approval before the gates opening at 5 p.m. today.

**Hours and gate and ride specials:**
■ Friday — Gates are open from 5 p.m. to 11 p.m. and the $20 McDonald's Ride-A-Thon tickets can be used.
■ Saturday — Gates are open from noon to 11 p.m.
■ Sunday — Gates are open from 1 to 10 p.m. and there is $1 off the gate admission with a church bulletin and rides are $1 per ride or two ride tickets.

**Gate and ride ticket prices:**
■ Gate admission is $7 and ride tickets are $3 or 22 tickets for $20. The number of tickets per ride ranges from two to five tickets.

## This weekend's events include:
■ Friday — 5 p.m. ribbon cutting ceremony at the main gate and 7 p.m. Alabama Bowl Lamb Show in the agriculture building.
■ Saturday — 9 a.m. scramble winners from 2006 in the agriculture arena, 3 a.m. Jr. Heifer/Feeder Steer in the ag arena, 11 a.m. cheerleading competition at America Arena at the South Entrance, 12 p.m. Southern Boykens' Opus Karate Tournament at the Civic Center, 12 p.m. NPF gates open, 2 p.m. Go Go Parade at South Entrance, 3 p.m. Mercy Me on the Midway, 4 p.m. Open Market Lamb Show at the ag building and 7 p.m. Steven Curtis Chapman concert at the amphitheatre.
■ Sunday — 1 p.m. NPF gates open, 3 p.m. Youth Rabbit Show at the ag building, 4 p.m. Breeder Rabbit Show at the ag building and 7 p.m. Joe Nichols concert.

### How to contact the NPF organizers:
5622 Highway 231 South in Dothan

■ By phone @ 793-4323 or 866-277-2952 or by e-mail at nationalpeanut@snet.com.
■ The NPF Web site is www.nationalpeanut-festival.com.

**At www.dothaneagle.com:**
■ Go here to check the *Dothan Eagle* and the paper's Web site each day for a schedule of that day's events at the festival. The Web site will also offer special videos, slideshows and polls each day.
■ See today's *Accent* section to read about the recipe contest winners and videos on the *Eagle's* Web site of the winner.

## Arbitrator rules local investment firm misled clients

**Lance Griffin**
lgriffin@dothaneagle.com

Seven Wiregrass residents are set to recover most of their life savings after an arbitrator ruled they were misled by a local financial agent.

A panel of three arbitrators acting on behalf of the National Association of Securities Dealers has awarded a total of $372,000 to the seven residents, as well as $250,000 in attorney fees and costs after it determined Raymond James and Associates agent Maxine Chappell said the investors a veritable annuity without properly informing them of the risks.

"Our clients lost their hard-earned retirement savings in an inappropriate investment," said Richard Frankowski of the Birmingham law firm of Whaley, Drake and Kallas.

The names of the investors — most of whom were retired — have not been released. Frankowski said they live "in and around" Dothan, Enterprise and Elba. The individual awards ranged from $15,000 to $145,000. Collectively, they sought $2 million in damages.

Chappell said she was not specifically named in the claims against Raymond James and disagreed "totally" with the findings of the panel.

"The people who made the claims invested in the markets at the high and took a large percentage of money from the accounts on a monthly basis while the markets were declining, which accelerated their losses," Chappell said in a written statement. "Much of the clients was advised to lower the distributions they were taking during this period of the bad markets, but ignored the advice."

In lieu of a lawsuit, most securities dealers resolve disputes through binding arbitration.

According to Frankowski, the investors first came into contact with Chappell after she made a presentation on financial products and retirement at Rex River Electric Co-op in Ozark.

*See INVEST, 3A*

> **Inside:**
> Written statement by Maxine Chappell
> 3A

## Glover, Hughes tout their experience in sheriff's race

**Peggy Ussery**
ussery@dothaneagle.com

Both incumbent and challenger in the race for Houston County sheriff point to their experience.

Lamar Glover touts his 12 years as Houston County's sheriff, his 16 years with the Alabama state troopers and his management of an $8-million sheriff's budget.

"I think my experience set me apart — formal education, formal training sets me apart," Glover said.

"I've been fortunate enough to have a master's degree in criminal justice. I've had 44 years of experience otherwise in law enforcement."

Andy Hughes has



06

> **Inside:**
> More candidate stories

| | |
|---|---|
|  | **Name:** Lamar Glover<br>**Age:** 64<br>**Party:** Democrat |
|  | **Name:** Andy Hughes<br>**Age:** 39<br>**Party:** Republican |

half the number of years under his law enforcement belt, but focuses on what he calls his "practical" experience.

*See SHERIFF, 3A*

## Ex-felons prepare to vote

**Abbey Brown**
abrown@dothaneagle.com

A simple piece of paper helped push the Rev. Kenneth Glasgow. This paper made him feel like a member of society. This paper encouraged him to become a productive person in America's society. This paper was the restoration of his voting rights that he received in 2004 after it was taken away for various drug convictions in Florida.



Glasgow and other voting rights' activists throughout Alabama have helped register about 8,000 ex-felons to vote, including more than 65 in the Wiregrass. He also was able to witness about 18 people currently housed in the Houston County Jail vote by absentee ballot Thursday.

Glasgow is state director of The Ordinary People's Society, one of many organizations

statewide that makes up the Alabama Alliance to Restore the Vote. He said he is passionate about making sure that more than just physical things are restored to people when they are released from prison.

"Too, food, shelter, clothing are all important to give people," Glasgow said. "But if you don't change the person's mindset they won't change. These people have to feel like citizens once again and be called and characterized as citizens before they start asking like a citizen. And they can't do that if they can't vote. If they have no say-so in the democratic process."

The Rev. Earl Jones, chairman of the local Democratic conference, said he is going to make a database of those ex-felons who are now registered to vote.

*See VOTE, 3A*


1 Owner          1 Owner

*Maya J. Yusudan*

**EXHIBIT C**

**Whatley Drake & Kallas LLC**
**Press Release/Page 2**

The victims in this case lived and worked in and around Dothan, Elba, and Enterprise, AL. Most were retired and had been convinced to take their lump sum retirement distributions and roll them over to Raymond James. In some cases, the victims first came into contact with the Raymond James sales rep, Maxine Chappell, at Pea River Electric Coop. in Ozark, AL, where Ms. Chappell made a presentation on financial products and retirement.

**NASD AWARD**

The NASD Award found Raymond James and Associates, Inc. "liable for breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control and violation of federal and state securities laws and NASD Rules of Fair Practice." The company was ordered to pay the seven victims a total of $577,000 in compensatory damages. The NASD Panel also awarded attorney fees and expenses of approximately $150,000.

**VARIABLE ANNUITY CONTRACTS**

Frankowski explained that "variable annuities are essentially contracts between the contract owner ("owner") and a life insurance company. In return for the owner's payment(s), the insurance company agrees to provide either a regular stream of income or a lump sum distribution at some future time. The owner's premiums generally are invested in one or more securities portfolios, where they may earn interest and/or capital appreciation."

**DETRIMENTS NOT EXPLAINED – NEST EGG LOST**

"Unfortunately, the detriments associated with variable annuities, are oftentimes not explained to the investor as the law requires." Frankowski continued. "These detriments often far outweigh any alleged benefits conferred upon the investor. As a result, the investor may end up losing their life savings – their "nest egg" - while the broker makes a huge commission."

**If you wish to discuss this action or have any questions, please contact:**
**Richard S. Frankowski, Esq. at Whatley Drake & Kallas LLC 1- 800-695-6950**
**email rfrankowski@whatleydrake.com or visit**
**http://www.whatleydrake.com.**

**END**

2

**EXHIBIT D**

# Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

| | |
|---|---|
| <u>Names of the Claimants</u><br>Douglas M. Cherry, Lance K. Dyess,<br>Ira J. Edmundson, Jimmy E. Jones,<br>Rachel McKinney, Linda J. Middleton and<br>Victor E. Stafford | <u>Case Number</u>: 05-03030 |
| <u>Name of the Respondent</u><br>Raymond James & Associates, Inc. | <u>Hearing Site</u>: Birmingham, Alabama |

Nature of the Dispute: Customer vs. Member.

## REPRESENTATION OF PARTIES

For Douglas M. Cherry ("Cherry"), Lance K. Dyess ("Dyess"), Ira J. Edmundson ("Edmundson"), Jimmy E. Jones ("Jones"), Rachel McKinney ("McKinney"), Linda J. Middleton ("Middleton") and Victor E. Stafford ("Stafford"), hereinafter collectively referred to as "Claimants": Richard S. Frankowski, Esq., Whatley Drake LLC, Birmingham, Alabama.

For Raymond James & Associates, Inc., hereinafter referred to as "Respondent": Luther M. Dorr, Esq. and Andrea Morgan Greene, Esq., Maynard, Cooper & Gale P.C., Birmingham, Alabama.

## CASE INFORMATION

Statement of Claim filed on or about:  June 13, 2005.
Claimant Cherry signed the Uniform Submission Agreement: January 27, 2005
Claimant Dyess signed the Uniform Submission Agreement: April 13, 2005
Claimant Edmundson signed the Uniform Submission Agreement: February 8, 2005
Claimant Jones signed the Uniform Submission Agreement: June 9, 2005
Claimant McKinney signed the Uniform Submission Agreement: April 7, 2005.
Claimant Middleton signed the Uniform Submission Agreement: May 18, 2005.
Claimant Stafford signed the Uniform Submission Agreement: May 5, 2005.
Statement of Answer filed by Respondent on or about:  September 16, 2005..
Motion to Sever filed by Respondent on or about: September 15, 2005.
Response to Motion to Sever filed on by Claimants or about: October 11, 2005.
Reply Brief in Support of its Motion to Sever filed by Respondent on or about: November 1, 2005.
Respondent signed the Uniform Submission Agreement: June 20, 2005.
Motion to Dismiss on Statute of Limitations Grounds filed by Respondent on or about: May 19, 2006.
Response to Motion to Dismiss on Statute of Limitations Grounds filed by Claimant s on or about: June 8, 2006.
Brief in Support of its Motion to Dismiss filed by Respondent on or about: July 6, 2006.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 2</u>

Motion to Amend the Statement of Answer filed by Respondent on or about: September 12, 2006.

## <u>CASE SUMMARY</u>

Claimants asserted the following causes of action: 1) breach of fiduciary duty; 2) breach of contract 3) common law fraud; 4) negligence; 5) negligent misrepresentation/omission; 6) failure to supervise and control; and, 7) violation of federal and state securities laws and NASD Rules of Fair Practice.. The causes of action relate to the purchase of various variable annuities including, but not limited to, AXA Equitable Accumulator, Putnam Allstate Advisor, Equitable Accumulator Rollover IRA, Scudder Destinations, Putnam Hartford Capital Manager and AIG Sun America Polaris II in Claimants' accounts.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## <u>RELIEF REQUESTED</u>

Claimants requested compensatory damages in the amount of $2,000,000.00, professional costs and adverse tax consequences, disgorgement and restitution, lost opportunity costs and costs of this proceeding, attorney's fees and costs, pre and post-judgment interest, punitive damages, rescission and such other relief as this Panel deemed just and equitable.

Respondent requested that the Statement of Claim be denied in its entirety, that all costs be assessed against Claimants and an award of such other and further relief as this Panel deemed just and proper

## <u>OTHER ISSUES CONSIDERED AND DECIDED</u>

On November 8, 2005, the Panel issued an Order that denied Respondent's Motion to Sever and, on or about July 13, 2006, the Panel issued an Order that denied Respondent's Motion to Dismiss based on Statute of Limitations Grounds however, the Order stated that Respondent could renew the motion at any time during the final hearing.

Respondent's Motion to Amend the Statement of Answer was not ruled on and deemed moot by the Panel.

During the evidentiary hearing for this matter, Respondent renewed its Motion to Dismiss based on Statute of Limitations Grounds and also made a Motion for a Directed Verdict as to Claimants' fraud claims. Claimants requested and were granted the opportunity to respond to the documentation presented with oral argument on the two motions. Respondent was also given the opportunity to reply. The Panel denied the Motion for Directed Verdict as to Claimants' fraud claims and reserved ruling on the Motion to Dismiss Based on Statute of Limitations Grounds until the conclusion of the hearing. As part of the post hearing deliberations, the Panel considered the Motion to Dismiss Based on Statute of Limitations Grounds, the oral arguments and the supporting documents from all parties and denied the motion.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 3</u>

Pursuant to the contract Claimants have with Respondent, the Panel determined that Florida law applies in this matter.

The parties have agreed that the Award in this matter may be entered in counterpart copies or that a signed handwritten Award may be entered.

<u>AWARD</u>

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

Respondent is found liable for breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control and violation of federal and state securities laws and NASD Rules of Fair Practice and shall pay to Claimants compensatory damages in the following amounts:

| | |
|---|---|
| 1) To Douglas Cherry | $124,000.00 |
| 2) To Lance K. Dyess | $ 52,000.00 |
| 3) To Ira J. Edmondson | $149,000.00 |
| 4) To Jimmy E. Jones | $ 51,000.00 |
| 5) To Rachel McKinney | $ 54,000.00 |
| 6) To Linda J. Middleton | $ 59,000.00 |
| 7) To Victor E. Stafford | $ 88,000.00 |

plus, interest on each amount at the statutory rate in the state of Florida per annum from the date of service of the Award until the date of payment.

Respondent is found liable and shall pay attorney's fees in the amount of $124,334.00 and costs in the amount of $26,946.05 pursuant to Florida Statutes, Chapter 517.211.

Any and all claims for relief not specifically addressed herein, including Claimants' request for punitive damages, are denied.

<u>FEES</u>

Pursuant to the NASD Code of Arbitration Procedure (the "Code"), the following fees are assessed:

<u>Filing Fees</u>
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
    Initial claim filing fee                    = $ 500.00

<u>Member Fees</u>
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute.

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 4

Accordingly, Respondent is a party to this dispute and was a member of NASD at the time the following fees were assessed:

| | |
|---|---|
| Member surcharge | = $ 2,800.00 |
| Pre-hearing process fee | = $   750.00 |
| Hearing process fee | = $ 5,000.00 |
| Total Member Fees | = $ 8,550.00 |

## Adjournment Fees

No requests for adjournments were filed in this matter.

## Three-Day Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within three business days before the start of a scheduled hearing session:

No cancellation fees were assessed in this matter.

## Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary injunction in court. Parties in these cases are also assessed arbitrator travel expenses and costs when an arbitrator is required to travel outside his or her hearing location and additional arbitrator honoraria for the hearing for permanent injunction. These fees, except the injunctive relief surcharge, are assessed equally against each party unless otherwise directed by the panel.

No injunctive relief fees were incurred during this proceeding.

## Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

Four (4) Pre-hearing sessions with the Panel @ $1,200.00        = $ 4,800.00

| Pre-hearing conferences: | | |
|---|---|---|
| November 7, 2005 | 1 session |
| November 8, 2005 | 1 session |
| November 11, 2005 | 1 session |
| July 11, 2006 | 1 session |

Eighteen (18) Hearing sessions with the Panel @ $1,200.00        = $21,600.00

| Hearing Dates: | | |
|---|---|---|
| October 2, 2006 | 2 sessions |
| October 3, 2006 | 2 sessions |
| October 4, 2006 | 2 sessions |
| October 5, 2006 | 2 sessions |
| October 6, 2006 | 2 sessions |
| October 9, 2006 | 2 sessions |
| October 10, 2006 | 2 sessions |

NASD Dispute Resolution
Arbitration No. 05-03030
**Award    Page 5**

| | October 11, 2006 | 2 sessions | |
| | October 12, 2006 | 2 sessions | |
| Total Forum Fees | | | = $26,400.00 |

The Panel has assessed $1,885.71 of the forum fees to Claimant Douglas Cherry.
The Panel has assessed $1,885.71 of the forum fees to Claimant Lance K. Dyess.
The Panel has assessed $1,885.71 of the forum fees to Claimant Ira J. Edmundson.
The Panel has assessed $1,885.71 of the forum fees to Claimant Jimmy E. Jones.
The Panel has assessed $1,885.71 of the forum fees to Claimant Rachel McKinney.
The Panel has assessed $1,885.71 of the forum fees to Claimant Linda J. Middleton.
The Panel has assessed $1,885.71 of the forum fees to Claimant Victor E. Stafford.
The Panel has assessed $13,200.03 of the forum fees to Respondent.

**Administrative Costs**
Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

No administrative costs were incurred during this proceeding.

**Fee Summary**

Claimants are jointly and severally liable for:

| | |
| --- | --- |
| Initial Filing Fee | = $  500.00 |
| Total Fees | = $  500.00 |
| Less payments | = $  500.00 |
| Balance Due NASD Dispute Resolution | = $    0.00 |

Claimant Cherry is solely liable for:

| | |
| --- | --- |
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Dyess is solely liable for:

| | |
| --- | --- |
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Edmondson is solely liable for:

| | |
| --- | --- |
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 6

Claimant Jones is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant McKinney is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Middleton is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Stafford is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.42 |
| Balance Due NASD Dispute Resolution | = $1,714.29 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $  8,550.00 |
| Forum Fees | = $ 13,200.03 |
| Total Fees | = $ 21,750.03 |
| Less payments | = $  8,550.00 |
| Balance Due NASD Dispute Resolution | = $ 13,200.03 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Helen E. Huyler, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Benjamin F. Richards, Jr. | - | Public Arbitrator |
| Robert E. Graves | - | Non-Public Arbitrator |

## Concurring Arbitrators' Signatures

_____/s/_____
Helen E. Huyler, Esq.
Public Arbitrator, Presiding Chairperson

10/26/06
Signature Date

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 7</u>


<u>        /s/        </u>          <u>10/26/06        </u>
Benjamin F. Richards, Jr.          Signature Date
Public Arbitrator


<u>        /s/        </u>          <u>10/26/06        </u>
Robert E. Graves          Signature Date
Non-Public Arbitrator


<u>        10/26/06                                      </u>
Date of Service (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 6

Claimant Jones is solely liable for:
| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant McKinney is solely liable for:
| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Middleton is solely liable for:
| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Stafford is solely liable for:
| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.42 |
| Balance Due NASD Dispute Resolution | = $1,714.29 |

Respondent is solely liable for:
| | |
|---|---|
| Member Fees | = $  8,550.00 |
| Forum Fees | = $ 13,200.03 |
| Total Fees | = $ 21,750.03 |
| Less payments | = $  8,550.00 |
| Balance Due NASD Dispute Resolution | = $ 13,200.03 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Helen E. Huyler, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Benjamin F. Richards, Jr. | - | Public Arbitrator |
| Robert E. Graves | - | Non-Public Arbitrator |

**Concurring Arbitrators' Signatures**

Helen E. Huyler, Esq.
Public Arbitrator, Presiding Chairperson

10/26/06
Signature Date

NASD Dispute Resolution
Arbitration No. 05-03030
Award   Page 7

*Benjamin F. Richards, Jr.*

26 October 2006

Benjamin F. Richards, Jr.
Public Arbitrator

Signature Date

Robert E. Graves
Non-Public Arbitrator

Signature Date

Date of Service  (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 05-03030
Award   Page 7

Benjamin F. Richards, Jr.
Public Arbitrator

Robert E. Graves
Non-Public Arbitrator

Signature Date

10/26/06
Signature Date

Date of Service  (For NASD Dispute Resolution office use only)

**EXHIBIT A**

MAYNARD, COOPER
& GALE PC
ATTORNEYS AT LAW

Andrea Morgan Greene
DIRECT 205.254.1229
EMAIL agreene@maynardcooper.com

October 31, 2006

**VIA FAX & U.S. MAIL**

Ms. Jennifer Kozielski
NASD Dispute Resolution
One Liberty Plaza
165 Broadway, 52nd Floor
New York, NY 10006

Re:     **Douglas M. Cherry, Lance K. Dyess, Ira J. Edmondson, Jimmy E. Jones, Rachel McKinney, Linda J. Middleton and Victor E. Stafford v. Raymond James & Associates, Inc.**
**NASD Arbitration No. : 05-03030**

Dear Ms. Kozielski:

This is to confirm that as of October 31, 2006, Respondent Raymond James & Associates, Inc. has complied with the Panel's October 26, 2006 Award in the above-referenced matter.

Thank you for your attention to and assistance with this matter. Please do not hesitate to contact me should you have any questions.

Yours very truly,

Andrea Morgan Greene

AMG/vmt
4069-029
01408590.1

Cc:     Richard S. Frankowski, Esq.
A. Inge Selden, III, Esq.
Luther M. Dorr, Jr., Esq.

**EXHIBIT B**

**EXHIBIT C**



complex litigation.

2323 2nd Avenue North
Birmingham, Alabama 35203

P.O. Box 10647
Birmingham, Alabama 35202-0647

Tel. 205-328-9576
Fax. 205-328-9669
www.whatleydrake.com

75 Rockefeller Plaza
19th Floor
New York, New York 10019
Tel. 212-447-7070
Fax. 212-447-7077
www.whatleydrake.com

For More Information Contact:
    Amy E. Gallimore, Esq.
    Whatley Drake & Kallas LLC
    Birmingham, AL
    205.488-1238 direct line
    205-613-5628 cell

November 1, 2006

### Dothan Area Retirees Win Large Award Against
### Raymond James & Associates, Inc.

**Dothan, AL /Birmingham, AL –** The National Association of Securities Dealers (NASD) recently awarded damages to seven Dothan-area residents who lost much of their life savings after being defrauded by Raymond James and Associates, Inc.  Raymond James, through its agent, Maxine Chappell, wrongfully sold each of the investors a product called a variable annuity.

The seven individuals were represented by **Richard S. Frankowski** of the Birmingham-based **Whatley Drake & Kallas LLC** law firm.  **Frankowski** said, "Our clients lost their hard-earned retirement savings to an inappropriate investment.  Variable annuity products were not appropriate investments for our clients for a number of reasons.  First, most of our clients were retired and needed income from their investments.  Second, the variable annuity products were extremely expensive and were full of charges that were not disclosed by the broker.  Third, the broker placed each of our clients in aggressive subaccounts within the annuity, exposing them to much greater risk than they wanted.  Fourth, the annuities had large surrender charges that effectively prevented the clients from getting out of the investment.  Finally, the annuities were held in an IRA, and therefore, provided no additional tax benefits to the investors."

-more-

1

**Whatley Drake & Kallas LLC**
**Press Release/Page 2**

The victims in this case lived and worked in and around Dothan, Elba, and Enterprise, AL. Most were retired and had been convinced to take their lump sum retirement distributions and roll them over to Raymond James. In some cases, the victims first came into contact with the Raymond James sales rep, Maxine Chappell, at Pea River Electric Coop. in Ozark, AL, where Ms. Chappell made a presentation on financial products and retirement.

**NASD AWARD**
The NASD Award found Raymond James and Associates, Inc. "liable for breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control and violation of federal and state securities laws and NASD Rules of Fair Practice." The company was ordered to pay the seven victims a total of $577,000 in compensatory damages. The NASD Panel also awarded attorney fees and expenses of approximately $150,000.

**VARIABLE ANNUITY CONTRACTS**
Frankowski explained that "variable annuities are essentially contracts between the contract owner ("owner") and a life insurance company. In return for the owner's payment(s), the insurance company agrees to provide either a regular stream of income or a lump sum distribution at some future time. The owner's premiums generally are invested in one or more securities portfolios, where they may earn interest and/or capital appreciation."

**DETRIMENTS NOT EXPLAINED – NEST EGG LOST**
"Unfortunately, the detriments associated with variable annuities, are oftentimes not explained to the investor as the law requires." **Frankowski** continued. "These detriments often far outweigh any alleged benefits conferred upon the investor. As a result, the investor may end up losing their life savings – their "nest egg" - while the broker makes a huge commission."

**If you wish to discuss this action or have any questions, please contact:**
**Richard S. Frankowski, Esq. at Whatley Drake & Kallas LLC 1- 800-695-6950**
**email rfrankowski@whatleydrake.com or visit**
**http://www.whatleydrake.com.**

**END**

2

**EXHIBIT D**

# Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

<u>Names of the Claimants</u>
Douglas M. Cherry, Lance K. Dyess,
Ira J. Edmundson, Jimmy E. Jones,
Rachel McKinney, Linda J. Middleton and
Victor E. Stafford

<u>Case Number</u>:  05-03030

<u>Name of the Respondent</u>
Raymond James & Associates, Inc.

<u>Hearing Site</u>: Birmingham, Alabama

Nature of the Dispute: Customer vs. Member.

## REPRESENTATION OF PARTIES

For Douglas M. Cherry ("Cherry"), Lance K. Dyess ("Dyess"), Ira J. Edmundson ("Edmundson"), Jimmy E. Jones ("Jones"), Rachel McKinney ("McKinney"), Linda J. Middleton ("Middleton") and Victor E. Stafford ("Stafford"), hereinafter collectively referred to as "Claimants": Richard S. Frankowski, Esq., Whatley Drake LLC, Birmingham, Alabama.

For Raymond James & Associates, Inc., hereinafter referred to as "Respondent": Luther M. Dorr, Esq. and Andrea Morgan Greene, Esq., Maynard, Cooper & Gale P.C., Birmingham, Alabama.

## CASE INFORMATION

Statement of Claim filed on or about:  June 13, 2005.
Claimant Cherry signed the Uniform Submission Agreement: January 27, 2005
Claimant Dyess signed the Uniform Submission Agreement: April 13, 2005
Claimant Edmundson signed the Uniform Submission Agreement: February 8, 2005
Claimant Jones signed the Uniform Submission Agreement: June 9, 2005
Claimant McKinney signed the Uniform Submission Agreement: April 7, 2005.
Claimant Middleton signed the Uniform Submission Agreement: May 18, 2005.
Claimant Stafford signed the Uniform Submission Agreement: May 5, 2005.
Statement of Answer filed by Respondent on or about:  September 16, 2005..
Motion to Sever filed by Respondent on or about: September 15, 2005.
Response to Motion to Sever filed on by Claimants or about: October 11, 2005.
Reply Brief in Support of its Motion to Sever filed by Respondent on or about: November 1, 2005.
Respondent signed the Uniform Submission Agreement: June 20, 2005.
Motion to Dismiss on Statute of Limitations Grounds filed by Respondent on or about: May 19, 2006.
Response to Motion to Dismiss on Statute of Limitations Grounds filed by Claimant s on or about: June 8, 2006.
Brief in Support of its Motion to Dismiss filed by Respondent on or about: July 6, 2006.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 2</u>

Motion to Amend the Statement of Answer filed by Respondent on or about: September 12, 2006.

## <u>CASE SUMMARY</u>

Claimants asserted the following causes of action: 1) breach of fiduciary duty; 2) breach of contract 3) common law fraud; 4) negligence; 5) negligent misrepresentation/omission; 6) failure to supervise and control; and, 7) violation of federal and state securities laws and NASD Rules of Fair Practice.. The causes of action relate to the purchase of various variable annuities including, but not limited to, AXA Equitable Accumulator, Putnam Allstate Advisor, Equitable Accumulator Rollover IRA, Scudder Destinations, Putnam Hartford Capital Manager and AIG Sun America Polaris II in Claimants' accounts.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## <u>RELIEF REQUESTED</u>

Claimants requested compensatory damages in the amount of $2,000,000.00, professional costs and adverse tax consequences, disgorgement and restitution, lost opportunity costs and costs of this proceeding, attorney's fees and costs, pre and post-judgment interest, punitive damages, rescission and such other relief as this Panel deemed just and equitable.

Respondent requested that the Statement of Claim be denied in its entirety, that all costs be assessed against Claimants and an award of such other and further relief as this Panel deemed just and proper

## <u>OTHER ISSUES CONSIDERED AND DECIDED</u>

On November 8, 2005, the Panel issued an Order that denied Respondent's Motion to Sever and, on or about July 13, 2006, the Panel issued an Order that denied Respondent's Motion to Dismiss based on Statute of Limitations Grounds however, the Order stated that Respondent could renew the motion at any time during the final hearing.

Respondent's Motion to Amend the Statement of Answer was not ruled on and deemed moot by the Panel.

During the evidentiary hearing for this matter, Respondent renewed its Motion to Dismiss based on Statute of Limitations Grounds and also made a Motion for a Directed Verdict as to Claimants' fraud claims. Claimants requested and were granted the opportunity to respond to the documentation presented with oral argument on the two motions. Respondent was also given the opportunity to reply. The Panel denied the Motion for Directed Verdict as to Claimants' fraud claims and reserved ruling on the Motion to Dismiss Based on Statute of Limitations Grounds until the conclusion of the hearing. As part of the post hearing deliberations, the Panel considered the Motion to Dismiss Based on Statute of Limitations Grounds, the oral arguments and the supporting documents from all parties and denied the motion.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award    Page 3</u>

Pursuant to the contract Claimants have with Respondent, the Panel determined that Florida law applies in this matter.

The parties have agreed that the Award in this matter may be entered in counterpart copies or that a signed handwritten Award may be entered.

<u>AWARD</u>

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

Respondent is found liable for breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control and violation of federal and state securities laws and NASD Rules of Fair Practice and shall pay to Claimants compensatory damages in the following amounts:

| | |
|---|---|
| 1) To Douglas Cherry | $124,000.00 |
| 2) To Lance K. Dyess | $ 52,000.00 |
| 3) To Ira J. Edmondson | $149,000.00 |
| 4) To Jimmy E. Jones | $ 51,000.00 |
| 5) To Rachel McKinney | $ 54,000.00 |
| 6) To Linda J. Middleton | $ 59,000.00 |
| 7) To Victor E. Stafford | $ 88,000.00 |

plus, interest on each amount at the statutory rate in the state of Florida per annum from the date of service of the Award until the date of payment.

Respondent is found liable and shall pay attorney's fees in the amount of $124,334.00 and costs in the amount of $26,946.05 pursuant to Florida Statutes, Chapter 517.211.

Any and all claims for relief not specifically addressed herein, including Claimants' request for punitive damages, are denied.

<u>FEES</u>

Pursuant to the NASD Code of Arbitration Procedure (the "Code"), the following fees are assessed:

<u>Filing Fees</u>
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
Initial claim filing fee                                = $ 500.00

<u>Member Fees</u>
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute.

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 4

Accordingly, Respondent is a party to this dispute and was a member of NASD at the time the following fees were assessed:

| | |
|---|---|
| Member surcharge | = $ 2,800.00 |
| Pre-hearing process fee | = $   750.00 |
| Hearing process fee | = $ 5,000.00 |
| Total Member Fees | = $ 8,550.00 |

## Adjournment Fees

No requests for adjournments were filed in this matter.

## Three-Day Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within three business days before the start of a scheduled hearing session:

No cancellation fees were assessed in this matter.

## Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary injunction in court. Parties in these cases are also assessed arbitrator travel expenses and costs when an arbitrator is required to travel outside his or her hearing location and additional arbitrator honoraria for the hearing for permanent injunction. These fees, except the injunctive relief surcharge, are assessed equally against each party unless otherwise directed by the panel.

No injunctive relief fees were incurred during this proceeding.

## Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

Four (4) Pre-hearing sessions with the Panel @ $1,200.00                         = $ 4,800.00
Pre-hearing conferences:    November 7, 2005        1 session
                            November 8, 2005        1 session
                            November 11, 2005       1 session
                            July 11, 2006           1 session


Eighteen (18) Hearing sessions with the Panel @ $1,200.00                        = $21,600.00
Hearing Dates:              October 2, 2006         2 sessions
                            October 3, 2006         2 sessions
                            October 4, 2006         2 sessions
                            October 5, 2006         2 sessions
                            October 6, 2006         2 sessions
                            October 9, 2006         2 sessions
                            October 10, 2006        2 sessions

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 5

|  | October 11, 2006 | 2 sessions | |
|--|--|--|--|
|  | October 12, 2006 | 2 sessions | |
| Total Forum Fees | | | = $26,400.00 |

The Panel has assessed $1,885.71 of the forum fees to Claimant Douglas Cherry.
The Panel has assessed $1,885.71 of the forum fees to Claimant Lance K. Dyess.
The Panel has assessed $1,885.71 of the forum fees to Claimant Ira J. Edmundson.
The Panel has assessed $1,885.71 of the forum fees to Claimant Jimmy E. Jones.
The Panel has assessed $1,885.71 of the forum fees to Claimant Rachel McKinney.
The Panel has assessed $1,885.71 of the forum fees to Claimant Linda J. Middleton.
The Panel has assessed $1,885.71 of the forum fees to Claimant Victor E. Stafford.
The Panel has assessed $13,200.03 of the forum fees to Respondent.

## Administrative Costs

Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

No administrative costs were incurred during this proceeding.

## Fee Summary

Claimants are jointly and severally liable for:

| | |
|--|--|
| Initial Filing Fee | = $  500.00 |
| Total Fees | = $  500.00 |
| Less payments | = $  500.00 |
| Balance Due NASD Dispute Resolution | = $    0.00 |

Claimant Cherry is solely liable for:

| | |
|--|--|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Dyess is solely liable for:

| | |
|--|--|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Edmondson is solely liable for:

| | |
|--|--|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $  171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 6

Claimant Jones is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant McKinney is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Middleton is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.43 |
| Balance Due NASD Dispute Resolution | = $1,714.28 |

Claimant Stafford is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $   171.42 |
| Balance Due NASD Dispute Resolution | = $1,714.29 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $  8,550.00 |
| Forum Fees | = $ 13,200.03 |
| Total Fees | = $ 21,750.03 |
| Less payments | = $  8,550.00 |
| Balance Due NASD Dispute Resolution | = $ 13,200.03 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule
10330(g) of the Code.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Helen E. Huyler, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Benjamin F. Richards, Jr. | - | Public Arbitrator |
| Robert E. Graves | - | Non-Public Arbitrator |

## Concurring Arbitrators' Signatures

_____/s/_____
Helen E. Huyler, Esq.
Public Arbitrator, Presiding Chairperson

10/26/06_____
Signature Date

NASD Dispute Resolution
Arbitration No. 05-03030
Award   Page 7


_____/s/_____                    10/26/06_____
Benjamin F. Richards, Jr.            Signature Date
Public Arbitrator


_____/s/_____                    10/26/06_____
Robert E. Graves                     Signature Date
Non-Public Arbitrator


_____10/26/06_____
Date of Service (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 6

Claimant Jones is solely liable for:
|                                   |                |
|-----------------------------------|----------------|
| Forum Fees                        | = $1,885.71    |
| Total Fees                        | = $1,885.71    |
| Less payments                     | = $  171.43    |
| Balance Due NASD Dispute Resolution | = $1,714.28  |

Claimant McKinney is solely liable for:
|                                   |                |
|-----------------------------------|----------------|
| Forum Fees                        | = $1,885.71    |
| Total Fees                        | = $1,885.71    |
| Less payments                     | = $  171.43    |
| Balance Due NASD Dispute Resolution | = $1,714.28  |

Claimant Middleton is solely liable for:
|                                   |                |
|-----------------------------------|----------------|
| Forum Fees                        | = $1,885.71    |
| Total Fees                        | = $1,885.71    |
| Less payments                     | = $  171.43    |
| Balance Due NASD Dispute Resolution | = $1,714.28  |

Claimant Stafford is solely liable for:
|                                   |                |
|-----------------------------------|----------------|
| Forum Fees                        | = $1,885.71    |
| Total Fees                        | = $1,885.71    |
| Less payments                     | = $  171.42    |
| Balance Due NASD Dispute Resolution | = $1,714.29  |

Respondent is solely liable for:
|                                   |                |
|-----------------------------------|----------------|
| Member Fees                       | = $  8,550.00  |
| Forum Fees                        | = $ 13,200.03  |
| Total Fees                        | = $ 21,750.03  |
| Less payments                     | = $  8,550.00  |
| Balance Due NASD Dispute Resolution | = $ 13,200.03 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule
10330(g) of the Code.

### ARBITRATION PANEL

| | |
|---|---|
| Helen E. Huyler, Esq. | Public Arbitrator, Presiding Chairperson |
| Benjamin F. Richards, Jr. | Public Arbitrator |
| Robert E. Graves | Non-Public Arbitrator |

**Concurring Arbitrators' Signatures**

_Helen E. Huyler_
Helen E. Huyler, Esq.
Public Arbitrator, Presiding Chairperson

10/26/06
Signature Date

NASD Dispute Resolution
Arbitration No. 05-03030
Award    Page 7

*Benjamin F. Richards, Jr.*

26 October 2006
Signature Date

Benjamin F. Richards, Jr.
Public Arbitrator


Signature Date

Robert E. Graves
Non-Public Arbitrator


Date of Service  (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Award   Page 7</u>

Benjamin F. Richards, Jr.
Public Arbitrator

Robert E. Graves
Non-Public Arbitrator

Signature Date

10/26/06
Signature Date

Date of Service  (For NASD Dispute Resolution office use only)

**EXHIBIT F**

IN ARBITRATION BEFORE NASD DISPUTE RESOLUTION

DOUGLAS M. CHERRY, LANCE K.   )
DYESS, IRA J. EDMONDSON, JIMMY )
E. JONES, RACHEL MCKINNEY,     )
LINDA J. MIDDLETON and VICTOR )
E. STAFFORD,                        )
                                     )
       Claimants,             )     NASD Arbitration No: 05-03030
                                     )
v.                                 )
                                     )
RAYMOND JAMES AND          )
ASSOCIATES, INC.,           )
                                     )
       Respondent.          )

## RESPONDENT'S ANSWER

Respondent Raymond James Financial Services, Inc. ("Raymond James" or "Respondent"), incorrectly designated in the Statement of Claim as Raymond James and Associates, Inc. hereby answers the Statement of Claim filed by Douglas M. Cherry, Lance K. Dyess, Ira J. Edmondson, Jimmy E. Jones, Rachel McKinney, Linda J. Middleton and Victor E. Stafford (collectively, "Claimants").[1]

## I.    INTRODUCTION

Claimants are seven investors who maintained separate accounts at Raymond James' Dothan, Alabama office. Each of the Claimants dealt with Financial Advisor Maxine Chappell. Each of the Claimants alleges that their purchases of various annuities were unsuitable, that Maxine Chappell made various misrepresentations to them, and Raymond James failed to supervise Ms. Chappell. However, the actual course of dealing between Claimants and

---

[1] Each of the accounts at issue were held by Claimants at Raymond James Financial Services, Inc., and not Raymond James and Associates, Inc., a wholly separate corporate entity. Raymond James and Associates, Inc. should be immediately dismissed from this matter.

Respondent is completely different -- and it involves no impropriety on the part of Respondent. The truth is, Respondent provided each of the Claimants with investment services in a diligent and responsible manner, fully consistent with all applicable securities rules and regulations. The investments made within each of the Claimants' accounts were made with Claimants' approval and consent, and were fully consistent with Claimants' respective investment objectives and tolerance for risk. Moreover, Respondent accurately represented the features, risks and expenses associated with Claimants' investments, it followed each of the Claimants' investment instructions, and it reasonably supervised the servicing of each of the Claimants' accounts.

This arbitration proceeding is an unfounded exercise in blame-shifting for investment decisions made by individuals who were fully capable of appreciating and undertaking the risks inherent in those investments. Claimants should take nothing in this proceeding, and Raymond James should be reimbursed all attorneys' fees and costs that it has incurred in defending this claim.

## II.     RESPONSE TO CLAIMANTS' INDIVIDUAL FACTUAL ALLEGATIONS[2]

### A.     Mr. Douglas M. Cherry

Ms. Chappell was asked to conduct a question and answer session for the employees of Pea River Electric to discuss general topics involving various financial issues relating to retirement. No particular investments were presented at the meeting. The meeting was held after hours at Pea River Electric, and Mr. Cherry, Mr. Edmondson and Mr. Stafford were present at the meeting.

---

[2] In filing this Answer, Raymond James does not waive its position that the claims asserted by the Claimants do not satisfy the standard for joinder under Rule 10314(d) because (a) the claims do not arise from the same occurrence, transaction or series of transactions or occurrences, and (b) the claims do not involve common questions of law or fact. Raymond James has therefore filed a Motion to Sever with this Answer, which is due to be granted.

2

Mr. Cherry is in his early sixties. Mr. Cherry's relationship with Raymond James began in August 1999, when he opened an IRA account with Maxine Chappell in Raymond James' Dothan, Alabama branch office. In connection with opening this account, Mr. Cherry represented that his investment objective was medium-risk growth over a ten-year time horizon. He also stated that his net worth was between $500,000 and $1,000,000 and that he had moderate experience investing in mutual funds.

In September 1999, Mr. Cherry and his wife came to Ms. Chappell's office to discuss investments for his IRA account. Ms. Chappell discussed the features, fees and costs associated with different types of investments with Mr. Cherry and his wife, including managed accounts, mutual funds and variable annuities. Mr. Cherry indicated his preference for variable annuities because they did not have front-end sales charges. He also liked other features of annuities, especially the death benefit, which he wanted for his wife and children.

Mr. Cherry decided to invest $375,000 in the Equitable Accumulator annuity, a combination variable and fixed deferred annuity. On the annuity's application, Mr. Cherry represented that he received the Equitable Accumulator Prospectus, and that the annuity was in accordance with his investment objectives. The annuity application also contained a disclosure which stated that the annuity did not guarantee the principal invested. Ms. Chappell explained and reviewed this section of the application with Mr. Cherry. At no time did Ms. Chappell tell Mr. Cherry that he could withdraw his entire principal after seven years.

On September 17, 1999, Raymond James sent a letter to Mr. Cherry concerning the processing of his annuity application. The letter clearly disclosed that the annuity was issued through an insurance company.

3

In February 2001, over a year after Mr. Cherry purchased the Equitable Accumulator annuity, he rolled over approximately $116,703 to Raymond James from a 401(K) account held through his employer. Mr. Cherry came to Ms. Chappell's office to discuss investment options for these funds, and told Ms. Chappell that he was happy with his Equitable Accumulator annuity and wished to purchase another like it. Ms. Chappell recommended that Mr. Cherry invest in the Putnam Allstate variable annuity, sold by Allstate Insurance Company. Ms. Chappell fully disclosed the risks and features of the annuity and provided Mr. Cherry with a copy of the annuity's prospectus. Mr. Cherry decided to buy the variable annuity.

The Putnam Allstate annuity application clearly stated that the annuity was insured through Allstate Life Insurance Company. Moreover, on February 23, 2001, a letter was sent to Mr. Cherry regarding the processing of his Putnam Allstate variable annuity application. The letter clearly indicated that his funds were being sent to Allstate Life Insurance Company for investment into the annuity, and further stated that annuities are investment contracts issued by life insurance companies. Through letters and documentation relating to his annuities that Mr. Cherry received and conversations with Ms. Chappell, it was fully disclosed to Mr. Cherry that the annuity products he purchased were issued by insurance companies.

Throughout his relationship with Raymond James, Mr. Cherry remained in regular contact with Ms. Chappell. In February 2002, Mr. Cherry met with Ms. Chappell and reallocated the funds within the sub-accounts of both annuities. Later, in August 2003, Mr. Cherry met with Ms. Chappell to review his accounts. Mr. Cherry did not make any changes at this time, but he spoke with Ms. Chappell over the phone in August 2004 and reallocated the funds within the Equitable Accumulator annuity. In September 2004, Mr. Cherry met with Ms. Chappell for an account review in which they discussed in detail the performance of his annuities, and Ms.

Chappell met with Mr. Cherry again in September 2005 to discuss his accounts. Mr. Cherry clearly understood that he could change the investments within his annuities' sub-accounts at any time.

**B.    Dr. Lance K. Dyess**

Dr. Dyess is a highly-educated physician with assets of over one million dollars, who had significant investment experience before moving his accounts to Raymond James. Dr. Dyess first contacted Ms. Chappell in April 1996. He told her that he was unhappy with the retirement plan he then held with First Alabama Bank because of its overly-conservative nature and high fees. He further indicated that he wished to retire at the relatively young age of 53 and that he knew that he would have to aggressively invest in order to seek to reach that goal. Dr. Dyess' aggressive posture is reflected in the New Account Form that he approved and signed in connection with opening his IRA account on July 31, 1996. That form indicates that the primary objective of the account is high-risk growth over a ten-year period.

During one of his initial conversations with Ms. Chappell, Dr. Dyess made clear that one of his major concerns was the welfare of his wife and children should anything unexpected happen to him. Dr. Dyess also stated that he would discuss all of Ms. Chappell's investment recommendations with his accountant, Ernest Clark. In August 1996, Ms. Chappell prepared a comprehensive financial plan for Dr. Dyess.

Dr. Dyess ultimately opened a number of accounts with Raymond James through which he invested in mutual funds, individual equities and an Equitable Accumulator annuity. Specifically, in November 1998, Dr. Dyess decided to invest $435,419 in the Equitable Accumulator combination variable and fixed deferred annuity. On the application for the annuity, Dr. Dyess represented that he received the Equitable Accumulator Prospectus, and that

the annuity was in accordance with his investment objectives. The annuity application also contained a disclosure which stated that the annuity did not guarantee the principal invested. In addition, it was fully disclosed to Dr. Dyess that the annuity was an investment contract issued by an insurance company.

### C.    Mr. Ira J. Edmondson

Mr. Edmondson and his wife first met with Ms. Chappell in November 1999. Mr. Edmondson opened an individual account with Raymond James. In connection with opening the account, Mr. Edmondson represented that he had moderate experience trading equities and mutual funds, that he had an annual income of $20,000 to $50,000, and that he had a net worth of $500,000 to $1,000,000. He also represented that his primary objective was medium-risk growth and that his secondary objective was income, also with medium risk.

During their initial meeting, Ms. Chappell discussed the Equitable Accumulator annuity with Mr. Edmondson and his wife in great detail. Ms. Chappell reviewed each section of the contract with Mr. Edmondson, including the portion that stated that the guaranteed minimum income benefit could only be in the form of a lifetime income. She never told Mr. Edmondson that his principal would be guaranteed or not at risk, and she told him that the funds would be invested in mutual fund sub-accounts.

Mr. Edmondson decided to purchase the Equitable Accumulator annuity in November 1999. In connection with completing the annuity's application, Mr. Edmondson represented that he received the Equitable Accumulator Prospectus, and that the annuity was in accordance with his investment objectives. The annuity application also contained a disclosure which stated that the annuity did not guarantee the principal invested. Mr. Edmondson deposited approximately $200,000 into the annuity. He appointed his wife as primary beneficiary and his son and

daughter as contingent beneficiaries. Ms. Chappell told Mr. Edmondson to review the annuity's prospectus and contact her with any questions.

Presumably pleased with his investment in the Equitable Accumulator annuity, in June 2000, Mr. Edmondson purchased a Scudder Destinations annuity issued by Kemper Investors Life Insurance Company. Ms. Chappell discussed with Mr. Edmondson in detail the features offered by the Scudder Destinations annuity, comparing it to his investment in the Equitable Accumulator annuity. Mr. Edmondson initially deposited approximately $200,000 into the annuity. By signing the annuity application on June 28, 2000, Mr. Edmondson represented that he had received a copy of the annuity's prospectus, which contained important disclosures regarding the nature of the investment.

In connection with purchasing each of the annuities, Mr. Edmondson indicated to Ms. Chappell that he understood the investments and that they met his objectives of systematic distributions and providing a death benefit for his wife. Moreover, it was fully disclosed to Mr. Edmondson through letters and other documentation sent to him regarding his annuity contracts that the annuities he purchased were issued through insurance companies.

Mr. Edmondson elected to take regular distributions from his annuities. Ms. Chappell recommended on many occasions that he lower the amount of his distributions, as the large distributions he and his wife desired would have a negative effect on the account balance. Mr. Edmondson ignored these recommendations.

In July 2001, Mrs. Edmondson opened an individual account with Raymond James. In connection with opening her account, she represented that she had extensive experience investing in mutual funds and that her investment objective was medium-risk growth over a time

horizon of over ten years. Mrs. Edmonson invested approximately $29,375 in a variable annuity through MetLife Investors USA Insurance Company.

The Edmondsons remained in regular contact with Ms. Chappell throughout their relationship with Raymond James. For example, the Edmonsons came to Ms. Chappell's office in May 2003, November 2003 and April 2004 for account reviews. In April 2004, the Edmonsons decided to reallocate the funds in both of their annuities.

### D.    Mr. Jimmy E. Jones

Mr. Jones first met with Ms. Chappell in September 1999. At that time, he indicated to Ms. Chappell that he wanted to utilize the tax advantages offered by IRS Code 72(t) because he wanted to receive equal distributions from his IRA account. Mr. Jones had taken early retirement at age 49. In explaining the different methods by which Mr. Jones could take advantage of IRS Code 72(t), Ms. Chappell informed Mr. Jones that once he determined the amount of his monthly distributions, he could not change the amount without incurring a tax penalty. Mr. Jones told Ms. Chappell that he wanted to withdraw the maximum amount allowable every month.

During their initial meeting, Ms. Chappell recommended various products in an effort to achieve Mr. Jones' goals, and offered a comparative analysis of the sales charges and fees associated with each investment. Mr. Jones had moderate experience investing in mutual funds, but told Ms. Chappell that some of his former colleagues had purchased the Putnam Hartford Capital Manager Variable Annuity, and that he wanted to invest in the same annuity. Ms. Chappell told him that the Putnam Hartford annuity only had a death benefit, paid out at the highest anniversary value, adjusted for any withdrawals or distributions that he had taken from

8

the account. She further stated that the annuity would not guarantee protection of Mr. Jones' principal nor would it guarantee any return.

A few days after his initial meeting with Ms. Chappell, Mr. Jones opened an individual account and an IRA account with Raymond James. In connection with opening the accounts, Mr. Jones represented that his primary investment objective was medium-risk growth and that his secondary objective was income, also with medium risk. He indicated that the time horizon for his investments was over ten years. Mr. Jones further represented that he had moderate experience trading equities and mutual funds.

In November 1999, Mr. Jones completed an application for the Putnam Hartford Capital Manager Variable Annuity, which was purchased through his individual account. In connection with executing the annuity application, Mr. Jones represented that he had received a variable annuity and fund prospectus, which disclosed all of the risks and costs associated with his investment. Further, directly above his signature, the application stated as follows in all capital letters: "I/WE UNDERSTAND THAT ANNUITY PAYMENTS OR SURRENDER VALUES, WHEN BASED UPON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT, ARE VARIABLE AND NOT GUARANTEED AS TO A FIXED DOLLAR AMOUNT." Moreover, on the first page, the application clearly indicates that it is a product of the Hartford Life Insurance Company.

Mr. Jones initially deposited $172,197 into the annuity and later deposited an additional $35,298 in December 1999. In January 2000, Mr. Jones began taking regular distributions from the account in accordance with IRS Code 72(t).

Mr. Jones received letters sent from Raymond James on November 4, 1999, November 11, 1999 and December 13, 1999 regarding his annuity applications and deposits into the annuity

accounts. Each of these letters also stated that "[a]nnuities are investment contracts, issued by insurance companies." In light of Mr. Jones' detailed conversations with Ms. Chappell regarding the nature and features of the annuity at issue and the multiple documents that Mr. Jones received which clearly indicate that the annuity was issued by an insurance company, it is completely unfounded for Mr. Jones to now argue that he did not know that the annuity was an insurance product.

### E.    Ms. Rachel McKinney

In December 1998, Ms. McKinney opened an IRA account with Raymond James. In connection with opening her IRA account, Ms. McKinney represented that her primary account objective was growth with medium risk and that her secondary objective was income with medium risk. Ms. McKinney represented that the time horizon for her investment objectives was over ten years. She also represented that she had moderate experience trading equities and mutual funds. Ms. McKinney further represented that she had an annual income of $20,000 to $50,000 and a net worth of $500,000 to $1,000,000.

In March 1999, Ms. McKinney opened an individual account with Raymond James. In connection with opening the account, Ms. McKinney again represented that her primary account objective was medium-risk growth and that her secondary objective was income with medium risk. Ms. McKinney also represented that the time horizon for her investment objectives was over ten years.

Ms. McKinney and Ms. Chappell discussed various investment options for Ms. McKinney's accounts, such as stocks, bonds, mutual funds and variable annuities. Ms. Chappell described the pros and cons in investing in various investments, including their associated fees and costs. Ms. McKinney ultimately decided to purchase a variable annuity, and indicated that



she was particularly drawn to the annuity's death benefit feature for her spouse and sons. Ms. Chappell explained that through the annuity, Ms. McKinney's funds would be invested in mutual fund sub-accounts. Ms. Chappell further explained that the annuity was issued by an insurance company.

Ms. McKinney executed an application with Anchor National Life Insurance Company for the Polaris II variable annuity in March 1999. Ms. McKinney ultimately deposited $418,964 in the annuity. Ms. McKinney had retired at the age of 50 and expressed to Ms. Chappell her desire to take monthly distributions from her account. Thus, in April 1999, Ms. McKinney began taking monthly withdrawals from her annuity in accordance with IRS Code 72(t) in the amount of $3,256.80.

Ms. McKinney received letters sent from Raymond James on March 11, 1999, April 10, 1999 and April 15, 1999, each of which clearly stated that her annuity policy was issued by a life insurance company. In light of Ms. McKinney's detailed conversations with Ms. Chappell regarding the nature and features of the annuity at issue and the multiple documents that Ms. McKinney received which clearly indicate that the annuity was issued by an insurance company, it is completely unfounded for Ms. McKinney to now argue that she did not know that the annuity was an insurance product.

In January 2004, Ms. McKinney made adjustments to the allocations of the funds in her annuity's sub-account.

F.    **Ms. Linda J. Middleton**

Ms. Middleton met with Ms. Chappell in May of 1999 to discuss rolling over her 401(K) and pension plan from her former employer, GTE. Ms. Middleton had retired at the age of 50 and desired to take early withdrawals from her retirement account without incurring tax

penalties. Ms. Chappell explained to Ms. Middleton that she could take monthly withdrawals from her retirement account and bypass tax consequences through IRS Code 72(t). Ms. Chappell prepared calculations demonstrating how Ms. Middleton could utilize these tax benefits and gave her a copy of the calculations to review at home.

On August 9, 1999, Ms. Middleton opened an individual account with Raymond James. In connection with opening the account, Ms. Middleton represented that she had an annual income of $20,000 to $50,000 and a net worth of $250,000 to $500,000. Ms. Middleton represented that she had moderate experience trading equities and mutual funds. She further represented that her account objective was growth with moderate risk, and that the time horizon for her investment objective was over ten years.

Ms. Middleton indicated to Ms. Chappell that she wanted to invest the proceeds of her rollover account in an annuity. Ms. Chappell discussed with Ms. Middleton the benefits, risks and costs of investing in an annuity, and Ms. Middleton ultimately decided to invest in the Equitable Accumulator combination variable and fixed deferred annuity. Ms. Chappell told Ms. Middleton that the principal she planned to invest in the Equitable Accumulator annuity would not be guaranteed in any way. In addition, the annuity application also contained a disclosure which stated that the annuity did not guarantee the principal invested.

On August 9, 1999, Ms. Middleton executed an application for the Equitable Accumulator combination variable and fixed deferred annuity. Ms. Chappell carefully reviewed each section of the annuity application with Ms. Middleton. On the application for the annuity, Ms. Middleton represented that she received the Equitable Accumulator Prospectus, and that the annuity was in accordance with her investment objectives. The annuity application also contained a disclosure which stated that the annuity did not guarantee the principal invested.

Ms. Middleton appointed her daughter and son as beneficiaries of the annuity. Ms. Middleton invested $220,790 in the annuity. In October 1999, Ms. Middleton authorized the initiation of monthly distributions from her annuity account.

Ms. Middleton received letters sent from Raymond James on August 31, 1999 and October 21, 1999 which clearly stated that her annuity policy was issued by a life insurance company. In light of Ms. Middleton's detailed conversations with Ms. Chappell regarding the nature and features of the annuity at issue and the multiple documents that Ms. Middleton received which clearly indicate that the annuity was issued by an insurance company, it is completely unfounded for Ms. Middleton to now argue that she did not know that the annuity was an insurance product.

Throughout her relationship with Raymond James, Ms. Middleton remained in regular contact with Ms. Chappell. In August 2004, Ms. Middleton came to Ms. Chappell's office for an account review, and decided to reallocate the funds in her annuity sub-account.

### G.    Mr. Victor Stafford

In March 2000, Mr. Stafford and his wife met with Ms. Chappell to discuss retirement planning. On March 14, 2000, Mr. Stafford opened an individual account with Raymond James. In connection with opening the account, Mr. Stafford represented that he had moderate experience trading mutual funds. He further represented that his primary investment objective was growth with medium risk and his secondary investment objective was income with medium risk. The time horizon for Mr. Stafford's investment objectives was over ten years. Finally, Mr. Stafford represented that his net worth was $500,000 to $1,000,000.

In discussing investment options for Mr. Stafford's retirement account, Ms. Chappell suggested that Mr. Stafford could invest in a number of different vehicles, including mutual

funds, managed accounts, stocks, bonds or annuities. Ms. Chappell discussed with the Staffords the fees and charges associated with each type of investment. One of Mr. Stafford's primary concerns was the welfare of his wife should anything happen to him. Both Mr. Stafford and his wife were very interested in variable annuities. Ms. Chappell further explained risks and benefits associated with investing in an annuity, and told the Staffords that the principal invested in a variable annuity is not guaranteed.

Mr. Stafford ultimately decided to purchase the Equitable Accumulator combination variable and fixed deferred annuity through his individual account with Raymond James. Mr. Stafford executed the annuity application on March 14, 2000. He appointed his wife as the primary beneficiary and his daughter as the contingent beneficiary. In connection with completing the annuity application, Mr. Stafford represented that he had received a copy of the annuity's prospectus. Mr. Stafford further represented that the annuity contract was in accordance with his investment objectives. The annuity application also contained a disclosure which stated that the annuity did not guarantee the principal invested. Mr. Stafford ultimately invested approximately $241,000 in the annuity. Mr. Stafford received a letter a sent from Raymond James on March 24, 2000 which clearly stated that his annuity policy was issued by a life insurance company.

Presumably happy with his initial investment in the Equitable Annuity, in July 2000, Mr. Stafford purchased a second annuity through his individual account with Raymond James. He purchased the Putnam Hartford Capital Manager variable annuity, into which he ultimately invested approximately $55,000. Ms. Chappell fully disclosed the features of the annuity, including the fact that the annuity was issued through Hartford Life Insurance Company. In connection with executing the Putnam Hartford annuity application, Mr. Stafford represented

14

that he had received a variable annuity and fund prospectus, which disclosed all of the risks and costs associated with his investment. Further, directly above his signature, the application stated as follows in all capital letters: "I/WE UNDERSTAND THAT ANNUITY PAYMENTS OR SURRENDER VALUES, WHEN BASED UPON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT, ARE VARIABLE AND NOT GUARANTEED AS TO A FIXED DOLLAR AMOUNT."

Both the annuity application and the documentation that Mr. Stafford received throughout his relationship with Putnam Hartford clearly indicated that his annuity was issued through Hartford Life Insurance Company. Moreover, the letter sent to Mr. Stafford from Raymond James on April 17, 2000 clearly stated that his annuity policy was issued by a life insurance company. In light of Mr. Stafford's detailed conversations with Ms. Chappell regarding the nature and features of the annuities at issue and the multiple documents that Mr. Stafford received which clearly indicate that the annuities were issued by insurance companies, it is completely unfounded for Mr. Stafford to now argue that he did not know that the annuities were insurance products.

In May 2002, Mr. Stafford met with Ms. Chappell to review his accounts. He decided to reallocate the funds within the sub-accounts of both annuities. In July 2004, Mr. Stafford met with Ms. Chappell again to review his accounts. At this time, Mr. Stafford reallocated the funds within the sub-accounts of his Equitable Accumulator annuity.

Mr. Stafford also executed an updated new account form for his individual account with Raymond James in July 2004. In connection with updating his account information, Mr. Stafford represented that his primary and secondary investment objective was growth with

medium risk. He further represented that he had extensive experience with equities, mutual funds and annuities.

In February 2005, Ms. Chappell met with Mr. Stafford again and reviewed the investments in his Equitable Accumulator annuity, and Mr. Stafford again decided to reallocate the underlying sub-accounts within the annuity.

## III.    RESPONSES TO ALLEGATIONS

Raymond James denies all material allegations of wrongdoing contained in Claimants' Statement of Claim, and denies that any of the Claimants has sustained any damages as a result of wrongdoing on the part of Raymond James. Respondent further specifically responds to Claimants' allegations as follows:

### A.    Claimants' Unsuitability Claim Is Without Merit.[3]

Claimants allege that the various annuities recommended by Respondent and purchased by Claimants were unsuitable. This claim is unfounded.

In order to make out an unsuitability cause of action, each of the Claimants must prove at least four elements: (1) the broker recommended, (2) securities that are unsuitable in light of the investor's objectives, (3) with an intent to defraud or with reckless disregard for the investor's interests, and (4) the broker exercised control over the investor's account. *O'Connor v. R. F. Lafferty & Co.*, 965 F.2d 893, 898 (10th Cir. 1992). None of the Claimants can prove these elements as to their respective accounts.

---

[3] The Statement of Claim devotes several pages to the structure of variable annuity contracts, benefits and detriments of variable annuities and the commission structures associated with variable annuity contracts (Statement of Claim pages 2-7). This discussion adds nothing to the case, nor does it support an unsuitability claim by any of the Claimants. The opinions of investors and news reporters do not amount to a legal standard of unsuitability. Respondent requests that the irrelevant and prejudicial news articles attached to the Statement of Claim be stricken from this proceeding in their entirety.

First, with respect to investments that were recommended to Claimants by sources outside of Raymond James, Claimants have no suitability claim because they cannot meet the recommendation requirement.[4]  *See Parson v. Hornblower & Weeks-Hamphill, Noves*, 447 F. Supp. 482, 495 (M.D.N.C. 1977), *aff'd per curium*, 571 F.2d 203 (4th Cir. 1978) (there can be no unsuitability claim if broker does not recommend trades); *Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.*, 3 F.3d 208, 212 (7th Cir. 1993) ("Customer-directed transactions fall outside the 'suitability' requirement . . .").

Second, any investments recommended by Raymond James to Claimants were consistent with Claimants' investment goals and risk tolerance.  Respondent carefully inquired into and documented Claimants' risk tolerance, investment objectives and investment experience prior to advising Claimants about potential investments.  Claimants assert in their Statement of Claim that they wanted to guarantee their principal and return.  Each of the Claimants indicated, however, through conversations with Ms. Chappell or representations on their new account forms, that they were moderate or aggressive investors who were willing and able to accept risks in return for the growth of the principal they invested.  In addition, each of the Claimants also specifically sought the death benefit options that the annuities offered.  Accordingly, none of the Claimants can meet the second element of their suitability claims with respect to any of their transactions.

The third element of a suitability claim -- broker control of the account -- also is markedly absent in this case. Each of the Claimants approved all transactions in their respective non-discretionary accounts and maintained the right to say "yes" or "no" with respect to any

---

[4] For example, Mr. Jones' investment in the Putnam Hartford Capital Manager Variable Annuity was his own idea, and not that of Raymond James or Maxine Chappell.  Thus, Mr. Jones cannot prove the first element of his suitability claim -- that Raymond James recommended the security at issue -- and his suitability claim must therefore fail.

recommended investment.[5]  *See, e.g., M&B Contracting Corp. v. Dale*, 601 F. Supp. 1106, 1111

(E.D. Mich. 1984) (holding that where customer kept in contact with broker and specifically

approved each trade before it was made, there was no control of account by broker); *Murray v.*

*Dominick Corp. of Canada, Ltd.*, 117 F.R.D. 512, 516 (S.D.N.Y. 1987) (finding that where

evidence showed that customer approved each of the broker's recommendations, customer had

not shown that broker controlled account).  Moreover, with regard to the investments in the sub-

accounts of Claimants' annuities, neither Ms. Chappell nor Raymond James were in "control" of

the selection of these investments or the purchases made within them.  Instead, Claimants had

the right to reject any recommendation made by Raymond James with regard to the selection of

these funds, and could reallocate the funds at any time.  Indeed, Claimants did, at times, exercise

the right to change the allocation of individual investments within those accounts.  Thus,

Raymond James did not control any of Claimants' accounts, and their suitability claim fails.

Finally, Claimants cannot demonstrate that Respondent acted with an intent to defraud or

a reckless disregard for the Claimants.  Raymond James serviced Claimants' accounts in

accordance with their stated investment objectives.  The intent requirement in a suitability claim

is <u>not</u> met by evidence that the broker's recommendations were merely inappropriate or

unreasonable.  *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 815 (11th Cir. 1989).

"Severe recklessness" is the standard.  In addition, suitability is not judged in hindsight and is not

measured by profitability.  The mere fact that some of the recommended investments decreased

in value does not render the initial recommendations inappropriate or unsuitable in any sense.

---

[5] A "non-discretionary" account is generally defined as "an account in which the customer rather than the broker determines which purchases and sales to make." *Leib v. Merrill Lynch, Pierce, Fenner & Smith*, 461 F. Supp. 951, 952 (E.D.Mich. 1978), *aff'd without opinion*, 647 F.2d 165 (6th Cir. 1981). A "discretionary" account, by contrast, is an account in which the broker has authority to determine which purchases and sales to make absent prior specific approval by the customer. *See id.*, at 952-53.

For the foregoing reasons, Claimants' unsuitability claims should be denied.

**B.    Claimants' Breach Of Fiduciary Duty Claim Fails.**

Claimants' breach of fiduciary duty claim apparently is based on the incorrect premise that Respondent should have ignored Claimants' stated investment objectives and placed Claimants only in conservative investments "without risk to principal". In effect, Claimants -- with perfect 20/20 hindsight -- allege that Respondent should have forced them to invest in a security other than an annuity, despite their informed decisions at the time to invest in the annuities and notwithstanding the fact that they represented a willingness to take moderate to aggressive risks to achieve growth in their accounts.

Despite Claimants' allegations, the duties a financial advisor owes a customer in a non-discretionary account are very limited. Where an account is non-discretionary and control of the account remains with the customer -- as was the case with each of the Claimants' accounts -- the duties owed by the financial advisor to his or her customer are more "transactional" in nature (e.g., the duty to execute the customer's orders in a timely and accurate fashion) and <u>do not constitute a fiduciary relationship</u>:

> In a non-discretionary account each transaction is viewed singly. In such cases the broker is bound to act in the customer's interest when transacting business for the account; however, all duties to the customer cease when the transaction is closed. Duties associated with a non-discretionary account include: (1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interest; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the duty not to misrepresent any fact material to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer.

19

. . . .

> Remarkably absent from the above list is the duty, on the part of
> the broker, to engage in a particular course of trading. So long
> as a broker performs the transactional duties outlined above, he
> and his customer may embark upon a course of heavy trading in
> speculative stocks or in-out trading as well as upon a course of
> conservative investment in blue chip securities.

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951, 952-53 (E.D. Mich.

1978) (emphasis added; citations omitted); *See also J.C. Bradford Futures, Inc. v. Dahlonega*

*Mint, Inc.*, 1990 WL 95625, at *5 (6th Cir. 1990) ("It is generally accepted that no fiduciary duty

arises between a broker and his client in relation to a non-discretionary . . . account.").

In *Kwiatkowski v. Bear Stearns & Co., Inc.*, 306 F.3d 1293 (2d Cir. 2002), the United

States Court of Appeals for the Second Circuit emphasized the extremely limited duty owed by

financial advisors with respect to non-discretionary accounts. In its opinion, the Second

Circuit held that financial advisors have no ongoing duty to provide non-discretionary clients

with investment advice; rather, their duties are narrowly circumscribed on a transaction-by-

transaction basis. The Second Circuit held:

> A non-discretionary customer by definition keeps control over the
> account and has full responsibility for trading decisions. On a
> transaction-by-transaction basis, the broker owes duties of
> diligence and competence in executing the client's trade order and
> is obliged to give honest and complete information when
> recommending a purchase or sale. The client may enjoy the
> broker's advice and recommendations with respect to a given
> trade, but has no legal claim on the broker's ongoing attention.

*Id.* at 1302.

With the limited nature of the duty imposed upon a broker in dealing with a customer,

courts are quick to deny recovery for breach of fiduciary duty claims in cases such as this. *See,*

*e.g., de Kwiatkowski*, 306 F.3d at 1306; *Indep. Order of Foresters v. Donaldson, Lufkin &*

*Jenrette, Inc.*, 157 F.3d 939, 941 (2d Cir. 1998) (non-discretionary account did not give rise to a broad, general fiduciary duty); *Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs., Ltd.*, 823 F.2d 171, 173 (7th Cir. 1987) ("A fiduciary relationship does not give rise to strict liability on the part of the more knowledgeable party."); *Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 824, 825 (10th Cir. 1986) ("The jury should not, under the evocative phrase 'fiduciary duty,' be given carte blanche to decide any and all perceived transgressions, regardless of the law.").

In the present case, Claimants' accounts were non-discretionary, and Claimants made or approved all investment decisions with respect to the accounts. Furthermore, Claimants do not dispute that Respondent executed their orders accurately and promptly. Finally, Respondent gave complete and accurate information to Claimants regarding their investments in the annuities at issue. Because Respondent has not violated any legally cognizable duties with respect to Claimants' non-discretionary accounts, the Panel should dismiss Claimants' breach of fiduciary duty claim.

**C.    Claimants' Fraud Claim is Due to Be Dismissed.**

Claimants allege that Raymond James is liable to them for common law fraud because Raymond James breached its "duty of good faith and fair dealing to Claimants," and misled Claimants into believing that the investments at issue were suitable for them. Such allegations do not constitute evidence of fraud.[6] Rather, under Alabama common law, the elements of fraud include: (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the claimant (4) who suffered damage as a proximate consequence of the misrepresentation. *See Ex parte Michelin North America, Inc.*, 795 So.2d 674, 678-79 (Ala. 2001).

---

[6] While these allegations may be relevant to Claimants' suitability or negligence claims, they are not evidence of a fraud claim.

21

Respondent did not misrepresent any facts to Claimants regarding their investments in the annuities at issue. Nor did Respondent fail to disclose to Claimants any material information regarding their investment or the risks associated with the annuities. Indeed, Ms. Chappell discussed in detail the costs and risks associated with Claimants' investment in each of the annuities at issue. Moreover, each Claimant received a detailed prospectus in connection with their investment in the annuities at issue which fully disclosed the costs and risks associated with each investment. In addition, each of the Claimants received documentation from Raymond James and the annuity companies and/or letters from Raymond James which clearly disclosed that the annuities they purchased were insurance products. Because Respondent did not mislead Claimants with regard to the nature of the investments at issue, their common law fraud claim is due to be dismissed.

**D.    Claimants' Negligent Misrepresentation Claim Fails.**

Claimants attempt to bootstrap their suitability claim into a negligent misrepresentation claim by alleging that Respondent "failed to provide Claimants with advice and guidance in accordance with their investment objectives and financial situation." Such allegations are a far cry from the proof necessary to sustain a negligent misrepresentation claim.      Under Alabama law, a claim for negligent misrepresentation requires Claimants to prove "(1) a misrepresentation; (2) concerning a material fact; (3) justifiably relied on by the plaintiff; (4) and loss or damages proximately caused by such misrepresentation." *Industrial Partners, Ltd. v. CSX Transportation, Inc.*, 974 F.2d 153, 157 (11th Cir. 1992). For the same reasons that Claimants' fraud claims referenced above fail (*i.e.*, failure to show fraudulent statement of material fact, failure to show intent and reliance, and failure to show that alleged fraud was cause of Claimants' alleged damages), Claimants' negligent misrepresentation claim also fails.



**E.    Claimants' Negligence Claim is Without Merit.**

Respondent is not liable to Claimants for negligence because Respondent did not breach any duty owed to Claimants.  Claimants' allegation that Respondent recommended "unsuitable securities for the Claimants in disregard of the Claimants' risk tolerances, needs and financial situations" constitutes a claim for suitability, not negligence.  Instead, a negligence-claim under Alabama law requires proof of four elements: (1) that the Respondent owed a duty to the Claimants; (2) that the Respondent breached that duty; and (3) proximate causation of (4) damages. *Roberts v. Public Cemetery of Cullman*, 569 So. 2d 369, 371 (Ala. 1990).  Claimants have not alleged or demonstrated any facts to support a claim that Respondent breached any duty to them. ˉAccordingly, Claimants' claim for negligence must fail.

**F.    Claimants' Breach of Contract Claim Also Fails.**

Claimants also fail to state a valid claim for breach of contract.  A breach of contract claim under Alabama law requires proof of four elements: "(1) the existence of a valid contract binding upon the parties in the action, (2) the plaintiff's own performance, (3) the defendant's nonperformance, or breach, and (4) damage." *Teitel v. Wal-Mart Stores, Inc.*, 287 F. Supp. 2d 1268, 1285 (M.D. Ala. 2003).  Claimants do not identify any contracts (or contractual provisions) that Raymond James has allegedly breached.  Moreover, Claimants' vague allegations regarding Respondent's alleged failure to provide "professional services" to Claimants do not satisfy their breach of contract claim.  Because of this, and because Claimants' allegations are untrue, Claimants' breach of contract claim is due to fail.

**G.    Raymond James Is Not Liable For Failure To Supervise.**

In order to recover on a failure to supervise claim against a broker-dealer, a claimant must prove each and every one of the following four elements: (1) an underlying violation of the

23

federal securities laws, (2) association of the registered representative or other person who committed the violation, (3) supervisory jurisdiction over that person, and (4) failure to reasonably supervise the person committing the violation. *See Philadelphia Investors, LTD.,* Initial Decision, 66 SEC Docket 1992 at *11 (Mar. 20, 1998), Final, 68 SEC Docket 572 (Oct. 6, 1998); *see also In the Matter of Dean Witter Reynolds, Inc.,* Initial Decision, 74 SEC Docket 522 at *38 (Jan. 22, 2001).

In the present case, Claimants' failure to supervise claim fails because their Raymond James financial advisor did not violate any securities laws with respect to the servicing of Claimants' accounts, and Raymond James' supervision of the accounts was more than reasonable.

**H.    There is No Cause of Action for Violation of Industry Rules.**

In the Statement of Claim, Claimants contend that Respondent is liable for violating rules promulgated by the National Association of Securities Dealers (NASD).    Respondent emphatically denies that any rules or regulations were violated by Respondent. Moreover, Claimants cannot allege a private right of action under the SRO rules.    *See, e.g., Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 200 (3rd Cir. 1990) (no right of action for violation of NASD rules); *Thompson v. Smith Barney, Harris Upham & Co.,* 709 F.2d 1413 (11th Cir. 1983) (no private right of action for violation of know your customer or suitability rules of SROs); *Jablon v. Dean Witter Co.,* 614 F.2d 677 (9th Cir. 1980) (no implied cause of action for rules violations); *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 493 (6th Cir. 1990) ("NYSE Rule 405 does not imply a private right of action").

Because there is no implied cause of action under NASD rules, any action based upon alleged violations of such rules must be dismissed as a matter of law.

## I.    General Denials.

Respondent denies any liability under Sections 10 and 20 of the Securities Exchange Act, including Rule 10(b)-5 promulgated thereunder; it denies any liability under Sections 12(2) and Section 15 of the Securities Act of 1933; it denies that it violated section 8-6-19 of the Alabama Securities Act; it denies that it violated any laws or rules in connection with any of the Claimants' accounts; it denies that it breached any duty (fiduciary or otherwise) to any Claimant; it denies that it breached any contract with any Claimant; it denies that any trades in any Claimant's account were unsuitable; it denies that any of the Claimants' accounts were non-diversified and/or over-concentrated; and it denies that it is liable for any damages or for attorney's fees or costs associated with this proceeding.

## IV.    AFFIRMATIVE DEFENSES

Respondent also sets forth the following defenses to Claimants' claims:

1.    The Statement of Claim fails to state a claim on which relief can be granted.

2.    Claimants' claims are barred by the applicable statutes of limitation.

3.    Claimants' claims are barred by waiver, ratification, acquiescence, and estoppel.

4.    Respondent is not the proximate cause of Claimants' alleged losses.

5.    Claimants were contributorily and/or comparatively negligent.

6.    Claimants' claims are barred by the equitable doctrine of laches.

7.    Claimants' alleged losses were not foreseeable.

8.    Claimants assumed the risk of the market.

9.    Claimants' losses, if any, were market losses that were not caused by Respondent and for which Respondent should not be held liable.

10.    Claimants failed to timely notify Respondent, either orally or in writing, of complaints arising out of the accounts and, therefore, waived and are estopped from asserting these claims.

11.    Claimants failed to mitigate their alleged damages and, in addition, affirmatively incurred damages for which they are solely responsible.

12.    Claimants authorized, directed, ratified and approved all of the transactions in their accounts and, therefore, are barred from asserting the claims herein.

13.    Respondent conducted itself in a professional manner, did not breach any duties owed to Claimants, and acted in good faith and without knowledge of any wrongdoing or improper activity in the Claimants' account.

14.    Respondent did not act with any intent to defraud Claimants or with any willful disregard for them.

15.    Respondent did not misrepresent facts or fail to disclose material facts.

16.    Any and all duties owed to Claimants were fully and faithfully performed.

17.    Respondent had in place adequate supervisory procedures that it reasonably implemented and followed.

18.    Claimants are not entitled to attorneys' fees as a matter of law.

19.    Respondent denies that it engaged in any conduct in violation of the applicable state securities laws or any principles of common law.

20.    Respondent denies that it engaged in any conduct in violation of the federal securities laws or any of the rules promulgated thereunder.

21.    Respondent denies that under the facts of this case it owed any fiduciary duty to Claimants.

22.    Any and all trades within any of the Claimants' accounts were suitable in light of Claimants' respective risk tolerance, expressed investment objectives, and financial status.

23.    Respondent denies all claims for damages (including punitive damages), interest, attorneys' fees, costs and expenses.

24.    Respondent denies liability under theories of respondeat superior or vicarious liability; and denies that it was negligent or breached any contractual obligations with respect to Claimants.

25.    Opinions relating to future performance are not actionable.

Respondent reserves the right to amend its Answer, and to assert additional defenses.

## V.    CONCLUSION

Respondent requests that the relief requested in the Statement of Claim be denied in all respects, that the costs of this proceeding be assessed against the Claimants, and that the Panel grant Respondent such other and further relief as is deemed just and proper.

Respectfully submitted,

Luther M. Dorr, Jr.
Julie W. Portera
Andrea M. Greene
Attorneys    for    Raymond    James    and Associates, Inc.

OF COUNSEL:
MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama  35203-2602

27

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been served on the NASD and on the attorney listed below via facsimile and U. S. mail on this 16th day of September, 2005:

Richard S. Frankowski, Esq.
WHATLEY DRAKE LLC
2323 2nd Avenue North
Birmingham, Alabama 35203

OF COUNSEL



# LANCE K. DYESS, M.D.

918 DRAYTON AVE.
ELBA, ALABAMA 36323

TELEPHONE 334/897-2207
FAX 334/897-3476

12/02/04

Maxine Chappell
2464 West Main Street
Suite 2
Dothan, AL 36301

RE:  THREE-WAY CONVERSATION REGARDING THE PAYOUT OF MY RETIREMNT ANNUITY

Dear Maxine:

As per our phone conversation of last week, I am giving my permission for you to arrange a three-way conversation between yourself, AXA's representative, and Earnest Clark at Jackson Thornton.  Hopefully then I can get a straight answer to my questions about the way in which AXA will payout the monies I have invested with their guaranteed 6% interest (as the market return has been well below the 6% rate of return).

I cannot make any significant retirement plan without the information.  I invested $420,000.00 over 6 years ago, and expect to receive that amount plus the 6% guaranteed compounded interest at the conclusion of the 7 years of this annuity.  As you told me when I purchased this annuity, it would provide a safe haven for the financially-wary investor.  Following the Market's collapse of a few years ago, I am proud you provided me with such an insulated investment vehicle to preserve (and grow) my retirement.

Please give Earnest a call in a few days, and we can get this matter resolved .

Happy Holidays:

Lance K. Dyess, MD

cc:  Earnest Clark

*Earnest — Give me a call if we need*
*to discuss this prior to the*
*3 way call*

*Doc*



# LANCE K. DYESS, M.D.

918 DRAYTON AVE.
ELBA, ALABAMA 36323

TELEPHONE 334/897-2207
FAX 334/897-3476

4/3/04

Marci Uhl
Customer Service Representative
AXA Financial
The Equitable Life Assurance Society of the US
P.O. Box 1547
Secaucus, NJ 07096-1547

RE: Equitable Accumulator Account #98684790

Dear Ms. Uhl:

In response to your letter of December 9, 2003; let me ask as to why you cannot give me a current value of the account above. My investment counselor assures me that at maturity; I will receive the current market value of my account, or the amount of my initial investment + 6% compounded interest (on the initial investment over the 7 year life of this product).....whichever is greater.

Please elaborate also on the pay-out procedure. I understood it would all be available at maturity (7 years from purchase date), but now my investment counselor states that I can only get 90% of the above at maturity.....with the balance to be paid out over another year. Please explain.

Sincerely,

Lance K. Dyess, MD

5



**EQUITABLE**
ACCUMULATOR
P.O. BOX 1547, SECAUCUS, NEW JERSEY 07096-1547

**Annual Account Review**
July 05, 2003- July 05, 2004

300 611 540
0000779 0t MB 0.369  **AUTO  T5 0 4135 36311  0

IRA J Edmondson
2004 West County Rd 19
Ariton AL 36311-6612

Contract Number: 300 611 540
Contract Type: Equitable
    Accumulator®(Rollover IRA)
GMDB Election: Roll up
Contract Date: July 05, 2000
Contract Owner: IRA J Edmondson
Annuitant Name: IRA J Edmondson

Introducing enhanced internet access features. Now you can do interfund transfers among investment options and change the allocation for new contributions online. Just go to www.equitable.com and click on EQAccess.

| Account Activity Summary | Contract Year 7/5/2003-7/5/2004 | Since Purchase 7/5/2000-7/5/2004 |
|---|---|---|
| Account Value as of 7/5/2003 | $605.00.00 | |
| Contributions | $0.00 | $206,217.79 |
| Requested Withdrawals | ($23,400.00) | ($99,278.99) |
| Net Investment Option Results | | |
|   Variable Investment Option Results | $6,435.89 | |
| Current Total Account Value | $40,000.00 | |

### Your Account Allocation

Your Account Value is currently invested among the asset classes below. Totals may not be exact due to rounding. To review your investment strategy, contact your registered representative.



☐ 69% Large Company Stocks     ☒ 29% Small/Mid Company Stocks
☐ 2% International Stocks

### For Assistance, Contact:

Your Financial Professional
Maxine Chappell
Raymond James Financial Svcs.
Raymond James Financial Servic
2464 West Main St
Suite 2
Dothan AL 36301
334-677-2812

You can obtain current account information, including balances and unit values, any time you wish.

* Call our TOPS voice response system 1-888-909-9770, or
* Visit our Website: www.equitable.com and click on EQAccess.

If you want to speak to one of our Customer Service Representatives please call 800-789-7771 8:30 – 5:30 ET Monday - Friday

6



# Scudder Destinations℠

Statement
Of Value

| Account Number | Reporting Period |
|---|---|
| KI11015009 | 10/01/2004 through 12/31/2004 |

Prepared for:

6422/3 B 6 0010 01 01204011-0001 00885 A - (IMC)
IRA EDMONDSON
2004 WEST COUNTY RD 19
ARITON, AL 36311

Financial Representative:

MAXINE H CHAPPELL
PLANNING CORP OF AMERICA
2464 W MAIN STREET #2
DOTHAN, AL 36301

Owner:        Ira Edmondson
Annuitant:    Ira Edmondson
Issue Date:   07/20/2000
Plan Type:    IRA

Representative Phone Number: (334) 677-2812
*If you have any questions regarding this statement,
or need additional service, please call your financial
representative or our Customer Service number at
1-800-449-0523.*

# Activity
## CONTRACT SUMMARY

|  | Quarter Ending 12/31/2004 |  | Year-To-Date 12/31/2004 |
|---|---|---|---|
| Inception-to-Date Deposits | $210,288.42 | Beginning Contract Value | $43,988.80 |
| Beginning Contract Value | $29,607.83 | Withdrawals | $15,752.76 |
| Withdrawals | $1,653.35 | Change in Value* | $3,319.75 |
| Change in Value* | $3,601.31 | Ending Contract Value | $31,555.79 |
| Ending Contract Value | $31,555.79 | | |
| Surrender Value | $25,661.89 | | |
| Death Benefit Value | $160,671.05 | | |

* Includes any investment results and/or any interest earnings net of any contract fees or charges.

**Your Current Allocation**
This chart is representative of your current
allocation as of 12/31/2004.



| | |
|---|---|
| Small Cap Equities | 30% |
| Large Cap Growth Equities | 16% |
| Mid Cap Equities | 16% |
| Large Cap Value Equities | 14% |
| Global Equities | 7% |
| Sector/Specialty Equities | 6% |
| Multi-Cap Equities | 6% |
| International Equities | 5% |

Kemper Investors Life Insurance Company
Administrative Office:
PO Box 19097
Greenville, SC 29602-9097

Page    1 of    6

7

# PUTNAM HARTFORD
# CAPITAL MANAGER
### VARIABLE ANNUITY QUARTERLY STATEMENT
### JANUARY 1, 2003 - MARCH 31, 2003
### PAGE 1 OF 3

Is your portfolio's allocation still tailored to your goals? Given last year's economic environment, an 80% stock/20% bond mix would have finished 2002 with 73% in stocks and 27% in bonds. Left unattended, an 80/20 ratio in 2000 would have changed to 64% stocks/36% bonds by the end of 2002, much different from the mix that you and your investment representative customized to your specific goals. With the start of a new year, this is a good time to meet with your investment representative to review your financial situation. (Stocks represented by the S&P 500 Index. Bonds represented by the Lehman Bros. Aggregate Bond Index. Indexes are not available for direct investment.)

---

#BWNGSGR
#VI9ESRERJXHR4#
V1A14743  2 AB  0.526  AUTO  T70 200 0401 36330-14300113

*4/12/03*

Jimmy E Jones
501 Dixie Drive
Enterprise AL  36330-1430

| | |
|---|---|
| CONTRACT NUMBER | 710702480 |
| PURCHASE DATE | November 11, 1999 |
| CONTRACT TYPE | IRA |
| OWNER NAME | Jimmy E Jones |
| ANNUITANT | Jimmy E Jones |

## SUMMARY

| | QUARTER 1/1/03 - 3/31/03 | YEAR-TO-DATE 1/1/03 - 3/31/03 | SINCE PURCHASE 11/11/99 - 3/31/03 |
|---|---|---|---|
| Beginning Value | 90,674.96 | 90,674.96 | |
| Premium Payment | 0.00 | 0.00 | 207,495.63 |
| Total Surrenders * | 4,800.00- | 4,800.00- | 60,800.00- |
| Annuity Performance | 2,859.47- | 2,859.47- | 63,680.14- |
| **Ending Value** | **$83,015.49** | **$83,015.49** | **$83,015.49** |

## YOUR ANNUITY AT A GLANCE



| | |
|---|---|
| 32.7% | Health Sciences |
| 24.8% | Growth & Income |
| 17.0% | Voyager |
| 13.7% | Investors |
| 11.8% | Global Equity |

## FOR ASSISTANCE, CONTACT EITHER:

**Your Investment Professional**
John J Hughes
SYNOVUS SECURITIES
3680 West Main
Dothan        AL 36305

**The Hartford**
Attn: Investment Products Services
PO Box 5085
Hartford CT 06102-5085
www.putnaminvestments.com
1-800-992-8610    Automated Annuity Information
                  (Toll-Free 24 hours a day)
1-800-521-0538    Service Representative

---

* Total Surrenders include Contingent Deferred Sales Charges and Annual Maintenance Fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. If you have any further questions, or for information on fixed interest rates or crediting, call 1-800-521-0538 Monday - Friday 8:30am to 8:00pm (Eastern time).

8




# PUTNAM HARTFORD
# CAPITAL MANAGER
## VARIABLE ANNUITY QUARTERLY STATEMENT
### JANUARY 1, 2005 - MARCH 31, 2005
#### PAGE 1 OF 4

Annual IRA contribution limits have increased this year to $4,000 and $4,500 for those aged 50 and above. Are you taking full advantage? Talk to your investment professional about increasing your contributions to take full advantage of the tax benefits that variable annuities provide.

#BWNGSGR
#VI9ESRERJXHR4#
V1A19355 2 MB 0.534 00 AUTO T108 453 0421 36330-143001 12

ldldldldllddllddldllddldl

JIMMY E JONES
501 DIXIE DRIVE
ENTERPRISE AL 36330-1430

**CONTRACT NUMBER** 710702480
**PURCHASE DATE** November 11, 1999
**CONTRACT TYPE** IRA

**OWNER** Jimmy E Jones
**ANNUITANT** Jimmy E Jones

## SUMMARY

|  | QUARTER 1/1/05 - 3/31/05 | YEAR-TO-DATE 1/1/05 - 3/31/05 | SINCE PURCHASE 11/11/99 - 3/31/05 |
|---|---|---|---|
| Beginning Value | 2,865.11 | 2,865.11 |  |
| Premium Payment | 0.00 | 0.00 | 207,495.63 |
| Total Surrenders * | 0.00 | 0.00 | -153,958.72 |
| Annuity Performance | -38.16 | -38.16 | -50,709.96 |
| **Ending Value** | **$2,826.95** | **$2,826.95** | **$2,826.95** |

## YOUR ANNUITY AT A GLANCE



- ▨ 20.0% George Putnam
- ▩ 17.0% Income
- ▦ 16.3% American Govt Incm
- ▥ 16.0% Research Fund
- ☐ 12.3% Intnat'l Equity
- ◪ 10.9% Discovery Growth
- ■ 7.5% Small Cap Value

## FOR ASSISTANCE, CONTACT EITHER:

**Your Investment Professional**
John J Hughes
SYNOVUS SECURITIES
3680 West Main
Dothan AL 36305

**The Hartford**
Attn: Investment Products Services
PO Box 5085
Hartford, CT 06102-5085
www.putnaminvestments.com
**1-800-992-8610**    Automated Voice Services
1-800-521-0538    Client Services
1-800-521-0963    Producer Services



* Total Surrenders include Contingent Deferred Sales Charges and Annual Maintenance Fees, if applicable.
All information about your variable annuity, including charges and expenses, is described in your prospectus. Please read it carefully and keep it for your records. Our hours of operation are Monday - Friday 8:30am to 8:00pm (Eastern time).

V1A19355 00076137 00002

9



0004490

**Polaris II**
**Variable Annuity**
**Quarterly Statement**
October 1, 2004 to December 31, 2004

RACHEL MCKINNEY
515 GOLF VIEW DR
DOTHAN, AL 36301-7817

 Dalbar, Inc. Ranks Your
AIG SunAmerica Statement #1!

## Your Account Summary

 Customer Service: 1-800-445-SUN2

Owner: RACHEL MCKINNEY                    Account #: P3799510481
Annuitant: RACHEL MCKINNEY                Account Type: IRA

| | Since Issue Date 03/11/1999 | Year to Date |
|---|---|---|
| Account Value on 09/30/2004 | | |
| Contributions | $418,964.92 | $0.00 |
| Withdrawals/Charges | -$229,892.68 | -$39,861.75 |
| Change in Market Value* | -$54,379.34 | $9,486.30 |
| Account Value on 12/31/2004 | | |

The 12/31/04 value will be provided to the Internal Revenue Service as the fair market value of your annuity. If you made qualified contributions to your account during 2004, Tax Form 5498 will be mailed by May 31, 2005.

*Change in market value represents the change in your account value, from the end of the last period to the end of this quarter, adjusted for contributions and/or withdrawals/charges during this quarter.

## Allocation by Asset Class as of 12/31/2004

Asset allocation is an important consideration for many investors. Your investment representative is uniquely qualified to help you determine the asset allocation strategy that is right for you.



▨ 100% Stocks

Percentages may not be exact due to rounding.

Issued by:
AIG SunAmerica Life Assurance Company

10

*Equitable  umulator (Rollover) IRA*

# DATA

**PART A — This part lists your personal data.**

**Owner:**      Linda J Middleton

**Annuitant:**   Linda J Middleton                          Age: 52      Sex: Female

**Contract:**  Group Annuity Contract No. AC 6727

**Certificate Number:**          99 629 647

**Endorsements Attached:**   Minimum Income Benefit Endorsement
Endorsement Applicable to IRA Certificates
Endorsement Applicable to Market Value Adjustment Terms
Rider to Endorsement Applicable to Market Value
Adjustment Terms

**Issue Date:**          October 7, 1999

**Contract Date:**       October 7, 1999

**Annuity Commencement Date:**    October 7, 2037

**The maximum maturity age is age 90 — see Section 7.03.**
The Annuity Commencement Date may not be later than the Processing Date which follows your 90th birthday.

However, if you choose a date later than age 70 1/2, distribution of at least the minimum payments required must commence by April 1 of the calendar year following the calendar year in which you attain age 70 1/2 (see item 2 of the Endorsement Applicable to IRA Certificates).

**Guaranteed Benefits:**   Combined Guaranteed Minimum Income Benefit
and Guaranteed Minimum Death Benefit (5% Roll Up to Age 80)

**Beneficiary:**  Lauren Kathryn Smyth/Matthew Eric Smyth

No. 94ICB                               Data page 1          (5/99)

11

 **AXA EQUITABLE**

ACCUMULATOR
P.O. BOX 1547, SECAUCUS, NEW JERSEY 07096-1547

 

**Quarterly Account Review**
**Statement Period:**
October 01, 2004– December 31, 2004

300 610 913
0090012 01 AT 0.282 **AUTO  T2 O 9101 36311  0

Victor E Stafford
644 River Road
Ariton AL 36311-7508

**Contract Number: 300 610 913**
**Contract Type: Accumulator (Rollover IRA)**
**GMDB Election: Roll up**
**Contract Date: April 05, 2000**
**Contract Owner: Victor E Stafford**
**Annuitant Name: Victor E Stafford**

Safety in Diversity!  Are your assets properly allocated to help you ride out the market's ups and downs?  It is important to make sure your retirement assets are diversified and allocated according to your risk tolerance and individual situation.  Call your financial professional today; he or she can help you review your portfolio and develop an asset allocation plan designed to help meet your needs. GE-24807

| Account Activity Summary | Quarter 10/1/2004-12/31/2004 | Year-To-Date 1/1/2004-12/31/2004 | Since Purchase 4/5/2000-12/31/2004 |
|---|---|---|---|
| Account Value as of 9/30/2004 | $149,400.57 | | |
| Contributions | $0.00 | $0.00 | $241,058.71 |
| Requested Withdrawals | $0.00 | $0.00 | $0.00 |
| Net Investment Option Results: | | | |
| Variable Investment Option Results | $17,610.85 | | |
| Current Total Account Value | $167,011.42 | | |

### Your Account Allocation

Your Account Value is currently invested among the asset classes below. Totals may not be exact due to rounding. To review your investment strategy, contact your registered representative.




- 40% Small/Mid Company Stocks
- 38% Large Company Stocks
- 22% International Stocks

### For Assistance, Contact:

**Your Financial Professional:**
Maxine Chappell
Raymond James Financial Svcs.
Raymond James Financial Servic
2464 West Main St
Suite 2
Dothan AL 36301
334-677-2812

You can obtain current account information, including balances and unit values, any time you wish.

- Call our TOPS voice response system 1-888-909-7770, or
- Visit our Website: www.axa-equitable.com and click on EQAccess

If you want to speak to one of our Customer Service Representatives please call 800-789-7771 8:30 – 5:30 ET Monday - Friday



**EXHIBIT G**

## IN ARBITRATION BEFORE NASD DISPUTE RESOLUTION

DOUGLAS M. CHERRY, LANCE K.    )
DYESS, IRA J. EDMONDSON, JIMMY  )
E. JONES, RACHEL MCKINNEY,     )
LINDA J. MIDDLETON, and VICTOR  )
E. STAFFORD,                        )
                                   )
        Claimants,             )       NASD Arbitration No.: 05-03030
                                   )
v.                               )
                                   )
RAYMOND JAMES and ASSOCIATES, )
Inc.,                               )
        Respondents.           )

## CLAIMANTS' PRE-HEARING BRIEF

Claimants submit this Pre-Hearing Brief to address certain legal issues that may be at issue during the arbitration. Before addressing those matters, however, Claimants wish to call attention to the equitable nature of this proceeding, as noted in the introductory words of the *Arbitrator's Manual*:

> Equity is justice in that it goes beyond the written law. And it is equitable to prefer arbitration to the law court, for the arbitrator keeps equity in view, whereas the judge looks only to the law, and the reasons why arbitrators were appointed was that equity might prevail.

*The Arbitrator's Manual* at 1, *citing* Domke on Aristotle.

It is Claimants' position that, in addition to the well-reasoned legal basis for their claim for relief, equitable principles mandate an Award in their favor.

## I.    FACTUAL BACKGROUND

The facts of this case are set forth in the Statement of Claim and will be addressed in more detail during the hearing. For purposes of this Pre-Hearing Brief, Claimants note the following salient points:

A.    Most of the Claimants were financially unsophisticated.

B.    Most of the Claimants needed their retirement savings to last them for the remainder of their lives.

C.    Respondents promised each of the Claimants that the variable annuity sold to them would guaranty their invested principal.

D.    Respondents promised each of the Claimants that they would receive a guaranteed rate of return.

Claimants never would have purchased the variable annuities had they known that the Respondents' representations were false. As a result of the misrepresentations and omissions, Claimants have suffered substantial financial losses.

## II.    ARGUMENT

### A.    Florida Law Applies In This Arbitration

The contract signed by each of the Claimants contains one the following choice of law provisions:

> *Choice of Law: This agreement and any accounts opened hereunder shall be construed, interpreted and the rights of the parties shall be determined in accordance with the internal laws of the State of Florida (without referencing Choice of Law provisions of Florida or any other state).*

> *Choice of Law: This agreement shall be construed in accordance with the laws of the State of Florida.*

As a result of Respondents' decision to include this choice of law provision, Florida law must be used to analyze all legal issues involved in this arbitration. As noted earlier, however, the Panel is not limited to legal principles, and may incorporate equitable principles in their analysis.

2

**B.      Breach of Fiduciary Duty**

"Fiduciary or confidential relation" is a very broad term, and such relation exists in all cases in which influence is being acquired and abused and in which confidence has been reposed and betrayed; term embraces both technical fiduciary relations and informal relations existing wherever one trusts and relies upon another. *Atlantic Nat. Bank of Florida v. Vest*, 480 So.2d 1328 (Fla. App. 2. Dist., 1985).

A fiduciary relationship may be either express or implied. *Maxwell v. First United Bank*, 787 So.2d 431 (Fla. App. 4. Dist., 2001). A fiduciary relationship which is implied in law is based on the circumstances surrounding the transaction and the relationship of the parties, and may be found when confidence is reposed by one party and a trust accepted by the other. *Id*. The procurement of a benefit or advantage by reason of misrepresentation is one factor to be considered in determining the existence of a fiduciary relationship implied in law. *Atlantic Nat. Bank of Florida v. Vest*, 480 So.2d 1328 (Fla. App. 2. Dist., 1985).

Florida courts have long recognized a breach of fiduciary duty claim at common law. *Episcopal Diocese of Cent. Florida v. Prudential Securities, Inc.* 925 So.2d 1112, 1116 (Fla. App. 5 Dist., 2006). The fiduciary concept derives from trust and agency principles. Actions contrary to the duties of loyalty and care are remedied by giving the beneficiary of the relationship the right to recover for the fiduciary's breach. *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042 (11th Cir. 1987).

In general, a stockbroker must deal with its clients in good faith and owes them a fiduciary duty of loyalty and care. *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987). These duties include (1) duty to recommend investment

3

only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; (2) duty to perform customer's orders promptly in a manner best suited to serve customer's interests; (3) duty to inform customer of risks involved in purchasing or selling a particular security; (4) duty to refrain from self-dealing; (5) duty not to misrepresent any material fact to transaction; and (6) duty to transact business only after receiving approval from customer. *Ward v. Atlantic Sec. Bank*, 777 So.2d 1144 (Fla. App. 3. Dist., 2001).

In this case, Respondents continuously misrepresented the terms, risks, and benefits of the variable annuities and omitted material facts about the annuities sold to each Claimant.    Claimants relied on the misrepresentations and omissions to their detriment.  Indeed, Claimants would not have purchased and maintained these annuities, but for Respondents' misrepresentations and omissions.    As a result of these misrepresentations and omissions, Respondents have breached their duties to each Claimant.

### C.    Breach of Contract

Each Claimant signed a Raymond James Client Agreement contract.    The contract contains the following provisions:

> *I/we acknowledge and agree that my/our relationship with Raymond James & Associates, Inc. is governed by the provisions of this agreement. Throughout this agreement, "I", "me", "we" and "us" refer to the undersigned and any other actual or beneficial owner of property in this account. "You" and "your" refer to Raymond James & Associates, Inc. and the introducing broker, if applicable. The terms "property" and "securities" mean securities of all kinds, monies, options and all other property dealt in by brokerage firms.*
>
> *Applicable Regulations:    (a) I understand and agree that every transaction in my account is subject to the rules or customs in effect at the time of the transaction which, by the terms of the rule or custom, applies*

4

*to the transaction. These rules or customs include state and federal laws, rules and regulations established by state or federal agencies, the Constitution, rules, customs and usages of the applicable exchange, association, market or clearinghouse or customs and usages of individuals transacting business on the applicable exchange, market or clearinghouse.*

*I understand that when I sign the Client Agreement, this Client Agreement becomes a legally binding contract between you and me. (b) If this agreement is incompatible with any rule or custom, or a if a rule or custom is changed, this agreement will be automatically modified to conform to the rule or custom. The modification of this agreement shall not affect any of its other provisions.* (emphasis added).

The elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach. *Rollins, Inc. v. Butland,* 932 So.2d 1172, 1187 (Fla. App. 2 Dist., 2006) citing *Knowles v. C.I.T. Corp.,* 346 So.2d 1042, 1043 (Fla. 1st DCA 1977).

In the present case, contracts clearly exist between Respondents and Claimants. As mentioned above, Respondents refer to the Client Agreement as a "legally binding contract...." As such, the first element has been met. Second, Respondents specifically incorporated into this contract, the laws, rules and regulations of all applicable state and federal agencies, exchanges and associations. Thus, the contract has incorporated federal and state laws as well as NASD regulations. Respondents breached these laws, rules and regulations through their fraud, negligence, statutory violations and violations of the NASD Rules of Practice. Each of these violations will be proven at arbitration.

Furthermore, it is axiomatic that "[e]very contract includes not only its written provisions, but also the terms and matters which, though not actually expressed, are implied by law, and these are as binding as the terms which are actually written or spoken." *See First Nationwide Bank v. Florida Software Servs., Inc.,* 770 F.Supp. 1537, 1542 (M.D.Fla.1991), citing *Sharp v. Williams,* 192 So. 476, 480 (1939). One of the

5

implied contract terms recognized both in Florida law…is the implied covenant of good

faith, fair dealing, and commercial reasonableness. *See Scheck v. Burger King Corp.*,

798 F.Supp. 692, 700 (S.D. Fla. 1992); *First Nationwide Bank,* 770 F.Supp. at 1542; *The*

*Green Companies, Inc. v. Kendall Racquetball Invs., Ltd.,* 560 So.2d 1208, 1210 (Fla. 3d

DCA 1990); *Fernandez v. Vazquez,* 397 So.2d 1171, 1173-1174 (Fla. 3d DCA 1981); *see*

*also* Robert S. Summers, *The General Duty of Good Faith-Its Recognition and*

*Conceptualization,* 67 Cornell L.Rev. 810 (1982); Restatement (Second) of Contracts §

205 (1979).

This implied covenant arises because "[a] contract is an agreement whereby each

party promises to perform their part of the bargain in good faith, and expects the other

party to do the same." *First Nationwide Bank,* 770 F.Supp. at 1543. Thus, the implied

covenant of good faith and fair dealing is designed to protect the contracting parties'

reasonable expectations. *See Scheck,* 798 F.Supp. at 693, n. 5.; *Cox v. CSX Intermodal,*

*Inc.* 732 So.2d 1092, *1097 (Fla.App. 1 Dist., 1999)

The duty to perform the contract in good faith cannot, by definition, be waived by

either party to the agreement. *Cox v. CSX Intermodal, Inc,.* 732 So.2d 1092, 1098 (Fla.

App. 1 Dist., 1999). Additionally, Florida statutory law specifically provides that "[T]he

obligations of good faith, diligence, reasonableness and care prescribed by this code may

not be disclaimed by agreement but the parties may by agreement determine the

standards by which performance of such obligations is to be measured if such standards

are not manifestly unreasonable." F.S.A. § 671.102(3); *see also* Thomas A. Diamond &

Howard Foss, *Proposed Standards for Evaluating When the Covenant of Good Faith and*

6

*Fair Dealing Has Been Violated: A Framework For Resolving the Mystery,* 47 Hastings L.J. 585, 624-628 (1996).

Even if Respondents attempt to disclaim any contract between the parties, as they did in their Answer, Respondents are still in breach under the concept of quasi contract. The elements of a cause of action for quasi contract are: (1) plaintiff has conferred benefit on defendant; (2) defendant has knowledge of benefit; (3) defendant has accepted or retained benefit conferred; and (4) circumstances are such that it would be inequitable for defendant to retain benefit without paying fair value for it. *Magwood v. Tate,* 835 So.2d 1241, (Fla. App. 4. Dist., 2003).

In the present case, each Claimant has purchased variable annuity products for which Respondents received thousands of dollars in commissions. Respondents clearly knew of this benefit. Indeed, the commission structure provided Respondents with a very real motivation to sell the annuities to Claimants. Respondents have retained these benefits despite misrepresenting the product to each of the Claimants. Finally, it is inequitable that Respondents have maintained these benefits after they committed a fraud against the Claimants. As such, Claimants request disgorgement of all commissions and rescission of the misrepresented annuities.

**D.     Fraud**

Respondents should be held liable for common law fraud, fraud in the inducement and/or constructive fraud.

The essential elements of a fraud claim are: (1) a false statement, or intentional omission, concerning a specific material fact; (2) maker's knowledge that representation is false; (3) an intention that representation induces another's reliance; and (4) consequent

7

injury by other party acting in reliance on interpretation. *Ward v. Atlantic Sec. Bank* 777 So.2d 1144 (Fla.App. 3 Dist., 2001).

Here, Respondents made false statements and intentional omissions regarding the terms, risks and benefits of the annuities sold to Claimants. Respondents knew that the representations were false because they had dealt in these very products for years. Respondents misrepresentations and omissions were clearly intended to induce the Claimants' reliance because they were made solely to generate commissions, and the commissions would not have been made without the Claimants' purchase of the annuities. As a result of Respondents intentional misrepresentations and omissions, each Claimant was injured in an amount to be proven at arbitration.

Additionally, Respondents should be held liable for fraudulent inducement. In order to state a cause of action for fraudulent inducement, a plaintiff must allege that: (1) the representor made a misrepresentation of a material fact, (2) the representor knew **or should have** known of the falsity of the statement, (3) the representor intended that the representation would induce another to rely and act on it, and (4) the plaintiff suffered injury in justifiable reliance on the representation. *Biscayne Inv. Group, Ltd. v. Guarantee Management Services, Inc.*, 903 So.2d 251 (Fla. App. 3. Dist., 2005).

For the same reasons that Respondents are liable for common law fraud, they are liable for fraudulent inducement. The only difference between the elements of fraud and fraud in the inducement is that the Respondent need not know of the falsity of the statement. Indeed, it is enough if the Respondent "should have known" of the falsity of the statement. Here, Respondents certainly made false misrepresentations of material fact regarding the terms, risks and benefits of the annuities sold to Claimants. Clearly,

the Respondents knew or should have known that the representations would induce the Claimants to purchase and hold the annuities. Respondents also intended that the representations would induce the Claimants to purchase and hold the annuities sold to them. The Claimants were injured in an amount to be proven at arbitration.

Finally, constructive fraud may be based on a misrepresentation or concealment, or the fraud may consist of taking an improper advantage of the fiduciary relationship at the expense of the confiding party. *Levy v. Levy*, 862 So.2d 48 (Fla. App. 3. Dist., 2003). In this case, Respondents took improper advantage of their fiduciary relationship with Claimants. In misrepresenting the terms, risks and benefits of the annuities and in omitting material facts about the annuities, the Respondents breached their fiduciary duties and caused Claimants to suffer substantial economic and emotional damages.

### E.    Negligence/Negligent Misrepresentation and Omission

The elements of negligence are: (1) the existence of a duty recognized by law requiring the defendant to conform to a certain standard of conduct for the protection of others including the plaintiff; (2) a failure on the part of the defendants to perform that duty; and (3) an injury or damage proximately caused by such a failure. *Superior Garlic Intern. v. E & A Corp.*, 913 So.2d 645, (Fla. App. 3. Dist., 2005).

It has already been established that under Florida law, Respondents owed Claimants a fiduciary duty and a duty to act in good faith and to deal fairly with them. Respondents breached their duty by misrepresenting the terms, risks and benefits of the annuities sold to the Claimants and by omitting material facts relating to the terms, risks and benefits of the annuities sold to the Claimants. As a result of Respondents' failure to perform their duties, Claimants were injured in an amount to be proven at arbitration.

9

**F.     Failure to Supervise and Control/Negligent Supervision**

To prevail on a theory of negligent supervision, appellant must prove the basic elements of negligence: (1) a legal duty to supervise; (2) a negligent breach of that duty; and (3) proximate causation of the Plaintiff's injury by the negligence. *Roberson v. Duval County School Bd.* 618 So.2d 360, 362 (Fla.App. 1 Dist.,1993).

In the present case, Respondent Raymond James had a legal duty to supervise Maxine Chappell. That duty exists under the laws of agency and under NASD regulations. To show an agency relationship requires establishing the existence of: (1) acknowledgment by the principal that the agent will act for it; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the action of the agent. *Banco Continental, S.A. v. Transcom Bank (Barbados), Ltd.* 922 So.2d 395 (Fla.App. 3 Dist.,2006).

Each of these elements for agency has been met in the present case. Raymond James allowed Chappell to act for it by allowing her to use the corporate name, to sell corporate products and to use corporate documents in those sales. Chappell clearly accepted that role by continuing to work for Raymond James, by continuing to use the Raymond James name and by continuing to share revenue with Raymond James. Raymond James had control over Chappell because they trained her and regulated her sales activities.

While Chappell may argue that she was merely an independent contractor, such an argument is without merit. The existence of an agency relationship may be established expressly, or by estoppel, apparent authority, or ratification. *Chase Manhattan Mortg. Corp. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A,*

10

694 So.2d 827 (Fla. App. 4. Dist., 1997). Indeed, agency may be inferred from the facts of the case or implied from a course of dealings. *Harrell v. Branson,* 344 So.2d 604 (Fla. App. 1 Dist., 1977). Here, the Claimants believed that Chappell was a representative of a nationally recognized brokerage firm. The Raymond James name gave Chappell instant credibility in the mind of the Claimants. Raymond James placed their name on client documents, Chappell used those documents and caused the Claimants to rely on Chappell as a representative of Raymond James.

Even if Chappell did not have a formal agency relationship, she did have apparent authority to act on behalf of Raymond James. Under the doctrine of agency by estoppel, in order to hold a principal liable, a plaintiff must establish (1) that the principal manifested a representation of the agent's authority or knowingly allowed the agent to assume such authority; (2) that the plaintiff in good faith relied upon such representation; and (3) that by relying upon such representation the plaintiff changed his position to his detriment. *Carolina-Georgia Carpet & Textiles, Inc. v. Pelloni,* 370 So.2d 450 (Fla. App. 4 Dist., 1979).

Here, Raymond James allowed Chappell to use their name on contracts, statements, business signage and marketing materials. Claimants relied on these representations to their detriment. As such, Chappell had apparent authority to act on behalf of Raymond James and Raymond James should be held liable for the negligent acts of their actual and/or apparent agent and for its own negligence in failing to supervise the wrongful acts of its agent.

**G.   Violation of Federal and State Securities Laws**

Florida statue section 517.301 provides:

11

(1)      It is unlawful and a violation of the provisions of this chapter for a person:

(a)      In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

    1.      To employ any device, scheme, or artifice to defraud;

    2.      To obtain money or property by means of any untrue statement of a material  fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    3.      To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

(b)      To publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, communication, or broadcast which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or from an agent or employee of an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount of the consideration.

(c)      In any matter within the jurisdiction of the office, to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry.

F.S.A. § 517.301.

In this case, Respondents defrauded the Claimants by making misrepresentations and by omitting material facts regarding the terms, risks and benefits of the annuities they sold to Claimants.  Claimants relied on the misrepresentations and omissions.  As a direct result of the fraud and deception, Claimants were injured in an amount to be proven at the arbitration hearing.

A securities fraud claim under Florida Securities Investors Protection Act is nearly identical to a securities fraud claim under Rule 10b-5 of related federal law, and, thus, Florida courts will look to interpretations of federal securities laws for guidance in interpreting Florida's securities laws. *Ward v. Atlantic Sec. Bank,* 777 So.2d 1144 (Fla. App. 3 Dist., 2001). A successful cause of action under Section 10(b) or Rule 10b-5 requires that the plaintiff prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiffs' loss. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir. Unit A 1981), *modified on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The Florida statutory requirements are identical to Rule 10b-5, *Alna Capital Associates, et al v. Wagner,* 758 F.2d 562, 565 (11th Cir.1985), except that the scienter requirement under Florida law is satisfied by a showing of mere negligence. *Cf. Merrill Lynch, Pierce, Fenner & Smith v. Byrne,* 320 So.2d 436, (Fla. D.C.A. 3d 1975) (negligence satisfies scienter requirements under Florida law). *Gochnauer v. A.G. Edwards & Sons, Inc.* 810 F.2d 1042, 1046 -1047 (11th Cir. 1987).

The misrepresentations and omissions made by Respondents regarding the terms, risks and benefits of the variable annuities sold to Claimants fulfill each element of the Florida statute.

**H.      Violation of NASD Rules of Practice**

**1.      NASD Rule 2310 (Suitability Rule)**

The NASD suitability rule prescribes the basic requirements of performing suitability reviews. The rule provides that a member shall have reasonable grounds for believing that [a] recommendation is suitable for such customer upon the basis of the

13

facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs. The Suitability Rule also provides that a member shall make reasonable efforts to obtain information concerning: (a) the customer's financial status; (b) the customer's tax status; (c) the customer's investment objectives; and (d) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.

In the present case, Chappell failed to place Claimants in investments that were suitable for their needs, objectives and risk tolerances. Clearly, Chappell and Raymond James failed to consider each Claimant's financial status, their individual needs for income and asset protection, and their varying ages and employment situations.

### 2.    NASD Conduct Rule IM-2310.2 (Fair Dealing)

This NASD rule provides that members and registered representatives have a fundamental responsibility for dealing fairly with their customers. Respondents failed to follow this rule. They failed to deal fairly with Claimants by misrepresenting the terms, risks and benefits of the annuities they recommended, by omitting material facts about the annuities they recommended and by placing Claimants in unsuitable investments.

### 3.    NASD Rule 3010 (Failure to Supervise)

The National Association of Securities Dealers, Inc. (NASD) Rule 3010 requires each member to establish and maintain a system to supervise the activities of each registered representative and associated person in order to achieve compliance with the securities laws, regulations, and NASD rules.   Raymond James failed to supervise Chappell. As a result of this failure, Claimants lost much of their retirement savings.

14

While Respondents argue that Claimants have no right to pursue any remedies based on NASD regulations, a brief search over the past two years clearly shows that Claimants consistently recovered for violations of these very regulations.

The following arbitrations included awards for violations of the suitability provision:

**2006 WL 2236915 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
DINA MOSKOWITZ v. SUMMIT BROKERAGE SERVICES, INC., CAPITAL
GROWTH FINANCIAL, INC, MICHAEL SCHEURICH
Docket Number 05-01934

**2006 WL 1028495 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
SHARON B. ELLIS v. MORGAN KEEGAN & COMPANY, INC., TOMMY RAY
COCKRELL
Docket Number 03-05575

**2006 WL 1562630 (N.A.S.D.)**

National Association of Securities Dealers, Inc.
IN THE MATTER OF THE ARBITRATION BETWEEN:
JOAN F. CAMMETT v. FREDERIC SILVERMAN AND FAHNESTOCK & CO., INC.,
Docket Number 03-00833

**2006 WL 1457966 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN
FREDERICK J. SHAHEEN AND JOANN P. SHAHEEN v. ROBERT DEKKER,
METRO FINANCIAL GROUP, INC., QUESTAR CAPITAL CORP.,
AND MUTUAL SERVICE CORP.
Docket Number 02-07796

**2005 WL 1529459 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
SUZANNE BAKER v. FIRST MONTAUK SECURITIES CORP. JOSEPH JACHETTI
LOUIS INGLESE
Docket Number 03-08630

15

**2005 WL 1249152 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
MASAO TAKAI, TRUSTEE; TOMIKO TAKAI, TRUSTEE; M. TAKAI MD INC.
PROFIT SHARING PLAN; M. TAKAI MD PROFIT SHARING SUB PLAN; MASAO
TAKAI MD IRA; TOMIKO TAKAI IRA; ERIKO TAKAI; MASAO TAKAI MD AND
TOMIKO TAKAI, JTWROS; AND MASAKI TAKAI, v. MERRILL LYNCH, PIERCE,
FENNER & SMITH, INC. AND FREDERICK C. WONG, RESPONDENTS
Docket Number 03-03015

**2005 WL 913727 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
BARBARA H. BOOKER v. MORGAN STANLEY DW, INC. SARIE NERINE
JOUBERT-DURR
Docket Number 04-01943

**2005 WL 2373787 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN: JULIE MCCASHIN v.
WACHOVIA SECURITIES, LLC AND TERRY LESTER

**2005 WL 913719 (N.A.S.D.)**
IN THE MATTER OF THE ARBITRATION BETWEEN:
JOANN E. DESROSIERS ESTATE OF WILFRED N. DESROSIERS, JOANN E.
DESROSIERS REVOCABLE TRUST v. ROBERT W. BAIRD & CO.
INCORPORATED v. DAVID DESROSIERS
Docket Number 04-03380

The following arbitrations included awards for violations of the failure to

supervise provision:

**2006 WL 1028495 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
SHARON B. ELLIS v. MORGAN KEEGAN & COMPANY, INC., TOMMY RAY
COCKRELL
Docket Number 03-05575

**2005 WL 3285617 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
MIKE KELLY v. MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.
Docket Number 03-05651

16

**2005 WL 1529472 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
JEANENNE SUMICH, CLAIMANT v. PATRICK T. DRUM AND MORGAN
STANLEY DW INC., RESPONDENTS
Docket Number 03-06794

**2005 WL 913719 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
JOANN E. DESROSIERS ESTATE OF WILFRED N. DESROSIERS, JOANN E.
DESROSIERS REVOCABLE TRUST v. ROBERT W. BAIRD & CO.
INCORPORATED v. DAVID DESROSIERS
Docket Number 04-03380

**2005 WL 913727 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
BARBARA H. BOOKER v. MORGAN STANLEY DW, INC. SARIE NERINE
JOUBERT-DURR
Docket Number 04-01943

**2005 WL 524769 (N.A.S.D.)**

IN THE MATTER OF THE ARBITRATION BETWEEN:
NICK THOMAS LOMORO, INDIVIDUALLY AND AS TRUSTEE OF THE NICK
THOMAS LOMORO REVOCABLE LIVING TRUST DATED 11/13/97, v. MORGAN
STANLEY DW INC. AND ANDREW D. ENGLAND
Docket Number 03-04329

## I.    Attorney's Fees

In the present case, equity and the law demand an award of attorney's fees. The
only way that Claimants will be made whole is through the granting of attorney's fees.
The Claimants should not have to bear the cost of litigating to get back from Respondents
the money that never should have been taken from them.

Florida case law, Florida statutory law, the NASD Arbitrator's Manual and equity
all allow for attorneys fees in arbitration. In Florida, if an investment firm is found by an

Florida case law, Florida statutory law, the NASD Arbitrator's Manual and equity

all allow for attorneys fees in arbitration. In Florida, if an investment firm is found by an

arbitrator to have breached their obligations under the securities laws, then the prevailing

investor is entitled to attorney's fees. *Kirchner v. Interfirst Capital Corp.*, 732 So.2d 482

(Fla. App. 5. Dist., 1999).

The Florida Securities statute, F.S.A. § 517.211 provides the following:

(6)    In any action brought under this section, including an appeal, the court shall
award reasonable attorneys' fees to the prevailing party unless the court finds that the
award of such fees would be unjust. (emphasis added).

F.S.A. § 517.211

Finally, the NASD Arbitrator's Manual provides:

"Arbitrators have the authority to consider awarding attorney's fees, but the
procedure varies from state to state. It is appropriate for the arbitrators to request the
parties to brief this issue."

Without an award of attorney's fees and expenses, justice may not be done in this

case. Claimants respectfully request that the Panel consider awarding attorney's fees and

expenses after hearing all of the information presented at the hearing.

**J.    Punitive Damages**

The present case involves facts that, when proven at the arbitration hearing,

should result in punitive damages. In Florida, punitive damage awards have been upheld

against employers on facts disclosing both an employee's reckless disregard for the rights

of others and the employer's failure to supervise properly the employee's duties or to

instruct him on the requirements the law has placed upon the discharge of his duties.

*Leon County Humane Soc., Inc. v. DeGroat.* 439 So.2d 949, 954 (Fla.App. 1 Dist., 1983)

citing *O'Loughlin v. Como Oil Co., Inc.,* 434 So.2d 367 (Fla. 4th DCA, 1983).

18

In this case, Chappell's acts were so egregious that punitive damage should be considered after hearing all of the evidence that will be presented at the hearing.

**K.      Claimants' Claims Should Not Be Dismissed**

Claimants have already briefed all of the issues and law involved with Respondents' Motion to Dismiss. As such, Claimants will not duplicate those efforts, but would respectfully request that the Panel review Claimants' Opposition to Respondents' Motion to Dismiss.

## III.    CONCLUSION

Respondents are liable for their wrongful conduct. Namely, Respondents breached their fiduciary duties, breached their contract, acted fraudulently and negligently, and violated state and federal laws as well as SEC and NASD rules and regulations. By misrepresenting the terms, risks and benefits of the variable annuities sold to Claimants, by omitting material facts regarding these products, and by placing Claimants in unsuitable investments that were inconsistent with the Claimants' needs and objectives. As a result of these wrongful acts, Respondents should be held accountable through an award of all damages requested in Claimants' Statement of Claim, including: compensatory damages, rescission, punitive damages, and attorney's fees and costs.

Date:  September 13, 2006.

Respectfully submitted,

Richard S. Frankowski
Attorney for Claimants

19

**OF COUNSEL:**
WHATLEY, DRAKE & KALLAS, LLC
2323 2nd Avenue North
Birmingham, AL  35203
(205) 328-9576
(205) 328-9669
rfrankowski@whatleydrake.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been served on the NASD and on all counsel of records via facsimile, hand delivery and/or U.S. Mail, postage prepaid and properly addressed on this 13th day of September, 2006.


Luther M. Dorr, Jr.
Andrea M. Greene
Maynard, Cooper & Gale, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203-2602

Bonnie R. Simon
NASD Dispute Resolution
5200 Town Center Circle
Tower 1, Suite 200
Boca Raton, FL 33486-1012

OF COUNSEL

**EXHIBIT H**

*Att.. Richard S. Frankowsi Jr.*

**NASD Dispute Resolution Arbitration**
**UNIFORM SUBMISSION AGREEMENT**

*Claimant(s)*

**In the Matter of the Arbitration Between**

Name(s) of Claimant(s)

Douglas M. Cherry

**and**

Name(s) of Respondent(s)

Raymond James and Associates, Inc.

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

X Douglas M Cherry
Claimant Name (please print)

_Douglas m Cherry_    1-27-05
Claimant's Signature    Date

X Douglas m Cherry
Claimant Name (please print)

_Douglas m Cherry_    1-27-05
Claimant's Signature    Date

If needed, copy this page.

21

## NASD ARBITRATION UNIFORM SUBMISSION AGREEMENT

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)

Victor Stafford

and

Name(s) of Respondent(s)

Raymond James and Associates, Inc.

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

_Victor STAFFORD_

Claimant Name (please print)

_Victor Stafford_                                                    5-5-5

Claimant's Signature                                                    Date

Claimant Name (please print)

Claimant's Signature                                                    Date

**If needed, copy this page.**

23

# NASD ARBITRATION UNIFORM SUBMISSION AGREEMENT

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)

*LiNdA MiddlEtoN*

Linda Middleton

and

Name(s) of Respondent(s)

*RAMONd JAMES iNvESTMENTS*

Raymond James and Associates, Inc.

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

*LiNdA MiddlEtoN*                                    *5 18-05*

Claimant Name (please print)

*Linda middleton*                                    *5 - 18 - 05*

Claimant's Signature                                           Date

_____

Claimant Name (please print)

_____

Claimant's Signature                                           Date

**If needed, copy this page.**

23

# NASD ARBITRATION UNIFORM SUBMISSION AGREEMENT

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)    *RACHEL McKINNEY*

Rachel McKinney

and

Name(s) of Respondent(s) *RAYMOND JAMES ASSOCIATES*

Raymond James and Associates, Inc.

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

*RACHEL McKINNEY*
Claimant Name (please print)

*Rachel McKinney*                                    4-7-05
Claimant's Signature                                  Date

*RACHEL McKINNEY*
Claimant Name (please print)

*Rachel McKinney*                                    4-7-05
Claimant's Signature                                  Date

If needed, copy this page.

23

# NASD ARBITRATION UNIFORM SUBMISSION AGREEMENT

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)

Jimmy E. Jones

and

Name(s) of Respondent(s)

Raymond James and Associates, Inc.

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

Claimant Name (please print)

Claimant's Signature                                          Date

_Jimmy E. Jones_

Claimant Name (please print)

_Jimmy E. Jones_                                      6-9-05

Claimant's Signature                                          Date

_Jimmy E. Jones_            If needed, copy this page.

23

# NASD ARBITRATION UNIFORM SUBMISSION AGREEMENT

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)    *LANCE K. Dyess, MD*

Lance K. Dyess

and

Name(s) of Respondent(s)    *Raymond James*

Raymond James and Associates, Inc.

1.  The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2.  The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3.  The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4.  The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.  The parties hereto have signed and acknowledged the foregoing Submission Agreement.

*LANCE K. Dyess, MD*

Claimant Name (please print)

Claimant's Signature                                      *4-12-05*
                                                          Date

Claimant Name (please print)

Claimant's Signature                                      Date

**If needed, copy this page.**

23

## NASD ARBITRATION UNIFORM SUBMISSION AGREEMENT

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)

Ira J. Edmondson

and

Name(s) of Respondent(s)

Raymond James and Associates, Inc.

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

Ira J. Edmondson

Claimant Name (please print)

Claimant's Signature                                    Date    2-8-05

Claimant Name (please print)

Claimant's Signature                                    Date

If needed, copy this page.

23

**EXHIBIT I**

IN RE:  DOUGLAS M. CHERRY, LANCE DYESS,
IRA J. EDMONDSON, JIMMY E. JONES,
RACHEL McKINNEY, LINDA J. MIDDLETON,
VICTOR E. STAFFORD,

                              Claimants,

vs.

RAYMOND JAMES FINANCIAL SERVICES, INC., (RJFS),

                              Respondent.

NASD ARBITRATION CASE #05-03030
_____/


PROCEEDINGS:              AUDIO-RECORDED ARBITRATION


DATE:                     October 2, 2006 - October 13, 2006


PLACE:                    Birmingham, Alabama


PANELISTS:                HELEN E. HUYLER, Madam Chair
                          Benjamin F. Richards, Jr., Chairman
                          Robert E. Graves, Chairman


APPEARANCES:              RICHARD FRANKOWSKI, ESQUIRE
                          Attorney for Claimants

                          LUTHER M. DORR, ESQUIRE
                          ANDREA MORGAN GREENE, ESQUIRE
                          Attorneys for Respondent


TRANSCRIBED BY:           LAURA J. HECKMAN


                *Excerpt from Last Day of Proceedings*
                        *(Pages 1 - 84)*

                  SUPERIOR COURT REPORTING, INC.
                  6822-22ND Avenue North, #158
                     St. Petersburg, FL 33710
                 (727) 345-5306 or (813) 223-3380

79

1    you'd like.

2        MS. HUYLER:  I think it would be easier for you to

3    fax it to -- either hand deliver it or fax it to the

4    hotel.

5        MR. FRANKOWSKI:  Okay.

6        MS. HUYLER:  In case you run into a time factor, I

7    can give you the hotel fax number.

8        MR. FRANKOWSKI:  We'll just have someone bring it

9    right up there, ma'am.

10       MS. HUYLER:  Oh, okay.

11           Prior to closing the hearing, I would like to ask

12   each of the parties, if you will, state affirmatively

13   whether you have had a full and fair opportunity to be

14   heard.

15       MR. FRANKOWSKI:  Claimants believe they have, Madam

16   Chair.

17       MR. DORR:  Respondents have been pleased with their

18   (inaudible).

19       MS. HUYLER:  I would like to say on behalf of the

20   panel that we too have appreciated the matter in which

21   you have presented this case.  Even though I have not

22   mentioned this to either of them, even the staff on this

23   floor have commented on the way in which the entire

24   group has handled themselves.  Apparently they have had

25   arbitrations here before where attorneys did not behave